# DEPOSITION OF
# WILLIAM RAGLAND

**EXHIBIT E**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PATRICK LEWIS, JACK RICHARDSON,
NATHANIEL LAMAR, WILLIAM RAGLAND, RALO
COLVIN, and ERVIN TARVER,
    Plaintiffs,

vs.    CIVIL ACTION NO. 2:06-CV-497-WKW

K2 INDUSTRIAL SERVICES, INC., and
MANSFIELD INDUSTRIAL, INC.,
    Defendants.
        *   *   *   *   *   *
    DEPOSITION OF WILLIAM RAGLAND,
taken pursuant to notice and
stipulation on behalf of the
Defendants, at One Union Street, Selma,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large,
on June 7, 2007, commencing at 9:30a.m.

Page 2

1        APPEARANCES
2
3
4   FOR THE PLAINTIFFS:
5   Collins Pettaway, Esquire
6   CHESTNUT, SANDERS, SANDERS, PETTAWAY
7     and CAMPBELL
8   One Union Street
9   Selma, Alabama 36702
10
11
12  FOR THE DEFENDANTS:
13  Natasha L. Wilson, Esquire
14  LIGHTFOOT, FRANKLIN & WHITE
15  The Clark Building
16  400 20th Street North
17  Birmingham, Alabama 35203
18
19
20
21
22
23

Page 3

1        STIPULATIONS
2        It is hereby stipulated and
3   agreed by and between counsel
4   representing the parties that the
5   deposition of WILLIAM RAGLAND is taken
6   pursuant to notice and stipulation on
7   behalf of the Defendants; that all
8   formalities with respect to procedural
9   requirements are waived; that said
10  deposition may be taken before
11  Bridgette Mitchell, Shorthand Reporter
12  and Notary Public in and for the State
13  of Alabama at Large, without the
14  formality of a commission; that
15  objections to questions, other than
16  objections as to the form of the
17  questions, need not be made at this
18  time, but may be reserved for a ruling
19  at such time as the deposition may be
20  offered in evidence or used for any
21  other purpose as provided for by the
22  Civil Rules of Procedure for the State
23  of Alabama.

Page 4

1        It is further stipulated and
2   agreed by and between counsel
3   representing the parties in this case
4   that the filing of the deposition of
5   WILLIAM RAGLAND is hereby waived and
6   that said deposition may be introduced
7   at the trial of this case or used in
8   any other manner by either party hereto
9   provided by the Statute, regardless
10  of the waiving of the filing of same.
11       It is further stipulated and
12  agreed by and between the parties
13  hereto and the witness that the
14  signature of the witness to this
15  deposition is hereby waived.
16
17        INDEX
18
19  EXAMINATION              Page
20  By Ms. Andrews.................... 6
21
22
23

1 (Pages 1 to 4)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1  EXHIBITS:            Page
2  Defendants' Exhibit #1 ............ 6
3  Defendants' Exhibit #2 ........... 9
4  Defendants' Exhibit #3 ........... 73
5  Defendants' Exhibit #4 ........... 75
6  Defendants' Exhibit #5 ........... 80
7  Defendants' Exhibit #6 ........... 113
8  Defendants' Exhibit #7 ........... 150
9  Defendants' Exhibit #8 ........... 150
10 Defendants' Exhibit #9 ........... 172
11 Defendants' Exhibit #10........... 196
12 Defendants' Exhibit #11........... 232
13 Defendants' Exhibit #12........... 241
14 Defendants' Exhibit #13........... 263
15
16       COURT REPORTER:  Usual
17 stipulations?
18       MR. PETTAWAY:  That's fine.  We
19 do want to read and sign.
20       WILLIAM RAGLAND, having first
21 been duly sworn or affirmed to speak
22 the truth, the whole truth, and nothing
23 but the truth, testified as follows:

Page 6

1       EXAMINATION
2  BY MS. WILSON:
3  Q. Mr. Ragland, good morning.  My name is
4     Natasha Wilson and I represent
5     Mansfield Industrial.
6  A. All right.
7  Q. You do understand you're here to give
8     your deposition today in this case that
9     you filed against them?
10 A. Yes, ma'am.
11 Q. Did you see the deposition notice that
12    I gave to your attorney?  I'm going to
13    mark that as Exhibit 1.
14       (Defendants' Exhibit 1 was
15       marked for identification.)
16 A. Yes.
17 Q. Have you seen this before, Mr. Ragland?
18 A. Yes.  Yes, I've seen that.
19 Q. And you saw the document request that
20    was attached as Exhibit A on page 3?
21 A. Uh-huh.
22 Q. Is that a yes?
23 A. Yes.

Page 7

1  Q. Your attorney gave me some documents
2     just a few moments ago, three pages.
3     And these are the documents that you're
4     producing, additional documents that
5     you found --
6  A. Yeah, check stub.
7  Q. -- responsive to our request?  And
8     these are check stubs --
9  A. Yes, ma'am.
10 Q. -- from when you were employed with
11    Mansfield; is that right?
12 A. Yes, ma'am.
13 Q. Okay.  And you were terminated, I
14    think, on December --
15 A. 20th.
16 Q. December 26 is what we have in or
17    records.
18 A. That's what they wrote.  It was the
19    20th.
20 Q. Does that sound right to you, the 26th?
21 A. Uh-huh, close.
22 Q. So you've given me the last -- what
23    appears to be the last three pay stubs.

Page 8

1     It looks like November 30, December 21,
2     and December 28, 2003?
3  A. Yes, ma'am.
4  Q. Were there any other documents that you
5     were able to locate?
6  A. My lawyer got the rest of them as far
7     as papers out of orientation, the first
8     package they gave me for insurance.  I
9     kept it.  And then I went to get
10    another one and they said that it was
11    too late; I couldn't get the insurance.
12    But I kept the package, what I was
13    supposed to take home and fill out and
14    bring back the next day, and I gave it
15    to my lawyer.
16 Q. You mean you previously gave these
17    documents to him or did you give them
18    to him the same --
19 A. No.
20 Q. -- time you gave --
21 A. No.  I previous gave him those.
22 Q. Okay.
23 A. No.

2  (Pages 5 to 8)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 9

1  Q. I'm going to mark the documents that
2    you gave me today as Defendants'
3    Exhibit 2.
4  A. Okay.
5      (Defendants' Exhibit 2 was
6      marked for identification.)
7  Q. Have you ever had your deposition taken
8    before, Mr. Ragland?
9  A. No, ma'am.
10 Q. Well, let me tell you what you can
11   expect.  Your attorney has probably
12   already told you this.  But I'll ask
13   you questions about things relating to
14   this lawsuit and some other questions
15   that may be a little indirectly
16   related.  And I'll expect you to
17   answer.  And because what we're saying
18   is being taken down by the court
19   reporter, we should be careful not to
20   talk over each other.
21 A. Okay.
22 Q. Sometimes you may anticipate or think
23   you'll know the question I'm going to

Page 10

1    ask and start to answer it earlier,
2    before I'm finished.  But I would ask
3    that you not do that because we want to
4    make sure that the record is clear in
5    that what you start answering is
6    exactly responsive to the question that
7    I'm asking.
8  A. Okay.
9  Q. And I have a tendency to do this a lot.
10   I say uh-huh and uh-uh.  But because we
11   want to also be sure of exactly what
12   your response is, be mindful of saying
13   yes and no as opposed to uh-huh and
14   uh-uh.  If at any point during the
15   deposition you need to take a break, go
16   to the restroom, or you just want to
17   stop for a minute, get up and stretch
18   your legs, that's fine.  Just let me
19   know that you want to stop.  And if
20   we're at a good spot where a question
21   isn't on the table, then we can do
22   that.  Okay?
23 A. Okay.

Page 11

1  Q. And you do understand that everything
2    that you're saying is being taken down
3    as sworn testimony, so all of your
4    questions should be answered as if you
5    were in a court of law.  Okay?
6  A. All right.
7  Q. Let me get some personal information
8    from you.  How old are you, sir?
9  A. Forty-five.
10 Q. And what is your date of birth?
11 A. 11/15/61.
12 Q. Okay.  What's your Social Security
13   number?
14 A. 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.
15 Q. And do you live here in Selma?
16 A. Yes, ma'am.
17 Q. What's your current address?
18 A. 1522 Plant Street.
19 Q. Are you married?
20 A. No, ma'am.
21 Q. Do you have any children?
22 A. Three.
23 Q. What are their names?

Page 12

1  A. William Callens.
2  Q. How do you spell that last name?
3  A. Capital C-A-L-L-E-N-S.
4  Q. And how old is William?
5  A. Twenty-five.
6  Q. Does he live here in Selma?
7  A. Yes, ma'am.
8  Q. And who's next?
9  A. My daughter, Danielle Reese.
10 Q. R-E-E-S-E?
11 A. Yes, ma'am.
12 Q. And does she spell Danielle the normal
13   way?
14 A. Yeah.  D-A-N --
15     MR. PETTAWAY:  I don't think
16   these people will be serving on a jury
17   or anything, so is there any reason you
18   need all that?
19     MS. WILSON:  Well, they may be
20   potential witnesses.  So to the extent
21   that they may be additional witnesses,
22   I'd just like to get that information.
23     MR. PETTAWAY:  Okay.

3 (Pages 9 to 12)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1 Q. And you said Danielle is D-A-N-I-E --
2 A. That's it.
3 Q. -- L-L-E?
4 A. L-L-E.
5 Q. And how old is Danielle?
6 A. She's twenty-four.
7 Q. And does she live here in Selma, too?
8 A. No. Jacksonville, Florida.
9 Q. And your other child?
10 A. Andrew Callens, twenty-three.
11 Q. Okay.
12 A. Houston, Texas.
13 Q. Okay. And where did you go to school,
14    Mr. Ragland?
15 A. Selma High School.
16 Q. What years?
17 A. Long time ago. '79, '80.
18 Q. Did you graduate?
19 A. No.
20 Q. Did you get your GED?
21 A. No.
22 Q. Have you ever been arrested for any
23    crime?

Page 14

1 A. None other than no license.
2 Q. Driving without a license?
3 A. Yeah.
4 Q. When was that?
5 A. It's been years ago.
6 Q. Okay. And what else?
7 A. Assault.
8 Q. Did you say assault?
9 A. Yes, ma'am.
10 Q. Tell me about that.
11 A. I had loaned a guy some money not
12    knowing he was a crackhead. And he
13    said he needed some gas for his car. I
14    was laid off at the time. The plant
15    was shut down for a week. And I
16    dropped my daughter off at school.
17    Then he went to calling my sister's
18    name. He had went to school along with
19    my sister, so I kind of figured he was
20    all right so I let him have the money.
21    And he told me to take him to a house
22    to get the key, because he had called
23    his sister or something because she had

Page 15

1    got the key to his car that ran out of
2    gas but he had another set. So when I
3    took him to the house, he jipped on me.
4    You know, he went out the back door.
5    So I didn't have nothing to do. I was
6    laid off. I just rode around until I
7    found him, you know, and took action,
8    you know.
9 Q. What do you mean "took action"?
10 A. I jumped on him, you know, roughed him
11    up a little bit. And he called the law
12    and I got arrested for that. I had a
13    gun on me but it was empty, you know,
14    so they arrested me for that. That's
15    pretty much it. I ain't never been --
16    ain't never served no real time,
17    nothing like that.
18 Q. And when was this?
19 A. My daughter was twelve years old.
20    That's been about ten --
21 Q. So in 1997?
22 A. Somewhere around there. Probably
23    longer than that, because she was

Page 16

1    twelve --
2 Q. Okay.
3 A. -- at the time. She's twenty-four now.
4 Q. So twelve years ago, you think?
5 A. Yeah.
6 Q. And did you say you served some time as
7    a result of that?
8 A. No, no.
9 Q. Okay. You didn't?
10 A. No.
11 Q. Did you have to pay a fine?
12 A. Yeah.
13 Q. Do you remember what it was?
14 A. At the time, no.
15 Q. Anything else?
16 A. That's pretty much it.
17 Q. Have you ever been a party to any other
18    lawsuit?
19 A. No. I tried to file one one time with
20    the EEOC against Pilliod Table Company.
21    That was back in the early '90s. It
22    was a discrimination suit, too.
23 Q. When you say you tried to file one,

4  (Pages 13 to 16)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 17

1   what do you mean?
2   A. Yeah. I went through -- you know, I
3   was going through the channel with
4   Ms. Brenda Owens. I think that was her
5   name up there at the EEOC at time. We
6   got as far as her sending me a
7   questionnaire. I filled it out and
8   sent it to her. And, of course, after
9   she received it, ten days after that,
10   they would get in touch with my
11   employer. And I called back. I gave,
12   you know, gave the grace period of
13   time, ten days. She didn't get in
14   touch with me, so I called back. I
15   don't know if that lady was having a
16   bad day or what. She just brushed me
17   off like -- there was some information
18   that I couldn't get her from my doctor.
19   And she was, like, Well, if you can't
20   get that, I don't have time to be
21   talking. I got other people on the
22   line. You should have had that
23   information and hung the phone up in my

---

Page 18

1   face. So I never did try to -- I never
2   did pursue it after that.
3   Q. How do you spell the name of the
4   company?
5   A. It was EEOC.
6   Q. I know. You said it was against
7   Pilliod?
8   A. Pilliod Table Company -- Furniture
9   Company.
10   Q. How do you spell that?
11   A. P-I-L-L-I-O-D. They closed down in
12   '01.
13   Q. And it's Pilliod Furniture Company?
14   A. Yeah.
15   Q. And Brenda Owens was with the EEOC.
16   That was who you spoke with?
17   A. Uh-huh. (Witness nods head.)
18   Q. What was the basis of your complaint
19   there?
20   A. I started out in the model shop there
21   and that was where all the tables came
22   in on a print and we put them out on
23   the floor and raw wood as models.

---

Page 19

1   Okay. It was, like, eleven of us in
2   the shop at the time. And over the
3   years, you know, business slowed down.
4   They went to laying off and putting
5   people in different departments, you
6   know, or people sign up for other jobs.
7   And it ended up with me and this white
8   guy, Darryl Averet. And he signed for
9   another job over on the hill paying
10   more money, so that left me in the shop
11   by myself.
12   Q. I'm sorry. You said he was signed on
13   for another job?
14   A. He signed up for another job. He got
15   out of the shop. It was paying more
16   money.
17   Q. Was he still working for the same
18   company?
19   A. Same company, yeah.
20   Q. Okay.
21   A. And I was down there for, like, six
22   months by myself running that shop.
23   That company didn't have no problems.

---

Page 20

1   And they sent me -- I had a big bedroom
2   group to come through and they sent
3   this guy, this black guy, down there
4   with me, Fred Turner, sent him down
5   there with me just to get that suite
6   out. So we got that suite out. And
7   this guy Eric, he was -- that was my
8   boss man -- he comes down on a Friday,
9   and he says, I got some good news and I
10   got some bad news. He said, What do
11   you want first? I said, Well,
12   either/or. He said, Well, the good
13   news is I'm going to have you some help
14   down here Monday. So I said okay. So
15   he says, You have any problem working
16   with Darryl Averet? I said, No. I
17   said, Me and Darryl worked together
18   before when I first come down here. He
19   was here, too. So he said, Well,
20   that's the good news; he's going to be
21   your help. He said, The bad news is,
22   Darryl's going to be over you. I'm,
23   like, What? You mean to tell me I've

---

5 (Pages 17 to 20)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1  been running this shop down here for
2  six months, I ain't had no problems out
3  of the company, you know.  I said,
4  You're going to bring him back down
5  here and put him over me?  I said, Man,
6  that don't sound right.  I couldn't
7  work the rest of the day, you know.  So
8  I was talking to this guy up in quality
9  control, and my boss man, he walks up
10 to me, he was, like, Bill, if you need
11 to talk to anybody about that, he said,
12 talk to me.  Don't be putting that out
13 in the plant.  I said,  Why?  I said,
14 Everybody's going to see it after it's
15 done, you know.  And they brought
16 Darryl back down there, put him over me
17 and laid me off.
18 Q. So you didn't work any more after
19    Darryl was --
20 A. They called me back -- yeah, I worked
21    along with him, you know.
22 Q. So when are you saying you were laid
23    off?

Page 22

1  A. It was, like -- it was, like, a couple
2     months, two or three months after
3     Darryl came back they laid me off.  He
4     was even saying it wasn't right, you
5     know, because I had -- really I had
6     more experience than him.
7  Q. But you said he had worked there longer
8     than you?
9  A. Well, me and him got down there -- when
10    I got down there, Darryl had been
11    there, like, a week.  Because talking
12    to him, he had been there, like, a week
13    before I had.
14 Q. But the EEOC didn't pursue --
15 A. No.
16 Q. -- your claim?
17 A. No.
18 Q. What about any other --
19 A. No.
20 Q. -- lawsuits?
21 A. That's it.
22 Q. Have you been involved in any other
23    cases?

Page 23

1  A. No.
2  Q. Have you testified or --
3  A. No.
4  Q. -- been questioned by anybody as it
5     relates to any other kind of case?
6  A. No.
7  Q. Let's talk about your work history.
8     After you left high school, let's talk
9     about from that time coming up to
10    today.  So tell me what your first job
11    was and coming back -- coming up.
12 A. First job, McDonald's.  Okay.  I was a
13    grill man at McDonald's.
14 Q. And how long were you there?
15 A. About a year and a half, two years at
16    most.
17 Q. And this was from '80 to '82, you
18    think?
19 A. Uh-huh.  (Witness nods head.)  Yes.
20 Q. Okay.  Where next?
21 A. Then I went to -- me and my father-in-
22    law, we went in business together -- my
23    stepdad, we went in business together.

Page 24

1     We had a county trash route we started.
2     I worked with him for about two
3     years -- three or four years, because I
4     know I left in '86.  That's when I went
5     to Georgia.  I moved to Georgia.
6  Q. So from '82 to '86 you worked with your
7     stepdad?
8  A. Uh-huh.  (Witness nods head.)
9  Q. Doing a county trash route?
10 A. Yeah.
11 Q. And what all did you do with that?
12 A. It was just -- we picked up garbage in
13    rural areas, you know.  Not in the
14    city, just out on the outskirts of
15    town.  That was pretty much it.
16 Q. And then you say in '86 you moved to
17    Georgia?
18 A. Georgia, yeah.
19 Q. What did you do when you moved to
20    Georgia?
21 A. I started landscaping in the daytime
22    and I worked at a hamburger joint at
23    night.

6  (Pages 21 to 24)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 25

1 Q. Were you landscaping with a company?
2 A. Atlanta Landscaping Company.
3 Q. What did you do with them?
4 A. I started out a landscaper. Then in
5 seven, it was about, months, I ended up
6 a crew leader. I had my own crew. But
7 as far as starting out, I was cutting
8 grass, weed eating, pulling weeds, you
9 know, et cetera. Then after I became a
10 crew leader, you know, I would put them
11 out to do that, you know, and I just
12 drove around, made sure things were
13 being done.
14 Q. What else did you do with Atlanta
15 Landscaping? I'm saying were you a
16 landscaper and crew leader up until the
17 time that you left there?
18 A. Yeah. Uh-huh.
19 Q. How long were there?
20 A. I'd say about three years.
21 Q. Okay. Do you think until 1989?
22 A. Yes.
23 Q. Then where did you go?

Page 26

1 A. I came back home when my mother died.
2 I came home. And I --
3 Q. Was this in 1989?
4 A. Yeah. And I went to work with Pilliod.
5 That's when I went to work for Pilliod
6 Table Company.
7 Q. You started at Pilliod in 1989?
8 A. Uh-huh. And I worked with them
9 fourteen years. I might be a little
10 off with those dates there, but I know
11 I was with them fourteen years.
12 Q. So that was until 2003?
13 A. No. Pilliod -- I'm off with those
14 dates. Pilliod closed in '01. They
15 shut down. So I'm a little off on
16 those dates.
17 Q. So you think you worked with Pilliod
18 from '89 to 2001?
19 A. Uh-huh. (Witness nods head.)
20 Q. And what was your job title at Pilliod?
21 A. I worked all over that place.
22 Q. Well, tell me --
23 A. I ended up supervisor out there, but I

Page 27

1 started out in shipping. I just went
2 all through the plant. Started in
3 shipping, came through finishing,
4 assembly room, machine room, and model
5 shop. And from the model shop, that's
6 when I became a lead man. After they
7 laid me off, they called me back, you
8 know, and two months after that they
9 made me a lead man. But I eventually
10 ended up a supervisor.
11 Q. And this is the same company that you
12 said --
13 A. Uh-huh. Yes.
14 Q. -- you planned to sue?
15 A. Yes.
16 Q. But you ended up being promoted
17 throughout the company?
18 A. Yes.
19 Q. And stayed there for about twelve
20 years?
21 A. Yes.
22 Q. When is it during your time from
23 shipping, finishing, assembly room,

Page 28

1 machine room, model shop, lead man, and
2 supervisor, what were you -- where were
3 you working at the time that you
4 decided to file this EEOC claim against
5 them?
6 A. Model shop.
7 Q. Okay. And so you said you were laid
8 off for about a couple of months?
9 A. Couple of months, yeah.
10 Q. This was after you were thinking about
11 filing your EEOC claim that you were
12 laid off?
13 A. Yes.
14 Q. Okay. And then when you came back, you
15 were promoted and you were a lead man
16 and then you became a supervisor
17 eventually with the company?
18 A. Exactly, yes.
19 Q. Did you ever tell anyone or complain
20 about your alleged discrimination to
21 anyone at Pilliod?
22 A. Yes. It was obvious. I mean, people
23 came up to me, you know, telling me

7 (Pages 25 to 28)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 29

1    about it.
2    Q. But the question that I asked you was,
3    did you complain to anyone at Pilliod?
4    I'm not asking you if other people came
5    up and said, Man, I think you've been
6    done wrong, or any of that. What I
7    want to know, did you, William Ragland,
8    complain to anybody at Pilliod?
9    A. Yes.
10   Q. Who did you complain to?
11   A. James Spears, Fred Turner, Danny Jones,
12   Nathan Ellis, Cammie Ellison.
13   Q. Cammie?
14   A. Cammie.
15   Q. Is that a she?
16   A. Yes.
17   Q. Do you know how she spells her name?
18   A. Capital C-A-M-M-I-E.
19   Q. And her last name is Ellison?
20   A. Ellison, yes.
21   Q. And who else?
22   A. Darryl Averet.
23   Q. Who else?

Page 30

1    A. Eric Harrison.
2    Q. Okay.
3    A. Mike Brady, Kenny Wilkerson, Douglas
4    Ellis, Adolph Smith, Dennis Smith.
5    Q. And these are all --
6    A. Uh-huh.
7    Q. -- employees at Pilliod?
8    A. Yes.
9    Q. Dennis Smith.
10   A. Mike Brady, he was maintenance
11   supervisor.
12   Q. Was he your supervisor?
13   A. No.
14   Q. But he was a supervisor in the plant?
15   A. Yes.
16   Q. Who was your supervisor?
17   A. My supervisor at the time was Eric
18   Harrison.
19   Q. So you did complain to Eric Harrison?
20   You gave me his name already?
21   A. Uh-huh. (Witness nods head.)
22   Q. So he was your immediate supervisor?
23   A. Yes.

Page 31

1    Q. Who did you complain to first? Do you
2    recall?
3    A. James Spears.
4    Q. Who is James?
5    A. He was a quality control inspector.
6    Q. Did he work at the plant?
7    A. Yes, ma'am.
8    Q. Why did you complain to him first?
9    A. Well, we shot ball and stuff together.
10   We're pretty close.
11   Q. Okay. And you told him about the
12   situation?
13   A. Yeah.
14   Q. Did he advise you of how to handle the
15   situation?
16   A. No.
17   Q. Okay. Who did you complain to next, if
18   you recall?
19   A. Fred Turner. He -- yeah, it was Fred.
20   Q. Who was Fred?
21   A. He was a lift driver in the machine
22   room at the time.
23   Q. And this all occurred while you were in

Page 32

1    the model shop?
2    A. Yes.
3    Q. You had already left the machine room?
4    A. Uh-huh.
5    Q. And he was -- James Spears and Fred
6    Turner, would you consider them your
7    co-employees or would you consider them
8    in supervisor positions ahead of you?
9    A. No. I would say co-employees.
10   Q. You considered them coworkers,
11   co-employees?
12   A. Yeah.
13   Q. On the same level?
14   A. Uh-huh, pretty much so. Yeah.
15   Q. When did you complain to your immediate
16   supervisor, Eric Harrison?
17   A. The same day.
18   Q. The same day it happened?
19   A. Yes. Matter of fact, I complained to
20   James Spears and Fred Turner also the
21   same day.
22   Q. Same day it happened?
23   A. Yes, ma'am.

8 (Pages 29 to 32)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1  Q. Do you have any recollection of who you
2     saw first?
3  A. James Spears was the first one I saw.
4  Q. Okay. Why did you go to Mr. Harrison
5     and complain to him? Did you
6     understand that there was a -- was
7     there a policy or procedure at the
8     plant?
9  A. No. Eric, he was -- they sent him out
10    of North Carolina, because they really
11    can't keep -- what was Eric's position?
12    I believe it was -- they just kept
13    flowing through, you know, kept calling
14    people. They couldn't keep nobody in
15    that position. And he was a young guy.
16    And he was telling me -- what made me
17    think I could go to him, he came to me
18    one time, he said, Bill, this is off
19    the record. He said -- Paul Webb was
20    our plant manager. He said, Paul Webb
21    is a racist. Now, this is a white guy
22    talking to me. He said, And this is
23    not the fact that I can't work for

Page 34

1     these people. He said, I can't work
2     with these people. Because he was a
3     plane trip with Paul and he said he was
4     using the N-word freely, you know,
5     around him, and he said he wasn't
6     brought up like that. So, you know, he
7     walked up on me talking to James.
8     James Spear was the first one I went
9     to. He walked up on me talking to
10    James Spears and he told me, you know,
11    if there's anybody you need to talk to,
12    come talk to him. Well, at the time I
13    was kind of, you know, mad with him for
14    coming giving me something, laying
15    something like that on me.
16 Q. I'm sorry. Let me stop you. Eric
17    Harrison was the one who told you
18    that --
19 A. Uh-huh.
20 Q. -- Darryl was going to be your
21    supervisor?
22 A. Yeah. Yes.
23 Q. And you were standing there talking to

Page 35

1     James --
2  A. James Spears.
3  Q. -- Spears complaining about what had
4     happened?
5  A. Yes.
6  Q. And so he came up on your conversation
7     and said, If somebody wants to talk,
8     come and talk to me?
9  A. Yes.
10 Q. So that all happened on the same day?
11 A. Yes, ma'am.
12 Q. Then you went and talked to him?
13 A. It was after -- well, I walked off from
14    James and him then because I was upset.
15    I walked back to him and that's when I
16    talked to Fred. So after I talked to
17    Fred, I was standing there talking and
18    I saw him coming. I said, Let me
19    leave, man, because he's coming to bust
20    us up, too. So I went back to the
21    model shop. And that's when he came
22    down and me and him talked about it,
23    you know.

Page 36

1  Q. So did you go to him or did he come to
2     you?
3  A. Well, he came down to the shop, you
4     know.
5  Q. And then you decided to approach him?
6  A. Yeah. That's when me and him talked
7     about it.
8  Q. When you were at Pilliod, did you ever
9     receive any kind of harassment training
10    or were there any kinds of orientations
11    or trainings regarding if you have any
12    problem with harassment or
13    discrimination this is what you should
14    do?
15 A. No.
16 Q. Did you --
17 A. I don't recall.
18 Q. Had you ever had that -- any kind of
19    training like that in any of your other
20    employers that you've told me about?
21       (No immediate response given.)
22 Q. Have you ever had any kind of sexual
23    harassment, racial harassment, or

9 (Pages 33 to 36)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1    discrimination training at any of your
2    previous employers before Pilliod?
3    A. No. No.
4    Q. Did you understand that there was a
5    hierarchy at Pilliod? There are
6    certain employees, then you have your
7    supervisor, your supervisor may have a
8    supervisor, a reporting hierarchy?
9    A. Yes.
10   Q. And is that why you decided to talk to
11   Eric Harrison about it, because you
12   knew that was your immediate
13   supervisor?
14   A. Yes. I confided in Eric because he --
15   he seemed like he was a pretty good
16   fellow, you know. I mean, when he
17   first got hired in, it was like --
18   something came up and I can't remember
19   what it was. I said, Man, you don't
20   know these people. He said, Well, just
21   let me find out for myself. And it was
22   a while after that when this incident
23   came up he told me, he said, Bill, I

Page 38

1    see what you're talking about. And
2    that's when he told me about the plane
3    ride and all this stuff with his plant
4    manager that we had.
5    Q. Did you voice your concerns or
6    complaints to any supervisors above
7    Eric Harrison?
8    A. No.
9    Q. Why did you not do anything else after
10   that?
11   A. Well, I don't really know. Well, I
12   did. After that, that was when I got
13   into the EEOC.
14   Q. How soon after you talked to Eric
15   Harrison did you contact the EEOC?
16   A. It was about three days to a week. It
17   was right after that, few days after
18   that.
19   Q. Did you ask Eric to do anything when
20   you had a conversation with him?
21   A. No.
22   Q. Was there something you wanted him to
23   do as it pertained to that situation

Page 39

1    where --
2    A. No.
3    Q. -- you felt you were discriminated
4    against?
5    A. No.
6    Q. You didn't ask the company to do
7    anything to rectify the situation that
8    you thought was discriminatory?
9    A. No. Because after that, after I filed
10   that complaint, I, you know, said to
11   myself, I'm planning on handling it
12   myself. And I didn't ask them too
13   much. And then after that --
14   Q. What do you mean you were going to
15   handle it yourself?
16   A. I was going to go through the channels
17   myself, call the EEOC, you know, see
18   what I need to do.
19   Q. Okay. I think I'm getting confused.
20   When you talked to Eric, what made you
21   think, I'm going to handle these
22   channels myself?
23   A. After what he said as far as off the

Page 40

1    record, Paul Webb is a racist.
2    Q. Who is Paul Webb?
3    A. He's the plant manager.
4    Q. He's the one that made the decision to
5    return Darryl to the same --
6    A. Yes.
7    Q. -- area where you were working?
8    A. Yes.
9    Q. How do you know?
10   A. Well, because he really made all the
11   decisions as far as moving people
12   around, him and our personnel manager,
13   Bill Nichols. And when that did
14   happen, I said -- and Eric came down
15   and told me that, he said, If you need
16   to know anything else, you need to talk
17   to Paul.
18   Q. Okay. Any other situations like this
19   that you just told me about at Pilliod?
20   A. No.
21   Q. Okay. So when you left Pilliod -- and
22   they closed in, you said, 2001, then
23   where did you work?

10  (Pages 37 to 40)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1   A. I moved back to Atlanta and I worked
2      with American Air Filters. I started
3      with them August and I didn't work with
4      them but eight months because my sister
5      passed and I came back home.
6   Q. When in 2001 did you work there?
7   A. Excuse me?
8   Q. Well, I'm trying to figure out when you
9      would have left since you only worked
10     eight months.
11  A. I know I started in August.
12  Q. Okay. So eight months from August
13     2001?
14  A. That's around February, March -- I know
15     my sister passed on February 18, so I
16     left Georgia after her funeral.
17  Q. So up until February 2001 -- I'm
18     sorry -- 2002 you worked at American
19     Air Filters?
20  A. August up until, like, February.
21  Q. August 2001 to February 2002?
22  A. Uh-huh. (Witness nods head.)
23  Q. What did you do at American Air

Page 42

1      Filters?
2   A. I was an auditor.
3   Q. What does that mean?
4   A. Audit, you know, loads coming in and
5      loads going out.
6   Q. Loads of what?
7   A. Air filters.
8   Q. Okay. And did you do anything else
9      there?
10  A. When I wasn't auditing, I would pull
11     orders.
12  Q. And let me just go back for a minute.
13     When you were at Pilliod in shipping,
14     what did you do?
15  A. Loaded trucks.
16  Q. When you were in finishing, what did
17     you do?
18  A. I wiped down glass and finished.
19  Q. And the assembly room you assembled
20     furniture?
21  A. Uh-huh. Yes.
22  Q. And machine room, what did you do?
23  A. Ran -- operated machines in the machine

Page 43

1      room -- boring machine, table saws,
2      laminate machines, edge banders. Bunch
3      of it up there.
4   Q. And then the model shop, what did you
5      do?
6   A. We were -- we were rated as craftsmen
7      down there. Like I said, we -- the
8      tables or whatever type furniture we
9      had to build, it came in on prints.
10     And we put it on the floor as a model,
11     raw wood, you know, and from there we
12     made all the machine room forms such as
13     boring forms or whatever off of that
14     one unit, you know, assembly forms,
15     et cetera.
16  Q. Okay.
17  A. It would go to the engineers and if
18     they had to work any kinks out,
19     whatever, you know, then they would
20     send the finished prints down to us and
21     that's what we would go by.
22  Q. And when you became a lead man, what
23     were your responsibilities?

Page 44

1   A. I was a lead man over in the machine
2      room. I was over all -- basically, I
3      was over -- I was assistant up under my
4      supervisor. I would -- see, if he
5      missed a day, I pretty much just
6      stepped into his shoes. I would go
7      over everything, make sure everybody,
8      you know, was doing what they were
9      supposed to do, the area was clean,
10     everybody was pretty much working in a
11     safe environment, making sure
12     everything, you know, had been greased,
13     making sure their logbooks was kept up,
14     you know, et cetera.
15  Q. And then you became a supervisor. And
16     what were your responsibilities?
17  A. My responsibility then, I was over the
18     whole machine, over all the edge
19     banding, boring, shapers. I was over
20     all of that as far as making sure all
21     the rates were right, the machines were
22     running right. If anybody needed
23     anything, I would go through

11  (Pages 41 to 44)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1   maintenance, you know, as far as those
2   machines. Just pretty much -- it was
3   pretty much the same as a lead man,
4   just different job title, really.
5   That's the way it seemed to me, anyway.
6   Just a little more paperwork.
7   Q. Did you take Eric Harrison's position?
8   A. No.
9   Q. I thought you said he was your
10  immediate supervisor before?
11  A. At the time he wasn't over machinery.
12  He was over the model shop.
13  Q. I see.
14  A. Bill Simon was over machinery.
15  Q. So you became supervisor over the model
16  shop when you became supervisor?
17  A. No. No, no, no.
18  Q. Which department were you supervisor?
19  A. When they called me back after they
20  laid me off after they put Darryl over
21  me.
22  Q. That was the model shop?
23  A. That's right. After they called me

Page 46

1   back, they put me up in the machine
2   room.
3   Q. So you went back to the machine room?
4   A. Yes.
5   Q. Okay.
6   A. That's where I got my lead man title
7   and my supervisor title from after
8   that.
9   Q. And so we were just finishing talking
10  about American Air Filters. You were
11  an auditor there. You would load loads
12  of air filters. You worked there until
13  February 2002. Then where did you go?
14  A. My sister passed. I came home. Well,
15  I had been calling home, because after
16  she passed, you know, I went, you know,
17  back up there right after her funeral.
18  And I had been calling home trying to
19  get a job. And Ervin Tarver, he's on
20  this suit with us, I called him. And I
21  said, Hey, man, you think you can get
22  me a job where you work? And he called
23  and he asked the supervisor, Johnny

Page 47

1   Crutchfield, and he told me to come on.
2   So that's when I came home and started
3   working with Mansfield Industrial.
4   Q. But you started with Mansfield in April
5   of 2003, according to our records. So
6   there's a gap between the time that you
7   say you stopped working at American Air
8   Filters in February 2002 up until a
9   year and two months later in April
10  2003.
11  A. That about right.
12  Q. That's what you told me, you said up
13  until February 2002 when your sister
14  died you came -- left Atlanta or were
15  in the process of coming back. You
16  don't start at Mansfield until April of
17  2003. So what happened in between
18  then? Where did you work in between
19  that time?
20  A. No, no, no. Something wrong there.
21  Q. Is your timeline off?
22  A. Yeah. My timeline is off there because
23  I remember vaguely after I came back

Page 48

1   home from Atlanta when my sister passed
2   it was, like, two or three weeks I was
3   working with Mansfield.
4   Q. All right.
5   A. So my timeline is off.
6   Q. So did you -- did Pilliod close later
7   than 2001?
8   A. No.
9   Q. Okay.
10  A. Like I said, my dates may be off.
11  Q. Right. That's what I'm trying to
12  figure out. Because I don't have in
13  your discovery responses every place
14  that you told me that you've worked,
15  and so I'm trying to establish where
16  all you've been employed. So -- let's
17  see.
18  A. I should have brought -- brought that
19  thing I got from the Social Security
20  Department. It had all of it right
21  there.
22  Q. You have a Social Security printout?
23  A. Uh-huh.

12  (Pages 45 to 48)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1  Q. Can you get that to your attorney so
2     that we can have a record of it?
3  A. Yeah.
4         MR. PETTAWAY: I don't know if
5  I want to give it.
6  A. I can do that. I've got that. And
7     that will square all that up. Like I
8     told you from the beginning, my time
9     might be off.
10        MR. PETTAWAY: So you're saying
11 your Social Security file?
12        THE WITNESS: Right.
13 A. I knew that couldn't be no year because
14    I went to work, like, three weeks after
15    I came from Atlanta.
16        MR. PETTAWAY: Well, that
17 doesn't show -- that printout doesn't
18 show your employers. It just shows the
19 wages.
20        MS. WILSON: It should show his
21 employers as well. Social Security
22 printouts usually show the names of the
23 employer and the wages with that

Page 50

1     employer.
2         MR. PETTAWAY: I don't think it
3  does.
4         MS. WILSON: I think it does.
5  A. I've got it. It's not a problem
6     getting it.
7  Q. Okay.
8  A. Matter of fact, I can get that back up
9     here today.
10 Q. That would be nice.
11 A. I keep up with stuff like that.
12 Q. What else do you keep up with? You got
13    some other stuff that is beneficial,
14    other documents?
15 A. No. No.
16 Q. But you do make it a record of -- you
17    normally keep documents --
18 A. Yeah.
19 Q. -- and records?
20 A. Yes, ma'am.
21 Q. Do you have any other documents and
22    records that relate to this lawsuit --
23 A. No.

Page 51

1  Q. -- that you haven't produced already?
2  A. No. Everything I had is up here.
3     He --
4  Q. Is up here at the firm?
5  A. Yes.
6  Q. Okay. So you're -- we're a little off
7     on the timeline, but you're saying
8     after sometime in February of 2003 --
9     is that possibly when your sister died,
10    2003?
11 A. Yeah.
12 Q. When you sister died?
13 A. Yeah.
14 Q. So February 2003 you came back from
15    Atlanta?
16 A. Uh-huh.
17 Q. And you said that you had called Ervin
18    Tarver?
19 A. Huh.
20 Q. Are you and Ervin Tarver friends?
21 A. Yeah. We used to work together --
22 Q. Where did you work --
23 A. -- before I left. We worked up at

Page 52

1     Billingsley. We built a power plant up
2     there.
3  Q. Hold on. You and Ervin --
4  A. We --
5  Q. You said you and Ervin Tarver worked
6     where?
7  A. Billingsley.
8  Q. In Billingsley?
9  A. Uh-huh.
10 Q. What job was that?
11 A. That was the first painting job that I
12    had.
13 Q. So you haven't told me about that.
14 A. Yeah. I'm thinking where did that one
15    come in. I didn't work there but three
16    months.
17 Q. That's fine. I just want all of your
18    employers. Do you remember when you
19    worked there?
20 A. I'm trying to think. This was right
21    after Pilliod closed, before I went to
22    Georgia. I did three months. I know I
23    worked three months there.

13 (Pages 49 to 52)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1 Q. So while you were at Pilliod you had
2   another job is what you were saying?
3 A. No. No, no. This is right after
4   Pilliod closed.
5 Q. Right after Pilliod closed is when you
6   started this job. Okay.
7 A. And this is before I went to Georgia.
8   Right before I went to Georgia. I left
9   after that job. I remember that now.
10 Q. What's the name of the company or the
11   organization that you worked with?
12 A. Pen Gulf, Incorporated.
13 Q. Is Pen P-I-N?
14 A. P-E-N.
15 Q. P-E-N?
16 A. Uh-huh.
17 Q. And Gulf, Incorporated?
18 A. Yeah.
19 Q. Do you know if they're still in
20   business?
21 A. Yes. Yes, it's still in business.
22 Q. Is that here in Selma?
23 A. No.

Page 54

1 Q. Where is it?
2 A. Atlanta, Georgia. I forgot about them.
3 Q. And what did you do at Pen Gulf?
4 A. I was a painter.
5 Q. And you said you worked with Tarver at
6   this job?
7 A. Uh-huh. (Witness nods head.)
8 Q. Did he recommend this job to --
9 A. Yes, ma'am.
10 Q. -- you as well?
11 A. Yes, ma'am.
12 Q. So this is right after Pilliod closed
13   down?
14 A. (Witness nods head.) Uh-huh.
15 Q. Did you call Tarver to ask if he knew
16   about work? Is that how --
17 A. Yes, ma'am.
18 Q. -- you learned of this job?
19 A. Yes, ma'am.
20 Q. Where was he at the time?
21 A. He was working there.
22 Q. He was working there in Atlanta?
23 A. No. He was working for Pen Gulf then.

Page 55

1 Q. Okay. So where was Pen Gulf located?
2   I thought you said Atlanta.
3 A. That's where they're based out of, but
4   the job was in Billingsley. But they
5   had Billingsley Power Plant.
6 Q. Pen Gulf is based in Atlanta?
7 A. Uh-huh.
8 Q. But this job was located at
9   Billingsley?
10 A. Billingsley, Alabama, yeah.
11 Q. Was it a specific plant or company that
12   you were painting, business?
13 A. I can't recall the name of that place.
14 Q. Did you say it was a power company?
15 A. Yes, ma'am.
16 Q. The power company in Billingsley?
17 A. Yes.
18 Q. Okay. And you worked there for three
19   months with Tarver?
20 A. Yeah.
21 Q. As a painter helper?
22 A. Yes.
23 Q. Any other jobs that you haven't told me

Page 56

1   about?
2 A. No.
3 Q. So this is the only painting job that
4   you recall was at Pen Gulf, other than
5   Mansfield?
6 A. Yes. That's the only one, yes.
7 Q. Can you think of any other places?
8 A. No.
9 Q. Okay. But you don't remember when you
10   worked at Pen Gulf?
11 A. I can't recall, no.
12 Q. Okay. So we were talking about the
13   last place you recall working before
14   going to Mansfield, and that was
15   American Air Filters?
16 A. Yeah.
17 Q. Okay. And you came back -- were coming
18   back from Atlanta. You called Tarver
19   and he told you about Mansfield?
20 A. Yes.
21 Q. Do you know how long he had been
22   working there?
23 A. He had been there almost a year.

14 (Pages 53 to 56)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 57

1    Q. Okay. And when he told you about
2    Mansfield, or the job opportunities at
3    Mansfield, what did he tell you it was
4    like as a working -- place to work?
5    A. He told me it was pretty much like what
6    we was doing at Pen Gulf, you know,
7    brush and roll, spraying, prepping, you
8    know. He said the people that they
9    worked for they're A-holes, but he
10   said, You'll find out when you get
11   here. I said, Well, man, I just want
12   to be closer to my family, because all
13   my family was here, you know. And
14   that's how I got hired on, through him.
15   Q. So he told you that they were assholes?
16   A. Uh-huh.
17   Q. But yet you still went to work there?
18   A. Yeah. Because I really was trying to
19   get home. It -- it really touched me
20   because my mama, when I went up there
21   in Georgia, you know, my mama passed.
22   And the same guy that called me and
23   told me my mama passed, years later it

Page 58

1    was the same guy who called me and told
2    me my sister passed. So I said, Well,
3    Georgia ain't for me.
4    Q. And I can appreciate that. I don't
5    want to diminish that situation for you
6    in any way. But I want to know about
7    your Mansfield work experience now.
8    And if we can keep it limited to just
9    the working issues.
10   So we were talking about Tarver
11   recommending that you apply to
12   Mansfield. And you said that he said
13   they're assholes, but come down and
14   apply anyway?
15   A. No, it wasn't like that. He said,
16   Well, you know, the people, they're
17   A-holes, he said, but you'll find out
18   when you get down for yourself. I
19   said, Man, I just need the job. I want
20   to be close to home.
21   Q. Did you apply anyplace else?
22   A. No. That was the first thing I got
23   when I came back home.

Page 59

1    Q. Does it sound strange to you that
2    somebody would say these people are
3    assholes, come on down, and you would
4    just go on down?
5    A. There's a lot of that going on around
6    here, so for me, no, that don't sound
7    strange to me.
8    Q. So it doesn't bother you when people
9    say, My coworkers are assholes; come on
10   down?
11       MR. PETTAWAY: Asked and
12   answered. I'm going to object to that
13   question.
14       MS. WILSON: Well, no. That's
15   a different question from what I just
16   asked him.
17       MR. PETTAWAY: He's answered
18   that. You're trying to argue with him.
19       MS. WILSON: I'm not trying to
20   argue with him at all. And I don't
21   want the record to reflect that I'm
22   being argumentative, because I
23   haven't raised my voice at all with

Page 60

1    Mr. Ragland.
2        MR. PETTAWAY: You are trying
3    to be argumentative with him.
4        MS. WILSON: I'm not trying to
5    be argumentative. I've asked him two
6    different questions. The first
7    question I asked him was what Tarver
8    said. And the second question I asked
9    him was, does that sound strange.
10       MR. PETTAWAY: And he's
11   answered that.
12       MS. WILSON: The third question
13   that I asked him -- those are two
14   different questions, Collins. The
15   third question I've asked him, which is
16   a different question, is would you
17   normally go to work for a place when
18   someone has said these people are
19   assholes, but come down and apply
20   anyway?
21       MR. PETTAWAY: That's not what
22   you asked him.
23       MS. WILSON: That is exactly

15 (Pages 57 to 60)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 61

1  what I asked him.  And you interrupted
2  him before he could answer.  So those
3  are three different questions all
4  revolving around the same issue.
5       MR. PETTAWAY:  Asked and
6  answered.
7       MS. WILSON:  It's very
8  relevant.
9  Q. And I want you to answer.
10      MS. WILSON:  Are you
11  instructing him not to answer?
12      MR. PETTAWAY:  He's already
13  answered.
14      MS. WILSON:  But are you
15  instructing him not to answer the third
16  question that I asked him, which was
17  different from the first two that I
18  just told you?  Are you instructing him
19  not to answer the question that I just
20  asked, which was, do you normally apply
21  for a job at a place where somebody has
22  told you, These people are assholes,
23  but come and work here anyway?

Page 62

1  A. Like I said, I'm used to that around
2  here, you know.  That don't bother me
3  because William Ragland is William
4  Ragland.  You can't change me, you
5  know, and I can adapt to any
6  atmosphere.  I can work with anybody.
7  But when I get into a place, I will
8  find out what type of person you are,
9  you know.  I judge people for myself,
10  you know.  I don't care what you say or
11  what Ervin say.  I'll listen to that,
12  but like I said, at the time, I pretty
13  much would have took anything.  I was
14  trying to get back home.
15  Q. So your answer is yes?  Because it was
16  a yes or no question.
17  A. Yes.
18  Q. Yes, you would --
19  A. Yes.
20      MR. PETTAWAY:  He answered it.
21  A. Yes.  You know, like I say . . .
22  Q. It's just yes.  That's what you're
23  saying?

Page 63

1  A. Yes.
2  Q. Okay.  Thank you.  So Tarver
3  recommended you for this position?
4  A. Uh-huh.
5  Q. And then you started.  Do you remember
6  what position you started as when you
7  started at Mansfield?
8  A. He said he was going to start me off as
9  a helper.
10  Q. Who is "he"?
11  A. Johnny Crutchfield.
12  Q. So you met with Mr. Crutchfield, filled
13  out an application?
14  A. Yes.
15  Q. And he said he would start you as a
16  helper?
17  A. Yes.
18  Q. Is that what you started as?
19  A. Yes.
20  Q. Do you remember how much you were
21  making when you started as a helper?
22  A. Nine dollars an hour.
23  Q. Did your position ever change in the

Page 64

1  time that you were at Mansfield?
2  A. No.  No.
3  Q. So you were always a helper when you
4  were at Mansfield?
5  A. Yes.
6  Q. Did your pay ever change when you were
7  at Mansfield?
8  A. It changed when I went to Hyundai.  We
9  started at GE and when we finished that
10  job over there we helped build that
11  Hyundai plant over in Hope Hull,
12  Alabama.  And that's when my pay
13  changed.  It went up a dollar.
14  Q. But you were still a helper --
15  A. Yes.
16  Q. -- when you moved to Hyundai?
17  A. Yes.
18  Q. Do you know or can you recall the time
19  frame or -- from the time that you were
20  at GE -- well, how many months later
21  was it that you moved to Hyundai?
22  A. About six months.
23  Q. Okay.

16  (Pages 61 to 64)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 65

1  A. Yeah, about six months.
2  Q. So when you were at GE, who did you
3     work with? Who was in your crew?
4  A. Ervin Tarver, Nathaniel Lamar, Ben
5     Gayle, Cindy, I think her last name is
6     Thigpen, I believe it is. I'm not sure
7     her last name. But she was the only
8     female with us. Who else? Corey
9     Watson, that was our lead person,
10    supervisor -- supervisor.
11 Q. Corey Watson was your immediate
12    supervisor?
13 A. Uh-huh.
14 Q. This is at GE; right?
15 A. Yes.
16 Q. Okay. Who else was in your crew at GE?
17 A. When I started, that was it at five.
18    The other crew was down at one and two.
19 Q. So while you were at GE, you only
20    worked with this crew; is that right?
21 A. Up until we finished that job and we
22    went down to one and two with the rest
23    of them, with the rest of the crew.

Page 66

1  Q. One and two at GE or at Hyundai?
2  A. GE. See, we was at plant five at GE.
3  Q. Okay.
4  A. They had another crew down the road at
5     one and two.
6  Q. Did you get with another crew when you
7     went to one and two, plant one and two?
8  A. Yeah. We finished plant five and went
9     down there and helped them finish.
10 Q. So at plant one, who was on your crew?
11 A. Excuse me.
12 Q. Who was on your crew at plant one?
13 A. Let's see. The same that was at plant
14    five, those and Ralo Colvin, Patrick
15    Lewis, Earl Sow, Jack Richardson. I
16    don't know Jeff's last name.
17 Q. You said someone named Jeff?
18 A. Jeff and Richard. I remember them. I
19    don't know their last name.
20 Q. Okay. That's fine. Richard?
21 A. Yeah.
22 Q. Okay.
23 A. And Johnny Reed was down there. He was

Page 67

1     the supervisor.
2  Q. So at plant one, Johnny Reed was your
3     immediate supervisor?
4  A. Uh-huh.
5  Q. Okay. Did --
6  A. Then there was this other guy, his son,
7     I don't know their name. We used to --
8     his last name was Glato, but I didn't
9     know the first name. Him and his son
10    worked there.
11 Q. Both he and his son's last name was
12    Glato --
13 A. Yeah.
14 Q. -- to your recollection? Okay.
15 A. Johnny Crutchfield, he was the
16    superintendent. He was on that end,
17    too.
18 Q. All at plant one; right?
19 A. Uh-huh. (Witness nods head.)
20 Q. Anybody else you can think of at plant
21    one that was in your crew?
22 A. Can't think of nobody else right now.
23 Q. Okay. And at plant two, who was in

Page 68

1     your crew?
2  A. One and two was together.
3  Q. Okay.
4  A. So, I mean . . .
5  Q. So the same crew that was at plant one
6     became the same crew at plant two?
7  A. One and two, that building, it was
8     together.
9  Q. I see what you're saying. Okay. When
10    you were hired at Mansfield -- well,
11    tell me about that process. You went
12    in and applied, filled out an
13    application. And then what happened?
14 A. Then pretty much went to work. I
15    mean --
16 Q. Well, who hired you and told you you
17    had a job?
18 A. Johnny Crutchfield. He took me in.
19    And Mansfield didn't give us
20    orientation. GE did. They gave the
21    orientation. We didn't get orientation
22    through Mansfield.
23 Q. You didn't have any kind of training

17 (Pages 65 to 68)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 69

1   through Mansfield?
2   A. No.
3   Q. So tell me about the GE orientation.
4   A. We had to be there at, like, eight in
5     the morning.
6   Q. Is this the first day you started?
7   A. Yeah, this is the first day we started.
8     Yeah. Orientation was when I got
9     there, because I had went in and got
10    hired. We went to work -- we didn't
11    work -- we didn't work a good hour and
12    he came and got the new hirees and
13    that's when we went to orientation. I
14    remember that now. Yeah.
15  Q. Did you get hired the same day you
16    filled out the application?
17  A. Yeah.
18  Q. So that same day you started working?
19  A. Yeah.
20  Q. And you said that same day -- "they" do
21    you mean GE?
22  A. No. Mansfield, well, they came and got
23    us. Johnny came and got us.

Page 70

1   Q. Okay.
2   A. And took us over to orientation over in
3     GE's building, one of the GE buildings.
4   Q. How do you know the orientation was
5     done by GE people as opposed to
6     Mansfield people?
7   A. Well, Johnny said that they didn't give
8     orientation, Johnny Crutchfield,
9     superintendent.
10  Q. He said they didn't give orientation?
11  A. Yeah. He said GE gives the
12    orientation.
13  Q. What kind of orientation did you
14    receive through GE?
15  A. They was just talking mostly about
16    safety, areas where you need chemical
17    suits and hard hats and, you know,
18    you're supposed to wear them. It was
19    pretty much safety because we was
20    working around a lot of dangerous acids
21    and a lot of hot pipes and stuff like
22    that. They tell you to watch out, you
23    know, for signs, blue meant this,

Page 71

1   yellow meant this, red meant this,
2     white meant this, you know, stuff like
3     that. It was pretty much safety.
4   Q. Do you remember who else started the
5     same day that you started?
6   A. There was a guy named Robert. He was
7     out of Louisiana. I don't know
8     Robert's last name.
9   Q. Okay.
10  A. But I know Corey.
11  Q. Who else?
12  A. He -- he was the only one because I
13    remember me and him walking together
14    and I asked him, I said, Man, you ever
15    done this before? He was, like, No.
16    And I -- we was trying to find out, you
17    know, what he had started out with, you
18    know. And I asked him, What did they
19    start you off with? He said, Ten
20    dollars. He said, What they start you
21    off with? I said, Nine. He's a white
22    guy. Started him off with ten, started
23    me off with nine.

Page 72

1   Q. Do you remember who else started the
2     same day as you?
3   A. No.
4   Q. So you just remember --
5   A. I remember Robert.
6   Q. -- Robert?
7   A. Yeah.
8   Q. Okay. So you and Robert were the only
9     two people that went for orientation?
10  A. Yeah. That I know that was painting on
11    with us.
12  Q. You were saying that you recalled
13    safety orientation, basically, was --
14  A. Pretty much.
15  Q. -- what you recall. Was there any
16    discrimination or harassment training
17    given by who you thought was GE?
18  A. GE? No. No.
19  Q. Did --
20  A. It might have been in there. I can't
21    recall because, you know, it was, like,
22    they don't give you time to sit down
23    and read all this stuff, you know, what

18 (Pages 69 to 72)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 73

1  they're throwing at you.  They pretty
2  much go through it and they want to see
3  you sign here and boom, boom, blah,
4  blah, blah.  Like I said, it might have
5  been in there.  I can't recall.  I
6  don't remember nothing like that.  All
7  I do remember, it was mostly safety,
8  you know.
9  Q. Do you recall receiving any documents
10  when you applied for the job, any
11  company documents, handbooks, anything
12  like that?
13  A. No.  I didn't get that until we went to
14  Hyundai.  And Mr. Pettaway, he has
15  that.  I brought one of them books from
16  orientation that they gave us up there.
17  Q. Okay.  Well, let me show you something.
18  I'll mark it as Defendants' Exhibit 3.
19      (Defendants' Exhibit 3 was
20      marked for identification.)
21  Q. Does that look familiar to you,
22  Mr. Ragland?
23  A. No, ma'am.

Page 74

1  Q. You've never seen this?
2  A. No, I never saw this.
3  Q. You've never seen what is called the
4  Code of Conduct and Safe Practices
5  Employee Handbook?
6  A. I ain't.
7  Q. Do you want to look through it and see
8  of it refreshes your memory?
9  A. Yeah, I'll do that.  I ain't never seen
10  nothing like this.
11  Q. I'm going to give you a few minutes to
12  look at it.
13  A. Okay.
14      (Witness reviews document.)
15  A. Uh-uh.  I know I ain't never saw
16  nothing like this.
17  Q. So you gave your attorney some other
18  handbook is what you're saying?
19  A. It was some little booklets that they
20  had on the table, just a handbook,
21  safety handbook.
22  Q. Did you get that from Mansfield or did
23  you --

Page 75

1  A. No.  I said when I went to Hyundai.
2  When we left and went to Hyundai and
3  they had their orientation, I got that
4  book from them.  I was working with
5  Mansfield.
6  Q. Are you saying that you don't recall or
7  are you saying that you never received
8  a handbook?
9  A. This?
10  Q. Yes.  That's what I'm saying.  Did
11  you --
12  A. I don't recall receiving nothing like
13  this.  I'm pretty much up on keeping up
14  with stuff.
15  Q. That's fine.  Let me show you what I'm
16  going to mark as Defendants' Exhibit
17  No. 4.
18  A. I don't remember seeing this.
19      (Defendants' Exhibit 4 was
20      marked for identification.)
21  Q. This is what I want you to look at now,
22  Mr. Ragland.  Have you seen that
23  document before?

Page 76

1  A. Uh-huh.
2  Q. Is that a yes?
3  A. Yes.
4  Q. You have seen that before?
5  A. Yeah.
6  Q. And what I've given you as Defendants'
7  Exhibit 4 is Attachment 003-B, which is
8  a receipt, acknowledgement, and consent
9  form that is a part of Defendants'
10  Exhibit 3, the Code of Conduct and Safe
11  Practices Handbook.  Is that your
12  signature on Exhibit No. 4, the
13  receipt, acknowledgement, and consent
14  form?
15  A. Yeah, that's my signature.
16  Q. Do you see where the date is on this
17  exhibit?
18  A. 4/23/03.
19  Q. And I think we've agreed earlier that's
20  the date that you would have started
21  work at Mansfield; is that correct?
22  A. (Witness nods head.)  Uh-huh.
23  Q. Either the 22nd or the 23rd; is that

19  (Pages 73 to 76)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 77

1    right?
2    A. Uh-huh.  That's right.
3    Q. So you don't recall receiving this
4    booklet?
5    A. (Witness shakes head.)
6    Q. Do you recall signing this --
7    A. I remember --
8    Q. -- paper?
9    A. -- signing this.  Yeah.  But this, I
10   ain't never saw that.
11   Q. Well, do you see that this is page 57
12   of 67 at the bottom?
13   A. Yeah.
14   Q. And if you look at this handbook, do
15   you see that page 57 of Exhibit 3 -- do
16   you see that that is the same document
17   except Exhibit 4, that I've just showed
18   you, is the executed copy of that?
19   A. Yes, I see that.
20   Q. So do you recall now that you received
21   this handbook and this page that came
22   out of that booklet?
23   A. I remember signing that.  I don't

---

Page 78

1    remember that.
2         MR. PETTAWAY:  Hold on.
3    Q. So did someone just --
4         MR. PETTAWAY:  Hold on.  When
5    he was talking about "that," he was
6    talking about Exhibit 4.
7         MS. WILSON:  Right.  I think he
8    was saying he remembered --
9         MR. PETTAWAY:  The other thing,
10   he's talking about the handbook.
11        MS. WILSON:  Right.
12        MR. PETTAWAY:  See, she's
13   taking this down, and when I read it
14   later I need to know what "this" and
15   "that" is.
16        THE WITNESS:  Okay.
17   Q. So you were saying I remember that,
18   which is Exhibit 4, the receipt,
19   acknowledgment, and consent form that
20   you signed?
21   A. Yes.
22   Q. But you're saying you don't remember
23   this handbook?

---

Page 79

1    A. No.
2    Q. How was it that this receipt,
3    acknowledgment, and consent form was
4    given to you and you signed off on it?
5    A. In his office -- me and Robert signed
6    these papers in his office, because
7    both of us was in there at the same
8    time.
9    Q. So why were you all in his office?
10   That was the same day that you were
11   hired?
12   A. Yes.
13   Q. Was this before or after your
14   orientation that you said you had with
15   GE?
16   A. I think this was after.  I'm not sure.
17   I can't recall.
18   Q. Okay.
19   A. But I know me and Robert was together
20   when we signed this.
21   Q. You remember signing that that same day
22   after your orientation with GE?  You
23   remember signing Exhibit 4, the

---

Page 80

1    receipt, acknowledgment, and consent
2    form the same day you were hired?
3    A. Yeah.  I remember this.
4    Q. In Johnny Crutchfield's office?
5    A. Yeah.
6    Q. Okay.
7    A. I remember me and Robert signed these.
8    Q. Okay.  I'm going to show you what I'm
9    going to mark Defendants' Exhibit 5.
10        (Defendants' Exhibit 5 was
11        marked for identification.)
12   A. No, I never saw that.
13   Q. That's fine.  You don't have to comment
14   any more on it unless I ask you a
15   question.
16        And this is Defendants' Exhibit 5
17   that you're looking at; correct?
18   A. Yes.
19   Q. Which is Attachment 003-A, the handbook
20   orientation testing log.  Isn't that
21   what it says across the top?
22   A. Yes.
23   Q. And at the bottom of the page you see

---

20  (Pages 77 to 80)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1    it's page 55 of 67, and the last page
2    is, in my stapled handout, page 53 of
3    67. So there are a number of pages
4    here, isn't that correct?
5    A. Yes.
6    Q. You see page 55 is the first page?
7    A. Uh-huh.
8    Q. And the next page is 57. The next page
9    is 37 of 67 at the bottom. Do you see
10   that?
11   A. Yeah.
12   Q. Okay. The next page is 39 of 67. The
13   next page is 41 of 67. Do you see
14   that? Do you see all those numbers at
15   the bottom?
16   A. Uh-huh.
17   Q. Do you want to look through those for a
18   minute, sir?
19        (Witness reviews document.)
20   A. I remember this.
21   Q. How is it that you remember Exhibit 5?
22        (No immediate response given.)
23   Q. First let me ask you, you've looked

Page 82

1    through each one of those pages; is
2    that correct?
3    A. Yeah, I remember that.
4    Q. Is that right, sir, you remember?
5    A. Yes.
6    Q. Is that your signature on the bottom of
7    a number of these pages and across the
8    top of some of these pages?
9        MR. PETTAWAY: There's a name
10   across the top.
11   Q. There's a name across the top and in
12   some pages there's a signature across
13   the bottom. Do you see that,
14   Mr. Ragland?
15   A. Yes.
16   Q. Is that your signature on the first
17   page and the second page?
18   A. Yes.
19   Q. Is that your handwriting on each of
20   the --
21   A. That's what --
22   Q. -- tests?
23   A. -- I was just looking at.

Page 83

1    Q. Is that your handwriting on each of the
2    tests on the following pages, the next
3    page and the remaining pages?
4        (Witness reviews document.)
5    A. Yes.
6    Q. So does this help you to recall whether
7    or not on or about the date that you
8    were hired that you did have testing on
9    the Code of Conduct and Safe Practices
10   Handbook regarding a number of
11   procedures in the handbook by
12   Mansfield? Does this refresh your
13   recollection that you would have
14   attended -- participated in some
15   orientation by Mansfield on or about
16   the day that you were hired?
17   A. This came -- this here was later on
18   that day. Okay. Now I remember.
19   Yeah. Yes.
20   Q. So the answer is yes, you do recall
21   orientation or training on or about the
22   day that you were hired?
23   A. That's what they call this, yes.

Page 84

1    Q. Well --
2    A. I remember this.
3    Q. It says across the top, Handbook
4    Orientation Testing Log?
5    A. I remember the dude had monitors set up
6    when he was taking that.
7    Q. So who would have administered this
8    orientation and testing? Do you
9    recall?
10   A. I don't know who that guy was.
11   Q. Was Johnny Crutchfield there?
12   A. He was in there, yeah.
13   Q. Okay. Do you see where it says,
14   testing/instructor supervisor and it's
15   got Johnny Crutchfield's name?
16   A. Yes. But he -- no, he wasn't no
17   instructor there.
18   Q. But you just told me Johnny Crutchfield
19   was there.
20   A. He was there, but this other guy had us
21   going through this.
22   Q. Who was the other guy?
23   A. I don't know who he was. He -- he had

21 (Pages 81 to 84)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 85

1    monitors set up.  I remember this.  I
2    remember this now.
3    Q. Do you know if he was a Mansfield
4    employee?
5    A. No.
6    Q. You don't -- do you know one way or the
7    other, is what I'm asking?
8    A. After that I didn't see him no more.
9    Q. But I'm asking, do you know one way or
10   the other?
11   A. No.
12   Q. So you don't know.  Okay.
13   A. No.
14   Q. But Johnny Crutchfield was there the
15   entire time?
16   A. Yes.
17   Q. Okay.  Did the person who you say you
18   recall being there that you can't
19   recall his name, was he the instructor
20   of the orientation --
21   A. Yes.
22   Q. -- session?  Okay.  Tell me how that
23   orientation took place.  Did he go over

Page 86

1    the handbook with you?  Did he talk
2    about the procedures and then test you?
3    How did the orientation take place?
4    A. Really, he was letting us watch the
5    monitor on things up under these
6    different things here.
7    Q. Okay.  Let me stop you right there.
8    When you're saying monitor, do you mean
9    like a television?
10   A. Yeah.  He had, like, a little laptop
11   set up.  Matter of fact, there was two
12   or three of them in there and he had
13   them set up and we were watching them.
14   And he was really telling us what to
15   mark in these places here.
16   Q. You were watching -- was it a
17   videotape?
18   A. Yeah.  And I remember this now.  I
19   remember that clearly.  But I don't
20   think he was with -- like I said, that
21   was the only time I saw that guy.
22   Q. But, again, you just said you don't
23   know whether or not he was with

Page 87

1    Mansfield or not?
2    A. No.
3    Q. Were the videotapes, did they say
4    anything about Mansfield or K2
5    Industrial on them?  Do you know?
6    A. I can't recall.
7    Q. I'm sorry.  Did you say you can't
8    recall?
9    A. I can't recall.
10   Q. But you said that the monitors, these
11   laptops, as they may have been,
12   addressed each of the subject areas on
13   page 55 of 67, which is the first page
14   of Exhibit 5; is that correct?
15   A. All these, yeah.
16   Q. So it went hazard communications,
17   personal protective equipment, all the
18   way down to number 9, which lock out
19   and tag out?
20   A. Yes, ma'am.
21   Q. I don't know if I ever asked you this
22   question.  Have you ever seen this Code
23   of Conduct and Safe Practices Handbook?

Page 88

1    A. No, ma'am.
2    Q. But even though there are pages that
3    have your signature on them and other
4    pages that were --
5    A. In there.
6    Q. -- signed by you that were from this
7    manual, you say you don't recall ever
8    seeing --
9    A. I don't remember seeing that, no,
10   ma'am.
11   Q. Will you look at page 11 of the Code of
12   Conduct and Safe Practices Handbook?
13   A. Okay.
14   Q. And on page 11 there's a section called
15   conflict, harassment, and violence in
16   the workplace.
17       (Witness complies)
18   A. Okay.
19   Q. If you haven't -- even if you haven't
20   seen this document, were you aware that
21   there was a policy in place at
22   Mansfield addressing conflicts,
23   harassment, and violence in the

22  (Pages 85 to 88)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 89

```
1     workplace?
2   A. Yeah.  There should have been if there
3     wasn't.
4   Q. No. I'm asking you if you recall or
5     know if Mansfield had a policy.  Even
6     though you're saying you have never
7     seen this handbook before, were you
8     aware of a policy against or
9     prohibiting any kind of conflict,
10    harassment, or violence in the
11    workplace?
12  A. Through Mansfield?
13  Q. Were you aware of them having one?
14  A. No.
15  Q. Were you aware of any rules and
16    regulations that may have been in place
17    that Mansfield may have had regarding
18    absenteeism, timeliness, work rules and
19    regulations?  Were you ever told about
20    any work rules and regulations?
21  A. Rules and regulations.  Let me think on
22    that one.  I'm just trying to think,
23    you know, back here.
```

Page 90

```
1   Q. Well, let me ask you a question while
2     you're thinking about that.  Would you
3     agree with me that events and things
4     that happened back in 2003, you would
5     be more likely to remember it closer to
6     that time frame than you may be able to
7     remember it months, years, and time
8     removed from that time period?
9   A. I don't quite understand.  Could you
10    say that again?
11  Q. If something happened in 2003, let's
12    say if something happened in December
13    of 2003, would you agree that it's more
14    likely you would remember in December
15    2003 and January 2004 what happened as
16    opposed to remembering something that
17    happened in December 2005 -- or 2003 in
18    2005 and in 2006?  Do you think your
19    memory would be better in the beginning
20    or would your memory be better in the
21    end?
22  A. I have a pretty good memory.  I know
23    it's going to be better in the
```

Page 91

```
1     beginning.
2   Q. So would you agree with me that you
3     would remember something closer in time
4     to when the event occurred as opposed
5     to when the event is further removed
6     from you?
7   A. It's been a while, so . . .
8   Q. I'm just asking you yes or no.  Do you
9     remember if -- do you agree that your
10    memory would be better closer to the
11    time the event occurred as opposed to a
12    time when it was further removed?
13  A. Yes, it would be closer, yes, that I
14    would remember better.
15  Q. So I'll let you continue to think about
16    whether or not you were aware of any
17    rules and regulations that the company
18    had in place regarding --
19  A. Yes.  Yes.
20  Q. You do?
21  A. Yes.
22  Q. How do you remember that?  Did somebody
23    tell you that we have certain rules and
```

Page 92

```
1     regulations and policies in place?
2   A. Yeah.  The supervisors, Johnny Reed and
3     Corey as far as -- rules as far as
4     going up on stepladders over three feet
5     or getting into a manlift and not tying
6     off.
7   Q. So you recall them talking to you about
8     safety rules and practices?
9   A. Pretty much.  It's more safety.  You
10    heard about more safety.
11  Q. What about rules regarding smoking in
12    the workplace, do you ever recall any
13    rules regarding smoking in the
14    workplace?  Yes or no?
15  A. No, none other than the ones that they
16    made and I didn't think that was fair.
17  Q. I'm just asking you if you recall any
18    rules regarding smoking in the
19    workplace.  Do you recall any rules?
20    Yes or no?
21  A. Not at first, no.  But at the end, yes,
22    they made a rule.
23  Q. Okay.  Do you recall any rules
```

23  (Pages 89 to 92)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1    regarding absenteeism, timeliness,
2    coming to work on time? Do you recall
3    there being any rules in place
4    regarding that?
5    A. Yes. But that was something I didn't
6    have to worry about because I was on
7    time.
8    Q. Your answer was yes?
9    A. Yes, I remember that.
10   Q. Do you ever recall there being rules
11   about the various manners in which a
12   person could be disciplined if they
13   violated any company rules and
14   procedures?
15   A. Yes.
16   Q. What about whether -- do you recall any
17   rules regarding attention to job
18   duties, like no horseplay in the work
19   area or no leaving your workstation
20   before quitting time or no loafing off
21   or playing around in the workplace? Do
22   you recall rules --
23   A. Oh, yeah.

Page 94

1    Q. -- in place like that?
2    A. No horseplay, yeah, I remember that.
3    Q. Do you recall any rules about the
4    improper use or treatment of company
5    property or the customer's property in
6    the workplace?
7    A. I can't recall. I don't know.
8    Q. And just so I'm clear, no one at
9    Mansfield ever had a conversation or
10   training session with you regarding
11   harassment in the workplace and the
12   procedure in which you would report
13   such harassment?
14   A. With Mansfield? You said with
15   Mansfield?
16   Q. With Mansfield.
17   A. No.
18   Q. Did you have any training with GE?
19   A. GE had training, yeah, through
20   orientation.
21   Q. They had harassment training through
22   their orientation?
23   A. I'm quite sure it's in there. Like I

Page 95

1    say, they wouldn't let us just sit down
2    and read this book what they had there,
3    you know. That was something we was
4    supposed to take home.
5    Q. Did you take it home?
6    A. Yeah.
7    Q. So you did take it home?
8    A. Yeah.
9    Q. And you're talking about with GE?
10   A. Yes.
11   Q. But you do recall harassment
12   orientation training with GE?
13       MR. PETTAWAY: Object to the
14   form of the question. That's not what
15   he said.
16       MS. WILSON: That's why I'm
17   asking him to clarify.
18       MR. PETTAWAY: You asked him do
19   he --
20       MS. WILSON: I would appreciate
21   it, though, if you wouldn't have a
22   speaking objection which kind of tend
23   to lead him to what the answer is.

Page 96

1        MR. PETTAWAY: I would
2    appreciate it if you would quit trying
3    to tell him something he clearly didn't
4    say.
5        MS. WILSON: I'm not telling
6    him something he did or did not say.
7        MR. PETTAWAY: Yes, you did.
8        MS. WILSON: I'm asking him,
9    which I just did, was if his testimony
10   was --
11       MR. PETTAWAY: That's not what
12   you asked him.
13       MS. WILSON: -- that he had
14   training --
15       MR. PETTAWAY: That's not what
16   your question was.
17       MS. WILSON: -- with GE. And
18   he said previously, I'm pretty sure
19   that they did, and started to talk
20   about something else. What I want to
21   be clear on the record about, he's
22   shaking his head in agreement with me.
23   What I want to be clear on the record

24 (Pages 93 to 96)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 97

1  about is his recollection of training
2  of harassment during his orientation
3  with GE, any harassment or
4  discrimination training with GE.
5  Q. And what is your -- what is your
6  answer?
7  A. Like I said, I'm pretty sure they did
8  have it in there. But as far as me
9  hearing them talking about it verbally
10 to the person that was holding the
11 orientation, no, I didn't hear him say
12 nothing about no harassment or nothing
13 like that. Because like I say --
14 Q. Okay. That's --
15 A. -- it was mostly about safety.
16 Q. Okay. And that's what I want to be
17 clear about, because you keep saying
18 "I'm pretty sure." I want to make sure
19 because to me saying I'm saying pretty
20 sure implies yes because you're shaking
21 your head yes.
22 A. Uh-huh. (Witness nods head.)
23        MS. WILSON: So that's all I'm

Page 98

1  trying to clarify, Collins.
2  Q. Is to make sure that your "I'm pretty
3  sure" is yes or no.
4  A. I would have to say yes on that
5  because, I mean, GE, that's a major
6  corporation. I'm quite sure they would
7  have something like that in their
8  orientation manual, you know.
9        MR. PETTAWAY: Don't assume
10 anything in your answer. You're
11 confusing her.
12       THE WITNESS: Oh, okay. I'm
13 sorry.
14       MR. PETTAWAY: So answer her
15 question. Don't just assume.
16 A. Yes.
17 Q. So you do recall -- do you recall
18 training --
19 A. Yeah, I recall training, orientation
20 training with GE, yes.
21 Q. Regarding, though, what I'm asking you,
22 is harassment or discrimination
23 training?

Page 99

1  A. No.
2  Q. Okay.
3  A. No.
4  Q. Okay. That's what I want to be clear
5  about.
6  A. Okay.
7  Q. I know we've already talked about you
8  did have training with them. I want to
9  know specifically about this kind of
10 training.
11 A. Okay. I didn't mean to confuse you.
12 Q. No, I wasn't confused. I wanted to
13 make sure what your answer was to my
14 question.
15 A. Okay.
16 Q. So we were talking about your
17 orientation, the first day you started
18 working. You say you started with
19 someone named Robert, but you're not
20 quite sure of his last name.
21 A. Uh-huh.
22 Q. And this was at GE?
23 A. Uh-huh. (Witness nods head.)

Page 100

1  Q. Let's talk about at Hyundai. Who was
2  in your crew at Hyundai when you moved
3  over there?
4  A. Ben Gayles. I don't know Richard's
5  last name. Richard, Robert, Tim,
6  Corey, Scott.
7  Q. Do you remember Scott's last name?
8  That's someone you haven't mentioned
9  before.
10 A. No.
11 Q. Okay. Who else?
12 A. Glen, Cindy, the girl, she was over
13 there with us.
14 Q. And who else?
15 A. Johnny Reed, he eventually came on over
16 there with us, too.
17 Q. Was Johnny Reed in your crew or was he
18 your supervisor?
19 A. He was supervisor over one and two over
20 there at GE, but he eventually came on
21 over to Hyundai with us. He was
22 supervisor over there.
23 Q. Who else was on the crew?

25 (Pages 97 to 100)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 101

1   A. Did I say Glen?
2   Q. Yes.
3   A. I can't remember.
4   Q. You can't remember anybody else?
5   A. I know there was a few more, but I
6      can't recall any names right now.
7   Q. If you think of them when we're
8      talking, then you can just tell me.
9   A. See, a lot of those guys with Mansfield
10     was working, you know, down in Florida
11     and they'd send them up there and I
12     didn't know them.  Some of them was
13     from Georgia.
14  Q. But you did learn their names when you
15     were working with them?
16  A. No.  Because they worked in different
17     areas from us.
18  Q. But I just want to know the people that
19     are on your crew, that were in your
20     crew, not everybody that was at the
21     Hyundai plant.
22  A. Well, those were the people that were
23     on my crew.

Page 102

1   Q. So Ben, Richard, Robert, Tim, Corey,
2      Scott, Glenn, and Cindy, with Johnny
3      Reed as your supervisor --
4   A. Uh-huh.
5   Q. -- at the --
6   A. Corey -- Corey -- Corey, he was the
7      supervisor, too.  Like I said, when we
8      was at GE --
9   Q. At GE, though?
10  A. Uh-huh.  He was our supervisor at five.
11     Johnny Reed was over one and two.  All
12     right.  When we got -- before we got
13     ready to go to Hyundai, they had
14     already sent Corey over.  Corey was
15     already working there when we got
16     there.  After we got there, a few weeks
17     later, you know, Johnny Reed came over.
18     They had finished the job over there at
19     GE, so all of us was over there.  So
20     both of them, you know, are
21     supervisors.
22  Q. So you considered Corey your supervisor
23     at Hyundai as well?

Page 103

1   A. Yes, ma'am.
2   Q. Okay.  Were there -- well, let me ask
3      you, when you were at the GE plant in
4      plant five, that crew of people that
5      you told me about before, Tarver,
6      Nathaniel, Ben, Cindy, Corey -- said
7      Corey Watson was your immediate
8      supervisor -- was that entire crew all
9      black or was it a mixed crew?
10  A. Cindy was the only one white.
11  Q. Cindy was white?
12  A. Yes, ma'am.
13  Q. Was Corey?
14  A. And Corey.  Corey.
15  Q. And then when you went to plant one and
16     two, Ralo Colvin, Patrick Lewis, Earl
17     Sow, Jack Richardson, Jeff, Richard,
18     Glato, the father and son whose names
19     you can't recall, Johnny Reed and
20     Crutchfield.  Was that a mixed crew
21     or --
22  A. Yeah, it was mixed.
23  Q. Black and white?

Page 104

1   A. Black and white.
2   Q. Then at Hyundai you told me about Ben,
3      Richard, Robert, Tim, Corey, Scott,
4      Glenn, Cindy, Johnny Reed, and Corey
5      Watson.  Is that a mixed crew as well?
6   A. Yeah.  Yes.
7   Q. Black and white?
8   A. Black and white, yes.
9   Q. Did you ever work with any Hispanics or
10     people of any other races at the GE or
11     the Hyundai plant?
12  A. They work there but not with us, no.
13  Q. Okay.  To your knowledge, was there
14     ever an opportunity for employees to be
15     promoted or to apply for another
16     position?  Say, for example, you say
17     that you started out as a helper?
18  A. Yes.
19  Q. Were you ever a painter?
20  A. Yes, I ended up a painter.
21  Q. So you were promoted?
22  A. Yeah.
23  Q. When were you promoted?

26  (Pages 101 to 104)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 105

1  A. That's when I went to Hyundai, when
2    they gave me an extra dollar.
3  Q. So at Hyundai you were a painter?
4  A. Uh-huh.
5  Q. How did that promotion come about?
6  A. Well, I'm a self-starter, you know.  I
7    mean, when I get to work, I go to work
8    as soon as I get there.  And they
9    noticed that about me and every time
10   they put me somewhere and they come
11   through checking, they always noticed I
12   was working.  I wasn't the type that
13   was always in the bathroom trying to
14   run from work.  When they sent me
15   over -- they asked me to go to GE
16   [sic] they said, We're going to give
17   you another dollar.
18 Q. You mean Hyundai; right?
19 A. I mean Hyundai, yeah.  He said, We're
20   going to give you another dollar and
21   your title is going to change from
22   helper to painter.
23 Q. Okay.

Page 106

1  A. So that's how that came about.  And I
2    rarely missed any days or was late, you
3    know, because I don't believe in that.
4  Q. Okay.  And so when you were a helper,
5    did you ever attempt to apply for a
6    painter position or any of the other
7    positions?
8  A. Really, there wasn't too many positions
9    to apply for other than a journeyman, a
10   painter -- painter journeyman,
11   supervisor.  I mean, so . . .
12 Q. Did you apply for a journeyman
13   position?
14 A. No.
15 Q. Why not?
16 A. Well, I kind of -- I knew that wasn't
17   my line of work.
18 Q. What do journeymen do?
19 A. They're top painters.  They spray,
20   blast.  They just do it all.  I
21   mean . . .
22 Q. Okay.  And so there was another
23   position that you mentioned.  You said

Page 107

1    helper, painter, journeyman.  Was there
2    another position that you said there
3    was?
4  A. You know, from there on you go on to
5    supervisor, so forth and so on.
6  Q. Okay.  When you worked at the GE plant,
7    plant five, Corey, did he supervise you
8    every day?  Corey Watson, was he your
9    supervisor every day?
10 A. Yes, ma'am.
11 Q. Plant five?
12 A. At plant five.
13 Q. Were there any other supervisors that
14   you had at plant five?
15 A. No.
16 Q. And when you were at plant one and two,
17   you told me Johnny Reed was your
18   immediate supervisor but Crutchfield
19   was the superintendent?
20 A. That's right.
21 Q. So was Johnny Reed there every day with
22   your crew?
23 A. Yes.

Page 108

1  Q. Did Crutchfield come and go or was he
2    there every day with your crew at plant
3    one and two?
4  A. No.  He comes and goes because he's
5    from GE to Hyundai, you know, back and
6    forth.
7  Q. The Hyundai job was already going on
8    when you were at plant one and two?
9  A. Uh-huh.
10 Q. And then at Hyundai, Johnny Reed was
11   your immediate supervisor or was it
12   Corey Watson?
13 A. Corey Watson.
14 Q. So it was Corey Watson as your
15   immediate supervisor and then Johnny
16   Reed was above Corey Watson?
17 A. No.  No.
18 Q. How did that work?
19 A. See, both of them was right up under --
20   they're like assistants up under Johnny
21   Crutchfield, you know.  So like I say,
22   when we got to one and two, we had
23   finished up five.  They didn't need two

27 (Pages 105 to 108)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1  assistants down there, so they sent
2  Corey to Hyundai. All right. After we
3  finished up there and they sent me to
4  Hyundai, it was like -- it might have
5  been two weeks -- Johnny Reed came
6  over, you know. And, I mean, it was,
7  like, they didn't change his job title.
8  He still was, you know, assistant
9  supervisor. So him and Corey, you
10 know, they ran neck and neck. We just
11 had a crew over here and a crew over
12 there. And it's like we was in the
13 engine room and they was in, I think,
14 another assembly room. They were
15 spraying on one side, we were spraying
16 on the other.
17 Q. Let me ask you about the type of work
18 that you did when you were at plant
19 five at GE. What kind of jobs did you
20 do at plant five?
21 A. When I was at plant five, I started
22 brush and roll. What I mean by that,
23 you know how you use an oil paint

Page 110

1  brush, roller.
2  Q. Okay. What else did you do at plant
3  five?
4  A. I was a mixer, paint mixer. That's
5  pretty much it. Really wasn't much for
6  you to do after you get that paint
7  mixed, just go to work painting, you
8  know, putting it on.
9  Q. And then you were at plants one and
10 two. What types of --
11 A. Same thing.
12 Q. So a brush and roll, mixing the paint?
13 A. Uh-huh.
14 Q. Basically getting the work and doing
15 that?
16 A. And then -- then he found out that I
17 operated a license for a manlift. I'd
18 drive the manlift every now and then,
19 you know. But it was pretty much the
20 same thing, brush and roll.
21 Q. Manlift is driving that truck that
22 lifts people up with --
23 A. With the basket, uh-huh.

Page 111

1  Q. And you had a certificate to drive
2  that?
3  A. Uh-huh.
4  Q. Certification to drive that?
5  A. Uh-huh.
6  Q. Did you have any other kinds of
7  certifications?
8  A. Scaffold building. That was it, those
9  two.
10 Q. Did you do that while you were working
11 for Mansfield?
12 A. No.
13 Q. How do you get a certification to be
14 a -- to drive a manlift?
15 A. I got that during my time with Pen
16 Gulf. When I worked with them, they
17 took us through a scaffold building,
18 heavy equipment driving training
19 session, and I pretty much aced it.
20 And I -- he handed me those two cards,
21 scaffold building and a JLG operator
22 license.
23 Q. It was called a JLG operator license?

Page 112

1  A. Uh-huh.
2  Q. And what's the license called for the
3  scaffold building?
4  A. Scaffold building and JLG.
5  Q. Okay. That's exactly what it's called,
6  scaffold building?
7  A. Uh-huh.
8  Q. Do you still have copies of those
9  cards?
10 A. Yes. I can get those back up here
11 today.
12 Q. Okay. Thank you. So how did they
13 learn that you had these licenses?
14 A. Well, I didn't feel I was getting paid
15 enough at nine dollars an hour and I
16 went back to Johnny and I told him, I
17 said, Well, maybe I didn't position
18 myself right when I got hired in. When
19 I showed him the cards, we was in the
20 process of going to Hyundai and he
21 said, Well, I'm going to move your
22 money up when I get over there, so I
23 said, No problem.

28 (Pages 109 to 112)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

---

**Page 113**

1  Q. I just want to follow-up with what you
2     just said about maybe I didn't present
3     myself right when I hired in.
4  A. When I got hired, yeah.
5         (Defendants' Exhibit 6 was
6         marked for identification.)
7  Q. I'm going to show you what I'm going to
8     mark as Defendants' Exhibit 6. And
9     that is your application. Is this --
10 A. See, I didn't put that on there.
11 Q. This is your handwriting; is that
12    correct?
13 A. Yes.
14 Q. And on page 2, is that your signature?
15 A. Yeah.
16 Q. Okay. And so you just said when you
17    looked at this just now that you didn't
18    list --
19 A. Yeah.
20 Q. -- your licenses --
21 A. Uh-huh.
22 Q. -- on your application?
23 A. Yeah.

---

**Page 114**

1  Q. Okay. And so -- I'm sorry. Go ahead.
2     What were you saying?
3  A. I was just agreeing with you. Yeah,
4     you're right.
5  Q. So when you later realized, or thought
6     to yourself, that you didn't present
7     yourself right, you went to Johnny
8     Crutchfield or Johnny Reed?
9  A. Crutchfield. He's the superintendent,
10    yeah.
11 Q. And you told him that you had this
12    license?
13 A. I showed them to him, you know, and he
14    said, Well, we need to get this
15    straight, you know. Like I said, we
16    was on our way to Hyundai then and he
17    said, When we get over there, we're
18    going to give you another dollar. I
19    said, Okay. That's fine.
20 Q. And did you start driving the manlift
21    immediately once you told him that you
22    had this license?
23 A. Yeah.

---

**Page 115**

1  Q. And there wasn't a need to build any
2     scaffolds on those jobs?
3  A. No. Because they had scaffold
4     buildings already out there.
5  Q. Did you want to do scaffolding?
6  A. Yes. Whatever the job require for, I
7     was -- I'm ready.
8  Q. Did you let Johnny Crutchfield know
9     your interest also in steel --
10 A. Yeah.
11 Q. -- scaffold building? Did he tell you
12    that he would give you an opportunity
13    to do that?
14 A. He said, you know, if needed to, he
15    would use me, you know. But we never
16    did come across stuff like that because
17    the majority of the places -- well,
18    Hyundai and GE -- they had scaffold
19    building teams and that's some other
20    fellow carpenters.
21 Q. Okay.
22 A. So we didn't too much run in to nothing
23    like that.

---

**Page 116**

1  Q. So that's what we were talking about at
2     plant five and plant one and two?
3  A. Uh-huh.
4  Q. But it was at plant one and two when
5     you told Johnny about these licenses,
6     then you started driving the manlift?
7  A. That's right.
8  Q. And then you were getting ready to move
9     to Hyundai?
10 A. Yes.
11 Q. When you got to Hyundai, what kind of
12    work assignment did you do?
13 A. I pretty much went back to painter's
14    helper over there, brush and roll. I
15    might have drove a little. It wasn't
16    much over there that I drove a lift
17    over there for. It was pretty much
18    brush and roll. I mostly did those
19    block walls, concrete block walls.
20 Q. Was there not a need at Hyundai to
21    drive a manlift as much?
22 A. Well, it was a need but, you know, they
23    had plenty operators over there so, I

---

29  (Pages 113 to 116)

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 117

1    mean, it wasn't like they was in demand
2    for it.
3    Q. And just to be clear, when you moved to
4    Hyundai, you were promoted to a
5    painter; is that correct?
6    A. That's right.
7    Q. Do you think you ever got any bad
8    assignments when you were at plant
9    five, plant one and two, or at Hyundai?
10           MR. PETTAWAY: Can you clarify
11   what you mean by bad so there won't be
12   any issue?
13   Q. Do you think that there were any jobs
14   that you didn't feel were favorable
15   jobs that you were assigned to do?
16           (No immediate response given.)
17   Q. I know we were just talking earlier
18   about you saying you're the kind of
19   person that's a self-starter and you'll
20   do what needs to be done.
21   A. Uh-huh.
22   Q. Did there ever come a time when you
23   were at plant five, plant one and two,

Page 118

1    or at Hyundai where you thought a
2    particular job assignment was given to
3    you that perhaps other people might not
4    like to do?
5    A. On one occasion, yes.
6    Q. And what was that?
7    A. We was -- well, they had started doing
8    the tank and Patrick --
9    Q. A tank?
10   A. Yeah. We were spraying a tank.
11   Q. Okay.
12   A. And Patrick Lewis, he's a journeyman.
13   Him and Ervin Tarver, they're
14   journeymen. And Patrick didn't feel
15   that that job was safe enough, which it
16   wasn't. He refused to go. And when he
17   came down, he said, They're probably
18   going to get you. I said, For what?
19   He said, To go up on that tank. And,
20   Bill, I'm telling you, it ain't safe.
21   I said, Well, man, I got a family. So
22   he did come and get me. We went up
23   there and there was, like -- it was a

Page 119

1    real dangerous situation we were in.
2    GE ended up -- they was looking at us
3    through binoculars at a building across
4    the railroad from us and Johnny Reed
5    came and told all of us to come down.
6    And he said GE was watching us over in
7    that building and said if they didn't
8    bring us down and make it more safe,
9    they were going to run the whole
10   company -- painting company up out of
11   there. So, no, I didn't want to do
12   that.
13   Q. When was this?
14   A. This is when we was at one and two,
15   plant one and two. I felt that should
16   have been given to a journeyman, you
17   know, not helpers, because that's a
18   journeyman's job. See, helpers,
19   really, we're supposed to stay low on
20   the ground. But he had us up in the
21   air more than he had journeymen.
22   Q. Were there some other journeymen that
23   were up on the job with you?

Page 120

1    A. Just Ervin Tarver.
2    Q. Ervin stayed up?
3    A. He was the only one.
4    Q. And Patrick Lewis was the only one that
5    went down.
6    A. Patrick wouldn't go. He knew it wasn't
7    safe.
8    Q. When you went up, did you think it was
9    unsafe?
10   A. I knew it was, yeah.
11   Q. Why is that?
12   A. Because GE had gave us a class on
13   carbon monoxide. Where we were
14   working, the tank was right next to a
15   place where they'd be releasing carbon
16   monoxide in the air. And they issued
17   us monitors to wear on the outside.
18   And the GE personnel told us, said, If
19   these monitors go off, you come down
20   then. Don't wait. You stop doing what
21   you're doing, come down right then. He
22   said, Go to the pole barn, you know,
23   sit over there, you know, about five

30  (Pages 117 to 120)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 121

1  minutes and then come back to your
2  area. If your monitor continues to go
3  off, go back. So we were doing like
4  they told us to do, you know, and
5  Johnny Reed, he came through there, a
6  couple of us, we were sitting over
7  there by the pole barn when we came
8  down. And he comes over there one time
9  and he came over there cussing and
10 carrying on. He was, like, Y'all need
11 to get y'all's ass back up there. We
12 need to get this job done. So
13 Nathaniel told him, Man, these monitors
14 going off. You heard what that GE man
15 said. He told us to come down. He
16 said, Well, we need to get this job
17 done. Don't let Johnny come down --
18 he's talking about Johnny
19 Crutchfield -- let Johnny come down and
20 see you. He said, Man, that's carbon
21 monoxide over there. He said, The
22 monitors keep going off. Turn your
23 head.

Page 122

1  Q. This was Johnny Reed?
2  A. That's what Johnny Reed said. I heard
3     what he said. He said, Turn your head.
4     Okay. Wasn't nobody up there then but
5     me, Yogi, Ervin, and Nate. We're the
6     only three on the tank.
7  Q. This is the same -- we're talking about
8     the same event?
9  A. Same job.
10 Q. So Nate was up there?
11 A. Yeah, Nate -- Lamar, he was up there,
12    too. He seen the same thing.
13 Q. Is he a journeyman?
14 A. No. He was a painter helper, too.
15    They went to plant one and two and got
16    Blato and his son. When they came
17    over, they gave Blato a monitor. Any
18    time he came down and we was sitting
19    over there wasn't nothing said. Blato
20    a white guy. Wasn't nothing said. But
21    when we was up there by ourself, they
22    raised all kind of cane. And I wasn't
23    going back up there in that carbon

Page 123

1  monoxide. I know it will kill you.
2  When them monitors go off, I'd go back
3  over there. If the monitors don't go
4  off, we did like they said, we go right
5  back over and go back to work. I mean,
6  we wasn't cheating them out of nothing.
7  But when the monitors went off, we
8  would come down.
9  Q. And so you said they went and got Blato
10    and his son who are white?
11 A. Well, I guess they wasn't trusting us.
12    I guess he thought we were lying or
13    whatever. So they gave him a monitor.
14    As soon as the monitor would go off, he
15    would go in there, we would come down.
16    I mean, Johnny Reed comes there more
17    than two or three times when he was
18    over there, you know, sitting up under
19    the pole barn with us he didn't say
20    nothing.
21 Q. But when they went and got Blato and
22    his son, do you know for sure whether
23    they went and got him to work on -- him

Page 124

1  and his son to work on the job because
2  they needed to finish to the job, as
3  you said Johnny Reed said?
4  A. Y'all need to finish the job.
5  Q. Finish the job. So you don't know that
6     it is or it is not because they didn't
7     trust what y'all were saying?
8  A. That's the way it looked because, like
9     I said, all the while we three blacks
10    were over there and we were coming down
11    going by the little monitor it was a
12    problem. Well, once Blato and his son
13    came over there, the monitor went off
14    more frequently than they did when we
15    were up there.
16 Q. Okay. But my question to you was, you
17    don't know when they went and got Blato
18    and his son to do the job that Patrick
19    Lewis, who was a journeyman, refused to
20    do, that they brought them over there
21    because they didn't trust what you were
22    saying?
23 A. No, I don't know that.

31 (Pages 121 to 124)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 125

1  Q. Okay. And Blato and his son, are they
2     journeymen?
3  A. No.
4  Q. What were their roles?
5  A. They was helpers, too.
6  Q. They were helpers, too. Okay.
7  A. Okay. Well, when they -- when Patrick
8     said he wasn't going, they replaced me
9     with Patrick. So why would they go get
10    these two white guys? It's okay if we
11    come down with them, but we're over
12    there by ourself and we come down it's
13    a problem.
14 Q. I don't know. I don't know. And I
15    wasn't there.
16 A. I couldn't figure that out myself, you
17    know. That made me feel kind of funny
18    because I'm not a prejudiced person. I
19    wasn't brought up that way. A lot of
20    things went on out there, ma'am, you
21    wouldn't believe.
22 Q. Okay. So this is -- were there any
23    other occasions where you say you felt

Page 126

1     like you were asked to do a job that
2     you thought was unfavorable or, as you
3     said in this occasion, unsafe?
4  A. No.
5  Q. Okay. Have you ever heard anyone use a
6     racial slur --
7  A. Yes.
8  Q. -- when you were working at -- working
9     for Mansfield?
10 A. Yes.
11 Q. Tell me what you've heard.
12 A. The word nigger. It was used
13    frequently.
14 Q. Who used the word nigger?
15 A. Robert. I can't think of his last
16    name. But I'm quite sure Ervin -- they
17    know the last name.
18 Q. Robert is white?
19 A. He was a journeyman white guy.
20 Q. Okay. Who else?
21 A. I heard Corey Watson say -- well, he
22    told me to tell Nate to bring his black
23    ass on. We heard the word boy a lot.

Page 127

1     And you would walk up -- you could walk
2     up in the bathroom and you hear the
3     word nigger a lot. It came from some
4     of our employees and some of the
5     other -- you know, they had a lot of
6     different subcontractors out there.
7     There was a lot of that.
8  Q. So you told me about Robert, a white
9     journeyman, who's used the word nigger?
10 A. Yes.
11 Q. Corey Watson told you once to tell Nate
12    to bring his black ass on?
13 A. Yes.
14 Q. Who else from Mansfield have you heard
15    using racially -- racial slurs?
16 A. That's it. Those the only two that I
17    really heard say something myself.
18 Q. Okay. When you heard Robert, this
19    person whose last name you can't
20    remember, say nigger, who was he
21    talking to?
22 A. He was talking -- he was talking about
23    Patrick Lewis to another white guy.

Page 128

1  Q. Do you remember when this was?
2     (No immediate response given.)
3  Q. Or if you can't remember the date, do
4     you remember what job it was, the
5     plant?
6  A. We was Hyundai because I worked at --
7     that's when me and Robert, we worked
8     together when I got over to Hyundai.
9     But everybody had complaints against
10    Robert.
11 Q. So when you were at plant five and
12    plant one and two at GE, did you ever
13    hear anybody say -- did you ever hear
14    anybody use racial slurs?
15 A. That's where I heard Corey, at plant
16    five, when I was at GE. We was coming
17    off break and Nate had to use the
18    bathroom. He was the last one coming.
19    He thought he was just kidding around.
20    And I was walking behind Corey and
21    Corey turned around and said, Where the
22    hell is Nate? I said, He told me to
23    tell you he's coming on. He had to use

32  (Pages 125 to 128)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

Page 129

1  the bathroom. He said, Well, go tell
2  him to bring his black ass on right
3  now.
4  Q. And who did you say thought he was
5  kidding arond?
6  A. Corey. Corey. He thought Nate was
7  kidding around, but he had to use the
8  bathroom. That's where I saw him going
9  and he told me to tell Corey he was
10  coming.
11  Q. This is at plant five that you say --
12  A. Plant five, yes.
13  Q. -- Corey Watson said this to you?
14  A. Yes.
15  Q. Did you say anything back when he said
16  that?
17  A. No. I just told Ervin Tarver about it.
18  And then I told Nate. I said, I'm
19  going to tell you just like Corey told
20  me to tell you. And I told him. I
21  said, he told me to tell you to bring
22  your black ass on right now.
23  Q. Okay. And the conversation you said

Page 130

1  you overheard Robert using the N-word,
2  saying -- or Patrick --
3  A. Patrick Lewis, yes.
4  Q. -- as a nigger, who was he talking to?
5  A. I don't know who that was he was
6  talking to. I don't know who that was
7  he was talking to.
8  Q. Was it a Manfield employee?
9  A. It was a Mansfield employee.
10  Q. What exactly did he say?
11  A. He said, That nigger think he knows
12  anything. He said, He wants to be one
13  of them smart ass niggers.
14  Q. Where were you all?
15  A. We were in the bathroom. He said, I
16  see why Johnny got rid of him.
17  Q. When was this?
18  A. Just -- let's see. I started at
19  Hyundai in October. I don't recall.
20  It was during that time from October to
21  December, somewhere in between. I
22  can't really recall the exact time or
23  date.

Page 131

1  Q. But towards the end of your time at
2  Mansfield?
3  A. Yes.
4  Q. Okay. You said in the bathroom at
5  Hyundai?
6  A. Uh-huh. (Witness nods head.)
7  Q. And you said between -- did you say
8  October and December or November and
9  December?
10  A. October and -- because I went to
11  Hyundai in October, I believe it was,
12  and I was terminated in December.
13  Q. Any other times when you've heard
14  anyone use or make racial slurs while
15  you were an employee of Mansfield?
16  A. Like I say, you heard it a lot,
17  especially when we was at GE.
18  Q. You said especially when you were at
19  GE?
20  A. Yes, ma'am.
21  Q. But you told me about this one time
22  that Corey said to tell Nate to bring
23  his black ass on.

Page 132

1  A. (Witness nods head.) Uh-huh.
2  Q. What else did you hear at GE that you
3  haven't told me about?
4  A. That's where I get those -- that thing,
5  the drawings on the paper, that's where
6  I get all that stuff from. Corey
7  himself, he -- Robert told me some
8  things about him. I don't know if
9  they're true or not. But he said Corey
10  was prejudiced.
11  Q. This Robert that you were telling me
12  about, the white guy?
13  A. That's the one got hired in. We -- I
14  was telling you about me and him got
15  hired the same day.
16  Q. So he told you that Corey was
17  prejudiced?
18  A. Yeah.
19  Q. The person that you just said called
20  people nigger before?
21  A. Okay. These two different people now.
22  Q. So you're talking about two different
23  Roberts?

33 (Pages 129 to 132)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 133

1  A. Yeah. Two different Roberts, yeah.
2  Q. Okay.
3  A. Two different people.
4  Q. So the Robert you got hired in with, is
5  he white or black?
6  A. He's white.
7  Q. But this is not the same Robert who you
8  say at Hyundai was talking about
9  Patrick Lewis and --
10 A. No.
11 Q. -- called him a nigger?
12 A. No.
13 Q. Two different Roberts?
14 A. Two different Roberts.
15 Q. Okay. So Robert was no longer working
16 with you?
17 A. No. Not the other Robert, no.
18 Q. Not the Robert that said somebody was
19 racist?
20 A. Yeah, not him.
21 Q. Okay. I just want to know about what
22 you've heard.
23 A. Uh-huh. (Witness nods head.)

---

Page 134

1  Q. So you've told me about this white
2  Robert calling Patrick Lewis a nigger.
3  You've told me about Corey telling you
4  to tell Nate to bring his black ass on.
5  What else did you hear when you were
6  working at Mansfield?
7  A. You -- Man, you go in the bathroom,
8  them niggers sure smell when they
9  sweat, you know.
10 Q. Who said that?
11 A. Big guy. I know Jeff, he -- I'm going
12 to take you back, now. Jeff, he was a
13 supervisor before Corey came. Jeff was
14 the one drove the white truck. I heard
15 him use the word nigger talking to
16 Yogi -- Ervin, Ervin Tarver.
17 Q. What did he say to Ervin Tarver?
18 A. They had got into it about something
19 that Ervin said, and he was, like,
20 Nigger, you don't know what goes on in
21 my household. He said, Don't you say
22 another damn thing about my wife.
23 Ervin was saying it in a joking matter,

---

Page 135

1  but I could tell by the tone of his
2  voice he was serious, you know, because
3  he was getting mad.
4  Q. Who was getting mad?
5  A. Jeff. Ervin will tell you the guy's
6  last name. He knows him.
7  Q. Okay. But are you saying that Jeff was
8  playing or are you saying that Ervin
9  was --
10 A. Ervin was joking. He was saying it
11 joking. But Jeff, you could tell, the
12 tone of his voice -- he's a white
13 guy -- you can tell he was getting mad.
14 Q. Now, this is something that you heard?
15 A. Yes, ma'am.
16 Q. What else have you heard? What plant
17 was this at?
18 A. That was at plant five.
19 Q. So this was at the beginning of your
20 time at Mansfield?
21 A. Uh-huh. Because, see, Corey, he wasn't
22 there then.
23 Q. Okay. What else?

---

Page 136

1  A. That's pretty much it, pretty much what
2  I heard, you know, other than talking
3  in the bathroom. You can't see one of
4  them stalls that people that I know
5  that I heard. Like I said, Corey and
6  Robert. I can recall them using racial
7  slurs.
8  Q. Okay. And when you were an employee at
9  Mansfield, did you ever hear the black
10 employees refer to each other as
11 nigger?
12 A. Yeah, we do that. But I didn't hear
13 that much.
14 Q. You said "we do that." Have you done
15 that?
16 A. Yeah, coming up. But I done grew out
17 of that now.
18 Q. No. I'm just talking about when you
19 were employed at Mansfield --
20 A. No.
21 Q. -- right now. So when you were at
22 Mansfield, you never said -- used the
23 word nigger as in, nigger, please?

---

34 (Pages 133 to 136)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 137

1 A. No. I don't talk like that.
2 Q. Did you ever say -- did you ever call
3    any of the black employees boy?
4 A. Yeah, I've said that.
5 Q. You called the black employees at
6    Mansfield boy before?
7 A. I have, you know, joking. But I don't
8    too much use that nigger word.
9 Q. Do you know of any of the other black
10    employees at Mansfield using the word
11    nigger, nigger please, nigger, what you
12    talking about?
13 A. Yeah, you hear that.
14 Q. Who do you remember saying that?
15 A. Ervin, Nate.
16 Q. Who else?
17 A. That's about it.
18 Q. Did you ever hear Patrick Lewis say
19    that?
20 A. Patrick would say negro. I know he
21    would say that.
22 Q. Like how would --
23 A. Well, I probably heard him say that,

Page 138

1    too, you know. I just can't recall.
2    I'm quite sure he have. I ain't going
3    to say he haven't.
4 Q. Why do you say that?
5 A. Because that's common amongst
6    African-Americans.
7 Q. Why is it common amongst
8    African-Americans?
9 A. It always has been.
10 Q. So if an African-American said nigger,
11    are you offended by it?
12 A. No.
13 Q. Okay.
14 A. See, like I say, people I hang with, we
15    don't -- we don't talk like that. We
16    grew out of that.
17 Q. Okay. Has Jack Richardson ever said,
18    Nigger, please, or nigger or boy or
19    anything else that could be considered
20    racially -- a racial slur?
21 A. I haven't heard him say anything like
22    that, no.
23 Q. And you said Nathaniel Lamar, you have

Page 139

1    heard him say that?
2 A. Oh, yeah.
3 Q. Have you ever heard him refer to any of
4    the other black employees as boy or any
5    of the --
6 A. Yeah. Yes.
7 Q. Any other racially discriminatory --
8    any other words you can think of that
9    he said?
10 A. Jokingly, yeah. You know, they play
11    around with stuff like that. Yes.
12 Q. And what about Ralo, have you ever
13    heard Ralo Colvin ever say nigger?
14 A. Oh, yeah. Ralo, he's young. Yes.
15    Yes.
16 Q. What about -- have you ever heard any
17    of the white employees ever use -- I'm
18    sorry. Have you ever heard any of the
19    black employees refer to the white
20    employees at Mansfield as crackers or
21    honkeys?
22 A. Yeah. Yeah.
23 Q. Who do you remember saying cracker or

Page 140

1    honkey?
2 A. I can't recall, but I heard that. Many
3    occasions I've heard it, sitting there
4    at lunch, you know, stuff like that.
5 Q. Did they say it when you were at plant
6    one and two at GE? Do you recall?
7 A. Well, yeah. I'm quite sure, yeah.
8    Yes.
9 Q. And what about at plant five at GE? Do
10    you --
11 A. Yes.
12 Q. -- recall?
13 A. Yes.
14 Q. Do you recall it ever being -- those
15    words ever being used at -- do you
16    recall any black employees ever
17    using the same words, cracker, honkey,
18    or any slurs that could be directed at
19    while employees at Hyundai?
20 A. No.
21 Q. You don't remember anybody saying that
22    at Hyundai?
23 A. Because me and Ben was the only two

35 (Pages 137 to 140)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 141

1  blacks. Ben was an old man. We're the
2  only two blacks on that crew.
3  Q. Okay. So at Hyundai it was just -- you
4  and Ben were the only African-American
5  employees --
6  A. Yes.
7  Q. -- there?
8  A. Yes.
9  Q. And you're saying Ben would not say
10  that?
11  A. No, no.
12  Q. Do you ever remember anybody -- scratch
13  that. I think I asked you this. If I
14  asked you this already, I'm sorry. But
15  were you offended when Ervin, Nate,
16  Patrick, or Ralo referred to each other
17  as nigger or any of the other employees
18  as --
19  A. Yeah.
20  Q. -- nigger?
21  A. Yeah.
22  Q. Did you ever tell them it --
23  A. Yes.

Page 142

1  Q. -- bothered you?
2  A. Yeah. Man, use another word. Don't
3  use that word.
4  Q. And what did they say?
5  A. Oh, man, shut up. You know how they
6  talk, how we talk. I'd tell them, Man,
7  use something else. Don't use that
8  word. I'm saying the white people done
9  wore us out with that one.
10  Q. But you say you yourself used the word
11  boy --
12  A. Yeah.
13  Q. -- when referring to other African-
14  American employees?
15  A. (Witness nods head.)
16  Q. Did you use the word boy when you were
17  referring to white employees?
18  A. Yeah. I talked to them that way, too.
19  But, you know, they know I didn't mean
20  nothing by it. It didn't mean anything
21  black. We'd be, like, Boy, come over
22  here. Let's go, you know.
23  Q. Well, how would they know that you

Page 143

1  didn't mean anything by it?
2  A. I mean, they wasn't offended or nothing
3  or never did have you, you know, no type of
4  response behind it, so I'm quite sure I
5  it didn't bother them. Otherwise they
6  would have had something to say about
7  it. But I never did get no kickback
8  off of it. Which it wasn't used, you
9  know, frequently, just joking or
10  messing around. But I try to stay away
11  from that.
12  Q. So you say you told -- you would tell
13  Ervin, Nate, Patrick, and Ralo when
14  they refer to themselves and other
15  employees as --
16  A. Yeah.
17  Q. -- nigger, that you thought it was
18  offensive; is that correct?
19  A. Yeah.
20  Q. Did you tell any of the white employees
21  that you say -- specifically I think
22  you only said that you heard -- or can
23  identify Robert as saying or referring

Page 144

1  to Patrick as a nigger. Did you tell
2  Robert that you thought that was
3  offensive?
4  A. No. I just heard him and I left that
5  alone.
6  Q. Were you a part of that conversation?
7  A. No. No.
8  Q. So you overheard him talking to
9  somebody else?
10  A. Yes.
11  Q. So when Corey referred to -- when Corey
12  Watson referred to Nate --
13  A. Nate.
14  Q. When Corey told you to tell Nate to
15  bring his black ass on, did you tell
16  him that you didn't like that?
17  A. Yes. I told Corey that.
18  Q. What did he say?
19  A. I said, That's racist, man. He said, I
20  didn't say the N-word. I said, You
21  might as well said it. You said black.
22  I said how you -- I said -- I said, How
23  do you think that -- how do you think

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 145

1  that man's going to think about you
2  saying that to him like that, man?
3  Because he -- I was painting one day at
4  plant five and they had been talking
5  about the N-word.
6  Q. Who is "they"?
7  A. Corey and somebody else. But, anyway,
8  Corey come around --
9  Q. Let me make sure. So this "somebody
10  else," was that somebody that's white
11  or somebody that was black?
12  A. Let me think. Let me think.
13  Q. Okay.
14  A. I'm trying to see how this N-word come
15  up. I think that was --
16      MR. PETTAWAY: She asked you
17  about somebody else.
18  A. There was a bunch of us standing
19  around -- Corey, Robert, Nate, bunch of
20  us -- and somehow or another that came
21  up.
22  Q. When you say "that came up," what do
23  you mean, that came up?

Page 146

1  A. N-word, you know. They said they cut
2  it down from N-I-G-G-E-R to the N-word.
3  I think that was during the time
4  somebody was going to court on TV.
5  Anyway --
6  Q. Okay. I was getting confused. I
7  thought you were telling me the short
8  word, N-word, because you didn't want
9  to say. But you're saying that
10  Corey -- who else was standing around
11  did you say?
12  A. Yogi, Nate -- shoot, bunch of us
13  standing around. Robert. Bunch of
14  them. Ben.
15  Q. And was this the Robert that you
16  overheard using the N-word?
17  A. This is the Robert that was gone. No,
18  this isn't --
19  Q. The other Robert. Okay. Ben and who
20  else?
21  A. And Ben and -- Blato and them wasn't
22  there. But it was just standing
23  around, you know, at the water cooler

Page 147

1  talking and Corey walked over to me and
2  I was painting. I was painting boat
3  panels. He said, Bill -- that's what
4  he called me. He said, Bill, you're a
5  pretty good-sized fellow. He said, I
6  bet if anybody was to call you the N --
7  I said, Don't. I said, I don't play
8  that. I don't talk that. I said,
9  Don't even think it. He said, You'll
10  hurt somebody. I said, I will. He
11  said, Especially coming from a white.
12  I said, Yeah. I said, I tell them guys
13  don't use that word around me. We done
14  been through enough. You know what I'm
15  saying? And he said, Well, I ain't
16  gonna never say -- mention nothing like
17  that around you no more. I said,
18  Please. Thank you. Don't do that.
19  Q. So what I was trying to figure out,
20  though, you were saying that there were
21  a group of people standing around and
22  there was a discussion that came up
23  about how nigger has now been changed

Page 148

1  or people now say --
2  A. The N-word.
3  Q. -- the N-word?
4  A. Uh-huh.
5  Q. And that's what I was wanting us to
6  talk about was that incident where you
7  say that it was Corey Watson, Ervin
8  Tarver, Nathaniel Lamar --
9  A. Robert.
10  Q. -- Robert.
11  A. Yeah.
12  Q. Was it Patrick?
13  A. I don't think Pat was over there then.
14  Q. Ben, you said?
15  A. Ben was there.
16  Q. Okay. Who brought --
17  A. Cindy.
18  Q. Okay. Who started the conversation?
19  A. I really don't know. I can't recall.
20  Because, see, they was off then. As
21  they were walking off, I could hear
22  what they was talking about.
23  Q. So you weren't a party to the

37 (Pages 145 to 148)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 149

1    conversation, you --
2    A. No.
3    Q. -- heard it?
4    A. No. I was -- I was --
5    Q. You were up painting?
6    A. Uh-huh.
7    Q. Was it joking or --
8    A. Yeah, it was joking. You know, it was
9       like a joking thing, you know. And
10      when he came over to me and -- I heard
11      I think it was Nate said, Well, I hope
12      don't nobody call me that down here, no
13      white man call me that down here, you
14      know. And that's when Corey went to
15      walking over towards me and him and
16      talking and he asked me that question.
17      If somebody was to call you the N -- I
18      told him -- I stopped him. I said,
19      Don't. Don't do that.
20   Q. Do you remember working with someone
21      named James Baskins?
22   A. James. Can't recall.
23   Q. Okay. I'm going to mark as Defendants'

Page 150

1       Exhibit 7 your discovery responses.
2       (Defendants' Exhibit 7 was
3       marked for identification.)
4    Q. Have you ever seen that before,
5       Mr. Ragland?
6    A. Yes.
7    Q. I think on page 5 -- is that your
8       signature on page 5? Page 5, next to
9       last.
10   A. I only have four pages.
11   Q. Let me make sure I gave you the right
12      thing. Oh, I gave you request for
13      production. We're going to leave that
14      one 7. Let me find your answers.
15      MR. PETTAWAY: That's going to
16   be 7?
17      MS. WILSON: Yeah, we'll leave
18   that one 7. Let's make that Number 8.
19      (Defendants' Exhibit 8 was
20      marked for identification.)
21      MR. PETTAWAY: I wrote on it.
22      MS. WILSON: That's fine. That
23   will be Defendants' Exhibit 8, which

Page 151

1       are interrogatories.
2    A. Page 5?
3    Q. Yes, sir. Is there a 5 in that one?
4       Okay. Is that your signature at the
5       bottom of the page?
6    A. Yes, ma'am.
7    Q. Okay. I just wanted to ask you a
8       couple of questions about some of your
9       responses. You might need to keep it
10      because I'm going to ask you some
11      questions.
12   A. Okay.
13   Q. When we asked you on page 2 to state
14      whether you had sought any medical,
15      psychological, psychiatric, or other
16      treatment for the effects of the
17      alleged harassment and/or
18      discrimination that you say you
19      suffered in this case, your answer is:
20      None other than over-the-counter
21      medicine. I wasn't clear on that. Do
22      you mean that you've taken over-the-
23      counter medicine to treat some kind of

Page 152

1       medical or psychological or psychiatric
2       problem that you've had as a result of
3       this alleged harassment you say you
4       suffered at Mansfield?
5    A. Well, I was having some bad headaches
6       there one time. Me and my old lady
7       stayed into it. I always threw Corey
8       up in her face. And she was telling
9       me, That's your job. And I had went
10      and got regular aspirin and they didn't
11      do, so I thought I had a pressure
12      problem or something. So I went to the
13      doctor, you know, and he prescribed
14      me -- I can't think of the name. I got
15      a bottle at home.
16   Q. Well, did he tell you what your
17      condition was?
18   A. He told me it was due to stress. So I
19      told him, I don't too much --
20   Q. How did he come to that determination?
21   A. Well, he asked me, he said, You got
22      anything on your mind, anything
23      worrying you? I told him, Nothing but

38 (Pages 149 to 152)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 153

1  this job, man, I'm working on. I said,
2  There's a lot going on out here. He
3  said, Well, that's probably it. He
4  didn't know for sure. But, I mean,
5  that's just what he was saying.
6      But an incident did happen to me
7  out there and I didn't -- I didn't tell
8  my lawyers about it. I got a third-
9  degree burn out there that left a light
10  mark.
11  Q. Where were you burned?
12  A. On my butt cheek.
13  Q. How did this happen?
14  A. Caustic acid burn. And --
15  Q. Did you report it to Mansfield?
16  A. Yeah. They -- GE should have it
17  documented down because they got an
18  onsite little medical building out
19  there, like a little hospital.
20  Q. Did you go to the doctor?
21  A. Just to their doctor.
22  Q. Who is "they," Mansfield or GE's
23  doctor?

Page 154

1  A. GE.
2  Q. You went --
3  A. Yeah. I didn't understand. This is
4  one thing I mean, it was -- it was a
5  pretty bad burn. And the man told me,
6  that worked on me, he told me, This
7  dressing going to have to be changed
8  every four to six hours. He said,
9  You'll know when it needs changing;
10  it's going to start running. And I
11  didn't understand why they didn't let
12  me off work for a couple of days for
13  that, you know, until it got to where
14  it got a scab or whatever on it, you
15  know, to keep it from running.
16  Q. Who at Mansfield did you report it to?
17  A. Johnny Reed done know. Corey. All of
18  them knew about it. Because once you
19  get one of those safety showers at
20  GE -- they got somebody and one of them
21  always monitors them showers. And it
22  was burning so bad I went to the
23  shower. And once you hit one of them

Page 155

1  showers, everybody zero in. You know,
2  GE personnel walk around, they zero in
3  on them showers. Man, they were coming
4  from everywhere because they want to
5  know what's happening, you know. And I
6  didn't understand why he didn't let me
7  off a day or two because I'm out there,
8  you know, people cracking at me,
9  laughing at me. That made me feel kind
10  of bad, you know, because it would go
11  to running and I wouldn't know it.
12  Q. Was it on both of your checks or one?
13  A. No, it's just one check. And --
14  Q. Did the doctor that you went to see at
15  GE, did he tell you that you need to be
16  relieved from work?
17  A. Yeah.
18  Q. Did he give you a doctor's excuse?
19  A. When -- when I -- when they sent me
20  home that day, I thought they were
21  going to tell me, you know, Well, you
22  stay off a couple days, whatever. And
23  then -- so I came back to work the next

Page 156

1  day. So I told Johnny, I said, he told
2  me I had to get this dressing changed
3  every four to six hours. He said,
4  Well, just go over there and let them
5  do it. And the first trip I went over
6  there to them, he said, Why didn't he
7  let you off?
8  Q. Okay. Let me stop you right there.
9  You said that they sent you home for
10  the day --
11  A. No.
12  Q. -- when it first happened?
13  A. No. He didn't send me home for the
14  day. I came back after they put them
15  bandages and stuff on me and he sent me
16  back to work. I couldn't even wear
17  clothes up under that paint suit. I
18  was under there naked.
19  Q. Who sent you back to work?
20  A. Johnny Crutchfield.
21  Q. Did the doctor that you talked to, that
22  treated you, did he give you an excuse
23  from work?

39 (Pages 153 to 156)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 157

1  A. No.
2  Q. He didn't give you an excuse?
3  A. No.
4  Q. So you went back to work --
5  A. Yeah.
6  Q. -- that same day?
7  A. That same day.
8  Q. Okay.
9  A. And when I went home, you know, my ole
10    lady, she did the dressing and
11    everything. I got back to work the
12    next day and I was telling Johnny about
13    it. He said, Oh, it ain't nothing but
14    a scratch. So I told him, I said,
15    Well, the man said the dressing needs
16    to be changed every four to six hours.
17    He said, Well, you go over there and
18    let them change it. So I did. And as
19    soon as I got over there, the guy was,
20    like, Why are you here? He said, He
21    should have sent you home. You don't
22    need to be out here like this.
23  Q. But you said he didn't -- the doctor

Page 158

1    didn't give you an excuse?
2  A. The doctor didn't give me no excuse,
3    no. No.
4  Q. So are you saying that incident caused
5    you some type of psychological or
6    emotional --
7  A. Yeah.
8  Q. -- suffering?
9  A. You know, that -- that messed with my
10    mind. I couldn't understand that
11    why -- I mean, I'm human just like him.
12    And he saw the type of burn it was. I
13    mean, you -- I mean, you don't take
14    into consideration that I -- health
15    comes first. That job is going to be
16    there.
17  Q. Did you ask to take some time off?
18  A. No, I didn't ask.
19  Q. You didn't ask?
20  A. Uh-uh. (Witness shakes head.) But,
21    see, I got a life mark behind that. I
22    done talk to my minister and stuff
23    about these people when I was working

Page 159

1    with these folks.
2  Q. What minister is this?
3  A. He's dead now. But I talked to my
4    sister, too. She's a minister, too.
5    But L.C. Pettaway, he's dead. He's the
6    one I really mostly talked to.
7  Q. L.C. Pettaway?
8  A. Uh-huh.
9  Q. Is he related to Collins Pettaway?
10    THE WITNESS: Do you know him?
11    MR. PETTAWAY: Uh-huh.
12  Q. And you said you talked to your sister
13    about this?
14  A. Uh-huh. She's a minister.
15  Q. Did you talk to her --
16  A. It bothered me, you know. I just don't
17    understand. All these years, I don't
18    understand why people still like that.
19    I got a friend -- I just want to say
20    this before we go on. Me and Darryl
21    Averet, he -- he's a white guy and we
22    was real close when I worked at
23    Pilliod, this guy I was telling you

Page 160

1    about they brought back and put over
2    me. We was real close. I used to go
3    up to his house, sit at his table, and
4    he'd come to my house and sit at my
5    table and eat. But just to show you
6    there's some white people still
7    bringing their kids up that way, I was
8    up there one day -- and these are years
9    we've been doing this, now. And one
10    day I was up to his house and this girl
11    next door, she was running behind his
12    son. He had -- remember when Pizza Hut
13    had those black balls -- I think you
14    get them for 3.99 -- basketball? He
15    comes running in the house and he said,
16    Daddy, daddy, tell her, ain't this
17    nigger ball? That show you right
18    there, this stuff, man, it's alive.
19    It's heavy around there. They need to
20    quit that. I got up and left. I ain't
21    been back to the house since.
22  Q. Did you -- what was your sister's name?
23  A. Evelyn Scott.

40 (Pages 157 to 160)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 161

1   Q. Does she live here in Selma?
2   A. Yeah.  But she's out of town right now.
3      She's one of those nurses that travel
4      around.
5   Q. She's a traveling nurse?
6   A. Yeah.  She's out in California right
7      now.
8   Q. When did you -- would you have talked
9      to her about things that have gone on
10     at Mansfield?
11  A. When I was working there.
12  Q. Sir?
13  A. I talked to both of them when I was
14     working at Mansfield.
15  Q. You would talk to Evelyn?
16  A. Yeah.  Evelyn and Reverend Pettaway.
17  Q. Is Reverend Pettaway a she?
18  A. He.
19  Q. Okay.  And you said Reverend Pettaway
20     is deceased?
21  A. Uh-huh.  (Witness nods head.)
22  Q. And you said you've talked to Evelyn?
23  A. Uh-huh.

Page 162

1   Q. Back when you were working there?
2   A. Yeah.  I was working -- on -- talked to
3      both of them when I was working at --
4      with Mansfield.
5   Q. I mean talk to them about --
6   A. Yeah.
7   Q. -- the things you said was going on
8      with the job?
9   A. Oh, yeah.  Because I let her saw that
10     burn.  You know, she lifted the
11     bandage.  She said, Ain't none of them
12     people got no sense, folks at GE or
13     Mansfield, because looks like the
14     doctor should have gave you an excuse
15     or either your boss man should have
16     pulled you off of work a couple days,
17     at least until this thing stops
18     draining.  She said, Something's wrong
19     up there, something wrong with them
20     people.  I told her, You know I got to
21     work.  Got a family.  I got to work.
22  Q. Let me go back to the question that I
23     was originally asking you about --

Page 163

1   A. Okay.
2   Q. -- the page 2 where you say -- you were
3      talking about the over-the-counter
4      medicine.  And I was trying to figure
5      out what you said the doctor said was
6      the problem or the reason why he said
7      he prescribed you medication, what he
8      said your diagnosis was.  Was his
9      diagnosis stress?
10  A. Yes.
11  Q. But you don't remember what he
12     prescribed you?
13  A. No.  No.
14  Q. Do you remember the doctor's name?
15  A. Chudy Okoye.
16  Q. What was it?
17  A. Chudy Okoye.
18  Q. Chudy?
19  A. Uh-huh.
20  Q. Do you know how to spell his last name?
21  A. O-K-O-Y-E.
22     MR. PETTAWAY:  Should be in his
23     responses.

Page 164

1      MS. WILSON:  I don't think that
2   it's in there.
3      MR. PETTAWAY:  Yeah, it's in
4   here.
5      MS. WILSON:  Okay.  I see it.
6   It's at the back.
7   Q. So it's Dr. C-H-U-D-Y?
8   A. Uh-huh.
9   Q. And last name O-K-O-Y-E?
10  A. Uh-huh.  (Witness nods head.)
11  Q. And on page 5, where Dr. Okoye's name
12     is listed in response to Interrogatory
13     No. 14, we asked you to identify each
14     hospital, physician, and/or other
15     treating physician who would have seen
16     you, treated you, applied medication to
17     you in the last ten years, and asked
18     you to provide a description of the
19     injury and/or affliction, the dates of
20     treatments and/or visits, and the type
21     of treatment rendered and/or medication
22     prescribed.
23  A. Uh-huh.

41 (Pages 161 to 164)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 165

1  Q. And you said that Dr. Okoye has treated
2     you for lower back pain, gout, high
3     blood pressure, and on 12/11/2006 --
4  A. Had a heart attack.
5  Q. -- a heart attack?
6  A. Yes.
7  Q. But you didn't say that he treated you
8     for stress and provided you with some
9     kind of medication for stress?
10 A. No.  No, I didn't.
11 Q. So is that in addition to?
12 A. Yes.
13 Q. You're adding to your answer?
14 A. Yes.
15 Q. But you don't recall the medication
16    that Dr. Okoye has prescribed for
17    stress?
18 A. No.
19 Q. When were you diagnosed with high blood
20    pressure?
21 A. That was in -- I started taking -- I
22    believe that was in '03.
23 Q. Do you remember when in 2003?

Page 166

1  A. Could have been summer.  I believe it
2     was.
3  Q. You say the Summer of 2003?
4  A. I know it was after my sister passed
5     when I started taking that blood
6     pressure medicine.  I thought it came
7     from her passing, you know.  I don't
8     know.  But I know that's when I started
9     taking blood pressure medicine, after
10    her passing.  That was in '03.
11 Q. And so when are you saying it is that
12    he would have given you medicine for
13    stress?  Your response doesn't say --
14    does not say.
15 A. It was during the time I worked with
16    Mansfield because I know me and my ole
17    lady used to stayed into it about me
18    coming home bringing my job home.
19 Q. Okay.  What I'm trying to figure out,
20    you've been diagnosed with high blood
21    pressure and you said you started
22    taking Lortab -- Loritrol?
23 A. Lotrel.

Page 167

1  Q. -- Lotrel in 2003, Summer of 2003?
2  A. Uh-huh.
3  Q. What I want to know is, when do you
4     recall meeting or visiting the doctor
5     and he was saying, I think you have
6     stress problems?
7  A. That was -- that was during that time.
8  Q. So this was during the same time?
9  A. Yeah.
10 Q. Right after your sister died?
11 A. Yeah.
12 Q. And were you saying -- arguing or
13    bickering with your wife?
14 A. This -- me and my wife -- when I went
15    and he told me it was stress, this was
16    me and my -- my girlfriend was carrying
17    on about that job out there, because I
18    would bring it home every day.  And I
19    was having headaches behind that.  I
20    just thought it was, you know, just a
21    regular headache and I was just going
22    to the store buying Excedrin and taking
23    them.  And after they wouldn't do me no

Page 168

1     good, that's when, you know, I
2     considered going to the doctor, because
3     I didn't know if I had a brain tumor or
4     what.  But I knew I wasn't used to
5     having headaches like that.
6  Q. Are you talking about multiple visits
7     to Dr. Okoye?
8  A. No.  I went a couple of times, twice.
9  Q. Okay.
10 A. Twice for that.
11 Q. The first time you went --
12 A. Because the first time I went he
13    prescribed it, he said he just don't --
14    he said he wasn't going to prescribe me
15    that many of them pills.  I think he
16    gave me, like, five of them.  And then
17    when I went back -- he wanted to see me
18    that following week, because that's my
19    family doctor, and he went on and
20    prescribed me five more.
21 Q. Okay.  But that wasn't the Lotrel?
22    That was something else?
23 A. No, that wasn't the Lotrel.  Lotrel he

42 (Pages 165 to 168)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

| Page 169 |
|---|
| 1   gave me them later, later on that year, |
| 2   because my mother was dead when I |
| 3   started taking that high blood pressure |
| 4   medicine -- after my sister passed. |
| 5   Q. On page 4 at the top -- the bottom of |
| 6   page 3 we asked you a question. I |
| 7   think we asked you to identify each and |
| 8   every action you or anyone acting on |
| 9   your behalf took after your employment |
| 10  with Mansfield ended to seek and obtain |
| 11  any alternative income -- employment or |
| 12  income source. And it goes on to say, |
| 13  This interrogatory is continuing in |
| 14  nature and covers a time period from |
| 15  the end of your employment with |
| 16  Mansfield to the trial of this lawsuit. |
| 17  So we were asking you about any -- each |
| 18  and every action you or anyone has |
| 19  taken on your behalf -- acting on your |
| 20  behalf -- took to seek and obtain any |
| 21  alternative employment or income |
| 22  source. And your answer was: I went |
| 23  to file for unemployment, which they |

| Page 170 |
|---|
| 1   tried to block. Are you referring to |
| 2   Mansfield? |
| 3   A. Yes, ma'am. |
| 4   Q. Okay. And you went on to say, After |
| 5   Georgia Department of Labor did some |
| 6   investigating, they sent me a letter |
| 7   stating I was able to get my |
| 8   unemployment because Mansfield could |
| 9   not give them a reason why they |
| 10  terminated me. |
| 11       THE WITNESS: You should have |
| 12  that letter. |
| 13  A. He should have that letter. |
| 14  Q. I don't have a copy of that letter. I |
| 15  have a some documents from the Georgia |
| 16  Department of Labor. |
| 17       MR. PETTAWAY: Y'all have that. |
| 18  That's what he's talking about. |
| 19       MS. WILSON: No. I don't have |
| 20  it. |
| 21  Q. You're talking about just a regular |
| 22  statement? We don't have a statement |
| 23  saying that -- a letter stating that -- |

| Page 171 |
|---|
| 1   by the Georgia Department of Labor |
| 2   stating that they sent you a letter |
| 3   saying that you were able to get |
| 4   unemployment because Mansfield could |
| 5   not give them a reason why -- |
| 6   A. It pretty much said that. I |
| 7   remember -- |
| 8   Q. So you do have something? |
| 9   A. I remember -- I remember -- |
| 10       MR. PETTAWAY: No, no. Hold |
| 11  on. You all have that in discovery |
| 12  response. |
| 13       MS. WILSON: Okay. Well, I'll |
| 14  look again. But the documents weren't |
| 15  numbered. |
| 16       MR. PETTAWAY: As a matter of |
| 17  fact, your counsel, when they were |
| 18  complying and sending that EEOC |
| 19  compliance, it included it in there, |
| 20  included with this response to the EEOC |
| 21  also. |
| 22       MS. WILSON: Can you just point |
| 23  it to me? Because I want to make sure |

| Page 172 |
|---|
| 1   that I know what we're talking about. |
| 2       MR. PETTAWAY: Well, look at |
| 3   exhibits H -- no. Exhibit G to their |
| 4   response. |
| 5       MS. WILSON: Hold on one |
| 6   second. Let me make sure I'm on the |
| 7   right page. |
| 8       MR. PETTAWAY: All of it may be |
| 9   in G. |
| 10       MS. WILSON: I'm sorry? |
| 11       MR. PETTAWAY: All of them in |
| 12  Exhibit G to the August 26, 2004, |
| 13  response to the EEOC that was sent by |
| 14  Attorney Deborah Wallace Ford. But |
| 15  that's the same letter that he's |
| 16  talking about. |
| 17       MS. WILSON: I have only one |
| 18  copy of this. I'm going to mark this |
| 19  as Defendants' Exhibit 9 to make sure |
| 20  we're talking about the same thing. |
| 21       (Defendants' Exhibit 9 was |
| 22  marked for identification.) |
| 23       MS. WILSON: And this is what I |

43 (Pages 169 to 172)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 173

1  have as Exhibit G to what you were just
2  referring to, Collins, as a response to
3  the EEOC charge. Do you have a copy
4  there?
5        MR. PETTAWAY: I have a copy.
6        MS. WILSON: I just want to
7  make sure we're looking at the same
8  thing. This is what I have as
9  Exhibit G.
10        MR. PETTAWAY: Yeah. This --
11  this is it.
12        MS. WILSON: Will you pass it
13  to the plaintiff, please?
14        MR. PETTAWAY: It says, Your
15  employee has not done -- this is it.
16        MS. WILSON: Let me see. I
17  want to make sure that what you're
18  representing is exactly what it says.
19  Q. Okay. So what your response to
20  Interrogatory No. 10 said -- No. 9 says
21  is, After Georgia Department of Labor
22  did some investigating, they sent me a
23  letter stating I was able to get my

Page 174

1  unemployment because Mansfield could
2  not give them a reason why they
3  terminated me.
4        MS. WILSON: This is the only
5  copy I have. Can you let him look at
6  that same exhibit so I can read what it
7  says?
8        (Attorney Pettaway provides
9        witness with document.)
10  Q. And just for the record, we're looking
11  at Exhibit G to a letter that was sent
12  in response to the EEOC -- one of the
13  EEOC charges as a response to
14  Mr. Ragland's charge of discrimination.
15  Do you see that, Mr. Ragland, what your
16  attorney is showing you?
17  A. Uh-huh.
18  Q. And on the third page of this claim
19  examiner's determination, which is not
20  a letter but it's a document, I think
21  what your attorney was referring to was
22  section 3 under reasoning as to why you
23  would be able to receive benefits.

Page 175

1  A. Uh-huh.
2  Q. And I'm just going to read it to you.
3  You were fired for failing to obey
4  rules, orders, instructions or the
5  established procedures of your employer
6  when you failed or refused to lift a
7  box as instructed by your supervisor.
8  You have stated you did not fail to
9  comply. You said you told your
10  supervisor about your back injury and
11  that you were unable to lift the box.
12  You also stated that the head of safety
13  told you that the box was supposed to
14  be lifted by forklift equipment. For
15  you to be disqualified, your employer
16  must show that you failed to work as
17  required. Your employer has not done
18  so. Therefore, you can be paid the
19  benefits.
20  A. And, see, as far as it saying that box
21  supposed to be lifted by forklift, in
22  that blue book, what I got from
23  orientation at Hyundai, it states in

Page 176

1  that book we wasn't supposed to lift
2  nothing over fifty pounds. That box
3  weighed about four hundred -- three or
4  four hundred pounds.
5  Q. Okay. Well, let's talk about that
6  incident, then.
7  A. Okay.
8  Q. Tell me about -- and this is the
9  incident that led to you being
10  terminated; is that correct?
11  A. That's right.
12  Q. Tell me what happened.
13  A. Okay. We got to work that morning
14  and -- well, Corey had came up to us
15  that Friday evening. He said,
16  Everybody's agreed to work tomorrow.
17  He said, Those that don't come, just
18  don't come back, like that. So they
19  was talking about working that Saturday
20  for straight time. I said, No, man. I
21  said, I'm already in overtime. I said,
22  I ain't coming in. So I thought about
23  it. I went home that night and I said,

44 (Pages 173 to 176)

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 177

1  Well, I better go on in because I need
2  my job. I go in that morning and the
3  company truck wouldn't start from the
4  jump. So Corey sends for Johnny,
5  Johnny comes and picks me up. We stop
6  and picked Cindy up. I jumped out of
7  the truck to let her get in the middle.
8  She said, You better had of been here
9  because Corey was going to fire your
10  tail. I said What? I'm thinking to
11  myself, where does this come from?
12  Which I already knew that they knew
13  that we had filed a Complaint.
14  Q. How do you know that?
15  A. When I first got to Hyundai, Ben told
16  me. Ben said, I heard y'all done filed
17  a lawsuit against Johnny Crutchfield.
18  That's how I knew, you know. I said,
19  How you know that? Ben an old guy.
20  He's been working for Johnny a long
21  time, so they talk. So back to what I
22  was saying. When Cindy got in the
23  truck, we went over to the engine room.

Page 178

1  He told me, he said, Bill, I need you
2  to be my ground man for the day. I
3  said okay. So Johnny Reed, he was
4  driving the manlift and I was -- as a
5  ground man, all I was doing was keeping
6  the hose out of the way of the manlift
7  while they walk around, you know, the
8  aisle. So this guy, he worked with --
9  he was working with another contractor.
10  He was a lift driver. And all he was
11  doing was just sitting there watching
12  the crane. And I went over there and I
13  was talking to him because Johnny went
14  to the bathroom. He said, Man, he
15  said, all I got to do is sit here.
16  Y'all need anything moved, he said, let
17  me know. So we did. We had him to
18  clean out a long walkway for that
19  manlift, you know, because he was
20  spraying, you know. So Corey pulls up
21  and I was standing right there watching
22  Johnny, making sure he don't hit
23  nothing, you know, keeping the hose out

Page 179

1  of the way. And Scott pulls up. He
2  said, Get in the truck with Scott. He
3  said, Y'all go pick up all the empty
4  cans and stuff that you see laying
5  around. So I'm doing like this man
6  told me to do. We went around, checked
7  all the spots. So we're coming back to
8  where Johnny was, he walked up to us
9  and yells, Hold it. Bill, get your
10  damn ass out of the truck. I said,
11  Man, what? I go, Where'd this come
12  from? He said, Get out of the damn
13  truck. He said, Don't need two of
14  y'all in that truck. I said -- well,
15  Scott and Glenn and them, they white.
16  I said, I'm doing what you told me to
17  do. You told me -- and it was Scott,
18  he said, You're right. You did tell
19  him, Corey. Just get your damn ass out
20  of the truck and go on back over there
21  with Johnny and watch the lines. So I
22  went on over there. So I'm doing my
23  job. This man done left and

Page 180

1  everything. Scott's left and they
2  left. Few minutes later, he pulls back
3  up. But like I said, I'm working. He
4  gets out of the truck rubbing his chin,
5  said, Bill, come here for a minute. So
6  I walked over there. I said, What you
7  need? He said, For one thing, I don't
8  like your attitude. I said, Excuse me?
9  He said, You're fired. Get off the
10  premises. I said, Man, what's wrong
11  with you this morning? I said, I ain't
12  said two words to you. I said, What's
13  the matter with you?
14  Q. And who is this?
15  A. This is Corey.
16  Q. Corey Watson?
17  A. Corey Watson. And I really thought --
18  that's what I told the department of
19  labor, they fired me in retaliation, in
20  retaliation of the lawsuit. I said,
21  Man, what's wrong with you? I said, I
22  ain't -- I ain't -- I ain't said two
23  words to you. He said, Get off the

45 (Pages 177 to 180)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 181

1  premises. I said, No, I ain't getting
2  off the premises. I said, I'm going
3  back to work. So I walked off and I
4  went back to doing what I was doing.
5      Okay. This how I knew they had
6  plotted up to get rid of me that
7  morning. When he left -- see, him and
8  Johnny Reed hadn't been talking because
9  Johnny was in that manlift. When he
10 left, I walked up under the manlift to
11 get my water keg, get me a drink of
12 water, and Johnny said, You gone? That
13 made me think, Why would he ask me
14 something like that?
15 Q. Johnny Crutchfield?
16 A. Johnny Reed. He's up in the air, now,
17 and he sees me go up and I got my water
18 jug. I was just fixing to get a drink
19 of water. I wasn't fixing to go
20 nowhere. Corey had left. He said, You
21 gone? I'm, like, no. So I took a
22 drink of water. I'm thinking, what in
23 the world going on? I set my jug down

Page 182

1  and I just went on back to working, you
2  know. Here he comes. He went and got
3  Mike, the head of safety, and two
4  security guards. I seen them coming.
5  So Scott had came in the truck. He
6  said, Man, Corey gone to get -- when he
7  was talking about it, I said, Man, let
8  me get my stuff. I don't want no
9  trouble. So when they came up, Mike
10 came over to me. He said, Bill, Corey
11 said you refused to leave. I said,
12 Yes, I do. I refuse to leave, but I'm
13 not refusing to work. I said, This man
14 come pull me off my job, I'm working,
15 and he fired me and he can't even tell
16 me why he's getting rid of me. I said,
17 This man can't tell me why he's firing
18 me. I said, I'm going to ask him in
19 front of you. Why are you getting rid
20 of me? Why? Why am I being
21 terminated? Just get off the property.
22 So I said, Well, I don't want no
23 trouble. Let me get my stuff. I got

Page 183

1  my stuff.
2      So Scott took me outside. I'm
3  riding with them, Glenn and Scott. He
4  said -- it was cold. He said, You sit
5  in the car and warm the car up, you
6  know. I'm sitting in the car outside
7  off the premise. Corey was -- I seen
8  his truck coming. He come flying
9  through the gate, come out of the gate,
10 come to that car. He said, I thought I
11 told you to get off the premise? It
12 just so happened Mike, the head of
13 safety, was looking with his
14 binoculars. He was fixing to make me
15 get out of that car and sit on the side
16 of the road 'til they got off two
17 hours -- I had to wait two hours
18 before they got off. Mike come out on
19 the four-wheeler. He said, What's the
20 problem, Corey? He said, Why are you
21 out here? You're supposed to be up in
22 there over your crew. I said, This man
23 telling me I can't sit in this car. He

Page 184

1  wants me to sit out there in the cold.
2  He said, No. And when Corey left, he
3  said, What you need to do is find out
4  where their base is, either down in
5  Mobile or Florida. Call them
6  and let them know. He said, If you
7  need me, call me.
8      That was who the man from the
9  department of labor in Georgia talked
10 to. That's why I got that letter back
11 from him. He called Mike first. He
12 told me, he said, I'm going to call
13 this safety man first, then I'm going
14 to call Johnny Crutchfield. And he
15 said, I'm going to call you back
16 Tuesday. He called me back that
17 Tuesday morning. He told me, he said,
18 I called this guy Mike. He said, Mike
19 told me exactly what you told me. He
20 said you don't know why you got
21 terminated because every time he saw
22 you, you was working.
23 Q. And who -- I'm sorry. Who is Mike?

46 (Pages 181 to 184)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 185

1  A. He was head of Russ Safety. I don't
2  know his last name, but he gave the
3  orientation when we was over at
4  Hyundai. But he was head of Russ
5  Safety. That's the name of that
6  company.
7  Q. Did you work for Russ Safety?
8  A. No. They just gave the orientation.
9  Q. So Mike does not work for Mansfield?
10 A. No.
11 Q. Okay.
12 A. But he did call Mike and told Mike what
13 happened. He said, Mike told me
14 exactly what you told me and he told me
15 that he told you to call their home
16 office, whatever, which I did. I
17 called them and --
18 Q. Who did you call?
19 A. It was in Mobile, I believe it was.
20 Q. I said who did you call?
21 A. Mansfield's home office.
22 Q. Yes, sir. But who did you speak with?
23 A. I don't know who she was. I don't

Page 186

1  know. I gave my name. So they said --
2  they knew Johnny. They said, Well, you
3  need to get with Johnny.
4  Q. Let me ask you, because you're --
5  A. Okay.
6  Q. -- going on, but there's a lot of stuff
7  here that I want to ask you some
8  questions about. So this was the day
9  that you were terminated?
10 A. Yes.
11 Q. This is what you've been talking about?
12 A. Yes.
13 Q. When you applied for unemployment, you
14 spoke with someone at the Department of
15 Labor in Georgia?
16 A. Uh-huh. (Witness nods head.)
17 Q. Who did you speak with?
18 A. I don't know who that was.
19 Q. Did you write his name down anywhere?
20 A. No. Because I called and tried to get
21 that four-page letter that I had sent
22 them and they said they didn't keep
23 that information.

Page 187

1  Q. Did you keep a copy of that four-page
2  letter that you sent them?
3  A. No, I didn't. No, I didn't.
4  Q. And you don't have any idea who you
5  spoke with at the Georgia Department of
6  Labor?
7  A. No, ma'am.
8  Q. He said he was going to call you back
9  on Tuesday. You don't remember what he
10 said when he called you back what his
11 name was --
12 A. He called me back.
13 Q. -- when he called you back?
14 A. No. I promise you I don't.
15 Q. Was this conversation -- did this
16 conversation take place the
17 following -- the same day? When did
18 you talk to the guy from the department
19 of --
20 A. I got terminated that Saturday. I
21 called him that Monday.
22 Q. You called on Monday?
23 A. Uh-huh.

Page 188

1  Q. And you don't remember his name?
2  A. No, ma'am.
3  Q. You told him this situation and story?
4  A. (Witness nods head.) Uh-huh.
5  Q. And he told you, I'm going to call
6  Mike?
7  A. Uh-huh. (Witness nods head.)
8  Q. Who works for Russ, but doesn't work
9  for Mansfield?
10 A. Uh-huh. (Witness nods head.)
11 Q. And then I'm going to call the people
12 at Mansfield; is that correct?
13 A. (Witness nods head.) Uh-huh.
14 Q. Do you remember if the guy you spoke
15 with at the Georgia Department of Labor
16 was black or white?
17 A. I couldn't say. He sounded like he was
18 black, but who's to say. I don't know.
19 Q. Okay.
20 A. I can't say.
21 Q. And so he told -- the guy at the
22 department of labor told you to call
23 someone at Mansfield or did Mike?

47  (Pages 185 to 188)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 189

1  A. Mike told me.
2  Q. Mike with Russ?
3  A. Yes.
4  Q. Told you to call somebody in Mobile?
5  A. Yeah.
6  Q. About what?
7  A. And tell them what happened and why --
8     just tell them about this incident. He
9     said, I don't think what went on here
10    really went on. I said, No, he -- I
11    said, He just came up to me and just
12    fired me, man. I said, I don't know
13    what for.
14 Q. And so when you -- when did you call
15    somebody in Mobile with Mansfield?
16 A. It was probably that Monday when I was
17    on the phone talking to all them people
18    because I know I sent them that letter
19    after I had talked to them.
20 Q. The Department of Labor in Georgia?
21 A. Yeah. And that guy, he told me he was
22    going to get back with me that Tuesday.
23 Q. Okay.

Page 190

1  A. And he did. He called me back that
2     Tuesday morning, 8:30, just like he
3     said.
4  Q. And when you talked to someone in
5     Mobile at Mansfield, you don't recall
6     who you talked to?
7  A. No, ma'am.
8  Q. Was it --
9  A. It was a lady.
10 Q. -- a man or -- it was a woman.
11 A. It was a lady.
12 Q. Okay. And what did you tell her? What
13    were you calling her about?
14 A. I was telling her that I work for
15    Mansfield down here in -- I can't think
16    what that place was. Anyway, I told
17    her I work for Johnny Crutchfield. She
18    said, Yeah, I know Johnny. I said,
19    Well, Corey, he's one of Johnny's
20    supervisors. At the time, I think
21    Johnny was out of town or -- couldn't
22    get in touch with him. I know we
23    couldn't get in touch with him right

Page 191

1     then. And I was telling her, I said,
2     Corey fired me for no reason. I said,
3     And the guy with Russ told me to get in
4     touch with y'all to see if I can get my
5     job back. I was trying to get my job
6     back. And she said, Well, let me take
7     your name down. She said, I'll call
8     Johnny and talk to him, but you need to
9     talk to Johnny. So I said okay.
10 Q. Johnny Crutchfield?
11 A. Crutchfield, superintendent. So I got
12    in touch with Johnny. It was a few
13    days later I got in touch with Johnny.
14    And I was telling him what happened and
15    he told me, he said, Well, Bill, you're
16    a damn good worker. I just don't
17    believe this is going on. But I've got
18    to get with Corey. He said, I haven't
19    seen Corey. I've got to see what Corey
20    says. He said, I'll get back with you
21    and let you know. I said okay.
22 Q. When you called Mobile, what department
23    did you ask to speak to?

Page 192

1  A. I didn't really ask for a certain
2     department. I just called and told
3     them I needed to talk to somebody about
4     my job, I had got terminated, you know,
5     and I needed to know who I needed to
6     talk to because head of safety told me
7     this is what I need to do and I'm just
8     going -- you know, trying to go through
9     the channels, you know, to find out
10    what I need to do to get my job back.
11    I was really concerned about getting my
12    job back because I knew I hadn't done
13    nothing wrong.
14 Q. But that was the head of safety for
15    Russ?
16 A. Uh-huh.
17 Q. Not anyone related to Mansfield?
18 A. No.
19 Q. And when you called and spoke with this
20    woman on the phone, she told you you
21    need to talk to Johnny Crutchfield who
22    was the superintendent --
23 A. That's right.

48 (Pages 189 to 192)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 193

1  Q. -- at your job?
2  A. (Witness nods head.) Uh-huh.
3  Q. And you tried -- you called Johnny and
4     you talked to Johnny?
5  A. Yes.
6  Q. When he said that he would talk to
7     Corey and try to find out what was
8     going on, when you did not hear back
9     from him did you follow up with him?
10 A. Yeah. I did call him back and he told
11    me, he said, Corey's telling me you
12    refused to lift a box. I said, Johnny,
13    I said, the man in orientation told us
14    he will get the box. That's why they
15    got four-by-four blocks up under them,
16    one up under each end and one in the
17    middle for a manlift -- I mean a
18    forklift to get up under them. He
19    said, Well, I got some more work coming
20    up at GE again. He said, I'm going to
21    try to get you back over there. I
22    said, What am I supposed to do in the
23    meantime, you know? He said, Well, if

Page 194

1     something come up -- something come up
2     sooner than that anywhere else, I'll
3     give you a call. Because, see, they
4     had a lot of little jobs going on like
5     at Hammermill, GE, you know, bunch of
6     little spots they were working right .
7     around here. But he never did call me
8     back. So that's what throwed me to go
9     and apply for my unemployment.
10 Q. I wanted to ask you a question about
11    something you said when you were
12    telling that story. You said that you
13    think -- you said that you knew you
14    were terminated because they found out
15    that y'all had filed a lawsuit?
16 A. Okay. Now, that's what I wrote in the
17    four-page letter to the department of
18    labor, because they had asked me -- in
19    one of those letters they were asking
20    me why do I think I got terminated, you
21    know. And that was the only reason I
22    could think of because, like I said,
23    I'm there every day on time, you know,

Page 195

1     and I worked when I got there.
2  Q. Okay. Let me -- let me stop you while
3     you're talking right there. So you
4     were terminated December 26, according
5     to our records.
6  A. It was the 20th. I remember it
7     vaguely.
8  Q. So you think it was the 20th and we
9     maybe have records that say the 26th.
10 A. Okay.
11 Q. And that you --
12       MR. PETTAWAY: That's the day
13    after Christmas.
14       MS. WILSON: I'm sorry?
15       MR. PETTAWAY: The 26th is the
16    day after Christmas.
17 Q. Well, I do know that you've given me
18    today as Defendants' Exhibit 2
19    documents showing that you were working
20    the period -- up to the period ending
21    December 21, 2003. And you also have
22    time showing that you were working up
23    until the period ending December 28.

Page 196

1  A. No. Now, they had terminated me, but
2     those checks right there, I got those
3     checks after I was terminated, one of
4     them.
5  Q. That's right. For time that you put
6     in --
7  A. Right.
8  Q. -- or would have put in coming at the
9     end of December 28, the week ending
10    December 28.
11 A. Uh-huh.
12 Q. So it is possible that you were still
13    at work the week ending December 28,
14    which could have been the 26th?
15 A. Possible.
16 Q. Okay. This is what your documents are
17    showing.
18 A. Uh-huh. I follow.
19 Q. So our records say the 26th,
20    December 26th, is when you were
21    terminated.
22       (Defendants' Exhibit 10 was
23       marked for identification.)

49  (Pages 193 to 196)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 197

1  Q. And I'm going to show you what is
2  Defendants' Exhibit 10, which is the
3  Notice of Charge of Discrimination and
4  your Charge of Discrimination.
5      (Witness reviews document.)
6      (Short recess)
7  Q. When we took a break, Mr. Ragland, we
8  were just getting ready to look at
9  Defendants' Exhibit 10. We were
10  finishing up talking about -- your
11  termination is what we were talking
12  about and you were telling me how that
13  happened. And when you were describing
14  it in your story, you told me that you
15  knew that they -- that Mansfield
16  terminated you because of the lawsuit
17  that you had filed. And so what I
18  wanted to try and find out is how you
19  think they knew such that your
20  termination was in retaliation for
21  having filed a lawsuit. Is that what
22  you said? I don't want to misrepresent
23  what you said. Is that what you said?

Page 198

1  A. That's the only reason I could think
2  of. Because at the time that I was
3  terminated, he couldn't give me no
4  reason. The only thing he said to me
5  was, For one thing, I don't like your
6  attitude. You're fired. Get off the
7  premises. That's the way it came to
8  me. So, I mean . . .
9  Q. So when you were terminated, you
10  thought you couldn't -- you didn't
11  think that his reasons were valid for
12  terminating -- Corey Watson's reasons
13  for terminating you were valid?
14  A. No.
15  Q. And in your mind you thought, Well, it
16  must be in retaliation for this
17  lawsuit --
18  A. Yes.
19  Q. -- that we filed?
20  A. Yes.
21  Q. So you thought -- and I don't want to
22  put any words in your mouth. So you
23  thought that they must -- "they"

Page 199

1  meaning Mansfield -- must have known
2  about the lawsuit and decided to
3  terminate you; is that correct?
4  A. Yes.
5  Q. Were you saying Mansfield the company
6  in general or are you saying you
7  thought Corey Watson terminated you
8  because he knew about the lawsuit that
9  you say that you had filed?
10  A. Yeah.
11  Q. Which one, is it yes to you thought the
12  company fired you or -- like you
13  said -- I'm using your words -- you
14  said that you thought the company
15  plotted to terminate you and that this
16  must be the reason, that you had filed
17  a lawsuit?
18  A. I'm thinking it was the company, yes.
19  Q. You're thinking it was the company.
20  What I've given you as Exhibit 10 is
21  the Charge of Discrimination. And
22  before the break we had agreed that
23  your last date must have been on or

Page 200

1  about December 26, 2003.
2      MR. PETTAWAY: Object to the
3  form of that question. We don't agree
4  to that.
5  Q. Well, I think that we looked back at
6  your Exhibit No. 2 and you agreed,
7  Mr. Ragland, that page 2 of Exhibit 2,
8  which is what you brought to the
9  deposition today, which are pay stubs,
10  there was one pay stub in here with a
11  period ending December 28, 2003.
12  A. Uh-huh.
13  Q. And it shows time that was worked
14  during the week ending December 28,
15  2003.
16      MR. PETTAWAY: 7.25 hours?
17  That's what you're talking about?
18      MS. WILSON: That's right. And
19  that could have been, though I don't
20  have all the records in front of me
21  right now, the December 26 date, the
22  last date that he would have worked.
23  Q. Because we also have a pay stub from

50 (Pages 197 to 200)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 201

1  you, Mr. Ragland, that you brought to
2  the deposition today which is page 1
3  with a period ending 12/21/2003, the
4  prior week. So if there was time
5  showing during the next week ending
6  12/28/2003, then you must have worked
7  during that week; is that correct?
8  A. If that's the way they've got it
9  documented, yes.
10  Q. And this is what you brought to the
11  deposition?
12  A. Uh-huh. That's right.
13  Q. Okay. And that's the last pay stub
14  that we have at the end of the year
15  2003.
16  A. Okay.
17  Q. So what I've given you is Defendants'
18  Exhibit 10. And this is the Charge of
19  Discrimination, the first page. And
20  then there is a statement, or
21  typewritten statement, thereafter. Do
22  you see that?
23  A. Okay.

Page 202

1  Q. The first page is the Notice of Charge
2  of Discrimination. The second page is
3  the actual charge of discrimination.
4  Have you seen this before, Mr. Ragland?
5  A. This?
6  Q. The document that I've given you as
7  Exhibit 10.
8      (Witness reviews document.)
9  Q. Is page 1 not familiar to you, the
10  Notice of Charge of Discrimination?
11  A. I don't think I have.
12  Q. Let's look at the second page, the
13  Charge of Discrimination. Is that your
14  signature at the bottom?
15  A. Yeah.
16  Q. Okay. And then behind that --
17  A. Let me read the statement.
18  Q. -- four pages of what appear to be
19  statements, a typewritten statement,
20  and then there are some documents. Two
21  pages behind that, your Notice of
22  Termination, Separation, and another
23  document that came from the EEOC; is

Page 203

1  that right?
2  A. Yes.
3  Q. Okay. So you recognize that?
4  A. Yes.
5  Q. Okay. And on the second page, at the
6  bottom it's dated February 17, 2004; is
7  that correct?
8  A. Yes.
9  Q. Is there another document or charge of
10  discrimination that came prior to this
11  or is this your initial charge of
12  discrimination?
13  A. This is the initial.
14  Q. Okay. So if you were terminated in
15  December of 2003 and you didn't file
16  this with the EEOC until February 17 of
17  2004, then why would you think the
18  company would have known about your
19  charge of discrimination if it happened
20  two months later?
21  A. No. We filed this complaint before --
22  this is before we left GE this
23  complaint was filed. Because, like I

Page 204

1  said, when I got to GE, that's when Ben
2  told me, he said, I didn't know y'all
3  had filed a lawsuit against Mansfield.
4  Q. And I understand that. We've already
5  had that conversation. What I'm asking
6  you is, you signed this charge of
7  discrimination on February 17, 2004; is
8  that correct?
9  A. Uh-huh.
10  Q. Okay. What other documents exist that
11  show that something occurred or was
12  filed prior to your being terminated?
13  This is what we have from the EEOC and
14  what you produced in your documents as
15  well. There aren't any other documents
16  pre-dating your date of termination.
17  So --
18      MR. PETTAWAY: Are you asking a
19  question or making a statement?
20      MS. WILSON: I'm getting ready
21  to ask a question. I'm trying to make
22  sure that he understands what I'm
23  asking him.

51 (Pages 201 to 204)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 205

1  Q. Before I was interrupted, I was asking
2     you, are there any other documents that
3     would evidence that you had filed a
4     lawsuit or met with the EEOC prior to
5     February 17, 2004, when you signed this
6     charge of discrimination?
7  A. No. Not other than when we came up
8     here and first filed a complaint.
9     That's the only thing -- only thing I
10    can think of.
11 Q. Okay. So are you saying you met with
12    your attorney prior to February --
13 A. Yes.
14 Q. -- 2004?
15 A. Yes.
16 Q. And when was that?
17 A. When did we come up here? We filed
18    this suit, it was in October or
19    November of '03. I know we filed
20    before I got terminated.
21 Q. Okay. What I'm asking you is -- and I
22    want to make sure that you're clear.
23    You've said that this is the initial

Page 206

1     Charge of Discrimination. That's what
2     you said, not me. This is what you
3     said was your initial Charge of
4     Discrimination. This is also what we
5     have from the EEOC as the initial
6     Charge of Discrimination. This is
7     dated February 17, 2004, after you were
8     terminated. What are you referring to
9     as something that was filed prior to
10    December of 2003?
11 A. There's nothing else filed other than
12    us coming up here and making a
13    complaint.
14 Q. When you say "making a complaint," you
15    mean meeting with an attorney and --
16 A. Attorney, yeah.
17 Q. -- telling him what your issues are?
18 A. That was it other than -- that was it.
19 Q. Do you remember when that was?
20 A. Like I said, it was in October or -- it
21    was in October or November of '03, I
22    know.
23 Q. That you first met with -- was it

Page 207

1     Prince Chestnut?
2  A. Prince Chestnut.
3  Q. You first met with Prince --
4  A. Yeah.
5  Q. -- in October or, you said, November --
6  A. November, yes.
7  Q. -- of 2003. Who decided to meet with
8     an attorney?
9  A. Patrick Lewis.
10 Q. Did Patrick Lewis approach you?
11 A. We was talking about it one day sitting
12    around in the pole barn before Pat got
13    fired.
14 Q. Talking about who?
15 A. Talking about filing a complaint
16    against this company.
17 Q. Who is "we"?
18 A. Me, Ervin Tarver, Nathaniel Lamar,
19    Patrick Lewis. And that's when Jack
20    Richardson walked up on us, white guy.
21    He said, I want -- I want a part of it,
22    too. He said, This company ain't
23    right.

Page 208

1  Q. Do you recall anybody else's?
2  A. Steve -- I can't think of Steve's last
3     name -- and Ralo, all of us sitting
4     there.
5  Q. Steve is African-American?
6  A. Yes.
7  Q. Was there anybody else?
8  A. No.
9  Q. Do you remember when this was?
10 A. It was right before Pat got terminated.
11    I don't know. I can't recall exactly
12    when. But I remember Pat saying, Well,
13    I know they're fixing to get rid of me.
14    Y'all start documenting stuff down and
15    times and dates and things happening.
16    We really didn't think, you know, he
17    was going to go through with it.
18 Q. Go through with what?
19 A. You know, coming and making a
20    complaint. We didn't think he was
21    going -- we thought he was just
22    talking, you know. And when he did get
23    in touch with us and told us -- called

52 (Pages 205 to 208)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 209

1   us and told us, all of us came down
2   here, you know.  And that's when we
3   looked at pursuing it, you know,
4   because we were -- we was treated
5   unfairly.
6   Q. So you think this conversation took
7     place just before Patrick Lewis was
8     terminated?
9   A. Terminated, yes.
10  Q. Okay.  So y'all came and met with
11    Mr. Chestnut?
12  A. Chestnut, yes.
13  Q. Steve also came?
14  A. No, Steve didn't come.
15  Q. Do you know why Steve didn't come?
16  A. No, I don't.  I don't know why he
17    didn't make it that day.
18  Q. Was there anybody besides the folks
19    that you named a little while ago that
20    came to the meeting --
21  A. No.
22  Q. -- that weren't part of the
23    conversation at the pole shed?

Page 210

1   A. No.
2   Q. So this was October or November 2003 --
3   A. Yes, ma'am.
4   Q. -- you came and met with Mr. Chestnut
5     and you told him what was going on?
6   A. Yes.
7   Q. Did you file any documents at that
8     time?
9   A. No.
10  Q. Okay.  So you were just --
11  A. They -- Mr. Chestnut and Mr. Gaines,
12    they just set down a recorder and
13    recorded our conversation, you know.
14  Q. You said Johnny?
15  A. Then later on -- Mr. Gaines.
16  Q. Mr. Gaines?
17  A. I ain't seen him since we first come
18    here.
19  Q. Okay.  You met with them, the two of
20    them?
21  A. Then after that we gave statements.
22    And that's when the senior executive
23    officer and the senior lawyer from the

Page 211

1   EEOC came down.
2   Q. I couldn't hear you.
3   A. Senior executive officer and senior
4     lawyer from the EEOC, after we came and
5     filed a complaint with Prince, later on
6     he took our statement.  Then that's
7     when the EEOC got involved and they
8     came down and talked to us.
9   Q. And to be clear, when you're saying you
10    came down and filed a complaint with
11    Prince, what you mean is you met with
12    Prince and-
13  A. Met with prince, yes.
14  Q. -- had a conversation?
15  A. Yes.
16  Q. You didn't file some kind of document
17    that day?
18  A. Oh, no, no.  No, ma'am.  No, ma'am.
19  Q. So when you met with Prince and talked
20    with him about it, some people from the
21    EEOC came down and met with Prince,
22    Mr. Chestnut, Mr. Gaines, and with you
23    and who else?

Page 212

1   A. They talked to us individually for
2     about an hour, hour and a half, each
3     one of us -- me, Nate, Ervin, Ralo,
4     Patrick, Jack -- and talked to each one
5     of us individually.
6   Q. Okay.
7   A. Mr. Prince, he was present, two
8     gentlemen from the EEOC, and I think
9     Mr. Gaines.  I'm not quite sure.  I
10    know those two guys and Mr. Chestnut.
11    They was talking to us one at a time,
12    because we come in here, like, one that
13    evening and leave about 9:30, ten at
14    night.  They was talking to us one at a
15    time.
16  Q. "They" being the people from the EEOC?
17  A. EEOC, yes, ma'am.
18  Q. Did they ask you to write anything
19    down?
20  A. They already had copies of our
21    statements and they was asking us
22    questions off of it.
23  Q. Okay.

53  (Pages 209 to 212)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 213

1  A. They were taking notes as they went,
2  you know. But, no, we never had to
3  write nothing down. He just told us,
4  you know, if we can think of anything
5  else, you know, to document it down and
6  give it to Mr. Chestnut.
7       (Off-the-record discussion.)
8  Q. We were talking about your charge of
9  discrimination, Mr. Ragland. What I
10 wanted to ask you is -- so you've
11 identified this as your signature at
12 the bottom of the document dated
13 February 17, 2004?
14 A. 2004.
15 Q. Okay. What I wanted to know, on the
16 statement that is attached, the
17 typewritten statement behind that -- I
18 think it's four pages. You should have
19 four pages.
20 A. Yes.
21 Q. Okay. Did you type this up, this
22 statement?
23 A. I didn't type it up.

Page 214

1  Q. Okay.
2  A. No.
3  Q. Who typed this up for you?
4  A. My lawyers had to.
5  Q. It was your lawyers here but not the
6  EEOC lawyers; is that correct? Or do
7  you know?
8  A. To be honest with you, I don't know.
9  Q. Okay. Have you seen this before?
10 A. Yes.
11 Q. You have seen this. You have read this
12 before; is that right?
13 A. Yes.
14 Q. Okay. I just wanted to ask you some
15 questions about it.
16 A. Okay.
17 Q. Did you ride to work every day or
18 occasionally with some of your
19 coworkers because you didn't have a way
20 to work?
21 A. I rode every day with Jack Richardson,
22 Ben Gayles, Nathaniel Lamar, and Ervin
23 Tarver. We five rode together every

Page 215

1  day.
2  Q. Who was the driver?
3  A. Jack Richardson.
4  Q. So he always drove the five of you
5  in --
6  A. Uh-huh.
7  Q. -- to work every day?
8  A. Uh-huh.
9  Q. What would happen on the days when Jack
10 was running late or was not going to go
11 in to work that day?
12 A. The majority of the time he would bring
13 us the car. Or if he wasn't going --
14 he knew he wasn't going the next day,
15 he would have us drop him off and we'd
16 keep the car.
17 Q. On those times that it didn't happen --
18 you said that was the majority of the
19 time?
20 A. Uh-huh.
21 Q. So for that other time that that didn't
22 happen?
23 A. Okay. Well, for instance, on a couple

Page 216

1  of occasions he didn't go he just
2  didn't show. And, I mean, it was,
3  like, we were just stuck. But we would
4  call Johnny, you know, and let him know
5  that if we could catch a ride up there
6  we would come. But that was a long
7  ways. You know, didn't nobody want to
8  really take us up there.
9  Q. Do you know or do you have an idea of
10 how many times it was that you would
11 call in because you didn't have a way
12 to work?
13 A. It wasn't many. It wasn't that many.
14 Q. When you say it wasn't that many, is
15 there a number you can place on it or a
16 range of numbers that you can place on
17 it? Was it less than ten?
18 A. Oh, yeah.
19 Q. It was less than ten times?
20 A. Yeah, less than ten.
21 Q. Okay. Were there instances when you
22 were riding with Jack and he was
23 running late and, therefore, all of you

54 (Pages 213 to 216)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 217

1    that were riding with him would be
2    late?
3    A. Late, uh-huh.
4    Q. How often did that happen?
5    A. That didn't happen often.
6    Q. Would you say it was more than five?
7    A. No. No.
8    Q. It was less than five times?
9    A. It was less than five, yeah. Like I
10   said, we was always on time.
11   Q. If Jack couldn't bring you to work,
12   would you just call in and then not go
13   to work or if another opportunity
14   presented itself for you to get a
15   ride --
16   A. We would always call Johnny and let him
17   know, you know, either something was
18   wrong with the car, Jack didn't show,
19   or whatever. And we would always tell
20   him, If we get a way, we'll be -- we're
21   coming on in, you know. Sometimes we
22   got a way, but most of the time we
23   didn't, you know. But like I said,

Page 218

1    that was, like, right at a fifty-mile
2    drive one way, you know.
3    Q. Is it that you don't -- you didn't have
4    transportation?
5    A. No, I didn't. And Yogi and Nate didn't
6    either and -- Ben had a car, but his
7    radiator was messed up in it. But the
8    other -- the rest of us, the other
9    three, didn't have a car at the time.
10   Q. Now, I know you said that someone else
11   typed this up for you. But what I'm
12   trying to figure out is, how they got
13   the information from you.
14   A. I gave written statements.
15   Q. So you wrote something down?
16   A. Yes.
17   Q. And who would you have given that to?
18   A. Prince Chestnut.
19   Q. Mr. Chestnut?
20   A. Uh-huh.
21   Q. You would have given him a written
22   statement?
23   A. Uh-huh.

Page 219

1    Q. Did you write anything down and give it
2    to the EEOC?
3    A. No.
4    Q. Okay.
5    A. No.
6    Q. Let me ask you about something you say
7    on page -- which is the first page that
8    we're looking at. You were saying that
9    there was an incident when you rode
10   with Jack -- or when Jack didn't show
11   up. We couldn't catch a ride. We all
12   called in and told Johnny we couldn't
13   make it. So the next morning when we
14   got to work, Johnny Crutchfield came in
15   the break room and called all of us
16   together for a meeting. Who was "all
17   of us together"?
18   A. That was me -- really, it was the whole
19   crew, because Cindy was there.
20   Q. Which crew was that?
21   A. Plant five.
22   Q. Plant five?
23   A. Uh-huh.

Page 220

1    Q. So Tarver --
2    A. Lamar.
3    Q. -- Nathaniel Lamar, Ben Gayle --
4    A. Yeah.
5    Q. -- Cindy, whose last name you can't
6    remember?
7    A. Yeah.
8    Q. Corey Watson?
9    A. Corey.
10   Q. Was there anybody else there? Because
11   these are the only people that you
12   listed in your crew?
13   A. No. Because when -- we were fixing to
14   walk off and Johnny pulled up, Corey
15   went to the truck and Corey stopped all
16   of us and told us to go up under the
17   pole barn. No, that was it.
18   Q. Okay. So it was your entire crew at
19   plant five that Johnny met with?
20   A. Uh-huh.
21   Q. And you said he said he's tired of this
22   shit -- miss a day, everybody miss a
23   day. No more excuses, doctor's excuse,

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 221

1  nothing. If you miss another day, you
2  might as well find a job closer to
3  home. You will no longer work for
4  Mansfield?
5  A. That's what he said.
6  Q. We already knew who he was talking
7  to -- we already knew he was talking to
8  us blacks because we were the only ones
9  that had missed the day before.
10     But you just said there were white
11  employees that were also at this
12  meeting; is that correct?
13  A. Uh-huh. Jack and Cindy and Corey.
14  Q. No, you didn't say -- you said it was
15  your crew at plant five, but you didn't
16  tell me Jack was in that crew.
17  A. Oh, no, Jack wasn't in -- at plant
18  five. That was Cindy and Corey. My
19  bad.
20  Q. That's okay. Did Mr. Crutchfield
21  single anybody out?
22  A. Well, it was like we knew he was
23  talking to us when he said when one

Page 222

1  miss, all miss.
2  Q. Okay.
3  A. He was talking about us.
4  Q. But did he call anybody's name?
5  A. Oh, no, he didn't call no names.
6  Q. Did he say, I'm talking to just you
7  blacks in this group, not the white
8  employees?
9  A. No, he didn't say that.
10  Q. Okay.
11  A. But he did say, I'm going to go down
12  there and tell the other crew at one
13  and two the same thing. And I asked
14  Jack that evening if he had that
15  meeting but he said no.
16  Q. But that's your -- you're relying on
17  Jack to tell you the truth about that;
18  is that correct?
19  A. No, I'm not relying on him. But I
20  asked him and that's the answer he gave
21  me.
22  Q. Did you ask any of the other employees
23  that were in that crew?

Page 223

1  A. Ralo.
2  Q. What did he say?
3  A. He said the same thing, they didn't
4  have that meeting.
5  Q. So he didn't talk to any of the other
6  crew members?
7  A. No.
8  Q. Those are the only two people that you
9  talked to was Ralo and --
10  A. Jack.
11  Q. -- Jack? You didn't talk to any of the
12  other parties --
13  A. No.
14  Q. -- who are not a party to this lawsuit?
15  A. No.
16  Q. Okay. Did you get a chance to read
17  this statement before it was submitted
18  to the EEOC? Do you remember?
19  A. No.
20  Q. Okay.
21  A. No, I don't think so. No.
22  Q. You just provided something that was
23  handwritten and to the best of your

Page 224

1  knowledge the attorneys typed it up and
2  this is what it resulted in; is that
3  correct?
4  A. Yes.
5     MR. PETTAWAY: Object to the
6  form of that question. I mean, you
7  assume attorneys typed it up. I don't
8  know.
9     MS. WILSON: Well, that's what
10  he said.
11  A. I don't know if the EEOC or who.
12     MS. WILSON: He said that his
13  attorneys typed it up.
14     MR. PETTAWAY: No. He cleared
15  it up, though. He didn't know.
16  A. I'm not sure.
17     MS. WILSON: Okay. Well, I
18  asked him as it relates to this if he
19  felt the EEOC typed it up and he said
20  no because he brought it to
21  Mr. Chestnut.
22     MR. PETTAWAY: I understand.
23  Actually, I think the EEOC did, but

56 (Pages 221 to 224)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 225

1  y'all check it out.
2       MS. WILSON: Well, all I know
3  is what was presented to my client, and
4  this is what we got --
5       MR. PETTAWAY: I understand.
6       MS. WILSON: -- as a
7  representation of what Mr. Ragland did.
8  Q. (By Ms. Wilson) Before you met with
9  Mr. Chestnut and before you were
10 approached by Patrick Lewis to seek out
11 an attorney to complain about
12 Mansfield, did you ever complain to
13 anyone at Mansfield about the fact that
14 you thought you were being
15 discriminated against?
16 A. Anybody that works for Mansfield?
17 Repeat that question, please.
18 Q. You said in October or November of 2003
19 is when you guys came and met with
20 Mr. Chestnut --
21 A. That's right.
22 Q. -- to talk with him about filing a
23 complaint because of the things that

Page 226

1  you say occurred at Mansfield. Prior
2  to that time, did you ever go to anyone
3  at Mansfield -- your supervisors, their
4  supervisors, anyone in the offices, their
5  regional offices with Mansfield -- and
6  complain about the things that you say
7  were occurring in the workplace?
8  A. No.
9  Q. Why not?
10 A. Well, it was, like, when we got hired
11 in, GE was over this -- over Mansfield.
12 We was doing the work for GE. And it
13 was like -- Johnny Crutchfield told us
14 when he hired us in, he said, Don't
15 y'all go bothering them GE men. They
16 got enough problems of their own. And,
17 see, if we -- if we had any complaints,
18 we was supposed to take it to them
19 because -- I'm going to take you back.
20 One morning we went in and it had
21 rained on us and we wasn't getting no
22 show-up time. We were complaining
23 about that. And one of the GE men was

Page 227

1  sitting there at the terminal and he --
2  Nathaniel Lamar asked him, said, Don't
3  we get show-up time? We done drove
4  this far and now turning around and
5  going back home? And Corey said, No,
6  we don't pay no show-up time.
7  Nathaniel looked at the GE man, he
8  said, You heard that? He said, Yeah.
9  Y'all need to talk to GE about that.
10 Q. Who said y'all need to talk to GE about
11 that?
12 A. One of them GE men that work with GE.
13 He said, Y'all supposed to get show-up
14 time.
15 Q. Let me stop you right there. Who did
16 you think you were working for?
17 A. I knew who I was working for.
18 Q. Who were you working for?
19 A. I was working for Mansfield.
20 Q. Okay. You were working for Mansfield,
21 you understood that --
22 A. Uh-huh.
23 Q. -- when you were at the GE plant?

Page 228

1  A. Uh-huh.
2  Q. When you worked at the Hyundai plant,
3  who did you think you were working for?
4  A. I was working for Mansfield.
5  Q. Okay. So why would you not complain to
6  someone at Mansfield if you knew you
7  were working for Mansfield?
8  A. Uh-huh.
9       MR. PETTAWAY: Now, your
10 question is argumentative. He's
11 answered and actually was answering
12 that question when you stopped him.
13      MS. WILSON: No. He --
14      MR. PETTAWAY: No. He said
15 what Johnny Crutchfield told him and
16 all that. Listen to his answer.
17      MS. WILSON: That's not what he
18 said. He said he talked to a GE man.
19      MR. PETTAWAY: No, no. If you
20 will listen to his answer, he's already
21 said what Johnny Crutchfield told him.
22      MS. WILSON: That is not what
23 he said. Now, you may want to try and

57 (Pages 225 to 228)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 229

1  change the testimony and make it sound
2  a certain way, but I'm listening to
3  what he's saying. And what I'm asking
4  him is, who he thought he worked for.
5  When I initially started asking him the
6  questions, he was talking about when we
7  worked for GE and GE was over
8  Mansfield. I want to make sure he
9  knows who he was working for.
10     MR. PETTAWAY: All that's fine.
11     MS. WILSON: And who he would
12  have reported to.
13     MR. PETTAWAY: That's fine.
14     MS. WILSON: And that's what
15  I'm trying to get to.
16     MR. PETTAWAY: And he was
17  answering all those questions.
18     MS. WILSON: And that's fine.
19  You can ask him any questions you want
20  to. If you want to clear it up later
21  on, that's absolutely fine. But I'm
22  not trying to misrepresent anything
23  that he's saying. I'm not trying to

Page 230

1  confuse him.
2     MR. PETTAWAY: Well, you were
3  trying to argue with him.
4     MS. WILSON: I'm not trying to
5  argue with him. I want to make sure
6  that the record is clear.
7     MR. PETTAWAY: And I'm making
8  sure it's clear you are trying to argue
9  with him. He answered that question.
10     MS. WILSON: Okay. That's
11  fine.
12     MR. PETTAWAY: And you want him
13  to --
14     MS. WILSON: Let's not try to
15  put -- have these little back and
16  forths every time because what it does
17  is it's interrupting the line of
18  questioning.
19     MR. PETTAWAY: We don't do it
20  every time.
21     MS. WILSON: Yes, we do. We do
22  it almost every --
23     MR. PETTAWAY: But it's

Page 231

1  necessary because you're doing this.
2     MS. WILSON: That's fine. If
3  you want to make your objections,
4  you're free to make your objections.
5  But the speaking objections have got to
6  stop.
7     MR. PETTAWAY: No. I have to
8  state my grounds and state why I'm
9  objecting to the form.
10     MS. WILSON: And you're free to
11  do that.
12     MR. PETTAWAY; we're in federal
13  court.
14     MS. WILSON: We are in federal
15  court. You're absolutely right. But
16  these speaking objections are only
17  slowing down what's going on. And then
18  it's indicating to the witness a
19  certain way to testify.
20     MR. PETTAWAY: No, that's not
21  the case.
22     MS. WILSON: Okay. Well,
23  that's fine.

Page 232

1  Q. (By Ms. Wilson) If I can get back on
2     track. I'm not even sure what the last
3     question was. What I was trying to ask
4     you was who you -- if you knew who you
5     were working for. And your testimony
6     is, if I'm correct, Mansfield?
7  A. That's right.
8  Q. And I asked you, and I think you
9     already answered this, did you complain
10     to anyone at Mansfield?
11  A. No.
12  Q. At any time?
13  A. No.
14  Q. Okay.
15     (Defendants' Exhibit 11 was
16     marked for identification.)
17  Q. What I'm going to show you now is what
18     I'm marking as Defendants' Exhibit 11.
19     And you can look through it and see if
20     you're familiar with this or you
21     recognize this.
22     (Witness reviews document.)
23  A. Uh-huh.

58  (Pages 229 to 232)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 233

1   Q. You do?
2   A. Yes, ma'am.
3   Q. On page 3, Mr. Ragland, is that your
4      signature at the bottom of the page?
5   A. Yes, ma'am.
6   Q. Okay.  On the last page, is that your
7      signature as well?
8   A. Yes, ma'am.
9   Q. Do you know why you made an amended
10     charge of discrimination?  Why did you
11     amend your charge of discrimination and
12     amend your statement?
13  A. So, in other words, you're saying why
14     did we file this complaint?
15  Q. No.  Why did it change?  Why did you --
16     your initial charge of discrimination,
17     which is Defendants' Exhibit 10, was
18     dated February 17, 2004.
19  A. Uh-huh.
20  Q. This Notice of Charge of Discrimination
21     and the document that you signed, the
22     amended charge of discrimination, is
23     dated a year and two months later.

Page 234

1   A. 14/4/05 [sic].
2   Q. April 14, 2005?
3   A. Uh-huh.
4   Q. Do you know why a year and some time
5      later you would have amended and
6      changed your statement as to why you
7      were -- why you believed you were
8      discriminated against in certain
9      situations and facts changed from your
10     initial --
11  A. Well --
12  Q. -- charge?
13  A. -- as time went on and -- Mr. Chestnut
14     was telling us, you know, if we can
15     think of anything --
16         MR. PETTAWAY:  Let's not talk
17     about what you and your lawyer talked
18     about.  Okay?
19  Q. And I don't want --
20         MR. PETTAWAY:  What are you
21     trying to ask him?
22  Q. I don't want to know what your attorney
23     told you.  What I want to know is, do

Page 235

1   you know why this was changed?  Why was
2   this charge of discrimination amended a
3   year and two months later?  But I don't
4   want to know what your attorney told
5   you about it.  I want to know if you
6   know why it was amended a year and two
7   months later and the facts changed from
8   your initial -- initial charge of
9   discrimination, which was filed in
10  2004.
11  A. No.  We was told, you know, if anything
12     come up --
13  Q. If that's something he told you, don't
14     tell me that.
15  A. Okay.
16  Q. What I just want to know is, do you
17     know why, if --
18  A. No.
19  Q. -- you can articulate why?
20  A. No.  I really can't, no.
21  Q. Well, let's look at -- it says, The
22     Particulars of William Ragland, on page
23     3 or 4 of the exhibit.

Page 236

1   A. I see.
2   Q. And that is a four-page statement?
3   A. Uh-huh.
4   Q. Do you know who would have typed this
5      up, if you did not do it?
6   A. No, ma'am.
7   Q. Okay.  Do you recognize this?
8   A. Yes, ma'am.
9   Q. Okay.  Do you remember if you told
10     someone or gave someone this
11     information and they typed it up?
12  A. No.
13  Q. Okay.  Look at that last few pages.  It
14     starts with, Affidavit at EEOC.
15     Affidavit of William Ragland.
16  A. Uh-huh.
17  Q. And it ends with your signature on the
18     last page, if that is your signature.
19     I think you've already said that's your
20     signature; is that correct?
21  A. Yes, ma'am.
22  Q. Do you remember reading this before you
23     signed it?

59  (Pages 233 to 236)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 237

1    A. Not thoroughly, no.
2    Q. You didn't read it thoroughly?
3    A. No.
4    Q. Why not, to make sure that it was
5       accurate?
6          (No immediate response given.)
7    Q. Why didn't you read it to make sure
8       that it was accurate?
9    A. Hold on, hold on. Excuse me one
10      minute.
11         (Witness reviews document).
12   Q. I'm not asking you if it's accurate
13      now. I'm asking you at the time did
14      you read it before you signed it, if
15      you recall?
16   A. Okay. Now, yeah, I remember reading
17      it.
18   Q. You do?
19   A. Yeah. Jeff and Robert and --
20   Q. Are those your initials in paragraph --
21      in the top of the letter, WR? Are
22      those your initials?
23   A. Yes.

Page 238

1    Q. Okay. So you were deleting the names
2       of those people because they weren't at
3       that meeting. Is that what you're
4       saying? Or, I'm sorry. Those weren't
5       the employees, all the employees, that
6       were included?
7          (No immediate response given.)
8    Q. I'm trying to figure out why you
9       scratched out Ralo Colvin and Steve's
10      name.
11   A. I don't know. I can't recall why --
12      yeah, I remember doing that.
13   Q. If you don't recall, that's fine. I
14      just wanted to see if you did recall.
15   A. No, I can't recall.
16   Q. Are you still thinking or are you
17      saying no?
18   A. No, I can't recall.
19   Q. And that's fine. I just wanted to know
20      if you did.
21         (Witness reviews document.)
22   Q. If you don't remember, that's fine.
23   A. I can't recall.

Page 239

1    Q. Don't guess about it. I don't want you
2       to guess about it.
3    A. No.
4    Q. But if you don't remember, then that's
5       fine. What I did want to ask you
6       about, in that second paragraph on
7       the -- where it says affidavit -- are
8       you looking at the affidavit?
9    A. Uh-huh.
10   Q. Okay. Let's see. About the middle
11      there you said, I was late roughly
12      eight or nine times because of car
13      trouble, Jack was not going, or Jack
14      overslept. And we talked about that
15      earlier?
16   A. Yeah.
17   Q. Is this more accurate when you were
18      saying -- does this refresh your
19      recollection as to about the number of
20      times that you were late because --
21   A. No, that ain't more accurate. No. It
22      wasn't that many times.
23   Q. So you're saying this statement in 2005

Page 240

1       is not accurate on that point but your
2       memory?
3    A. Not on this right here, no.
4    Q. Would you say your memory today is more
5       accurate?
6    A. We -- no, uh-uh. It wasn't that many
7       times, I know.
8    Q. Do you think if someone were late eight
9       or nine times to work that that is
10      excessive?
11   A. We would have been terminated,
12      probably. I don't think -- no, it
13      wasn't that many times.
14   Q. And just for the record, I know you
15      were shaking your head, but is that a
16      yes or no?
17   A. No.
18   Q. You don't think --
19   A. Oh, yes, I do think that's excessive.
20   Q. Just so the question will be clear, I
21      asked you, being late eight or nine
22      times, if someone were late eight or
23      nine times for work, would you agree

60  (Pages 237 to 240)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 241

1  that that is excessive?
2  A. Yeah.
3      MR. PETTAWAY: Object to the
4  form of the question.
5  Q. That's all I have for that. I just
6  wanted to know why you put WR right
7  there. But you don't have to guess.
8      (Defendants' Exhibit 12 was
9      marked for identification.)
10 Q. Okay. Now I'm going to show you what
11 I'm going to mark Defendants' Exhibit
12 No. 12. And you can look through those
13 and see if you recognize these
14 documents, if you recognize these
15 documents.
16     (Witness reviews documents.)
17 Q. Let me know when you're ready,
18 Mr. Ragland.
19 A. Okay.
20 Q. What I've just given to you I'll
21 represent as Defendants' Exhibit --
22 A. 12.
23 Q. -- 12 are a number of typewritten

Page 242

1  affidavits that are on the EEOC
2  letterhead but summarizing what appear
3  to be your facts regarding your
4  charges -- your charge of
5  discrimination against Mansfield. Have
6  you seen these before?
7  A. Yes, ma'am.
8  Q. Okay. One or all of them?
9      MR. PETTAWAY: Hold on. Let
10 me -- hold on.
11     (Conversation between Attorney
12     Pettaway and the witness
13     outside the hearing of the
14     court reporter.)
15     MS. WILSON: Okay. I'm going
16 to really object to that, Collins,
17 because what you're telling him may be
18 helping him to answer some of the
19 questions I'm getting ready to ask him.
20     MR. PETTAWAY: Well, I'm going
21 to help him with this question because
22 he's saying he's seen these. I don't
23 think he's seen these.

Page 243

1      MS. WILSON: Well, see, I don't
2  know. But that's what --
3      MR. PETTAWAY: Well, I'm going
4  to --
5      MS. WILSON: You can ask him
6  that later.
7      MR. PETTAWAY: I don't think
8  he's seen this.
9      MS. WILSON: You can ask him
10 that later.
11     MR. PETTAWAY: Well, let me
12 clear it up because, see, this must
13 have come from the EEOC. I don't even
14 have this. And apparently this must be
15 some drafts they did. He hasn't seen
16 these. I know he hasn't.
17     MS. WILSON: First of all, we
18 can't say that he hasn't seen those
19 because he just testified that he
20 signed --
21     MR. PETTAWAY: He saw one he
22 signed.
23     MS. WILSON: Okay. That's what

Page 244

1  we can talk about.
2      MR. PETTAWAY: He saw the one
3  he signed.
4      MS. WILSON: If you want to
5  clear something up, the way that we do
6  it is --
7      MR. PETTAWAY: I want to clear
8  it up now because I don't want --
9      MS. WILSON: No. The way we do
10 it is, I ask the questions and you're
11 free to come back and clear it up
12 later.
13     MR. PETTAWAY: Well, I want to
14 clear it up now.
15     MS. WILSON: And you're right,
16 we're in federal court. It's done that
17 way in federal and state court. In a
18 deposition, I ask my questions first,
19 you can come back and clear them up if
20 you have any discrepancies after I'm
21 finished questioning him.
22     MR. PETTAWAY: Well, I want to
23 clear it up now.

61  (Pages 241 to 244)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 245

1    MS. WILSON: Well, I don't --
2  it doesn't matter if you want to clear
3  it up now. The form is, you clear it
4  up later. But you certainly don't
5  indicate to a witness when I'm asking
6  him questions or getting ready to ask
7  him questions about something what
8  something is and explain to him
9  something that might shape his answer.
10    MR. PETTAWAY: Well, I think --
11    MS. WILSON: That's
12  inappropriate.
13    MR. PETTAWAY: -- I probably
14  need to.
15    MS. WILSON: No. It's --
16    MR. PETTAWAY: I'm his
17  attorney.
18    MS. WILSON: That's absolutely
19  right. But you should have looked at
20  documents prior to this deposition.
21    MR. PETTAWAY: I never had
22  these documents.
23    MS. WILSON: Collins, those

Page 246

1  documents came from the EEOC. You are
2  free to subpoena those documents from
3  the EEOC. But you will not --
4    MR. PETTAWAY: I didn't get
5  that.
6    MS. WILSON: Well, that's
7  between you and the EEOC. But you will
8  not stop in this deposition and start
9  to tell him something about a document
10  just because you haven't seen it.
11    MR. PETTAWAY: Well, if I
12  notice an obvious error, that's one
13  thing. If you were incorrect --
14    MS. WILSON: We're not talking
15  about an obvious error.
16    MR. PETTAWAY: -- on something,
17  I'll come back and --
18    MS. WILSON: This is not an
19  error.
20    MR. PETTAWAY: -- and --
21    MS. WILSON: That's right. You
22  can take --
23    MR. PETTAWAY: You can --

Page 247

1    MS. WILSON: The point is, what
2  you're doing is inappropriate, and you
3  know that, Collins. You absolutely
4  know that. And it's been going --
5    MR. PETTAWAY: You can't tell
6  me what I know.
7    MS. WILSON: -- on since the
8  beginning of this deposition.
9    MR. PETTAWAY: Now, hold it.
10  Now, you stop it right there. You were
11  the one been doing some inappropriate
12  stuff. I haven't been doing anything
13  inappropriate. I want to talk to him
14  and clear this up. But, now, when you
15  said this has been going on through
16  this deposition, that's wrong and I'm
17  not going to take that. And I'm not
18  going to have you saying that. That's
19  wrong, now.
20    MS. WILSON: You can disagree
21  with it all you want, but you
22  absolutely know that you are not
23  allowed to stop in the middle of a

Page 248

1  deposition and start telling a witness
2  something about a document. I haven't
3  even started asking him about it other
4  than have you seen it. If his answer
5  is yes or no, then his answer is yes or
6  no. Beyond that, just because you
7  haven't seen it does not mean that
8  there is something hokey-dokey going on
9  here and I'm trying to pull something
10  over on him.
11    These documents were not
12  manufactured at my office. These
13  documents came from the EEOC, which is
14  a public entity that you could get
15  these documents from just as easily as
16  I could. And that's all that I'm
17  trying to make a point of here. Please
18  do not stop him when I'm getting ready
19  to ask him something about a document.
20    MR. PETTAWAY: I'll do it as
21  needed.
22    MS. WILSON: You're absolutely
23  right. And if we need to take it to

62 (Pages 245 to 248)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 249

1 the court as a waste of our time, then
2 that's fine. But I am not trying to
3 mislead Mr. Ragland in any way. I just
4 want to ask him some questions.
5     MR. PETTAWAY: You can ask your
6 questions, but I don't want you
7 misleading him.
8     MS. WILSON: I'm not misleading
9 him. All I asked him was if he
10 recognized these documents. If you
11 want to ask him questions after the
12 fact to clear something up, that's what
13 your right is, Collins.
14     MR. PETTAWAY: Well, it wasn't
15 necessary at that point. But now you
16 can go on.
17     MS. WILSON: Thank you for
18 allowing me to do that.
19 A. The reason I said that, because it
20 looks familiar.
21     MR. PETTAWAY: Hold on. Let
22 her ask you a question.
23 A. Go ahead.

Page 250

1 Q. (By Ms. Wilson) You said these
2 documents look familiar to you; is that
3 correct?
4 A. Yeah. Look close to these right here,
5 the ones we just looked at.
6 Q. And so what you're pointing to is
7 Defendants' Exhibit 11, which is --
8 Defendants' Exhibit 11, which contains
9 a signed affidavit from you --
10 A. Yeah. That's what I thought it was.
11 Q. -- that appears to be one of those
12 documents in there. Is that what
13 you're saying?
14 A. Uh-huh. That's what I thought it was.
15 Q. And that's why it looked familiar to
16 you?
17 A. Yes.
18 Q. Because you just testified that you
19 recognized this --
20 A. Yes.
21 Q. -- which is a part of Defendants'
22 Exhibit 11 and that you signed that,
23 this document --

Page 251

1 A. Yeah.
2 Q. -- this affidavit; is that correct?
3 A. That's right.
4 Q. What I was going to ask you is, do you
5 have any idea why there would be so
6 many drafts of your statement or your
7 affidavit statement? Do you know?
8 A. No, ma'am.
9 Q. Do you know who would have typed these
10 up or -- do you know who typed these
11 up?
12 A. No.
13 Q. Did you type these up?
14 A. No.
15 Q. You didn't type these up?
16 A. No.
17 Q. Enclosed in that is three versions.
18 Enclosed in that Exhibit 12 is three
19 versions of your affidavit and
20 statement. Do you see that? It's
21 three different versions, or three
22 versions, I should say.
23 A. Uh-huh.

Page 252

1 Q. What I wanted to ask you was, if you
2 know, where would the EEOC, if you
3 know, have gotten this information as
4 it pertains to your affidavit
5 statement?
6     (No immediate response given.)
7 Q. Did you tell me earlier, just to be
8 clear, that you met with the EEOC was
9 it on one or more occasions?
10 A. Just one.
11 Q. And this was in the time frame of
12 October to December 2003?
13 A. It was.
14 Q. I know first of all you told me that
15 you met with Mr. Chestnut --
16 A. Right.
17 Q. -- in October-November of 2003?
18 A. Uh-huh.
19 Q. Was it thereafter that you met with the
20 EEOC?
21 A. Yeah, it was after that.
22 Q. How many times did you meet with them?
23 A. EEOC?

63  (Pages 249 to 252)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 253

1  Q. Yes, sir.
2  A. Just one.
3  Q. Just the one time?
4  A. Yes, ma'am.
5  Q. All right. If you met with them just
6     the one time -- and you said they came
7     down and tape-recorded your statement;
8     is that correct?
9  A. Yeah.
10 Q. Tape-recorded what you had to tell
11    them; is that correct?
12 A. Yes, ma'am.
13 Q. Okay. When would you have received
14    this affidavit that is a part of
15    Defendants' Exhibit 11 and sign for it?
16    When would you have gotten this
17    affidavit statement from the EEOC and
18    signed for it? Do you know?
19 A. No, I don't.
20 Q. Other than you know that your signature
21    is dated April 14, 2005?
22 A. Yes, ma'am.
23 Q. You don't remember when you would have

Page 254

1     looked at this to make these changes
2     and do all -- and discuss it, if you
3     had to discuss it?
4  A. No, I can't recall.
5  Q. Do you know if there was a discussion
6     prior to you signing this on April 14,
7     2005, or a meeting?
8  A. Quite sure there was, but I just can't
9     recall it right now.
10 Q. Okay. Would you look on page 5 of
11    this? It's not numbered five, but
12    you're going to have to count the fifth
13    page in there. Do you see the bottom
14    paragraph that starts with the
15    superintendent?
16 A. Uh-huh.
17 Q. Do you see that on page 5? The
18    superintendent and supervisors also
19    treated black and white employees
20    differently when it came to smoke
21    breaks. We were allowed to take smoke
22    breaks in the pole barn. We were given
23    breaks at nine, twelve, and three.

Page 255

1     However, we took smoke breaks more
2     frequently. Around August 2003, we
3     were moved to plant one and plant two
4     to work. Reed had a meeting with us
5     and told us that there would be no more
6     smoking unless you were on breaks. He
7     also said that if you were caught
8     smoking outside of breaks you would be
9     fired. About two hours later, I saw
10    Earl, a white employee, and Reed
11    smoking outside of the break period. I
12    told Yogi and Nate about the smoking,
13    so I went down and smoked, too. I was
14    not disciplined for smoking and do not
15    know of any black employees being
16    disciplined for a smoking violation.
17    Did you tell someone about this
18    situation?
19 A. About the smoking situation?
20 Q. Yes. Did you give someone this
21    information and they typed it up for
22    you?
23 A. No. I didn't tell nobody but Nate and

Page 256

1     Yogi, the two guys up there with me.
2  Q. Did there come a time when you may have
3     told the EEOC when you met with them
4     this information?
5  A. Probably so. I can't recall.
6  Q. Okay. What I wanted to ask you about
7     to see if you knew is, you see at the
8     end of that last sentence there's a
9     number one at the end?
10 A. Uh-huh.
11 Q. It's at the bottom of the page where
12    it's a number one footnote and it says,
13    I think this section on smoking should
14    be removed?
15 A. Uh-huh.
16 Q. Do you know who would have written that
17    or who would have made that notation?
18 A. No, ma'am.
19 Q. Okay. You were talking earlier about
20    rain days. Is it a part of your
21    complaint that you say you did not
22    receive pay for rain days?
23 A. Show-up time.

64  (Pages 253 to 256)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 257

1 Q. For show-up time?
2 A. Uh-huh.
3 Q. On the days that it rained?
4 A. Yes, ma'am.
5 Q. How many times would you say that
6    happened?
7 A. Oh, there was a bunch of times. But
8    after I left GE and went to Hyundai,
9    they was aware that we had filed a
10   complaint. I started getting show-up
11   time then.
12 Q. Okay. How do you know they were aware
13   that you had filed a complaint?
14 A. Like I said, Ben told me, the old guy,
15   told me when I got over to Hyundai that
16   Johnny had told him that.
17 Q. And when you say "filed a complaint,"
18   you're talking about, again, when you
19   came and met with Prince Chestnut?
20 A. Yes, ma'am.
21 Q. So you're saying that they knew that
22   you came and met with Prince? Or Ben
23   told you they, meaning Mansfield --

Page 258

1 A. Yes, ma'am.
2 Q. -- know that y'all came and met with --
3 A. Yes, ma'am.
4 Q. -- Prince Chestnut?
5 A. Yes, ma'am.
6 Q. That's what you're talking about.
7    Okay. Do you recall how many days you
8    say you did not receive show-up time
9    for rain days before you got to
10   Hyundai, since you say you did get pay
11   at Hyundai?
12 A. I can't recall, but it was a bunch of
13   them.
14 Q. Okay. Do you know the difference
15   between a casual employee and a regular
16   full-time employee?
17 A. No, ma'am.
18 Q. Do you know that you were classified as
19   a casual employee?
20 A. Yes, ma'am.
21 Q. You do know that?
22 A. Yes, ma'am.
23 Q. How do you know that?

Page 259

1 A. That's what Prince told us; that Johnny
2    had hired us as casual employees.
3 Q. But I think you're getting into a
4    conversation with your attorney.
5 A. Yeah.
6 Q. If it's something that Prince or
7    Mr. Gaines or Mr. Collins has told you,
8    you can't --
9 A. Okay.
10 Q. -- or shouldn't discuss those things
11   with me.
12 A. Okay.
13 Q. Just so you won't waive your
14   attorney-client privilege with them.
15   So if I'm asking you a question that
16   you think it relates to that, then if
17   you look over at him, that's fine.
18 A. Okay.
19        MS. WILSON: I'm sorry. Did
20   you tell him something?
21        MR. PETTAWAY: I told him to
22   check with me first.
23 Q. Yes. So that's how -- you knew from

Page 260

1    your attorney that you were a casual
2    employee?
3 A. (Witness nods head.) Uh-huh.
4 Q. Okay. You don't have to tell me that,
5    what exactly he said. That's that only
6    way that you knew, is that what you're
7    saying?
8 A. Yes, ma'am. Yes, ma'am.
9 Q. Are you also making as a part of your
10   claim -- are you saying as part of your
11   complaint with the lawsuit that you
12   were denied benefits --
13 A. Yes, ma'am.
14 Q. -- because you were -- do you think it
15   was because you were a casual employee
16   or do you know? That was a poorly --
17 A. I don't know.
18 Q. -- worded question. Let me ask you
19   again. What kind of benefits do you
20   think you were denied by Mansfield?
21 A. Health insurance.
22 Q. Health benefits?
23 A. Yes, ma'am.

65  (Pages 257 to 260)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 261

1  Q. Any other benefits that you think you
2     were denied?
3  A. No. I can't recall right now.
4  Q. Which white employees received health
5     benefits, to your knowledge?
6  A. Well, I know Earl Sow. We was sitting
7     at the lunch table one day and Ervin --
8     Ervin and Nate had been there longer
9     than him. And they was asking him did
10    he have his insurance card and he said,
11    Yeah, I got it right here in my pocket.
12    He said, Well, how did you get yours
13    and we've been here longer? We ain't
14    got one yet. And he, I got it, and he
15    showed it to them.
16 Q. Were you present during this --
17 A. Yes.
18 Q. -- conversation?
19 A. I was sitting at that table with them.
20 Q. And you saw his health insurance card?
21 A. His card.
22 Q. Do you know if any African-American
23    employees --

Page 262

1  A. No.
2  Q. -- received health insurance benefits?
3  A. (Witness shakes head.)
4  Q. You don't know of any African-American
5     employees who --
6  A. I know Nathan Lamar and Ervin, they
7     didn't --
8  Q. Nathaniel?
9  A. -- those two. Nathaniel.
10 Q. You know he didn't get them?
11 A. Yeah.
12 Q. And who else?
13 A. Ervin Tarver.
14 Q. But you don't know of any African-
15    American employees that did receive
16    benefits?
17 A. No. I don't recall.
18 Q. Did you sign an employment contract
19    with Mansfield when you started working
20    for them?
21 A. Contract?
22 Q. Do you know if you did or didn't?
23 A. No. No.

Page 263

1  Q. And in your complaint -- I don't know
2     if you've seen the complaint or not.
3     Have you seen the complaint to the
4     lawsuit?
5  A. No.
6  Q. You have not?
7  A. Which one are you talking about? Let
8     me see.
9        (Defendants' Exhibit 13 was
10       marked for identification.)
11 Q. This is 13, Defendants' Exhibit 13.
12    Have you seen this before, Exhibit 13,
13    which is the complaint to this lawsuit?
14 A. I'm not -- no.
15 Q. You have not?
16 A. No, ma'am. No, I ain't never seen
17    that.
18 Q. Do you know that as a part of your
19    claim that you are making a claim for
20    negligent training, supervision, and
21    retention, meaning that -- or I'm
22    assuming what your complaint means is
23    that Mansfield negligently retained

Page 264

1     employees, negligently supervised and
2     trained employees who you allege have
3     discriminated against you in some way.
4     Did you know that that's a part of your
5     lawsuit?
6  A. Say that again.
7  Q. Do you know that a part of the lawsuit
8     that you have filed alleges that
9     Mansfield was negligent in training,
10    supervising, and retaining certain
11    employees who you claim have
12    discriminated against you?
13 A. Yes.
14 Q. You do know that?
15 A. (Witness nods head.)
16 Q. Who were those employees? Who was
17    negligently trained?
18 A. As far as the ones that was making
19    racial slurs and stuff like that?
20    That's what you're saying?
21 Q. Are you asking me?
22 A. Yes, ma'am.
23 Q. I'm asking you. I'm asking you what

66 (Pages 261 to 264)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 265

1   your claim is.
2       MR. PETTAWAY: He's asking you
3   a question to clarify your question so
4   he can understand.
5   Q. What I'm asking you is, you're making a
6   claim for negligent training,
7   supervision, and retention of
8   employees. You're saying that
9   Mansfield -- I'm asking you. Are you
10  saying that Mansfield hired -- not
11  hired, but negligently trained
12  employees that discriminated against
13  you?
14      MR. PETTAWAY: And he asked you
15  a question to clarify that question.
16  Q. I'm sorry. What was that question
17  again?
18      MR. PETTAWAY: He asked you are
19  you talking about the ones who were
20  doing the racial slurs?
21      MS. WILSON: And I think we're
22  going to be going in a loop, because
23  that's what I'm trying to figure out.

Page 266

1   Q. Is a part of your lawsuit the claim
2   that Mansfield negligently or --
3   negligently trained employees that you
4   say were discriminatory against you or
5   did they negligently train employees in
6   other ways?
7   A. I don't know.
8   Q. You don't know what the basis of that
9   claim --
10  A. No.
11  Q. -- is?
12  A. I don't know.
13  Q. And the same thing for supervision,
14  what is the basis of your claim that
15  Mansfield negligently supervised
16  employees? Why do you say that
17  Mansfield negligently supervised
18  employees as a part of your claim?
19      MR. PETTAWAY: I'm going to
20  object to that question because, you
21  know, the complaint was prepared by the
22  attorneys. And I think it's kind of
23  compounded as his understanding,

Page 267

1   judging from what he's asked you
2   before, and not understanding your
3   question.
4       MS. WILSON: Right. And I'm
5   hoping, or thinking, that in filing the
6   complaint, the attorneys would have
7   talked with the plaintiffs about the
8   charges that are being made on their
9   behalf and that the charges that are a
10  part of the complaint should be or
11  would be based on information provided
12  by the plaintiff.
13      MR. PETTAWAY: Okay. Is that a
14  question you're asking or are you just
15  making an objection to my --
16      MS. WILSON: I'm talking to you
17  in response to your objection as to why
18  I'm asking him these questions. That's
19  why I'm looking at you. Because it
20  seems to me that there's some confusion
21  about why I'm asking him these
22  questions.

Page 268

1       MR. PETTAWAY: No, there's no
2   confusion. The confusion is -- the
3   question I was objecting to is your
4   question was confusing to him.
5       MS. WILSON: Right. And that's
6   why -- and I want to ask him because I
7   want to know what the basis of his
8   complaint is. That's why I'm asking
9   him that. And I can clarify --
10      MR. PETTAWAY: You want the
11  legal basis or factual basis?
12      MS. WILSON: The factual basis.
13  Of course I can't ask him the legal
14  basis because I would expect his
15  attorney to know that. And just as I
16  was explaining to you, that it would
17  have been based on facts he would have
18  given the --
19      MR. PETTAWAY: I got you. And
20  obviously my objection with that, your
21  question is compound and confusing.
22  Because based on what he asked you
23  earlier about the other question

67 (Pages 265 to 268)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 269

1  preceding that one and he never got an
2  answer to it. And I think your
3  question is confusing.
4       MS. WILSON: And what I did was
5  I clarified my question and asked him
6  was he making a claim that Mansfield
7  negligently trained employees that
8  discriminated against him in some way
9  or did they just negligently train
10 employees and they were negligent in
11 their training. I want to know what he
12 understands or thinks based on the
13 facts that he's told us and based on
14 the facts that he knows as to what
15 happened when he worked there what this
16 is about.
17      MR. PETTAWAY: I understand.
18 And my objection is I think the
19 question is confusing.
20      MS. WILSON: Well, let me see
21 if I can --
22      MR. PETTAWAY: If you want to
23 ask him what the --

Page 270

1  Q. Okay. Let me see if I can clarify it
2  for you. What I'm trying to
3  understand, Mr. Ragland, is you have a
4  claim in your lawsuit for negligent
5  training, supervision, and retention.
6  That you might not understand because
7  that's some legalese and stuff that we
8  get in to. But what I want to know is,
9  do you think that there were employees
10 at Mansfield who were not properly
11 trained in some way?
12 A. Yes.
13 Q. And if so, tell me how they were not
14 properly trained or negligently trained
15 and who those people are. So do you
16 understand --
17 A. Uh-huh.
18 Q. -- what I'm asking you? And then after
19 you talk about that, I'm going to ask
20 you the same thing about those folks
21 that you think or know were not
22 properly supervised or negligently
23 supervised by Mansfield and what those

Page 271

1  facts are related to those employees.
2  And we'll talk about the same thing
3  about those employees who were
4  negligently kept on, retained, by
5  Mansfield. So do you understand the
6  question I'm asking you?
7  A. Okay. Ask me the question.
8  Q. And the first one that I'm going to ask
9  you about is, the employees that you --
10 or whether you think there were
11 employees at Mansfield who were not
12 properly trained, who were negligently
13 trained that you worked with, how --
14 and this is going to be compound -- and
15 why? I'm asking a compound question
16 because I just want you to be able to
17 answer it since you understand what I'm
18 talking about.
19 A. Uh-huh.
20 Q. Negligent training, who were the
21 employees that you think were
22 negligently trained?
23 A. Those two supervisors, Johnny Reed and

Page 272

1  Corey Watson.
2  Q. Tell me why you say they were
3  negligently trained.
4  A. Simply because -- let's say the
5  incident -- on one occasion, Johnny
6  Reed had a meeting one morning. And
7  usually we have a meeting, if anybody
8  got a question, you know, they can ask
9  questions. Nathaniel went to ask a
10 question and he told him, Nate, I don't
11 want to hear that. If you don't want
12 to go on what I just said, just hit the
13 gate up there, you know, and that
14 wasn't right. You know, you're
15 supposed to hear this man out. If
16 you're a leader, you're supposed to
17 hear what this man have to say. You
18 know what I'm saying?
19      Corey was that way, too. He didn't
20 know how to talk to people. He didn't
21 know how to work with people. He'd
22 talk to you any kind of way. He had
23 and arrogant attitude. He was

68 (Pages 269 to 272)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 273

1  arrogant, you know. We just had to put
2  up with that because we had bills to
3  pay, too.
4  Q. Just to be clear, that was Johnny Reed?
5  A. Reed, uh-huh.
6  Q. And Corey Watson?
7  A. Corey Watson, yeah.
8  Q. Go on.
9  A. Those two supervisors.
10 Q. We were talking about negligent
11 training. So you're saying they were
12 not properly trained?
13 A. No. No.
14 Q. And negligent supervision -- I'm sorry.
15 Were those the only two employees as it
16 pertains to those that you think were
17 not properly or that were negligently
18 trained by Mansfield?
19 A. Yeah, pretty much so. Yeah. From what
20 I saw, yeah.
21 Q. What about the negligent supervision,
22 who were the employees that you think
23 were -- that Mansfield failed to

Page 274

1  properly supervise?
2  A. Same two.
3  Q. The same two?
4  A. (Witness nods head.)
5  Q. Is there any situation or incident that
6  you want to tell me about that makes
7  you say that?
8  A. Well, no, because a lot of it is
9  already in my statement. I mean, what
10 we had to go through and deal with with
11 those two guys as far as them being
12 supervisors.
13 Q. So you're saying the stuff that we've
14 already talked about?
15 A. Yeah.
16 Q. Or is there something else, is what I
17 want to know.
18 A. No, pretty much what we already went
19 over. I mean . . .
20 Q. What about -- tell me the names of the
21 employees who you say Mansfield was
22 negligent in retaining or keeping them
23 on. Who did they -- what employees did

Page 275

1  they keep on that you believe --
2  A. Should have been terminated?
3  Q. Well, is that what you think? You
4  think they kept somebody on that was
5  not a good employer -- a good
6  supervisor or a good coworker that
7  caused you to feel that you were being
8  discriminated in the workplace?
9  A. Yeah. Robert, for one.
10 Q. And this was the Robert we were talking
11 about earlier?
12 A. Over at Hyundai, uh-huh. Robert is
13 one. Corey and Johnny, Johnny Reed.
14 Q. Why do you say Robert?
15 A. Well, he was the one, you know, made
16 all the racial slurs. And me knowing
17 myself, if I had been around him any
18 longer, it would have turned into
19 something nasty because I don't want to
20 take that too much. I -- I just asked
21 Corey could he put me somewhere else
22 because I couldn't work with him,
23 couldn't work around him.

Page 276

1  Q. And what about Johnny Reed, why did you
2  say he was negligently retained as an
3  employee?
4  A. He -- I don't know why Johnny hung on
5  to Johnny Reed.
6  Q. You mean you don't know why Johnny
7  Crutchfield held on to Johnny Reed?
8  A. Yeah. He was a racist, too.
9  Q. Who was a racist, too?
10 A. Johnny Reed. And he didn't know how to
11 talk to people. And Corey, too, he was
12 the same way. They didn't know how to
13 talk to people. They'll talk to you
14 any kind of way, cuss at you and holler
15 at you and everything. And one time me
16 and Yogi was working and we was on a
17 ladder and white people sitting down
18 here. We just got to work that
19 morning. Corey standing there looking
20 at us like that (indicating). So he
21 said, Y'all ain't tied off on them
22 ladders. You don't have to be tied off
23 unless you're over three feet. We had

69 (Pages 273 to 276)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 277

1    our harnesses on, but we weren't --
2    didn't have it tied off. So Yogi said,
3    Man, he's getting at us about a harness
4    and they're sitting down over there
5    smoking cigarettes and ain't doing
6    nothing. So Yogi said, Man, you over
7    there watching us? He said, You need
8    to be putting them people to work right
9    there. Boy, he went to cussing. He
10   called Johnny. Johnny come around
11   there and Johnny said, Y'all just tic
12   off. Corey's probably just having a
13   bad day. So we walked off and Yogi
14   said, Oh, Yeah, Johnny, you need to
15   tell Corey all us grown out here. He
16   don't need to be cussing us like that.
17   Corey goes, Goddamit. He said, That's
18   what I'm talking about right there.
19   You tell him all of us grown. He don't
20   need to be talking to us like that. He
21   cooled off for a while, but he went
22   back to the same way.
23   Q. Okay. And the Robert that was at

Page 278

1    Hyundai, was he in a supervisory
2    position or no?
3    A. No. He was a journeyman.
4    Q. So he was only a coworker?
5    A. (Witness nods head.) Uh-huh.
6    Q. But you think he was one of the people
7    who was negligently retained, even
8    though he wasn't in a position of
9    authority?
10   A. Yes. Yeah.
11   Q. Okay.
12   A. Because he had -- I can't recall what
13   it was he done, but it was -- it was
14   supposed to terminate him for it. They
15   didn't. Instead of terminating him,
16   they sent him over to Hyundai early.
17   Q. As it relates to Robert, are you saying
18   that employee -- even coworkers who are
19   negligently retained, even though
20   they're not in positions of authority,
21   should be terminated?
22   A. Yeah.
23   Q. Okay.

Page 279

1    A. Yes.
2    Q. And what's the basis for you saying
3    that you and Robert couldn't get along?
4    Was it because he wasn't a good worker?
5    A. No, it wasn't that. It was verbal
6    abuse, using nigger freely, boy freely.
7    Q. Do you think he was --
8    A. See, I was -- I was the only white --
9    black guy working with them guys over
10   at Hyundai on that crew where we was,
11   over there in the engine room. And
12   that was used freely by him. He -- he
13   had a real nasty attitude.
14   Q. Do you think he was a good coworker in
15   terms of doing his work?
16   A. Oh, he -- yeah, he knew his stuff.
17   Q. Okay. So is it your testimony that
18   you're saying he should have been
19   terminated because he used the N-word
20   or -- the N-word freely and called
21   people boy freely? Is that what you're
22   saying?
23   A. He should have been reprimanded, you

Page 280

1    know, wrote up or something. But it
2    was like they didn't -- they didn't
3    really do nothing. Like I say, he had
4    got so bad on the GE, instead of doing
5    something they just moved him on over
6    to Hyundai early to get him away from
7    the guys over there.
8    Q. Do you think that only white employees
9    should be terminated if they use the
10   N-word?
11   A. Well, no, I don't think like that.
12   Q. So you've already told me earlier that
13   some of the plaintiffs have even used
14   the N-word?
15   A. Yeah.
16   Q. Do you think they should have been
17   terminated when they use the N-word?
18   A. Well, they don't use it as frequently
19   as they was, them guys was -- Robert,
20   especially Robert.
21   Q. So it depends on the number of times a
22   person used it in terms of whether you
23   think they should be terminated or not?

70 (Pages 277 to 280)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 281

1  A. I don't think -- I don't really think
2     they should be terminated.  Something
3     should be done about it, you know.
4  Q. As it relates to black and white
5     employees?
6  A. Yeah.
7  Q. So even Patrick Lewis, Ralo --
8  A. Myself, yeah.
9  Q. -- and yourself --
10  A. Yeah.
11  Q. -- should have been terminated for
12     using the N-word in the workplace?
13  A. For using that word like that, yeah.
14  Q. And calling people boy in the
15     workplace, which is what you said
16     Robert did also and you thought he
17     should be terminated for that?
18  A. Yeah.
19  Q. Are you saying yes, you're in agreement
20     with me or --
21  A. I'm saying yes, something should have
22     been done, you know.  I mean, something
23     should have been done that -- calm down

Page 282

1     or something, you know, because
2     that's -- that's a white racist word
3     when you call a black man a nigger.
4     You know that for yourself.
5  Q. Well, I'm just asking you about your
6     claims in the lawsuit and what's here.
7     I think we're almost at the end.  If --
8     what would be a remedy or what would
9     have been a remedy for you, a
10     resolution for you?  When you were
11     terminated in December 2003 and you
12     were saying that the workplace was
13     discriminatory and you had issues with
14     the workplace, what could have made
15     things right?  What in your mind could
16     have made things right?
17     MR. PETTAWAY: I'm going to
18  object to the form of that question.
19  And, also, I don't see how this is
20  going to lead to anything discoverable.
21     MS. WILSON: I appreciate that
22  as an objection.  But my question still
23  remains.

Page 283

1     MR. PETTAWAY: Because -- now,
2  I can see if there was some attempt or
3  something and you're trying to delve
4  into the facts about that.
5     MS. WILSON: Attempt at what?
6     MR. PETTAWAY: At some type of
7  resolution or something.
8     MS. WILSON: No.  I'm not
9  asking him about that.
10     MR. PETTAWAY: Right.  That's
11  what I'm saying.  I don't understand
12  the relevance of that question and how
13  it's going to lead to anything
14  discoverable.
15     MS. WILSON: The whole point
16  here is, I can ask the questions.  You
17  can object to the form.  And if you
18  don't like what he says or you think
19  that you need to clarify something, you
20  can come back and do that.
21     MR. PETTAWAY: Well, I'm going
22  to instruct him not to answer.  I don't
23  understand the relevance and how it's

Page 284

1     going to lead --
2     MS. WILSON: You're instructing
3  him not to answer?
4     MR. PETTAWAY: -- to anything
5  discoverable.
6     MS. WILSON: You're instructing
7  him not to answer?
8     MR. PETTAWAY: That question
9  you just asked him.
10     MS. WILSON: Okay.  If you
11  think it's inappropriate, that's fine.
12  You and I both know that the rules of
13  civil procedure, state or federal,
14  allows you to pursue any type of
15  discovery that may lead to
16  something --
17     MR. PETTAWAY: Right.
18     MS. WILSON: -- that might be
19  admissible.
20     MR. PETTAWAY: That's correct.
21     MS. WILSON: Whether you think
22  it is or not is not the beginning and
23  the end of that query.

71 (Pages 281 to 284)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 285

1    MR. PETTAWAY: Well, it is the
2  beginning.
3    MS. WILSON: It is not the
4  beginning because I'm the one asking
5  questions, so that's where it's
6  beginning. But if you want to take it
7  up with the judge, then that's
8  something we can do, too. Or you can
9  instruct him not to answer that
10  question.
11    MR. PETTAWAY: And I'm asking
12  you because if you can help enlighten
13  me where you're going on how it's going
14  to help. I don't see where it, so I'm
15  going to instruct him not to answer.
16    MS. WILSON: Well, it's not for
17  me to tell you --
18    MR. PETTAWAY: But if you can
19  help me out on that --
20    MS. WILSON: Well, it's not for
21  me to tell you where my line of
22  questioning is going. That's a fair
23  question. If you don't want him to

Page 286

1  answer it, then --
2    MR. PETTAWAY: I don't think --
3  I'm instructing you not to answer. I
4  don't understand that question.
5    MS. WILSON: Okay.
6  Q. (By Ms. Wilson) Mr. Ragland, so your
7    attorney has just instructed you not to
8    answer a question that I've asked. Are
9    you going to not answer that question?
10  A. No, I'm not going to answer it. He
11    told me not to.
12  Q. As a part of your lawsuit, as part of
13    this complaint, you are seeking
14    damages, a way to be compensated or
15    made whole for what you allege
16    Mansfield has done to you and your
17    employment with them. Tell me what you
18    think or what your response is
19    regarding how Mansfield can make you --
20    make you whole. How have you suffered?
21  A. How have I suffered? Emotionally.
22  Q. Okay. Tell me about the emotional --
23  A. Well, as far as --

Page 287

1  Q. -- suffering.
2  A. I have to look at the way, you know, my
3    old lady used to feel when I used to
4    come in there getting on her. I just
5    think about I'm wrong for this, you
6    know, getting on her about my job. As
7    far as having to go to the doctor. And
8    physical, this chunk out of my rump. I
9    don't like that. Then going to my
10    pastor and talking to him about it.
11    It's just a -- just a lot, you know,
12    went on with them people.
13  Q. You've also got a claim for -- you're
14    asking the court to require the
15    defendants to give you back pay. How
16    much do you think that Mansfield owes
17    you in terms of back pay?
18  A. Just back pay alone?
19  Q. Is back pay a loan?
20  A. Just back pay alone?
21  Q. No, sir.
22  A. Just back pay by itself.
23  Q. Are you asking if that's all that

Page 288

1    you've stated in here?
2  A. No. No.
3  Q. Are you saying A-L-O-N-E?
4  A. No. Ask me the question again.
5  Q. What I'm asking you is, you've got --
6    as a part of your request for damages,
7    you're asking the court to require
8    Mansfield to make you whole by giving
9    you back pay, back money, that you
10    believe you are owed. I'm asking you,
11    what do you think you are owed in terms
12    of back pay?
13  A. That's when I asked you just back pay
14    alone or --
15  Q. Right now I'm asking you about back
16    pay. I just asked you about emotional
17    stress and you were telling me about
18    that. So are you saying that you think
19    that there's a monetary amount you can
20    put on the emotional suffering?
21  A. All of it -- the emotional suffering,
22    back pay.
23  Q. Right. And what I want you to do is, I

72 (Pages 285 to 288)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 289

1  was asking you about emotional
2  suffering.  You were telling me the
3  basis of your emotional suffering.  So
4  I think what you're trying to ask me
5  is, are we talking about a monetary fee
6  for just all of this or -- what I want
7  to do is break it down.
8      So as it relates to the emotional
9  suffering, what amount do you put on
10 the emotional suffering that you've --
11 that you say you have suffered as a
12 result of what you allege in your
13 complaint as treatment by Mansfield?
14 A. How much?
15 Q. How much?  What do you put --
16 A. $125,000.
17 Q. And that's relating to you?
18 A. After the lawyer's cut.
19 Q. After the lawyer's cut?
20 A. Yes.
21 Q. Okay.  Is that just for the emotional
22 suffering or for everything?
23 A. Not for everything.

Page 290

1  Q. Okay.  So we've got 125.  And how did
2  you come at that number, $125,000?
3  A. I look at what I had to go through,
4  what I put my old lady through.
5  Q. And what's your old lady's name that
6  you keep referencing?
7  A. Brenda Callens.
8  Q. Brenda Callens?
9  A. Callens, C-A-L-L-E-N-S.
10 Q. Was she your former wife?
11 A. No.
12 Q. She was not?
13 A. No.
14 Q. But she's the mother of your --
15 A. Yes, ma'am.
16 Q. All three children or two?
17 A. All three.
18 Q. When did you and Brenda get together?
19 A. We've been together twenty-six --
20 twenty-five years.
21 Q. Are you still together?
22 A. Yes.
23 Q. Okay.  Were you legally married?

Page 291

1  A. No.
2  Q. Okay.  You've never been legally
3  married?
4  A. I have.
5  Q. You have?
6  A. I was married once.
7  Q. When was that?
8  A. '79.
9  Q. Who were you married to?
10 A. Cassandra Moore.
11 Q. Cassandra?
12 A. Moore.
13 Q. Is it Sandra or Cassandra?
14 A. Cassandra.
15 Q. Is that her maiden name, Moore?
16 A. Yeah, Moore.
17 Q. Where does she live?
18 A. She lives here in Selma.
19 Q. Okay.  When did you divorce?
20 A. Eleven months after that.
21 Q. How old were you at the time?
22 A. Eighteen.
23 Q. Did you have any children?

Page 292

1  A. No.
2  Q. So Cassandra Moore.  Were you married
3  after Cassandra?
4  A. No.  No.
5  Q. So you've been with Brenda for the last
6  twenty-five years?
7  A. Yes.
8  Q. When did y'all get together or when was
9  the beginning of that -- just go
10 twenty-five years back from today?
11 A. That's right.
12 Q. Okay.  So you say you put $125,000 on
13 the emotional suffering.  Did you
14 devise a formula to come at that
15 number?
16 A. No.
17 Q. Okay.  You just say that's -- you think
18 that's a fair number?
19 A. Yes.
20 Q. And what about back pay?
21 A. Back pay?
22 Q. How do you -- how much do you think
23 Mansfield owes you as it pertains to

73 (Pages 289 to 292)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 293

1    back pay that you are owed?
2    A. About 30,000.
3    Q. How do you come at that number?
4    A. Well, I should have been paid more when
5      I got hired in until I told you I
6      presented them that -- those two cards.
7      And then the time that I was off that I
8      lost when they fired me and -- no, I
9      wouldn't say 30,000.  Take that back.
10     Back pay I'd say about --
11           MR. PETTAWAY:  Speak up a
12     little louder.
13           THE WITNESS:  Okay.
14   A. I'd say about 20,000 in back pay.
15   Q. $20,000?
16   A. Yes, ma'am.
17   Q. Okay.  And, again, how did you come at
18     that number, 20,000?
19   A. See, I wasn't with them that long.
20   Q. Okay.  So you gave us a deduction?
21   A. Yeah.  I wasn't with them that long.
22     I'd say about 20,000.
23   Q. And how did you come at that number?

Page 294

1    A. Like I said, when I got hired in, I
2      wasn't hired in at the right amount.
3    Q. Did you have -- do you have a formula
4      that you came up with this number?  Is
5      there some kind of formula or reasoning
6      other than what you just told me,
7      besides the fact that you weren't there
8      for that long?
9    A. No, that's pretty much it.
10   Q. Okay.  And you also are asking for
11     front pay.
12   A. (Witness nods head.)
13   Q. You're shaking your head.  Is that yes?
14   A. I'm going to be honest with you, ma'am.
15     The way we were treated up there --
16     see, y'all don't know.  But the way we
17     were treated, it's worth way more than
18     what I'm -- the number I'm throwing at
19     you now.
20   Q. Well, I'm just asking you.  Tell me
21     what you think in terms of front pay
22     and what's the basis for your reasoning
23     with the amount you're going to give

Page 295

1    me.  So tell me how much you think
2    Mansfield owes you in terms of front
3    pay that would make you whole.
4    A. $90,000.
5    Q. How did you come at that number?
6    A. It's just off the top of my head.  I
7      didn't really think about it.
8    Q. So there is no method or --
9    A. No.
10   Q. -- reasoning as to --
11   A. No.
12   Q. -- how you're giving me these numbers
13     is what you're saying?
14   A. No.
15   Q. Okay.  And as it relates to benefits
16     that you say you've lost, is there any
17     number you put on the benefits that you
18     say you lost or the reasonable value of
19     the benefits that you say you've lost?
20     And I'm using the words from the
21     complaint.  The reasonable value of the
22     benefits that you lost and tell me why
23     you think you are owed that.

Page 296

1    A. Benefits, I would say 50,000.
2    Q. You think you lost 50,000 in benefits
3      or you think you are owed?
4    A. I was owed.
5    Q. You're owed 50,000.  Is that the same
6      thing, lost and owed?
7    A. (Witness shakes head.)
8    Q. So the benefits you say should have
9      been extended beyond the time that you
10     were paid -- beyond the time that you
11     were an employee of Mansfield?  Is this
12     figure -- I'm trying to figure out, is
13     this figure based on the time that you
14     were hired to the time that you were
15     terminated?
16   A. Yes.
17   Q. Okay.  For the benefits?
18   A. Yes.
19   Q. And you're also asking the court for
20     punitive damages.  Do you know what
21     that means?
22   A. Explain it to me.  Refresh my memory.
23     I know what it means.

74  (Pages 293 to 296)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 297

1  Q. Okay. Punitive damages, very rough
2     definition, could be defined as -- and
3     I don't want to put any words or try
4     and tell you exactly what it is,
5     because your attorney can explain that
6     better to you. But if he wants to jump
7     in, that's fine. But punitive damages
8     are damages that can be awarded for
9     egregious contact, something that's
10    just so bad that they can be added on
11    to the compensatory damages to punish
12    the defendant, or the person that's
13    accused, for the actions that they've
14    done, if they're proven to be true.
15 A. Uh-huh.
16    MS. WILSON: Is that okay with
17    you, Collins?
18    MR. PETTAWAY: And to send a
19    message so they would prevent any
20    further conduct.
21 Q. That's right. And to send a message to
22    prohibit further conduct.
23 A. They need to.

Page 298

1  Q. To prohibit Mansfield from doing this
2     again. That's punitive damages. So
3     you understand that?
4  A. Uh-huh.
5  Q. Okay. So you've got a request for
6     punitive damages as well.
7  A. Uh-huh.
8  Q. What would you assess at punitive
9     damages?
10 A. $250,000.
11 Q. And how do you come to that number?
12 A. Going back to what you said.
13 Q. I was just giving you a definition.
14 A. Yeah. That's just to send them a
15    message.
16 Q. So you think $250,000 would send them a
17    message?
18 A. Yeah.
19 Q. And make a -- I'm not going to put
20    words in your mouth. Would send a
21    message?
22 A. Yes.
23 Q. Okay. I didn't ask you earlier, but I

Page 299

1     was going to ask -- I want to ask you
2     now. We know from the documents that
3     you received unemployment benefits
4     after you were terminated. When did
5     you next start work again?
6  A. Trying to think where'd I go after
7     that. I started working April 4 -- I
8     mean April 1, 2004, at Citation Of
9     Alabama.
10 Q. Okay. That was your next job. I know
11    you had that in your discovery
12    responses that Citation was the next
13    place that you went. There was no
14    employment in between William --
15    Mansfield and Citation; is that right?
16 A. That's right.
17 Q. Okay. So you started on April 1 at
18    Citation?
19 A. Uh-huh.
20 Q. According to your discovery responses,
21    you started at nine dollars as a Remer?
22 A. Yes, ma'am.
23 Q. What is a Remer?

Page 300

1  A. Remer, that's -- it's a machine that
2     cleans out the holes on that -- the
3     rough spots on the iron. When they
4     pour it up and mold it and when they
5     break it off, it come to us and we just
6     clean the whole -- clean the -- what
7     you call -- just clean the rough spots
8     out of the iron. That's all it is.
9  Q. Are you currently employed at --
10 A. Yes, ma'am.
11 Q. -- Citation?
12 A. Yes, ma'am.
13 Q. Okay. And you say that your first
14    raise came after ninety days?
15 A. (Witness nods head.) Uh-huh.
16 Q. What were you given in terms of a raise
17    after ninety days?
18 A. I started at nine. After ninety days,
19    they gave me fifty cents. And then
20    after six months, you -- they got the
21    plant pretty much on -- the foundry and
22    finishing, they're pretty much on the
23    same scale. After six months, I was

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 301

1  making what they're making, and then
2  you've got maintenance and staff, you
3  know.
4  Q. So after ninety days it was 9.50?
5  A. Uh-huh.
6  Q. Do you know what it went up to next?
7  A. Ten -- I think 10.18, 10.27, something
8  like that.
9  Q. And that was after --
10 A. Six months.
11 Q. -- six months?
12 A. Yes, ma'am.
13 Q. Do you remember when your pay changed
14 again?
15 A. It changed again in October.
16 Q. October 2004?
17 A. Uh-huh. (Witness nods head.)
18 Q. What was that?
19     MR. PETTAWAY: That would be
20 six months.
21 Q. So October is --
22 A. See, when my pay changed, the company
23 gave us -- that's when we get our

Page 302

1  annual raise, in October. So I got
2  both of them pretty much around the
3  same time.
4  Q. So you got two raises in October?
5  A. Uh-huh. I was making 10.18 or 10.27.
6  And then when the company gave us our
7  raise, that pulled us to eleven --
8  no. That put us up to 10.90. That put
9  us to 10.90. Then the next October
10 comes, that's when we went up to 11.18.
11 Q. So you got two raises in October 2004?
12 A. Uh-huh.
13 Q. Six-month raise to 10.18, and then the
14 annual raise --
15 A. Right.
16 Q. -- at 10.90?
17 A. Uh-huh.
18 Q. And then October 2005, you went up to
19 eleven -- what was that?
20 A. That was 11.18.
21 Q. Okay. And you're still there now?
22 A. Yes, ma'am.
23 Q. So have you received an increase -- did

Page 303

1  you receive an increase in October
2  2006?
3  A. Yeah. We went up to 11.48.
4  Q. And are you currently at 11.48?
5  A. Yes, ma'am.
6  Q. And no other -- you haven't worked
7  anywhere else --
8  A. No.
9  Q. -- since then?
10 A. No.
11 Q. So you don't have a second job or --
12 A. No.
13 Q. -- any other job?
14     MS. WILSON: Collins, I think I
15 may be finished. If you want to --
16     MR. PETTAWAY: I don't have any
17 questions.
18     (Off the record)
19 Q. I have one last question, Mr. Ragland.
20 My question is, how often do you stay
21 in touch with the other folks who are
22 plaintiffs in this lawsuit?
23 A. We know one another well. It ain't

Page 304

1  like we hang out or go to one another's
2  house, nothing like that. Might bump
3  in to one another on the street, but
4  that ain't often.
5  Q. Do you consider yourselves friends?
6  A. Yeah, we're friends, you know. Might
7  stop by on the weekend or something
8  like that when we're off. But as far
9  as seeing one another every day, no,
10 that don't happen because I'm pretty
11 much a loner myself, pretty much stay
12 around the house.
13 Q. So it's not like you guys plan to meet.
14 If you see each other on the street,
15 then you see each other on the street?
16 A. Yeah.
17 Q. That's all I have. Thank you for your
18 time.
19     MR. PETTAWAY: I don't have
20 anything.
21 (The deposition of William Ragland
22 concluded at 2:42 p.m. on June 7,
23 2007.)

76 (Pages 301 to 304)

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 305

```
 1        * * * * * * * * * * *
 2          REPORTER'S CERTIFICATE
 3        * * * * * * * * * * *
 4      STATE OF ALABAMA
 5      COUNTY OF MONTGOMERY
 6          I hereby certify that the above
 7      and foregoing proceeding was taken down
 8      by me by stenographic means, and that
 9      the content herein was produced in
10      transcript form by computer aid under
11      my supervision, and that the foregoing
12      represents, to the best of my ability,
13      a true and correct transcript of the
14      proceedings occurring on said date at
15      said time.
16          I further certify that I am
17      neither of counsel nor of kin to the
18      parties to the action; nor am I in
19      anywise interested in the result of
20      said case.
21
22
            Bridgette Mitchell
23          Reporter and Notary Public
```

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

9d31a912-5a45-491f-a323-173367049c55

Exhibit E-1.tif