ENVIRONMENTAL SAFETY & HEALTH PROGRAM
The Kenny Industrial Services Family of Companies

Code of Safe Practices

DOC# FPP-003

Attachment 003-B

Receipt, Acknowledgment, & Consent Form

DEFENDANT'S
EXHIBIT

4

Substance Abuse Program

I (Print Name) William James Ragland have read and fully understand the Company's Substance Abuse Program and its policies and procedures. Further, I acknowledge that employment or continued employment with the Company at any project is subject to securing acceptable results on any drug screening tests for whatever the reason I was tested. I agree to be subject to future testing in accordance with this policy and understand that refusal to be tested or unacceptable test results subjects me to termination without prior notice.

| Employee Signature | | Social Security Number | Date |
|---|---|---|---|
| William James Ragland | | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | | Date |
| Johnny Crutchfield | | | 4-23-03 |

Consent For – Drug & Alcohol Testing

I (Print Name) William James Ragland do hereby give my consent to the Company and its authorized medical agent (Medical Review Officer) to collect a urine sample, blood sample, evidential breath test or other approved test and further give my consent to the Company or its authorized agent to forward the sample to an approved medical laboratory for performance of appropriate tests thereon to identify the presence of drugs or alcohol. I furthermore give the authorized laboratory my permission to release the results to the Company and/or Client if required.

| Employee Signature | | Social Security Number | Date |
|---|---|---|---|
| William James Ragland | | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | | Date |
| Johnny Crutchfield | | | 4-23-03 |

Receipt Acknowledgment - Employee Safety Handbook

My signature below verifies that I have received my copy of the Company Employee "Code of Safe Practices Handbook", along with orientation and testing on its contents. I shall comply with all the rules in the handbook and any other safety rules and procedures that relate to my job. Additionally, I will contact my Supervisor if I have any questions.

| Employee Signature | | Social Security Number | Date |
|---|---|---|---|
| William James Ragland | | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | | Date |
| Johnny Crutchfield | | | 4-23-03 |

Note: This form must be filled out by new employees on the first day of employment and forwarded to the Regional ESH Office immediately for filing. If there is doubt as to whether this form is already on file, have the employee fill it out again!

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

ENVIRONMENTAL SAFETY & HEALTH PROGRAM
*The Kenny Industrial Services group of companies*

DOC# PPP-003

Code of Safe Practices

**DEFENDANT'S EXHIBIT**

5

Attachment 003-A
Handbook Orientation Testing Log

Note: The information contained in the "Code of Safe Practices" Handbook is only a guide to our overall program expectations, it will help support field Supervision in initial orientation of new employees to our program and quickly determine their level of basic Safety understanding of our business. Answers to all questions in the testing can not be found in the handbook, this is by design, to identify those areas of training that will naturally require more in-depth training with specific Programs, Policies and/or Procedures.

The Supervisor is expected to review all tests, discuss incorrect answers with the employee to ensure understanding, and log the results in the matrix below. Test scores of 80% or below will indicate the need for more in-depth training from the ESH Program Manual to provide an appropriate level of training required for specific types of work, i.e. Confined Space, Fall Protection, or Lead & Heavy Metals Abatement, etc..

It may not be possible to go through the complete handbook in one setting and finish all testing, so it is expected that the training documentation may remain on the jobsite until completed. Once completed, the Supervisor should make a copy of the documentation for his jobsite file, and send the originals to the Regional ESH Office for filing.

| | Subject | Test Date | Testing/Instructor Supervisor | Initial Test Score | Reviewed to 100% "Initial" |
|---|---|---|---|---|---|
| 1. | Hazard Communications | 4-23-03 | J. Crutchfield | 80 | |
| 2. | Personal Protective Equipment | | | 80 | |
| 3. | Respiratory Protection | | | 80 | |
| 4. | Fall Protection | | | 70 | |
| 5. | Heat Stress | | | 90 | |
| 6. | Confined Space | | | 90 | |
| 7. | Scaffolds | | | 90 | |
| 8. | Lead Abatement | | | 70 | |
| 9. | Lock Out / Tag Out | | | 70 | |

I (Print Name) WILLIAM JAMES RAGLAND acknowledge by my signature below that the test answers to the test subjects listed above are my own, that the instructor has reviewed all incorrect answers with me, and that I understand the training I have received.

| Employee Signature | Social Security Number | Date |
|---|---|---|
| William James Ragland | 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 | 4/23/03 |

| Employee Supervisor (Print) | Signature | Date |
|---|---|---|
| Johnny Crutchfield | | 4-23-03 |

Exhibit E-3.tif

ENVIRONMENTAL SAFETY & HEALTH PROGRAM
The Kenny Industrial Services Family of Companies

DOC# PPP-003

Code of Safe Practices

Attachment 003-B

Receipt, Acknowledgment, & Consent Form

**Substance Abuse Program**

I (Print Name) _William James Ragland_ have read and fully understand the Company's Substance Abuse Program and its policies and procedures. Further, I acknowledge that employment or continued employment with the Company at any project is subject to securing acceptable results on any drug screening tests for whatever the reason I was tested. I agree to be subject to future testing in accordance with this policy and understand that refusal to be tested or unacceptable test results subjects me to termination without prior notice.

| Employee Signature | Social Security Number | Date |
|---|---|---|
| William James Ragland | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | Date |
| Johnny Crutchfield | | 4-23-03 |

**Consent For – Drug & Alcohol Testing**

I (Print Name) _William James Ragland_ do hereby give my consent to the Company and its authorized medical agent (Medical Review Officer) to collect a urine sample, blood sample, evidential breath test or other approved test and further give my consent to the Company or its authorized agent to forward the sample to an approved medical laboratory for performance of appropriate tests thereon to identify the presence of drugs or alcohol. I furthermore give the authorized laboratory my permission to release the results to the Company and/or Client if required.

| Employee Signature | Social Security Number | Date |
|---|---|---|
| William James Ragland | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | Date |
| Johnny Crutchfield | | 4-23-03 |

**Receipt Acknowledgment - Employee Safety Handbook**

My signature below verifies that I have received my copy of the Company Employee "Code of Safe Practices Handbook", along with orientation and testing on its contents. I shall comply with all the rules in the handbook and any other safety rules and procedures that relate to my job. Additionally, I will contact my Supervisor if I have any questions.

| Employee Signature | Social Security Number | Date |
|---|---|---|
| William James Ragland | 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 | 4/23/03 |
| Employee Supervisor (Print) | Signature | Date |
| Johnny Crutchfield | | 4-23-03 |

_Note: This form must be filled out by new employees on the first day of employment and forwarded to the Regional ESH Office immediately for filing. If there is doubt as to whether this form is already on file, have the employee fill it out again!_

Exhibit E-3.tif

ENVIRONMENTAL PROGRAM
*The Kenny Industrial Services Family of Companies*

Code of Safe Practices

DOC# PPP-003

TEST-003-1

Hazard Communication

SCORE: **80**

## William James Ragland

Employee Name (print)

1. The Hazard Communication standard is often referred to as the Right to Know standard?

   [✓] True      [ ] False

2. MSDS's are not required on shipping containers provided they are properly labeled?

   [ ] True      [✓] False

3. Right to Know deals with avoiding chemical exposure in the workplace?

   [✓] True      [ ] False

4. A carcinogen (cancer causing agent) would be an example of a physical hazard?

   [✓] True      [ ] False

5. There are two types of chemical hazards. One is physical and the other is chemical?

   [✓] True      [ ] False

6. You will find safe handling precautions on a MSDS?

   [✓] True      [ ] False

7. Health Hazards are either considered acute or short term?

   [ ] True      [✓] False

8. A chronic effect is usually the result of one exposure incident?

   [✓] True      [ ] False

9. One required item on a label is the name of the chemical inside the container?

   [✓] True      [ ] False

10. Copies of MSDS's shall be made available to employees?

   [ ] True      [✓] False

_____
Instructors Signature

4-23-03
Date

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

The Kenny Industrial Services Family of Companies

Code of Safe Practices

DOC# PPP-003

TEST-003-2

Personal Protective Equipment

SCORE:
80

WILLIAM JAMES RAGLAND
Employee Name (print)

1. PPE shall be inspected before each use. Defective or worn equipment shall not be used and replaced at once.
   ☑ True          ☐ False

2. Safety glasses are only required in certain operations and conditions.
   ☐ True          ☑ False

3. Hard hats shall be worn on all Company projects regardless whether owners require hard hats or not.
   ☑ True          ☐ False

4. The Material Safety Data Sheet (MSDS) can be checked for the type of hand protection to be worn.
   ☐ True          ☑ False

5. You should avoid wearing loose, dangling cloths or hanging jewelry around moving or rotating equipment.
   ☑ True          ☐ False

6. Hard hats may be worn backwards.
   ☐ True          ☑ False

7. You are not responsible for the cleaning and maintenance of your PPE.
   ☑ True          ☐ False

8. PPE should be for its intended purpose and suitable for the working conditions.
   ☑ True          ☐ False

9. It is not required to wear an all leather durable type work shoe. A safety tennis shoe is permitted on Company projects.
   ☐ True          ☑ False

10. Hearing protection must be worn when working around high noise areas.
    ☑ True          ☐ False

Instructors Signature _____

Date 4-23-03

Exhibit E-3.tif

### Code of Safe Practices

**TEST-003-3**

**Respiratory Protective Equipment**

SCORE: 80

WILLIAM JAMES RAGLAND
Employee Name (print)

1. All respirators shall be approved by NIOSH and MSHA?

   ☑ True          ☐ False

2. There are two types of respirators, air-purifying and air-supplied?

   ☑ True          ☐ False

3. Air-purifying respirators offer the most protection?

   ☑ True          ☐ False

4. Oil lubricated compressors used for breathing air must be equipped with in line filters and a CO monitor?

   ☑ True          ☐ False

5. It is okay to use an air purifying respirator in an oxygen deficient or IDLH atmosphere?

   ☑ True          ☐ False

6. A positive/negative pressure fit test should be done each time an air purifying respirator is put on?

   ☑ True          ☐ False

7. It is okay to wear a respirator with a beard?

   ☐ True          ☑ False

8. You must pass a training class, pulmonary function test, and fit test to wear a respirator?

   ☑ True          ☐ False

9. Your respirator shall be cleaned after each use and stored properly?

   ☑ True          ☐ False

10. Cartridges shall be replaced if you detect an odor, experience dizziness, or have difficulty breathing?

    ☑ True          ☐ False

Instructors Signature _____

Date 4-23-03

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

The Kenny Industrial Services Family of Companies

DOC# PPP-003

## Code of Safe Practices

TEST-003-4

Fall Protection

SCORE: 70

WiLLiAm JAmES RAGLANd

Employee Name (print)

1. The Company requires fall protection 100% of the time when working six (6) feet or more above a lower level?

   [✓] True     [ ] False

2. If a guardrail system is complete (has handrails, mid-rails, and toe-boards) this will serve as your fall protection?

   [✓] True     [ ] False

3. It is OK to wear safety belts on *Company Name* projects?

   [✓] True     [ ] False

4. Always anchor lanyards and lifelines to structure capable of supporting 5000 lbs?

   [✓] True     [ ] False

5. It is OK to anchor lifelines and lanyards to handrails, only if there's no other anchor point?

   [✓] True     [ ] False

6. Lifelines and lanyards shall be protected from sharp objects?

   [✓] True     [ ] False

7. Multiple workers can be attached to a vertical lifeline?

   [✓] True     [ ] False

8. Fall protection equipment shall be inspected prior to each use?

   [✓] True     [ ] False

9. Always anchor at or above the "d"-ring in the center of the back?

   [✓] True     [ ] False

10. It is OK to attach several lanyards together to make a longer lanyard?

    [ ] True     [✓] False

Instructors Signature

Date  4-23-03

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

ENVIRONMENTAL SAFETY & HEALTH PROGRAM
*The Kenny Industrial Services Family of Companies*

DOC# PPP-003

Code of Safe Practices

TEST-003-5

Heat Stress

SCORE:

90

Employee Name (print): William James Ragland

1. Heat stress is classified into three related illnesses: heat cramps, heat exhaustion, and heat stroke.

   ☑ True          ☐ False

2. Heat stroke is the least serious of the three types of heat related illnesses.

   ☐ True          ☑ False

3. Heat cramps are characterized by dry, red skin.

   ☐ True          ☑ False

4. Heat exhaustion is when one loses the ability to sweat and cannot cool down.

   ☑ True          ☐ False

5. Heat related illnesses can be prevented. One way is to drink plenty of water.

   ☑ True          ☐ False

6. A person gets a heat-related illness when the body loses its ability to get rid of excess heat.

   ☐ True          ☑ False

7. Heat stroke is the only heat-related illness that requires First Aid and/or medical attention.

   ☐ True          ☑ False

8. Another way to prevent heat related illness is to isolate the heat source (i.e., shut off a machine).

   ☑ True          ☐ False

9. Acclimation, is adjusting yourself to a hot environment through short exposures?

   ☑ True          ☐ False

10. It is OK to disregard possible symptoms of heat stress disorders if it doesn't seem to hot?

    ☐ True          ☑ False

Instructors Signature: J. C.

Date: 4-23-03

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

ENVIRONMENTAL, SAFETY & HEALTH PROGRAM
*Kenny Industrial Services of Complexities*
Code of Safe Practices

DOC# PPP-003

TEST-003-6

Confined Space

SCORE: 90

**William James Ragland**
Employee Name (print)

1. Monitoring of a permit required confined space shall include testing of oxygen, flammable levels, and toxins.
   [✓] True          [ ] False

2. The outside attendant in an emergency may enter a confined space.
   [ ] True          [✓] False

3. Only the entry supervisor may order an evacuation of a confined space.
   [ ] True          [✓] False

4. Everyone involved in confined space work must know what to do in the event of an emergency?
   [✓] True          [ ] False

5. The authorized entrant must read and understand all the precautions noted on the entry permit.
   [✓] True          [ ] False

6. It is not necessary to have an outside attendant while working inside a permit required confined space.
   [ ] True          [✓] False

7. A form of communication must be established and maintained between the entrant and attendant while working inside a permit required confined space.
   [✓] True          [ ] False

8. A confined space permit is no longer valid and immediately canceled when an evacuation or alarm sounds.
   [✓] True          [ ] False

9. The entrant is responsible for keeping an accurate head count of attendants inside the confined space.
   [✓] True          [ ] False

10. Never enter a permit required confined space without an entry permit and outside attendant.
    [✓] True          [ ] False

_____          4-23-03
Instructors Signature            Date

Exhibit E-3.tif

ENVIRONMENTAL SAFETY & HEALTH PROGRAM
*The Kenny Industrial Services Family of Companies*

Code of Safe Practices

DOC# PPP-003

TEST-003-7

Scaffolds

SCORE:

90

*William James Ragland*

Employee Name (print)

1. All scaffolds shall be inspected before each use.
   [✓] True          [ ] False

2. Additional fall protection is required when working off a scaffold that is missing guardrails.
   [✓] True          [ ] False

3. It is an acceptable practice to climb a scaffold using the cross braces.
   [✓] True          [ ] False

4. The Company permits employees to ride on mobile scaffold provided the scaffold is on a level surface.
   [ ] True          [✓] False

5. Scaffolds shall not be operated or erected near live power lines unless the proper measures have been taken.
   [✓] True          [ ] False

6. Always keep scaffolds free of debris and slippery conditions.
   [✓] True          [ ] False

7. It is not necessary to have a separate fall arrest system while working from a suspended scaffold.
   [ ] True          [✓] False

8. Tools, equipment and materials should be hoisted and lowered from scaffolds by the use of rope, hoist or other means.
9.
   [✓] True          [ ] False

9. Adding unstable objects to a scaffold to provide additional height is prohibited.
   [✓] True          [ ] False

10. Never work off of a scaffold during high winds and storms.
    [✓] True          [ ] False

Instructors Signature

4-23-03

Date

Exhibit E-3.tif

ENVIRONMENTAL COMPLIANCE PROGRAM
*The Kenny Industrial Services Family of Companies*

Code of Safe Practices

DOC# PPP-003

TEST-003-8

Lead Abatement

SCORE:

70

**William James Ragland**
Employee Name (print)

1) OSHA has established an allowable level of lead at 100 ug/m3 over an eight-hour period.
☑ True       ☐ False

2. If working in an area where lead exposure exists, always wash your hands and face prior to eating, drinking, smoking, or applying cosmetics.
☑ True       ☐ False

3. You must be removed from the lead environment when your blood level reaches 10 ug/dl.
☐ True       ☑ False

4. Personal hygiene is very important in preventing lead poisoning.
☑ True       ☐ False

5. In concentrations below 50 ug/m3, respiratory protection is not necessary.
☐ True       ☑ False

6. It is okay to take home lead contaminated clothing, but it must be washed immediately.
☐ True       ☑ False

7. As an employee you have no right to exposure monitoring results, unless they're >10 times the PEL.
☑ True       ☐ False

8. Do not remove lead dust from protective clothing by shaking or blowing, if co-workers are within 25 ft.
☐ True       ☑ False

9. On a lead job, all surfaces shall be maintained as free as practicable of lead dust.
☑ True       ☐ False

10. Only tobacco products are permitted to be present or consumed in regulated areas.
☑ True       ☐ False

_____
Instructors Signature

4-23-03
Date

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Exhibit E-3.tif

ENVIRONMENTAL, SAFETY & HEALTH PROGRAM
Code of Safe Practices

DOC# PPP-003

TEST-003-9

Lock Out / Tag Out Test

SCORE:

70

William James Ragland
Employee Name (print)

1. Lock out, tag out, try out, is the complete isolation of energy that may create a risk to the worker?
   ☑ True  ☐ False

2. The authorized person is one who de-energizes the equipment and re-energizes the equipment?
   ☑ True  ☐ False

3. The effected employee does not have to apply lock-out devices if his supervisor does?
   ☑ True  ☐ False

4. If a lock out device is accidentally left on by an employee, they are the only one that can remove the device?
   ☐ True  ☑ False

5. A danger tag can be used instead of a lock under any given situation?
   ☑ True  ☐ False

6. Every LO/TO must include the name of the Authorized Person?
   ☑ True  ☐ False

7. Gravity is not a potential hazardous energy sources?
   ☑ True  ☐ False

8. Protection in LO/TO is provided when the Client tells the Authorized Person it is safe?
   ☐ True  ☑ False

9. An effective Lock Out / Tag Out procedure involves the Supervisor, the Authorized Person and the Client Representative?
   ☑ True  ☐ False

10. Effected employees must understand the types of energy involved, before a Lock Out / Tag Out Procedure is performed?
    ☑ True  ☐ False

_J.C._
Instructors Signature

_4-23-03_
Date

Code of Safe Practices

Copyright Kenny Industrial Services L.L.C. 2001
Revision 0 – 01/01/01

Page 53 of 67

Exhibit E-3.tif

DEFENDANT'S EXHIBIT

6

# MANSFIELD INDUSTRIAL COATINGS, INC.

## APPLICATION

Date: 4/22/03    Referred by: ERVIN TARVER

Position(s) Applied For: Painter

Name: William James Ragland    SS# 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

Address: 1522 Plant St,    Apt # N/A

City: Selma    State: Alabama    Zip: 36701

Telephone Number: (334) 8750807    Alternate Telephone Number: (334) 874-1327

Are you over the age of 18? ✓ Yes ___ No

Are you able to submit proof of eligibility for employment in this country? ✓ yes ___ no

Have you ever been employed by MIC before? ___ yes ✓ no  If yes, when? ___

Will you travel/relocate if job requires it? ✓ yes ___ no    When the job requires, will you work overtime? ✓ yes ___ no

**EMPLOYMENT HISTORY:** List your last 3 employers.

| EMPLOYER | Phone | Job Title & Responsibilities |
|---|---|---|
| American Air Filter | (770) 441-3379 | Auditor Audited loads going on and off trucks |
| Pen Gulf Indust. | N/A | Painter Mixed Paint Sprayed Brush-n-Roll |
| Ladd Furniture | (334) 875-1500 | Lead Person over all Edgebanding Machines |

May we contact these employers for references? ✓ yes ___ no

**QUALIFICATIONS AND SKILLS:** List any special qualifications or skills which you have that prepare you for the position you have applied. I can use a spray guns Paint brushes and Rollers

**EDUCATION:**

| Name of High School | Did you Graduate? | If no, highest grade completed? |
|---|---|---|
| Selma High School | ✓ Yes ___ No ___ GED | |
| Name of Vo-Tech Training School N/A | What did you study? | Did you Complete Vo-Tech Training? |
| College N/A | Major | Degree/College Credit Earned |

Comments:

MIC is a Drug Free/Alcohol Free workplace.  Pre-employment screening is a condition of employment.

Application - Revised 7/97

Exhibit E-3.tif

This application is current for 60 days. At the end of 60 days, if you have not heard from Mansfield Industrial Coatings, Inc. and still wish to be considered for employment, it will be necessary to complete a new application.

Mansfield Industrial Coatings, Inc. is an Equal Opportunity Employer. MIC does not discriminate in employment and no question on this application is used for the purpose of limiting or excusing any applicant's consideration for employment on a basis prohibited by local, state or federal law.

I understand and agree that any misrepresentation by me in this application will be sufficient cause for cancellation of this application and/or separation form Mansfield Industrial Coatings, Inc. service if I have been employed. Also, I understand that I am free to resign at any time. MIC reserves the right to terminate my employment at any time, with or without cause and without prior notice. I understand that no representative of MIC has the authority to make any assurances to the contrary.

I give Mansfield Industrial Coatings, Inc. the right to investigate all references and to secure additional information about me, if it is related to the job. I hereby release Mansfield Industrial Coatings, Inc. and its representatives from liability for seeking such information and all other persons, corporations or organizations for furnishing such information.

_William James Ragland_
Signature of Applicant

_4/22/03_
Date

Application - Revised 7/97

Exhibit E-3.tif

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PATRICK LEWIS, JACK RICHARDSON, )
NATHANIEL LAMAR, WILLIAM          )
RAGLAND, RALO COLVON [sic] &       )
ERVIN TARVER                       )
                                   )
        Plaintiffs,                )        Case No.
                                   )
v.                                 )        2:06-CV-497-WKW
                                   )
K2 INDUSTRIAL SERVICES, INC. and   )
MANSFIELD INDUSTRIAL, INC.         )
                                   )
        Defendants.                )
                                   )

## PLAINTIFF WILLIAM RAGLAND'S RESPONSE TO DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now Plaintiff William Ragland, by and through counsel and respond to defendants first request for production as follows:

1. Any and all statements, of whatever nature, taken from any person which concern the factual allegations set forth in Plaintiffs' Complaint or any claims or issues in this lawsuit.

RESPONSE: None in my possession. EEOC has what was filed with them. My attorney has my communication (privileged) with him.

2. Any and all calendars, diaries, logs, scheduling books, appointment books, electronic records or any other type of document which contain any notes taken by each Plaintiff relating to his employment with Mansfield Industrial, Inc. or any claims or issues in this lawsuit.

RESPONSE: None.

3. All documents evidencing correspondence or communications (including all e-mail or other computer messages) between you and Defendants, including any documents evidencing communications or correspondence sent by or received by any agents, employees or representative(s) of Defendants.

RESPONSE: None.



DEFENDANT'S
EXHIBIT

7

4. Any and all documents supporting, concerning or related to each Plaintiff's allegations or damages.

**RESPONSE:** None, other pay stubs which have to be located. The company has better records.

5. All of each Plaintiff's federal and state tax returns, with all accompanying forms and attachments, including W-2 forms, for 2003, 2004, 2005, and subsequent years. This request is continuing in nature and seeks all responsive documents until the trial of this case.

**RESPONSE:** Provided IRS transcripts for 2000, 2001, 2002, 2003, 2004 and 2005.

6. Any and all documents showing all employment compensation, of whatever kind (including any unemployment benefits), received by each Plaintiff since his employment with Mansfield Industrial, Inc. ended.

**RESPONSE:** None in my possession. Trying to get it from the state.

7. Any and all documents in your possession, custody or control, including but not limited to any document maintained on any computer, computer disk or compact disc, concerning or relating to your efforts to obtain employment since your employment at Mansfield Industrial, Inc. ended, including but not limited to, all documents regarding injuries, job postings, cover letters, e-mail applications, interviews, etc.

**RESPONSE:** None in my possession. The state kept it in their computer.

8. An executed original of the enclosed Authorization for Release of Employment Records and Authorization for the Release of Protected Health Information for each Plaintiff.

**RESPONSE:** Will comply.

9. Any and all documents that each Plaintiff submitted to filed or otherwise gave any state and/or federal agency, which relates in anyway to Defendants.

**RESPONSE:** I do not have them. Please see EEOC.

10. All documents evidencing correspondence or communication (including email or other computer messages) between you and any non-party or entity concerning or relating to the allegations in Plaintiffs' complaint.

**RESPONSE:** None, other than EEOC.

11. All documents in the possession of you or your attorneys that were created by or emanated from Defendants.

RESPONSE: My attorney will respond. Only the EEOC documents are present.

12. All paycheck stubs for each Plaintiff from Defendants.

RESPONSE: I have provided what I have.

13. All documents evidencing any alleged retaliation and/or adverse employment action taken by Defendants regarding each Plaintiff.

RESPONSE: I do not understand.

14. All documents you have provided to or received from any expert witness you plan to call to testify at the trial of this matter (including all reports, summaries, work papers, notes, or other documents generated, obtained, reviewed, or otherwise relied upon by any expert witness you intend to call at the trial of this matter), and all documents consulted or relied upon by any such expert in reaching any conclusions and/or opinions in connection with those matters upon which said experts) will testify.

RESPONSE: No expert identified at this time.

15. All documents in the file or in the possession, custody, or control of each expert who may give testimony at the time of trial, including reports (and all drafts of any reports) relating to each Plaintiff's allegations and all documents, notes, memorandum, or other writings of any kind prepared, received, gathered, or used as a reference or support for testimony.

RESPONSE: N/A

16. Any and all documents not specifically requested which tend to prove or disprove any allegations made in Plaintiffs' complaint or otherwise in this action.

RESPONSE: I have provided what I have. My attorney will follow-up.

17. Produce all demonstrative aids or other matters which maybe disclosed, exhibited or shown during the trial, if any, of this matter (via supplementation if necessary).

RESPONSE: My attorney will provide.

18. For any charts, graphs or compilations to be used for or at trial, if any, produce all underlying data used to create the chart, graph or compilation (via supplementation if necessary).

RESPONSE: My attorney will provide.

Respectfully submitted,

CHESTNUT, SANDERS, SANDERS,
PETTAWAY & CAMPBELL, L.L.C.

_____
Collins Pettaway, Jr.(PET008)
Attorney for Plaintiffs
P. O. Box 1290
Selma, AL 36702-1290
(334) 875-9264

Bryon R. Perkins
Attorney for Plaintiffs
THE COCHRAN FIRM
505 N. 20th Street, Ste. 825
The Financial Center
Birmingham, AL 35203

## CERTIFICATE OF SERVICE

This is to certify that I have on this the 20th day of April 2007 served a copy of the foregoing answers by depositing the same in the U.S. mail properly addressed with postage prepaid upon:

William H. King
Natasha L. Wilson
Haley A. Anderson
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 N. 20th Street
Birmingham, AL 35203-3200

_____
OF COUNSEL

Exhibit E-3.tif

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PATRICK LEWIS, JACK RICHARDSON, )
NATHANIEL LAMAR, WILLIAM          )
RAGLAND, RALO COLVON [sic] &      )
ERVIN TARVER                      )
                                  )
    Plaintiffs,                )    Case No.
                                  )
v.                                )    2:06-CV-497-WKW
                                  )
K2 INDUSTRIAL SERVICES, INC. and  )
MANSFIELD INDUSTRIAL, INC.        )
                                  )
    Defendants.                )

## PLAINTIFF WILLIAM RAGLAND'S ANSWER TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Comes now plaintiff, William Ragland, by and through counsel and answers the defendants' first set of interrogatories. As follows:

1. State whether you have taken or received any statements, either oral or in writing, from any person, including parties and non-parties, who had or has any information or knowledge relating to the allegations made the basis of this lawsuit, and, if so, state as to each such person his/her identity, including name, address, occupation, age and telephone number, the date of any such statement, and the substances of any such statement.

ANSWER: None, other than to EEOC and my attorney.

2. Identify all persons with knowledge of any fact(s) that support(s) or relate(s) to any of the allegation(s) contained in the Complaint and describe the subjects of such knowledge as to each person.

1



DEFENDANT'S EXHIBIT
8

ANSWER: Patrick Lewis; Nathaniel Lamar; Jack Richardson; Ralo Colvan; Ervin Tarver. Also, former employees Earl Sow, Steve <u>unknown</u>, Jeff Smitherman, Ben Gayle and Gary Gordon.

3.  Identify all current or former employees of Defendants or General Electric with whom you or your attorneys have spoken, corresponded or otherwise communicated concerning any matter relating to the allegations of the Complaint or claims made in this lawsuit.

ANSWER:  Patrick Lewis; Nathaniel Lamar; Jack Richardson; Ralo Colvan; Ervin Tarver.

4.  Identify all persons who have provided you with any written correspondence, electronic information (including emails), letters, or any other form of document(s) relating to the claims and allegations in this lawsuit, and include a description of the correspondence and/or document(s) provided.

ANSWER:  EEOC, IRS, Prince Chestnut and GA Dept. of Labor, Attorneys for Defendant K2 Industrial Service, Inc.

5.  Identify any and all experts which will testify at the trial of this matter, including the subjects upon which each expert will testify.

ANSWER: None identified at this time.

6.  State whether Plaintiff sought medical, psychological, psychiatric, or other treatment for the effects of the alleged harassment and/or discrimination, and, if so:

    (a)    Describe the treatment.

    (b)    State the dates on which treatment was received.

    (c)    State the name and address of the practitioner who provided the treatment.

    (d)    Describe the practitioner's credentials or type of practice.

ANSWER:  None, other than over the counter medicine.

2

Exhibit E-3.tif

7. Please provide the style of all lawsuits to which Plaintiff has been a party, either as a Plaintiff or Defendant, including civil, criminal, domestic, and workers' compensation actions, a brief description of the substance of each lawsuit identified, and the ultimate outcome of each such lawsuit.

ANSWER: In the early 90's I filed a discrimination lawsuit against Pilliod of Alabama. I was the only person in my department for about five months (the model shop). After the five months they put a white guy over me who had moved out of the model shop for more money. They brought him back, put him over me and he (Darryl Averet) said himself "man this is not right". It felt like tome I got brushed by Ms. Brenda Owens of EEOC.

8. State whether you have ever filed a claim charging employment discrimination on the basis of age, race, sex, national origin, religion, or disability other than the claim at issue in this case, and for each claim state:

    (e)    Date filed.

    (f)    Parties named.

    (g)    Description of allegedly discriminatory conduct.

    (h)    Description and outcome of proceedings.

ANSWER: See seven above.

9. Identify each and every action you or anyone acting on your behalf took, after your employment with Mansfield Industrial, Inc. ended, to seek and obtain any alternative employment or income source. This interrogatory is continuing in nature and covers the time period from the end of your employment with Mansfield Industrial, Inc. to the trial of this lawsuit.

3

ANSWER: I went to file for unemployment, which they tried to block. After GA Dept. of Labor did some investigating they sent me a letter stating I was able to get my unemployment because Mansfield could not give them a reason why they terminated me.

10. If you have refused to produce any document(s) requested in Defendants' Document Requests to Plaintiffs, identify each such document and state the ground(s) for withholding the document.

ANSWER: None.

11. Give a complete history of your employment stating each employer, salary or rate of pay, title or position held, dates of any title or position changes, reasons for title or position changes or changes in employment, duties you performed or were responsible for in each title or position, and compensation and benefits associated with each title or position. . This interrogatory is continuing in nature and should include all employers for which you have worked from the time your employment at Mansfield Industrial, Inc. ended to the trial of this lawsuit.

ANSWER: After my employment with Mansfield, I drew unemployment for about three months. Then I started working for Citation of Alabama as a Remer at $9.00/hr. on 4/1/04. I am still with Citation of Alabama. My first raise came after 90 days. My position changed throughout my three years.

12. Identify all meetings that you attended during your employment with Defendants where an employee(s) or representative(s) of Defendants announced or discussed any aspect of Defendants' discrimination and/or harassment policy.

4

ANSWER: GE gave us orientation not Mansfield and they did have a no tolerance discrimination/harassment policy. I was told by Mansfield superintendent, Johnny Cruchfield not to bother any of GE personnel or people.

13. Please state the type (e.g., lost wages, back pay, mental anguish, punitive damages, etc.) and exact amount of each item of damages for which you seek recovery in this lawsuit.

ANSWER: My attorneys will provide.

14. Identify each hospital, physician, chiropractor, osteopath, psychiatrist/psychologist, social worker or counsel, pharmacist or pharmacy, and/or other medical practitioner or healthcare provider, who has seen, treated, and/or provided medication for Plaintiff in the last ten (10) years, and provide a description of the injury and/or affliction, the dates of treatment and/or visits, and the type of treatment rendered and/or medication prescribed.

ANSWER: Vaughan Regional Medical Center; Dr. Chudy Okoye; Winn-Dixie Pharmacy. Over the last ten years I've been treated for lower back pain, gout, high blood pressure and on 12/11/06 I had a heart attack. I had three blocked arteries. A stint was done at Jackson Hospital, Montgomery, AL by Dr. Sydi V. Askut.

15. Identify all Mansfield Industrial, Inc. employees who worked on your "shift" at the time each alleged incident of harassment or discrimination took place and at the time your employment with Mansfield Industrial, Inc. ended.

ANSWER: Ben Gail, Nathaniel Lamar, Ervin Tarver, Michael "Corey" Watson, Cindy, Robert.

_William Ragland_
WILLIAM RAGLAND

SWORN TO and SUBSCRIBED before me this _19th_ day of _April_ 2007.

5

Exhibit E-3.tif

_____

NOTARY PUBLIC

MY COMMISSION EXPIRES: 2-14-2009

_____

Collins Pettaway, Jr.(PET008)
Attorney for Plaintiffs
CHESTNUT, SANDERS, SANDERS,
PETTAWAY & CAMPBELL, L.L.C.
P. O. Box 1290
Selma, AL  36702-1290


Bryon R. Perkins
Attorney for Plaintiffs
THE COCHRAN FIRM
505 N. 20th Street, Ste. 825
The Financial Center
Birmingham, AL 35203


## CERTIFICATE OF SERVICE

This is to certify that I have on this the 20th day of April 2007 served a copy of the foregoing answers by depositing the same in the U.S. mail properly addressed with postage prepaid upon:

William H. King
Natasha L. Wilson
Haley A. Anderson
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 N. 20th Street
Birmingham, AL  35203-3200

_____

OF COUNSEL


6

DOL-442B2(R-2/97

## GEORGIA DEPARTMENT OF LABOR
## CLAIMS EXAMINER'S DETERMINATION

BYB ___11/09/03___

B ___11/09/03___

SSN ___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___

FIELD SERVICE OFFICE:
0901                                                        0000
GEORGIA DEPARTMENT OF LABOR
INTERSTATE CLAIMS CENTER
P.O. BOX 38184
ATLANTA, GEORGIA  30334
FAX # (404) 232-3087

| EMPLOYER | CLAIMANT |
|---|---|
| MANSFIELD INDUSTRIAL COATINGS<br>PO BOX 6205<br>PENSACOLA  FL  32503 | WILLIAM J RAGLAND<br>1522 PLANT STREET<br>SELMA AL        36703 |

### SECTION I - CLAIM DETERMINATION

Benefits are allowed as of 11/09/03.

### SECTION II - LEGAL BASIS FOR DETERMINATION

Section 34-8-194 (2) (A) of the Employment Security Law says that you cannot be paid unemployment benefits if you were fired from your most recent employer for not following your employer's rules or orders.  In addition, you may not be paid unemployment benefits if you were fired for failing to perform the duties for which you were hired, if that failure was within your control.  You also cannot be paid benefits if you were suspended for any of these same reasons.  The law says that your employer has to show that discharge or suspension was for a reason that would not allow you to be paid unemployment benefits.  If you cannot be paid unemployment benefits under this section of the law, you may qualify at a later time.  To do this, you must find other work and earn wages covered under unemployment.  The covered wages must be at least ten times the weekly amount of your claim.  If you become unemployed through no fault of your own, you may reapply for unemployment benefits.

### SECTION III - REASONING

You were let go by your employer because there was no work to do.  You are unemployed due to a lack of work.  You can be paid unemployment benefits.

DEFENDANT'S
EXHIBIT

9

### SECTION IV - ACCOUNT CHARGEABILITY

NOTICE TO EMPLOYER:
Signed, timely separation information was not received.

### SECTION V - APPEAL RIGHTS

This determination will become final unless you file an appeal on or before 12/11/03.  If you wish to appeal, submit a written request to the above address.  If you need further information, contact an office of the Georgia Department of Labor.

The claimant's potential benefit amount is shown on the reverse side.

| Georgia Department of Labor | 11/25/03 | 11/26/03 |
|---|---|---|
| Claims Examiner | Date of Interview | Release Date |

NM7009

**DETERMINATION OF MONETARY ENTITLEMENT:** By law, we are required to inform you of this information. The amount indicated was established based on earnings of the claimant during the base period (first four of the last five completed calendar quarters at the time of filing).

_219_  Weekly Benefit Amount,  _15_  Weeks,  $ _3285_ Maximum Benefit Amount.

The determination on the reverse side was based on information provided as of the date of the predetermination fact-finding interview. If you disagree with the determination and wish to appeal, you may do so by stating the reason below. If an appeal is filed by either party, a copy of all records upon which the original determination was based will be made available to both parties prior to the appeal hearing. If you do not want to appeal the determination, retain this copy for your records.

Charging (of benefits paid) to your tax account based on this decision does not apply unless you are a liable Georgia employer. Your account will not be charged more in benefits than you paid in wages to this individual.

## EMPLOYER'S STATEMENT OF APPEAL ON THIS CLAIM
(Complete and return this form ONLY if appeal is requested.)

_____        _____
Signature of Official, Employee of the Employer                     Date
or Authorized Agent for the Employer

WARNING:    It is a crime under Paragraph (b) of OCGA Section 34-8-256 of the Employment Security Law to make any false statement or to fail to disclose any material fact in connection with an unemployment insurance claim. VIOLATORS WILL BE PROSECUTED.

**OCGA Section 34-8-122**
**PRIVILEGED STATUS OF LETTERS, REPORTS, ETC., RELATING TO ADMINISTRATION OF CHAPTER** - "All letters, reports, communications, or any other matters, either oral or written, from the employer or employee to each other or to the Department of Labor or any of its agents, representatives, or employees, which letters, reports, or other communications shall have been written, sent, delivered, or made in connection with the requirements of the administration of this chapter, shall be absolutely privileged and shall not be made the subject matter or basis for any action for slander or libel in any court of the State of Georgia."

**LIST YOUR JOB OPENINGS WITH THE GEORGIA DEPARTMENT OF LABOR**

GEORGIA DEPARTMENT OF LABOR
CLAIMS EXAMINER'S DETERMINATION

BYB _____ 11/09/03 _____

⬤B _____ 12/21/03 _____

SSN _____ 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 _____

FIELD SERVICE OFFICE:
0901
GEORGIA DEPARTMENT OF LABOR
INTERSTATE CLAIMS CENTER
P.O. BOX 38184
ATLANTA, GEORGIA 30334
FAX # (404) 232-3087

0901

| EMPLOYER | CLAIMANT |
|---|---|
| MANSFIELD INDUSTRIAL COATINGS<br>P O BOX 6205<br>PENSACOLA  FL  32503 | WILLIAM J RAGLAND<br>1522 PLANT ST<br>SELMA AL        36703 |

## SECTION I - CLAIM DETERMINATION

Benefits are allowed as of 12/21/03.

## SECTION II - LEGAL BASIS FOR DETERMINATION

Section 34-8-194 (2) (A) of the Employment Security Law says that you cannot be paid unemployment benefits if you were fired from your most recent employer for not following your employer's rules or orders.  In addition, you may not be paid unemployment benefits if you were fired for failing to perform the duties for which you were hired, if that failure was within your control.  You also cannot be paid benefits if you were suspended for any of these same reasons.  The law says that your employer has to show that discharge or suspension was for a reason that would not allow you to be paid unemployment benefits.  If you cannot be paid unemployment benefits under this section of the law, you may qualify at a later time.  To do this, you must find other work and earn wages covered under unemployment law.  The covered wages must be at least ten times the weekly amount of your claim.  If you become unemployed through no fault of your own, you may reapply for unemployment benefits.

## SECTION III - REASONING

You were fired for failing to obey rules, orders, instructions or the established procedures of your employer when you failed or refused to lift a box as instructed by your supervisor.  You have stated you did not fail to comply.  You stated you told the supervisor about your back injury and that you were unable to lift the box.  You also stated that the head of safety told you that the box was supposed to be lifted by forklift equipment.  For you to be disqualified, your employer must show that you failed to work as required.  Your employer has not done so.  Therefore, you can be paid unemployment benefits.

## SECTION IV - ACCOUNT CHARGEABILITY

NOTICE TO EMPLOYER:
Signed, timely separation information was not received.

## SECTION V - APPEAL RIGHTS

NOTE: This determination will become final unless you file an appeal on or before 01/22/04.  If you wish to appeal, submit a written request to the above address.  If you need further information, contact an office of the Georgia Department of Labor.

The claimant's potential benefit amount is shown on the reverse side.

| Georgia Department of Labor | 01/06/04 | 01/07/04 |
|---|---|---|
| Claims Examiner | Date of Interview | Release Date |

DETERMINATION OF MONETARY ENTITLEMENT:  By law, we are required to inform you of this information. The amount indicated was established based on earnings of the claimant during the base period (first four of the last five completed calendar quarters at the time of filing).

$ __219__ Weekly Benefit Amount, __15__ Weeks, $ __3285__ Maximum Benefit Amount.

The determination on the reverse side was based on information provided as of the date of the predetermination fact-finding interview. If you disagree with the determination and wish to appeal, you may do so by stating the reason below. If an appeal is filed by either party, a copy of all records upon which the original determination was based will be made available to both parties prior to the appeal hearing. If you do not want to appeal the determination, retain this copy for your records.

Charging (of benefits paid) to your tax account based on this decision does not apply unless you are a liable Georgia employer. Your account will not be charged more in benefits than you paid in wages to this individual.

## EMPLOYER'S STATEMENT OF APPEAL ON THIS CLAIM
(Complete and return this form ONLY if appeal is requested.)

_____        _____
Signature of Official, Employee of the Employer                     Date
or Authorized Agent for the Employer

WARNING:  It is a crime under Paragraph (b) of OCGA Section 34-8-256 of the Employment Security Law to make any false statement or to fail to disclose any material fact in connection with an unemployment insurance claim. VIOLATORS WILL BE PROSECUTED.

OCGA Section 34-8-122
PRIVILEGED STATUS OF LETTERS, REPORTS, ETC., RELATING TO ADMINISTRATION OF CHAPTER - "All letters, reports, communications, or any other matters, either oral or written, from the employer or employee to each other or to the Department of Labor or any of its agents, representatives, or employees, which letters, reports, or other communications shall have been written, sent, delivered, or made in connection with the requirements of the administration of this chapter, shall be absolutely privileged and shall not be made the subject matter or basis for any action for slander or libel in any court of the State of Georgia."

LIST YOUR JOB OPENINGS WITH THE GEORGIA DEPARTMENT OF LABOR

EEOC Form 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| MANSFIELD INDUSTRY COATING<br>Attn: Liz Hebert<br>Human Resource Department<br>1029 La Crete<br>Baton Rouge, LA 70810 | **William Ragland** |

THIS PERSON (check one or both)

☐ Claims To Be Aggrieved

☒ Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**130-2004-02048**

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☒ Title VII of the Civil Rights Act          ☐ The Americans with Disabilities Act

☐ The Age Discrimination in Employment Act          ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☐ No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☒ Please provide by   **22-APR-04**   a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to _____
If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Samuel O. Hall,**
**Enforcement Supervisor**
*EEOC Representative*
*Telephone:*   **(205) 731-1317**

**Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): ☒ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE  ☐ DISABILITY  ☒ RETALIATION  ☐ OTHER

## See enclosed copy of charge of discrimination.

DEFENDANT'S
EXHIBIT
*10*

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| Mar 22, 2004 | Bernice Williams-Kimbrough,<br>District Director | *Bernice Williams Kimbrough (apt)* |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | 130-2004-02048 |

_____ and EEOC

State or local Agency, if any

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. William Ragland | (334) 875-0807 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1522 Plant Street | Selma, Alabama 36701 | 11/15/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME Mansfield Industry Coating Corporation | NUMBER OF EMPLOYEES, MEMBERS More than 50 | TELEPHONE *(Include Area Code)* (225) 752-7564 |
|---|---|---|

| STREET ADDRESS 1029 EasCrete Services, Inc. | CITY, STATE AND ZIP CODE Baton Rouge, LA 70810 | COUNTY Parish |
|---|---|---|

| NAME K2 Industrial Services, Inc. | TELEPHONE NUMBER *(Include Area Code)* (312) 645-7770 |
|---|---|

| STREET ADDRESS 414 N Orleans | CITY, STATE AND ZIP CODE Chicago, Illinois 60610 | COUNTY Cook |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] AGE
[X] RETALIATION   [ ] NATIONAL ORIGIN   [ ] DISABILITY   [ ] OTHER *(Specify)*

DATE DISCRIMINATION TOOK PLACE
EARLIEST *(ADEA/EPA)*   LATEST *(ALL)*

Sept. 2003-- Dec. 20, 2003

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHMENT

RECEIVED
MAR 12 2004

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 2-19/04   *William H. Ragland* Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |

EEOC FORM 5 (Test 10/94)

I started working with this company (Mansfield Industrial Coating) around the middle of March 2003. I worked the first seven months at the G.E. Plant in Burksville, Alabama. During those seven months a lot of racial incidents happened. Our Superintendent Johnny Krutchfield and our supervisor Michael "Cory" Watson were involved in those incidents. There were two crews at the G.E. Plant one crew mostly black at plant 5 and another mostly white at plant one or two. We caught a ride in with everyday he worked on the other end plant one or two. So is he missed a day we would have to catch a ride or we would call in to the office and let them know we were going to be late or we didn't have a ride. This on incident happened when Jack didn't show up and we couldn't catch a ride we all called in and told Johnny we couldn't make it. So the next morning when we got to work Johnny Krutchfield came in the break area he called all of us together for a meeting he said "I'm tired of this damn shit I miss a day, everybody miss a day he said from now on no more excuses doctor excuse nothing if you miss another day you might as well find you a job closer to home you will no longer work for Mansfield now I'm going down in the other end and have the same meeting with them. We already knew he was talking to us blacks because we were the only ones that had missed the day before that morning. So that evening we asked Jack Richardson when we all got in the car Nathaniel Lamar, Ervin Tarver and myself "did Johnny Krutchfield come and have a meeting with you all he said no we all witnessed one incident where Johnny Krutchfield told Johnny Reid if Rolo Covin comes in late send him home. Then he said from now on if anybody comes in late or miss a day and don't call in will be sent home for a day. Well Rolo Covin (a black guy)

came a few minutes late and was sent home on that same Jack Richardson didn't come in or call. So Johnny Reid said when Jack come in tomorrow I'm going to send him home. The next when Jack Richardson (a white guy) came in they put him straight to work no question asked. Rolo Covin was really upset. He said man they doing it in my face (letting the white guy work after they said they were going to send him home. Johnny Reid told us the only time we could smoke was on our 9:00 break our 12:00 lunch and our 3:00 break but when we would go the restroom. We would see some of the white guys over in the break area smoking sometimes Johnny Reid (also a white supervisor) would be standing over in the break smoking with them. There was another incident where me and Ervin Tarver we on 6 foot ladder spot priming and Michael Watson (a white supervisor) was standing over us and I pointed out to Ervin I said man he's over here watching us I said to Ervin look at those people sitting down doing nothing (white people our crew members) that's when Ervin said Cory you're standing over watching you need to be find those people over there sitting down something to do. That's when he moved. Didn't none of us blacks guys have insurance that worked at plant 5. Rolo Covin and Jack Richardson they worked at plant 1 or 2 they didn't have insurance either which was a concern for all of us because we worked around a lot of poison gases and chemicals. Another incident we were working on a silo, which was right next to a part on the plant that released carbon monoxide into the air. Before we when in that area G.E. Safety gave us a class on carbon monoxide. After the glass they gave us 1 monitor and told us if that monitor went off come down at once don't hesitate because that monitor is letting us know carbon

2

monoxide is in the air. We (myself, Ervin Tarver and Nathaniel Lamar) worked on this silo a few days. On one day the monitor going off pretty regular so we kept coming down. They told us to go to the break room when the monitor goes off until the air was clear. We were back to the silo when Johnny Reid asked why were we coming down so much we told the monitor was going off. He said (the next time it goes off turn your head the other way) which we all knew that wasn't right because we all know carbon monoxide can kill you. We all have been through something; seen something, heard something or saw something. I told Ervin and Nathaniel on day I said "man everyday I get in this car going to work I wish I getting in the car to come home. Most of the meetings we had were threatening you couldn't even ask a question without them saying something like if you don't like it go to the gate don't come back etc. Another incident on Friday some of the black guys at plant 5 needed to get off all little early to go pay bills Johnny Krutchfield said "anybody leave early don't come back Monday. So we didn't go but when we got off that evening Jack Richardson said, "I thought you all were leaving early" we told him what Johnny said and he said that ain't right. We said what are you talking about Jack said Johnny let Earl and Jeff, two white guys go home early they left at 12:00. They came back the following Monday and went to work well all of the guys that are on this suit have been fired or laid off from this company. I was the last to go I got fired for no reason. When I went through the channels for filing my unemployment compensation The Department of Labor in Georgia said this company wasn't showing my wages for the 2nd or 3rd quarter so I had to call the Department of Labor in Alabama they couldn't pull it up

3

so I had to take 2 of my check stubs to the employment office here in Selma and have them take copies of my check stubs and fax them to the department of labor. So I don't know what was going on there. I wrote them a four page on how I was fired. They called me and asked me if there was any other reason I could consider for one being fired I told them only reason I could think of was retaliation of this lawsuit.

Another thing I noticed, we didn't get show-up time if it rained us out at G.E., but we got show-up time at Haundi. There have also been time when they would let the white guys get overtime and the blacks guys wouldn't know about it until we got back to work on Monday.

4

| | PERSON FILING CHARGE |
|---|---|
| Chief Administrative Officer<br>General Electric Company<br>1 River Road<br>Schenectady, New York 12345 | **William Ragland**<br><br>THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s)<br>EEOC CHARGE NO.<br>130-2004-02048 |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act      [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act      [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **July 17, 2005** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____
If you **DO NOT** wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**J.W. Furman, Investigator**

    *EEOC Representative*

    *Telephone:*    **205/212-2061**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

```
DEFENDANT'S
EXHIBIT

  11
```

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| June 16, 2005 | Bernice Williams-Kimbrough, District Director | *[signature]* |

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

tion 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which h litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

This form is affected by the Privacy Act of 1974; see Privacy act Statement before completing this form.

130-2004-02648

| | FEPA |
|---|---|
| X | EEOC |

**MANSFIELD AMENDED CHARGE**

and EEOC

State or local Agency, if any

_(Indicate Mr., Ms., Mrs.)_
Mr. William Ragland

HOME TELEPHONE _(Include Area Code)_
(334) 875-0807

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1522 Plant Street | Selma, Alabama 36701 | 11/15/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME _(If more than one list below.)_

| NAME Mansfield Industry Coating Corporation | NUMBER OF EMPLOYEES, MEMBERS More than 50 | TELEPHONE _(Include Area Code)_ (225) 752-7564 |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1029 La Crete | Baton Rouge, LA 70810 | Parish |

| NAME R2 Industrial Services, Inc. | | TELEPHONE NUMBER _(Include Area Code)_ (312) 645-7770 |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 414 N. Orleans | Chicago, Illinois 60610 | Cook |

CAUSE OF DISCRIMINATION BASED ON _(Check appropriate box(es))_

| X RACE | ☐ COLOR | ☐ SEX | ☐ RELIGION | ☐ AGE |
|---|---|---|---|---|
| X RETALIATION | ☐ NATIONAL ORIGIN | ☐ DISABILITY | ☐ OTHER _(Specify)_ | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST _(ADEA/EPA)_    LATEST _(ALL)_
September 2003–December 20, 2003

☐ CONTINUING ACTION

THE PARTICULARS ARE _(If additional paper is needed, attach extra sheet(s)):_

OTHER EMPLOYER/AGENCY WHO DISCRIMINATED AGAINST ME:

NAME
General Electric Company

TELEPHONE
(518) 433-4308

STREET ADDRESS
1 River Road

CITY, STATE AND ZIP
Schenectady, New York 12345

SEE ATTACHMENT FOR THE PARTICULARS

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their proceedures.

I declare under penalty of perjury that the foregoing is true and correct.

2-14-05
_William Ragland_
Charging Party _(Signature)_

NOTARY - _(When necessary for State and Local Requirements)_

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
_(Day, month, and year)_

EEOC FORM 5 (Test 10/94)

Particulars of William Ragland:

I started working with this company (Mansfield Industrial Coating) around the middle of March 2003. I worked the first seven months at the G.E.Plant in Burksville, Alabama. During those seven months a lot of racial incidents happened. Our Superintendent Johnny Krutchfield and our supervisor Michael "Cory" Watson were involved in those incidents. There were two crews at the G.E. Plant one crew mostly black at plant 5 and another mostly white at plant one or two. We caught a ride in with everyday he worked on the other end plant one or two. So is he missed a day we would have to catch a ride or we would call in to the office and let them know we were going to be late or we didn't have a ride. This on incident happened when Jack didn't show up and we couldn't catch a ride we all called in and told Johnny we couldn't make it. So the next morning when we got to work Johnny Krutchfield came in the break area he called all of us together for a meeting he said "I'm tired of this damn shit I miss a day, everybody miss a day he said from now on no more excuses doctor excuse nothing if you miss another day you might as well find you a job closer to home you will no longer work for Mansfield now I'm going down in the other end and have the same meeting with them. We already knew he was talking to us blacks because we were the only ones that had missed the day before that morning. So that evening we asked Jack Richardson when we all got in the car Nathaniel Lamar, Ervin Tarver and myself "did Johnny Krutchfield come and have a meeting with you all he said no we all witnessed one incident where Johnny Krutchfield told Johnny Reid if Rolo Covin comes in late send him home. Then he said from now

on if anybody comes in late or miss a day and don't call in will be sent home for a day. Well Rolo Covin (a black guy) came a few minutes late and was sent home on that same Jack Richardson didn't come in or call. So Johnny Reid said when Jack come in tomorrow I'm going to send him home. The next when Jack Richardson (a white guy) came in they put him straight to work no question asked. Rolo Covin was really upset. He said man they doing it in my face (letting the white guy work after they said they were going to send him home. Johnny Reid told us the only time we could smoke was on our 9:00 break our 12:00 lunch and our 3:00 break but when we would go the restroom. We would see some of the white guys over in the break area smoking sometimes Johnny Reid (also a white supervisor) would be standing over in the break smoking with them. There was another incident where me and Ervin Tarver we on 6 foot ladder spot priming and Michael Watson (a white supervisor) was standing over us and I pointed out to Ervin I said man he's over here watching us I said to Ervin look at those people sitting down doing nothing (white people our crew members) that's when Ervin said Cory you're standing over watching you need to be find those people over there sitting down something to do. That's when he moved. Didn't none of us blacks guys have insurance that worked at plant 5. Rolo Covin and Jack Richardson they worked at plant 1 or 2 they didn't have insurance either which was a concern for all of us because we worked around a lot of poison gases and chemicals. Another incident we were working on a silo, which was right next to a part on the plant that released carbon monoxide into the air. Before we when in that area G.E. Safety gave us a class on carbon monoxide. After the glass they gave us 1 monitor and told

2

us if that monitor went off come down at once don't hesitate because that monitor is letting us know carbon monoxide is in the air. We (myself, Ervin Tarver and Nathaniel Lamar) worked on this silo a few days. On one day the monitor going off pretty regular so we kept coming down. They told us to go to the break room when the monitor goes off until the air was clear. We were back to the silo when Johnny Reid asked why were we coming down so much we told the monitor was going off. He said (the next time it goes off turn your head the other way) which we all knew that wasn't right because we all know carbon monoxide can kill you. We all have been through something, seen something, heard something or saw something. I told Ervin and Nathaniel on day I said "man everyday I get in this car going to work I wish I getting in the car to come home. Most of the meetings we had were threatening you couldn't even ask a question without them saying something like if you don't like it go to the gate don't come back etc. Another incident on Friday some of the black guys at plant 5 needed to get off all little early to go pay bills Johnny Krutchfield said "anybody leave early don't come back Monday. So we didn't go but when we got off that evening Jack Richardson said, "I thought you all were leaving early" we told him what Johnny said and he said that ain't right. We said what are you talking about Jack said Johnny let Earl and Jeff, two white guys go home early they left at 12:00. They came back the following Monday and went to work well all of the guys that are on this suit have been fired or laid off from this company. I was the last to go I got fired for no reason. When I went through the channels for filing my unemployment compensation The Department of Labor in Georgia said this company wasn't

3

showing my wages for the 2nd or 3rd quarter so I had to call the Department of Labor in Alabama they couldn't pull it up so I had to take 2 of my check stubs to the employment office here in Selma and have them take copies of my check stubs and fax them to the department of labor. So I don't know what was going on there. I wrote them a four page on how I was fired. They called me and asked me if there was any other reason I could consider for one being fired I told them only reason I could think of was retaliation of this lawsuit.

Another thing I noticed, we didn't get show-up time if it rained us out at G.E, but we got show-up time at Haundi. There have also been time when they would let the white guys get overtime and the blacks guys wouldn't know about it until we got back to work on Monday.

I was subjected to a hostile work environment, discriminated and retaliated against on the basis of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

4



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place, Suite 2000
1130 22ⁿᵈ Street South
Birmingham, Alabama 35205-2881
(205) 731-0082
TTY (205) 731-0175
FAX (205) 731-2101

# AFFIDAVIT

My name is William Ragland. My address is 1522 Plant Street Selma , 36701 and telephone number is (334)875-0807. I was hired by Mansfield around the middle of March 2003, as a helper at $9.00 per hour. I worked as a helper until May of 2003, when I was transferred to JLG with a raise to $10.00 per hour. My job duties included operating heavy equipment, assembling scaffolds, brush painting and roll painting. I worked for Mansfield at the G.E. plant site in Burksville Alabama, where the company was the subcontractor repainting the plant. I had coating experience with another employer and held a certification card. I was assigned by Mansfield to work at plant 5 at the G.E. site. There were about seven or eight Mansfield employees working at plant 5, including four Blacks Ervin (Yogi) Tarver, ~~Dale Colvin~~, Patrick Lewis and ~~Steve~~. The Whites were Jack Richardson, Earl and Cindy. Michael (Corey) Watson, White male, was our immediate supervisor. He was hired with the company about a week before I started with them. Mansfield had three different paint locations at the G.E. plant. The plant sites were about a half of a mile apart. We did not have a union at either location.

There was no public transportation from my home in Selma to the job site in Burksville. I rode to work with Jack Richardson for about five months. Yogi, Nat and Ben (Black) also rode with Jack. When Jack would not go to work, he would loan Nat or Yogi his car to drive us to work. We had to be at work at 10 minutes to 7. If you were going to be late, you had to call an hour before the start time and notify the supervisor. I was late, roughly, 8 or 9 times because of car trouble, Jack was not going or Jack overslept. I would call the Superintendent Crutchfield or his recorder to report being late. I was never wrote up for being late. On one morning around the last of May 2003, Jack did not show up. We called Crutchfield and he said that he was getting tired of this "shit" and yall needed to do something about this. When we got to work, Johnny Crutchfield said he needed to talk to us. He told us that he was tired of this "shit" one man miss all miss and if anybody else misses a day you are fired. Crutchfield said that he was going to plant one and two, where most of the Whites worked, and tell them the same thing.   We asked Jack Richardson if Crutchfield had a meeting with them and he said no.

Around the last of June 2003, we were scheduled to work our regular shift, 10 hours four days a week. Yogi, Nat and I wanted to leave work early because we had some bills to pay. We asked Johnny if we could get off early.  He told us that if anybody leaves early don't come back on Monday. However, on the same day, he let Whites leave early, Earl, Jeff and Robert. Around July 1, 2003, I heard Crutchfield tell supervisor Johnny Reed (White)  to sent Ralo Colvin (Black) home if he came in late. Ralo came late and he was sent home. However, Jack Richardson (White) did not show up and did not call. Crutchfield told Reed to send Jack home. However, Jack was allowed to work.

The superintendent and supervisors also treated Blacks and Whites differently when it came to smoke breaks. We were allowed to take smoke breaks in the pole barn. We were given breaks at 9.00, 12:00 and 3:00. However, we took smoke breaks more frequently. Around August 2003, we were moved to plant one and two to work. Reed had a meeting with us and told us that there would be no more smoking unless you were on breaks. He also said that if you were caught smoking outside of breaks you would be fired. About two hours later, I saw Earl (White) and Johnny Reed smoking outside of the break period. I told Yogi and Nat about the smoking.  So, I went down and smoked to.  I was not disciplined for smoking and do not know of any Black employees being disciplined for smoking violations.

There is another area where the company treats Blacks differently than Whites, health insurance. When I was hired in March 2003, Yogi and Nat had been with the company for about 9 or 10 months. Neither of us was offered insurance. Nat told us that  the  Whites had their insurance. Earl (White) showed us his insurance card and said he got it from the company. It was not until after I was transferred to th Hyundai plant in October 2003, that I was offered insurance. I did not take the insurance.

I was fired on December 20, 2003. We were working five days and supervisor Reed wanted us to work on Saturdays for straight hourly pay and Sundays. I told him that it was a default in wages, working Sunday to. I already had 60 hours. At 5:00 Corey Watson White supervisor  came up to us and said we were working late. He told me that if you go home, you are going to be fired. I left at 5:30 and came back to work on Monday and nothing was done to me.  On Friday December 19, 2003, I was riding with Glen Scott and Ben. Ben told me that whoever did not come in to work on Saturday they would not have a job. I went to work on Saturday and Corey Watson said that you better have had your tail here. I was fueling lifts, Corey said Bill get out that damn truck and two men do not need to be in the truck. I told him that two White guys were in the truck and nothing was said. Corey told me to get my box and clean up. He told me that I was fired. I went back to work. He came with the safety man and two security guards and told me to get off the property. Glen Scot (White) told the guys that he heard Johnny Reed and Corey plotting up that they were going to get rid of me. I witnessed Earl(White) come in a bad mood and refuse to get in the lift or prep tank. Nothing was done to him. Corey told Cindy (White) to paint  safety cage ladders, she refused and painted motors. Nothing was done to her. Yogi and Nat witnessed Cindy's insubordination.

I have never heard any racial slurs being used on the job by management or non-management employees.

I declare under penalty of perjury that my statement is true and correct to the best of my knowledge and belief.

_____    _____
Date    William Ragland

SWORN TO AND SUBSCRIBED before me this the __14th__ day of
___April___ 2005.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: ___07/27/08___

(SEAL)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
**Birmingham District Office**

Ridge Park Place, Suite2000
1130 22nd Street South
Birmingham, Alabama 35205-2881
(205) 731-0082
TTY (205) 731-0175
FAX (205) 731-2101

# AFFIDAVIT

My name is William Ragland. My address is 1522 Plant Street Selma , 36701 and telephone number is (334)875-0807. I was hired by Mansfield around the middle of March 2003, as a helper at $9.00 per hour. I worked as a helper until May of 2003, when I was transferred to JLG with a raise to $10.00 per hour. My job duties included operating heavy equipment, assembling scaffolds, brush painting and roll painting. I worked for Mansfield at the G.E. plant site in Burksville Alabama, where the company was the subcontractor repainting the plant. I had coating experience with another employer and held a]certification card. I was assigned by Mansfield to work at plant 5 at the G.E. site. There were about seven or eight Mansfield employees working at plant 5, including four Blacks Ervin (Yogi) Tarver, Ralo Colvin, Patrick Lewis and Steve. The Whites were Jack Richardson, Earl and Cindy. Michael (Corey) Watson, White male, was our immediate supervisor. He was hired with the company about a week before I started with them. Mansfield had three different paint locations at the G.E. plant. The plant sites were about a half of a mile apart. We did not have a union at either location.

There was no public transportation from my home in Selma to the job site in Burksville. I rode to work with Jack Richardson for about five months. Yogi, Nat and Ben (Black) also rode with Jack. When Jack would not go to work, he would loan Nat or Yogi his car to drive us to work. We had to be at work at 10 minutes to 7. If you were going to be late, you had to call an hour before the start time and notify the supervisor. I was late, roughly, 8 or 9 times because of car trouble, Jack was not going or Jack overslept. I would call the Superintendent Crutchfield or his recorder to report being late. I was never wrote up for being late. On one morning around the last of May 2003, Jack did not show up. We called Crutchfield and he said that he was getting tired of this "shit" and yall needed to do something about this. When we got to work, Johnny Crutchfield said he needed to talk to us. He told us that he was tired of this "shit" one man miss all miss and if anybody else misses a day you are fired. Crutchfield said that he was going to plant one and two, where most of the Whites worked, and tell them the same thing.   We asked Jack Richardson if Crutchfield had a meeting with them and he said no.

Around the last of June 2003, we were scheduled to work our regular shift, 10 hours four days a week.  Yogi, Nat and I wanted to leave work early because we had some bills to pay. We asked Johnny if we could get off early.  He told us that if anybody leaves early don't come back on Monday. However, on the same day, he let Whites leave early, Earl, Jeff and Robert. Around July 1, 2003, I heard Crutchfield tell supervisor Johnny Reed (White) to sent Ralo Colvin (Black) home if he came in late. Ralo came late and he was sent home. However, Jack Richardson (White) did not show up and did not call. Crutchfield told Reed to send Jack home. However, Jack was allowed to work.

DEFENDANT'S
EXHIBIT

12

The superintendent and supervisors also treated Blacks and Whites differently when it came to smoke breaks. We were allowed to take smoke breaks in the pole barn. We were given breaks at 9.00, 12:00 and 3:00. However, we took smoke breaks more frequently. Around August 2003, we were moved to plant one and two to work. Reed had a meeting with us and told us that there would be no more smoking unless you were on breaks. He also said that if you were caught smoking outside of breaks you would be fired. About two hours later, I saw Earl (White) and Johnny Reed smoking outside of the break period. I told Yogi and Nat about the smoking. So, I went down and smoked to. I was not disciplined for smoking and do not know of any Black employees being disciplined for smoking violations.

There is another area where the company treats Blacks differently than Whites, health insurance. When I was hired in March 2003, Yogi and Nat had been with the company for about 9 or 10 months. Neither of us was offered insurance. Nat told us that the Whites had their insurance. Earl (White) showed us his insurance card and said he got it from the company. It was not until after I was transferred to th Hyundai plant in October 2003, that I was offered insurance. I did not take the insurance.

I was fired on December 20, 2003. We were working five days and supervisor Reed wanted us to work on Saturdays for straight hourly pay and Sundays. I told him that it was a default in wages, working Sunday to. I already had 60 hours. At 5:00 Corey Watson White supervisor came up to us and said we were working late. He told me that if you go home, you are going to be fired. I left at 5:30 and came back to work on Monday and nothing was done to me. On Friday December 19, 2003, I was riding with Glen Scott and Ben. Ben told me that whoever did not come in to work on Saturday they would not have a job. I went to work on Saturday and Corey Watson said that you better have had your tail here. I was fueling lifts, Corey said Bill get out that damn truck and two men do not need to be in the truck. I told him that two White guys were in the truck and nothing was said. Corey told me to get my box and clean up. He told me that I was fired. I went back to work. He came with the safety man and two security guards and told me to get off the property. Glen Scot (White) told the guys that he heard Johnny Reed and Corey plotting up that they were going to get rid of me. I witnessed Earl(White) come in a bad mood and refuse to get in the lift or prep tank. Nothing was done to him. Corey told Cindy (White) to paint safety cage ladders, she refused and painted motors. Nothing was done to her. Yogi and Nat witnessed Cindy's insubordination.

I have never heard any racial slurs being used on the job by management or non-management employees.

I declare under penalty of perjury that my statement is true and correct to the best of my knowledge and belief.

_____                    _____
Date                                                          William Ragland

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office

Ridge Park Place, Suite 2000
1130 22nd Street South
Birmingham, Alabama 35205-2881
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

# AFFIDAVIT

My name is William Ragland and my race is black. My home address is 1522 Plant Street, Selma, Alabama 36701 and my telephone number is (334) 875-0807. I was hired by Mansfield Industrial ("Mansfield") around the middle of March 2003 as a helper at $9.00 per hour. I worked as a helper until May of 2003, when I was transferred to JLG with a raise to $10.00 per hour.

My job duties included operating heavy equipment, assembling scaffolds, brush painting and roll painting. I worked for Mansfield at the General Electric ("G.E.") job site in Burksville, Alabama, where the company was the subcontractor repainting the plant facilities. I had coating experience with another employer and held a certification card. I was assigned by Mansfield to work at Plant 5 at the G.E. site. There were about seven or eight Mansfield employees working at Plant 5, including four black employees, Ervin ("Yogi") Tarver, Ralo Colvin, Patrick Lewis and Steve (LNU). The white employees were Jack Richardson, Earl (LNU) and Cindy (LNU). Michael ("Corey") Watson, a white male, was our immediate supervisor. Watson was hired with Mansfield about a week before I started with them. Mansfield had three different paint locations at the G.E. job site. The G.E. plant sites were about a half of a mile apart. We did not have a union at either location.

There was no public transportation from my home in Selma, Alabama to the job site in Burksville. I rode to work with Jack Richardson, a white employee, for about five months. Yogi, Nathaniel Lamar ("Nat") and Ben (Black) also rode with Jack. When Jack would not go to work,

he would loan Nat or Yogi his car to drive us to work. We had to be at work at 6:50 a.m. If we were going to be late, we had to call an hour before the start time and notify the supervisor. I was late, roughly, 8 or 9 times because of car trouble, Jack was not going or Jack overslept. I would call the Superintendent, Johnny Crutchfield ("Crutchfield") or his voice mail recorder, to report being late. I was never written up for being late. On one morning around the last of May 2003, Jack did not show up. We called Crutchfield and he said that he was getting tired of this "shit" and "y'all needed to do something about this." When we got to work, Crutchfield said he needed to talk to us. He told us that he was tired of this "shit, one man miss, all miss, and if anybody else misses a day, you are fired." Crutchfield said that he was going to Plant One and Two, where most of the Whites worked, and tell them the same thing. Later that day, we asked Jack Richardson if Crutchfield had a meeting with them and he said no.

Around the last of June 2003, we were scheduled to work our regular shift, which was ten hours, four days a week. Yogi, Nat and I wanted to leave work early because we had some bills to pay. We asked Crutchfield if we could get off early. He told us that, "if anybody leaves early, don't come back on Monday." However, on the same day, he let white employees Earl, Jeff and Robert, leave early. Around July 1, 2003, I heard Crutchfield tell Supervisor Johnny Reed (white) to send Ralo Colvin, a black employee, home if he came in late. Colvin came in late that day and he was sent home. However, Jack Richardson, a white employee, did not show up and did not call in. Crutchfield told Reed to send Jack home. However, Jack was allowed to work.

The superintendent and supervisors also treated black and white employees differently when it came to smoke breaks. We were allowed to take smoke breaks in the pole barn. We were given breaks at 9.00, 12:00 and 3:00. However, we took smoke breaks more frequently. Around August 2003, we were moved to Plant One and Plant Two to work. Reed had a meeting with us and told

us that there would be no more smoking unless you were on breaks. He also said that if you were caught smoking outside of breaks you would be fired. About two hours later, I saw Earl, a white employee, and Reed smoking outside of the break period. I told Yogi and Nat about the smoking. So, I went down and smoked too. I was not disciplined for smoking and do not know of any black employees being disciplined for smoking violations.[1]

There is another area where the company treats black employees differently than white employees, health insurance. When I was hired in March 2003, Yogi and Nat had been with the company for about nine or ten months. Neither of us were offered insurance. Nat told us that the white employees had their insurance. Earl, a white employee, showed us his insurance card and said he got it from the company. It was not until after I was transferred to the Hyundai plant in October 2003, that I was offered insurance. I did not take the insurance.

We were working five days a week and Supervisor Reed wanted us to work on Saturdays for straight hourly pay and Sundays. I told him that it was a default in wages, working Sunday also. I already had 60 hours. At 5:00 p.m. on Friday December 19, 2003, Watson, a white supervisor, came up to us and said we had to work late. He told me that if you go home, you are going to be fired. I left at 5:30 p.m. and came back to work on Monday and nothing was done to me.

I was fired on December 20, 2003. On Friday December 19, 2003, I was riding with Glen Scott and Ben. Ben told me that whoever did not come in to work on Saturday they would not have a job. I went to work on Saturday and Watson said that you better have had you tail here. I was fueling lifts, Watson said, "Bill get out of that damn truck" and "two men do not need to be in the truck." I told him that when two white guys were in the truck, nothing was said. Watson told me

---

[1] I think this section on "smoking" should be removed.

to get my box and clean up. He then told me that I was fired.   However, I went back to work.

Watson came with the safety man and two security guards and told me to get off the property.  Glenn

Scott, a white employee, told the guys that he heard Reed and Watson plotting  that they were going

to get rid of me.  I witnessed Earl, a white employee, come to work in a bad mood and refuse to get

in the lift or prep tank.  Nothing was done to him.  Watson told Cindy, a white employee,  to paint

safety cage ladders.  She refused and painted motors.  Nothing was done to her.  Yogi and Nat

witnessed Cindy's insubordination.

I declare under penalty of perjury that my statement is true and correct to the best of my knowledge and belief.

Date

William Ragland



U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Birmingham District Office

Ridge Park Place, Suite2000
1130 22ⁿᵈ Street South
Birmingham, Alabama 35205-2881
(205) 731-0082
TTY (205) 731-0175
FAX (205) 731-2101

# AFFIDAVIT

My name is William Ragland. My address is 1522 Plant Street Selma , 36701 and telephone
number is (334)875-0807. I was hired by Mansfield around the middle of March 2003, as a
helper at $9.00 per hour. I worked as a helper until May of 2003, when I was transferred to JLG
with a raise to $10.00 per hour. My job duties included operating heavy equipment, assembling
scaffolds, brush painting and roll painting. I worked for Mansfield at the G.E. plant site in
Burksville Alabama, where the company was the subcontractor repainting the plant. I had coating
experience with another employer and held a certification card. I was assigned by Mansfield to
work at plant 5 at the G.E. site. There were about seven or eight Mansfield employees working at
plant 5, including four Blacks Ervin (Yogi) Tarver, Ralo Colvin, Patrick Lewis and Steve. The
Whites were Jack Richardson, Earl and Cindy. Michael (Corey) Watson, White male, was our
immediate supervisor. He was hired with the company about a week before I started with them.
Mansfield had three different paint locations at the G.E. plant. The plant sites were about a half
of a mile apart. We did not have a union at either location.

There was no public transportation from my home in Selma to the job site in Burksville. I rode to
work with Jack Richardson for about five months. Yogi, Nat and Ben (Black) also rode with
Jack. When Jack would not go to work, he would loan Nat or Yogi his car to drive us to work.
We had to be at work at 10 minutes to 7. If you were going to be late, you had to call an hour
before the start time and notify the supervisor. I was late, roughly, 8 or 9 times because of car
trouble, Jack was not going or Jack overslept. I would call the Superintendent Crutchfield or his
recorder to report being late. I was never wrote up for being late. On one morning around the last
of May 2003, Jack did not show up. We called Crutchfield and he said that he was getting tired
of this "shit" and yall needed to do something about this. When we got to work, Johnny
Crutchfield said he needed to talk to us. He told us that he was tired of this "shit" one man miss
all miss and if anybody else misses a day you are fired. Crutchfield said that he was going to
plant one and two, where most of the Whites worked, and tell them the same thing.  We asked
Jack Richardson if Crutchfield had a meeting with them and he said no.

Around the last of June 2003, we were scheduled to work our regular shift, 10 hours four days a
week.  Yogi, Nat and I wanted to leave work early because we had some bills to pay. We asked
Johnny if we could get off early.  He told us that if anybody leaves early don't come back on
Monday. However, on the same day, he let Whites leave early, Earl, Jeff and Robert. Around July
1, 2003, I heard Crutchfield tell supervisor Johnny Reed (White)  to sent Ralo Colvin (Black)
home if he came in late. Ralo came late and he was sent home. However, Jack Richardson
(White) did not show up and did not call. Crutchfield told Reed to send Jack home. However,
Jack was allowed to work.

The superintendent and supervisors also treated Blacks and Whites differently when it came to smoke breaks. We were allowed to take smoke breaks in the pole barn. We were given breaks at 9.00, 12:00 and 3:00. However, we took smoke breaks more frequently. Around August 2003, we were moved to plant one and two to work. Reed had a meeting with us and told us that there would be no more smoking unless you were on breaks. He also said that if you were caught smoking outside of breaks you would be fired. About two hours later, I saw Earl (White) and Johnny Reed smoking outside of the break period. I told Yogi and Nat about the smoking.  So, I went down and smoked to.  I was not disciplined for smoking and do not know of any Black employees being disciplined for smoking violations.

There is another area where the company treats Blacks differently than Whites, health insurance. When I was hired in March 2003, Yogi and Nat had been with the company for about 9 or 10 months. Neither of us was offered insurance. Nat told us that the Whites had their insurance. Earl (White) showed us his insurance card and said he got it from the company. It was not until after I was transferred to th Hyundai plant in October 2003, that I was offered insurance. I did not take the insurance.

I was fired on December 20, 2003. We were working five days and supervisor Reed wanted us to work on Saturdays for straight hourly pay and Sundays. I told him that it was a default in wages, working Sunday to. I already had 60 hours. At 5:00 Corey Watson White supervisor  came up to us and said we were working late. He told me that if you go home, you are going to be fired. I left at 5:30 and came back to work on Monday and nothing was done to me.  On Friday December 19, 2003, I was riding with Glen Scott and Ben. Ben told me that whoever did not come in to work on Saturday they would not have a job. I went to work on Saturday and Corey Watson said that you better have had you tail here. I was fueling lifts, Corey said Bill get out that damn truck and two men do not need to be in the truck. I told him that two White guys were in the truck and nothing was said. Corey told me to get my box and clean up. He told me that I was fired. I went back to work. He came with the safety man and two security guards and told me to get off the property. Glen Scot (White) told the guys that he heard Johnny Reed and Corey plotting up that they were going to get rid of me. I witnessed Earl(White) come in a bad mood and refuse to get in the lift or prep tank. Nothing was done to him. Corey told Cindy (White) to paint  safety cage ladders, she refused and painted motors. Nothing was done to her. Yogi and Nat witnessed Cindy's insubordination.

I have never heard any racial slurs being used on the job by management or non-management employees.

I declare under penalty of perjury that my statement is true and correct to the best of my knowledge and belief.

_____       _____
Date                             William Ragland

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
~~WESTERN~~ DIVISION
NORTHERN

RECEIVED
2006 JP 6: 13

P HACKETT CLK
U.S. DISTRICT COURT
MIDDLE DIST ALA.

| | |
|---|---|
| PATRICK LEWIS, JACK RICHARDSON, NATHANIEL LAMAR, WILLIAM RAGLAND, RALO COLVON & ERVIN TARVER ) ) ) ) | CA: 2:06cv497-SRW |
| Plaintiffs, ) | |
| v. ) | |
| K2 INDUSTRIAL SERVICES, INC ) and MANSFIELD INDUSTRIAL ) COATING, Inc., a Corporation ) | |
| ) | CIVIL ACTION NO.: |
| ) | CV |
| Defendant. ) | JURY TRIAL DEMANDED |

## COMPLAINT

This action is brought to redress a pattern and practice of employment discrimination based on race and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981 and 1981(a), common law breach of contract, negligence and outrage. Plaintiffs alleges a continuing violation of Title VII of the [Civil Rights Act of 1964", 42 U.S.C. § 2000e et seq. as amended, the [Civil Rights Act of 1991," and 42 U.S.C. § 1981 and 1981(a).

DEFENDANT'S
EXHIBIT

13

06/01/2006  15:23   2052441171              THE COCHRAN FIRM PC                    PAGE  03/18

## I.    JURISDICTION

1.    The jurisdiction of this Court is invoked by the plaintiffs pursuant to 28 U.S.C. §§ 1331 1343(4) and 28 U.S.C. §§ 2201 and 2202. This suit is authorized and instituted pursuant to the Act of Congress known as "The Civil Rights Act of 1866," 42 U.S.C. § 1981, and 1981(a) and The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991. The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights secured by Title VII and 42 U.S.C. § 1981, and 1981(a) providing for injunctive and other relief against racial discrimination and a racially hostile working environment. Plaintiffs claims of common law breach of contract, negligent hiring and negligent retention and outrage arise out of the same facts as plaintiffs federal claims.

2.    Plaintiffs  have fulfilled all conditions precedent to the institution of this action under Title VII of the Act of Congress known as the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.  Plaintiffs  timely filed this action within the two and/or four-year statute of limitations set forth under 42 U.S.C. § 1981. And within ninety (90) days of the receipt of his notice of right to sue pursuant to Title VII.

## II.    PARTIES

3.    Plaintiffs, Patrick Lewis. (hereinafter Lewis), Nathaniel Lamar (hereinafter Lamar), William Ragland (hereinafter Ragland). Ralo Colvin. (hereinafter Colvin). and Ervin Tarver

06/01/2006  15:23    2052441171    THE COCHRAN FIRM PC    PAGE  04/18

(hereinafter Tarver) are African-American male and residents of Alabama and a citizens of the United States. Plaintiff Jack Richardson (hereinafter Richardson) is a white male. Plaintiffs, Patrick Lewis, Jack Richardson, Nathaniel Lamar, William Ragland. Ralo Colvin, and Ervin Tarver are persons aggrieved under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., the [Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the [Civil Rights Act of 1991,] and 42 U.S.C. § 1981 and 1981(a).

4.    Defendant, K2 Industrial Services, Inc. And Mansfield Industrial Coating, Inc. are entities doing business in Alabama. K2 Industrial Services, Inc is a Chicago, Illionois corporation and the parent company of Mansfield Industrial. K2 and Mansfield are an entities subject to suit under Title VII of the [Civil Rights Act of 1964,] as amended, 42 U.S.C. § 2000e et seq., the [Civil Rights Act of 1991,] and 42 U.S.C. § 1981 and 1981(a). The defendants employs at least fifteen (15) persons.

III.    STATEMENT OF FACTS

5.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 4 above with the same force and effect as full set out in specific detail hereinbelow.

6.    Plaintiffs, area all former employees of the defendant Mansfield working in Alabama. Each of the Employees were employed with the defendant in 2002 or 2003.

7.    Each of the plaintiff[s suffered racial discrimination at the hands of their employer including the creation of a racially hostile working environment. Plaintiff Richardson

was discriminated and retaliated against for his association with African American employees including but not limited to the other plaintiffs. Once the white Superintendent Johnny Cruthfield found out that some of the African American employees rode to work with Richardson, he began to refer to Richardson as a nigger lover. Richardson also heard Crutchfield refer to other African American employees as [] dumb ass niggers.[]

## PATRICK LEWIS

8.      Patrick Lewis is an African American male and former employee of K2 and Mansfield. Lewis was hired March 10, 2003 as a journeyman painter. Prior to being hired at Mansfield he had 16 years experience as an industrial painter. Two of the white employees, Earl ( last name unknown) and the foreman Johnny Reed, did not know painting. Out of approximately 10 employees, I was the only African American employee assigned to plant 2.

9.      During my employment I was referred to as a black bastard and an [] arrogant nigger.  Moreover, I witnesses white employees refer to Mexican employees as wet back scumb. I also witnessed a white employee pull a knife on and threaten a Mexican emplyee. After complaining to Mansfield[]s management I was retaliated against in that I was transferred to another job site in Atlanta for my opposition to racial discrimination.

10.     White employees were  allowed to receive pay for rain days, however, I was denied this opportunity and upon information and belief other African American employees were denied

the same opportunity to work and receive pay for rain days. In addition I was denied the position of a regular full-time employee which would have allowed me to receive full employee benefits including medical and retirement benefits.

11.     My employment was terminated allegedley for cursing at a while supervisor who had cursed me for allegedly being late, however. I was not late. Moreover, white employees cursed all of the time and were not disciplined nor was there employment terminated.

## JACK RICHARDSON

12.     Jack Richardson, is a white male who was employed with the defendant in January 2003 as helper. Pryor to being hired at Mansfield he did not have any prior painting experience.  During his employment Richardson rode to work with African American employees. Throughout his employment Richardson witnessed a difference of treatment between himself and African American employees and witnessed the use of racial slurs by white supervisory employees including the white Superintendent Cruthfield. For example, Richardson witnessed that when the African American employees were late they were in some way disciplined. however, he was never disciplined. Moreover, as a white employee he would be paid for showing up on rain days, however, when he showed up with the African American employees, neither he or the African American employees would be paid.

13.     In June 2003, Mansfield hired a white male named Robert, last name unknown. In

my opinion, Robert was a racist. For example Robert would refer to African American employees as [ ignorant niggers] and Robert would state openly at work that he hated to work with niggers and Mexicans. Robert also referred to African American employees as stupid niggers. These statement were often made in the presence of Cruthfield and Supervisor Reed, however, Mansfield never disciplined Robert for these statements. Robert and Cruthfield found out that one of the African American employees was riding to work with me and they started refering to me as a a [ nigger lover.] I also heard Cruthfield say that if it was up to him he would not give them [ dumb ass niggers] their checks.

### NATHANIEL LAMAR

14.     Nathaniel Lamar was employed with the defendant in September 2002 as a laborer. Lamar was performing duties as a painter and had prior experience as a painter, however he was paid less than whites doing the same job who did not have as much experience and who did not know how to mix paint. Throughout my employment I was treated differently and disciplined more harshly for small infractions than white employees who made the same infractions. For example, while employees were paid show time on rain days but African American employees were not paid for rain days. Johnny Cruthfield and Johnny Reed would disciplined African American employees for being late however, while employees could be late or miss work and not be discplined.

## WILLIAM RAGLAND

15.  Ragland was employed with the defendant in March 2003 as a helper. His job duties included operating heavy equipment, assembling scaffolds, brush painting and roll painting. At the time Ragland was hired he had coating experience and held a certification card. During my employment whites were treated differently than African American employees. For example, when whites were late or did not show up for work they were not disciplined or terminated. Moreover, while employees were given insurance benefits where as African American employees were denied insurance benefits and/or had to spend more time on the job before they received insurance benefits from the defendant.

## RALO CALVIN

16.  Calvin was employed with the defendant on march 17, 2003 as a painter. At the time of hire Calvin had a spraying certification and forklift operator experience. However, he was paid less than white employees with less experience. Additionally whites were paid show up time for rain days wherein African American employees were not.

17. During my employment I was also subjected to a racially hostile environment. For example, Robert a white employee stated that he did not want to work with □ niggers□ and that he would rather go home than work with niggers. Johnny Reed, a supervisor heard this but did not discipline Robert.

18. K2/Mansfield□s actions evidence a pattern and practice of racial discrimination in

violation of Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, and 42.U.S. C. § 1981.

## IV.   STATEMENT OF CLAIMS:

## COUNT I:  VIOLATION OF 42 U.S.C. SECTION 2000e TITLE VII

19.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18 above with the same force and effect as full set out in specific detail hereinbelow.  This cause of action is brought against the defendant Farmers only.

20.    Plaintiffs have been discriminated against and treated differently than similar situated white employees solely because of their race. African American or association with people of the African American race. in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.  This treatment by the defendant has affected the terms and condition and enjoyment of plaintiffs employment.

21.    Furthermore. said acts of discrimination have affected the income of the plaintiffs and denied them insurance benefits.

22.    Plaintiffs, whether one or more, complained to Management about the difference in treatment, however, the all white management staff of the K2/Mansfield failed or refused to take any corrective remedial action.  Indeed, white managerial employees of the defendant would

refer to the plaintiffs in a racially derogatory manner and plaintiffs were the object of racially derogatory slurs and jokes. Plaintiffs were forced to be supervised by agents of the defendant, who demonstrated a general animus for blacks. Said animus affected the terms, conditions and enjoyment of the plaintiffs work and their income.

23.     This reckless and willful discrimination on the part of the defendants constitutes a violation of the plaintiffs statutory rights pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

24.     As a further consequence and effect of the defendants unlawful conduct and practices, the plaintiffs was deprived of income and other compensation and benefits.

25.     Plaintiffs have suffered embarrassment, humiliation, mental distress and emotional pain and anguish as a consequence of the defendant's racially discriminatory and demeaning and unlawful conduct.

26.     The plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiffs are now suffering and will continue to suffer irreparable injury from the defendants unlawful policies and practices as set forth herein unless enjoined by this Court.

## COUNT II:   42 U.S.C. SECTION 1981 and 1981(a)

27.     Plaintiffs re-allege and incorporates by reference paragraphs 1 through 18 above

with the same force and effect as full set out in specific detail hereinbelow.

28.    The effect of the defendants' discrimination as outlined above has been to deprive the plaintiffs of the same right to make and enforce contracts as is enjoyed by similarly-situated white persons in violation of 42 U.S.C. § 1981 and 1981(a).

29.    As a further consequence and effect of the defendants' unlawful conduct and practices, the plaintiffs were deprived of income and other compensation and benefits.

30.    Plaintiffs have suffered embarrassment, humiliation, mental distress and emotional pain and anguish as a consequence of the defendant's racially discriminatory, demeaning and unlawful conduct.

31.    The plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiff is now suffering and will continue to suffer irreparable injury from the defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## COUNT III  RETALIATION SECTION 704(a) CIVIL RIGHTS ACT OF 1964 AND 42 U.S.C. SECTION 1981

32.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18 above with the same force and effect as full set out in specific detail hereinbelow.

33.    Plaintiffs have been retaliated against for opposing or participating in opposition

to racial discrimination.

34.    The effect of the defendants' retaliation as outlined above has been to deprive the plaintiffs of the right to oppose discriminatory business practices in violation of Title VII and 42 U.S.C. § 1981 and 1981(a).

35.    As a further consequence and effect of the defendants' unlawful conduct and practices, the plaintiffs were deprived of income and other compensation and benefits.

36.    Plaintiffs have suffered embarrassment, humiliation, mental distress and emotional pain and anguish as a consequence of the defendant's racially retaliatory and demeaning and unlawful conduct.

37.    The plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiff is now suffering and will continue to suffer irreparable injury from the defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## COUNT IV COMMON LAW BREACH OF CONTRACT

38.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18 above with the same force and effect as full set out in specific detail hereinbelow.

39.    K2/Mansfield entered into a contract whereby the defendant(s), agreed to support the plaintiff's efforts, in good faith.. Defendant breached the duty of good

06/01/2006   15:23   2052441171             THE COCHRAN FIRM PC                  PAGE  13/18

faith by failing to assist the plaintiffs and by altering the terms and conditions of their employment.

40.    The plaintiffs has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiffs are now suffering and will continue to suffer irreparable injury from the defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## COUNT V:  NEGLIGENT TRAINING, SUPERVISION AND RETENTION

41.    Plaintiffs re-allege and incorporates by reference paragraphs 1 through 18 above with the same force and effect as full set out in specific detail hereinbelow.

42.    K2/Manisfield  was negligent in failing to properly train their agents in such a manner as to prevent the racial discrimination which proximately caused injury to the plaintiffs.

43.    K2/Manisfield was negligent in failing to properly supervise its managerial employees/agents in a manner which would have prevented the racial discrimination which proximately caused injury to the plaintiffs.

44.    K2/ Manisfield  was negligent in retaining employees who harbored racial animus and ill will towards people of color and who were in a position of authority over the plaintiffs. Said retention proximately caused  injury to the plaintiffs.

45.    The plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiff is now suffering and will continue to suffer irreparable injury from the defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## COUNT VI:   OUTRAGE

46.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18 above with the same force and effect as full set out in specific detail hereinbelow.

47.    The actions of the defendant(s) in all respects to the claims in this law suit concerning the relationship between the plaintiffs and K2/Manisfield  was intentional and reckless, and so extreme and   outrageous that it has caused the plaintiffs' emotional distress so sever that no reasonable person, or reasonable black person, could be expected to endure the defendant's actions.

48.    The plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit, and an action for injunctive, declaratory, and other relief, including punitive and compensatory damages, is his only means of securing adequate relief. The plaintiffs are now suffering and will continue to suffer irreparable injury from the defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## IV.   PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully prays that this Court:

1.    Issue a declaratory judgment that the defendants' acts, policies, practices, and procedures complained of herein have violated and continue to violate the rights of the plaintiffs as secured by The Civil Rights Act 1964, as amended, "Civil Rights Act of 1866," 42 U.S.C. § 1981, as amended, and the Civil Rights Act of 1991.

2.    Grant the plaintiffs a permanent injunction enjoining the defendants, its agents, successors, employees, attorneys and those acting in concert with the defendant and at the defendants' request from continuing to violate the plaintiffs' rights.

3.    Enter an Order requiring the defendants to make the plaintiffs whole by granting appropriate declaratory and injunctive relief, and back-pay, front-pay (plus interest), the reasonable value of all benefits lost, as well as nominal and/or compensatory and punitive damages.

4.    The plaintiffs further pray for such other relief and benefits as the cause of justice may require, including an award of attorney fees.


PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE BY JURY.

Respectfully submitted,

Byron R. Perkins
Alabama Bar No. ASB-0163-N75B
Attorney for Plaintiffs

## OF COUNSEL:

The Cochran Firm
505 North 20th Street Suite 825
The Financial Center
Birmingham, Alabama  35203
(205) 244 1115
BPERKINS@Cochranfirm.com

Prince Chestnut
Alabama Bar No. ASB-1709-R76C
Attorney for Plaintiffs

## OF COUNSEL

Chestnut, Sanders, Sanders
Pettaway & Campell, LLC
One Union Street
Post Office Box 1200
Selma, Alabama 36701

## PLAINTIFFOS ADDRESS:

All Plaintiffos in care Of:
c/o   Prince Chestnut, Esq
Chestnut, Sanders, Sanders, Pettaway & Campell, LLC
One Union Street
P.O. Box 1200
Selma, Alabama   36701

## DEFENDANTS0 ADDRESS:

K2 Industrial Services, Inc.
414 N. Orleans Suite 202
Chicago, Il 60610

Manisfield
The Corporation Company
2000 Interstate Park, Suite 204
Montgomery, Alabama    36109

Truck Insurance Exchange
The Corporation Company
2000 Interstate Park, Suite 204
Montgomery, Alabama    36109

Fire Insurance Exchange
The Corporation Company
2000 Interstate Park, Suite 204
Montgomery, Alabama    36109

Mid-Century Insurance Company
The Corporation Company
2000 Interstate Park, Suite 204
Montgomery, Alabama    36109

06/01/2006  15:23    2052441171              THE COCHRAN FIRM PC                    PAGE  10/18

Farmers New World Life Insurance Company
Mr. Knox Argo
300 South Hall
Montgomery, Alabama    36102

Mr. Michael T. McMahon
District Manager
2021 West Clinton Avenue, Suite A
Post Office Box 205
Huntsville, Alabama    35804

Mr. Ed Girard
Division Marketing Manager
28 Inverness Parkway #320
Birmingham, Alabama    35242

6/15/06

7005 1620 0000 2494 5445

FFICE OF CLERK
NITED STATES DISTRICT COURT
IDDLE DISTRICT OF ALABAMA
.O. BOX 711
ONTGOMERY, AL 36101-0711

Mansfield Industrial, Inc.
Reg. Agent: Lexishexis Ducument Solutions Inc
150 S. Perry Street
Montgomery, AL 36104