**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **PATRICK LEWIS, JACK RICHARDSON, NATHANIEL LAMAR, WILLIAM RAGLAND, RALO CALVIN & ERVIN TARVER,** ) ) ) ) ) | |
| **PLAINTIFFS,** ) | **CASE NO.** |
| ) | |
| **V.** ) | **2:06-CV-497-SRW** |
| ) | |
| **K2 INDUSTRIAL SERVICES, INC. AND MANSFIELD INDUSTRIAL,** ) ) | |
| ) | |
| **DEFENDANTS.** ) | |

**<u>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

William H. King (KINGW5426)
Natasha L. Wilson (WILSN6654)
Haley A. Andrews (ANDRH6198)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 20th Street North
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (facsimile)

*Attorneys for Defendants
K2 Industrial Services, Inc. and
Mansfield Industrial, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ iv

I.      BACKGROUND ...................................................................................................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................2

        A.     Jack Richardson ........................................................................................4

        B.     Nathaniel Lamar ........................................................................................5

        C.     Ervin Tarver ..............................................................................................7

        D.     Patrick Lewis ............................................................................................9

        E.     Ralo Colvin ............................................................................................10

        F.     William Ragland ....................................................................................11

III.    LEGAL STANDARD .........................................................................................12

IV.    ARGUMENT ......................................................................................................13

        A.     Mansfield is Entitled to Judgment as a Matter of Law on Plaintiffs' Hostile Work Environment Claim ...............................................................................13

                1.     Plaintiffs Were Not Subjected to a Racially Hostile Work Environment ..................................................................................13

                2.     The Alleged Harassment Was Not Sufficiently Severe or Pervasive ........14

                        (a)     Patrick Lewis ...........................................................15

                        (b)     Jack Richardson .......................................................16

                        (c)     Nathaniel Lamar .......................................................16

                        (d)     William Ragland .......................................................17

                        (e)     Ralo Colvin .............................................................17

                        (f)     Ervin Tarver .............................................................18

                  3.     The Frequency, Severity, and Level of Offensiveness Here is Not Sufficient ...............................................................................20

                  4.     There Was No Alteration of the Plaintiffs' Working Conditions .............22

i

B.    MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT ON THE
      HOSTILE WORK ENVIRONMENT CLAIMS BASED ON THE
      AFFIRMATIVE DEFENSE SET FORTH IN *BURLINGTON INDUSTRIES*
      AND *FARAGHER* ..................................................................................23

      1.    Mansfield Exercised Reasonable Care to Disseminate its Equal
            Employment Policy Statement Prohibiting Discrimination......................24

      2.    Plaintiffs Unreasonably Failed to Take Advantage of Available
            Avenues to Avoid Harm. ........................................................................25

C.    DISPARATE TREATMENT .............................................................................27

      1.    Plaintiffs cannot establish a prima facie case of disparate treatment.........28

            (a)    Disparate Treatment Claims Regarding Hourly Pay ....................28

            (b)    Disparate Treatment Claims Regarding Show-Up Time ..............31

            (c)    Disparate Treatment Claims Regarding Insurance Benefits..........32

            (d)    Disparate Treatment Claims Regarding Discipline ......................33

      2.    Mansfield had legitimate, non-discriminatory reasons for the alleged
            adverse actions...........................................................................................35

            (a)    Hourly Pay ....................................................................................35

            (b)    Show Up Time ...............................................................................36

            (c)    Insurance Benefits.........................................................................36

            (d)    Discipline .......................................................................................37

D.    THE PLAINTIFFS' RETALIATION CLAIM IS WITHOUT MERIT ...............37

      1.    William Ragland, Nathaniel Lamar, Ralo Colvin, and Ervin Tarver ........39

            (a)    William Ragland ............................................................................39

            (b)    Nathaniel Lamar.............................................................................39

            (c)    Ralo Colvin ....................................................................................40

            (d)    Ervin Tarver ...................................................................................41

            (e)    Jack Richardson .............................................................................42

            (f)    Patrick Lewis .................................................................................43

E.    THE PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS ......................46

F.    MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT AS A
      MATTER OF LAW AS TO PLAINTIFFS' NEGLIGENT TRAINING,
      SUPERVISION, AND RETENTION CLAIM.......................................................47

G.    PLAINTIFFS' OUTRAGE CLAIM FAILS BOTH PROCEDURALLY AND
      ON THE MERITS ...............................................................................................48

      1.    Plaintiffs' Outrage claim is time barred...................................................48

      2.    Plaintiffs' Outrage claim fails on the merits. ...........................................49

V.    CONCLUSION...............................................................................................................50

TABLE OF AUTHORITIES

**Cases**

*Alvarado v. Health Net, Inc.*,
   21 F.3d 1111 (9th Cir. 1994) ........................................................................................... 19

*American Cast Iron Pipe Co. v. Williams*,
   591 So. 2d 854 (Ala. 1991) ............................................................................................ 46

*American Road Service Co. v. Inmon*,
   394 So. 2d 361 (Ala. 1980) ............................................................................................ 49

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986*)* ..................................................................................................... 12

*Archie v. Enterprise Hospital & Nursing Home*,
   508 So. 2d 693 (Ala. 1997) ............................................................................................ 48

*Barrow v. Georgia Pacific Corp.*,
   144 Fed. Appx. 54 (11th Cir. 2005) ............................................................................... 21

*Boyce v. Cassese*,
   941 So. 2d 942 (Ala. 2006) ............................................................................................ 47

*Brooks v. County Commission of Jefferson County*,
   446 F.3d 1160 (11th Cir. 2006) .................................................................. 13, 27, 28, 38

*Burlington Industries, Inc. v. Ellerth*,
   524 U.S. 742 (1998) .......................................................................................... 23, 24, 25

*Clover v. Total Sys. Servs., Inc.*,
   176 F.3d 1346 (11th Cir. 1999) ..................................................................................... 38

*Cooper v. Southern Co.*,
   390 F.3d 695 (11th Cir. 2004) ....................................................................................... 27

*Daniels v. Essex Group, Inc.*,
   937 F.2d 1264 (7th Cir. 1991) ....................................................................................... 19

*Davis v. Town of Lake Park*,
   245 F.3d 1232 (11th Cir. 2001) ..................................................................................... 28

*E.E.O.C. v. Joe's Stone Crabs, Inc.*,
   296 F.3d 1265 (11th Cir. 2002) ..................................................................................... 28

*Earley v. Chapion Int'l Corp.*,
   907 F.2d 1077 (11th Cir. 1990) ............................................................................... 13, 23

iv

*Edwards v. Wallace Community College*,
    49 F.3d 1517 (11th Cir. 1995) ......................................................... 22

*EEOC v. Beverage Canners, Inc.*,
    897 F.2d 1067 (11th Cir. 1990) ...................................................... 23

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)............................................................... passim

*Griffin v. Ambika Corp.*,
    103 F. Supp. 2d 297 (S. D. N. Y. 2000) ........................................... 19

*Gupta v. Florida Bd. of* Regents,
    212 F.3d 571 (11th Cir. 2000) ................................................. 22, 38

*Hammons v. George C. Wallace State Cmty. Coll.*,
    174 Fed.Appx. 459 (11th Cir. 2006)................................................ 38

*Hansen v. Perry Tech, Inc.*,
    206 F. Supp. 2d 1223 (S.D. Fla. 2002) ...................................... 20, 22

*Hanson v. New Technology, Inc.*,
    594 So. 2d 96 (Ala. 1992)............................................................... 46

*Harris v. Forklift Systems, Inc.*,
    510 U.S. 17 (1993)................................................... 13, 19, 20, 23

*Henson v. City of Dundee*,
    682 F.2d 897 (11th Cir. 1982) ...................................................... 23

*Holifield v. Reno*,
    115 F.3d 1555 (11th Cir. 1997) ..................................................... 28

*Horne v. Russell County Comm'n*,
    379 F. Supp. 2d 1305 (M.D. Ala. 2005) .......................................... 24

*Howard v. City of Robertsdale*,
    2006 WL 304552 (11th Cir. 2006) ........................................... 14, 46

*Hudson v. S. Ductile Casting Corp.*,
    849 F. 2d 1372 (11th Cir. 1988) .................................................... 38

*Info. Sys. & Networks Corp. v. City of Atlanta*,
    281 F.3d 1220 (11th Cir. 2002) ..................................................... 12

*Johnson v. Booker T. Washington Broad. Serv.*,
    234 F.3d 501 (11th Cir. 2000) ....................................................... 38

*Johnson v. Bunny Bread Co.,*
646 F.2d 1250 (8th Cir. 1981) ................................................................. passim

*Kelley v. Worley,*
29 F. Supp.2d 1304 (M.D. Ala. 1998) .................................................................. 48

*Lawrence v. Wal-Mart Stores, Inc.,*
236 F. Supp. 2d 1314 ................................................................. 19, 20, 22

*Ledbetter v. Goodyear Tire & Rubber Co.,*
27 S.Ct. 2162 (2007) .................................................................................. 2

*Mahgoub v. Miami Dade Community College,*
2006 WL 952278 (11th Cir. 2006) ..................................................................... 21

*Malone v. K-Mart Corporation,*
51 F.Supp.2d 1287 (M.D. Ala. 1999) .................................................................. 29

*Mardis v. Robbins Tire & Rubber Co.,*
669 So. 2d 885 (Ala. 1995) .......................................................................... 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) .................................................................................. 13

*McCollum v. Bolger,*
794 F.2d 602 (11th Cir. 1986) ...................................................................... 20

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) .............................................................................. 27, 28

*Meeks v. Computer Assoc.,*
15 F.3d 1013 (11th Cir. 1994) ...................................................................... 38

*Mendoza v. Borden, Inc.,*
195 F.3d 1238 (11th Cir. 1999) ................................................................. 19, 20

*Metmor Fin., Inc. v. Commonwealth Land Title Ins. Co.,*
645 So. 2d 295 (Ala. 1994) .......................................................................... 46

*Miller v. Kenworth of Dothan, Inc.,*
277 F.3d 1269 (11th Cir. 2002) ................................................................. passim

*Potts v. Hayes,*
771 So. 2d 462 (Ala. 2000) .......................................................................... 49

*Saville v. Houston County Healthcare Auth.,*
852 F. Supp. 1512 (M.D. Ala. 1994) ................................................................. 50

*Standard v. A.B.E.L. Servs., Inc.,*
    161 F.3d 1318 (11th Cir. 1998) ............................................................ 38

*Tanner v. Church's Fried Chicken, Inc.,*
    582 So. 2d 449 (Ala. 1991) ................................................................... 46

*Texas Dept. of Community Affairs v. Burdine,*
    450 U.S. 248 (1981) .............................................................................. 27

*Thomas v. BSE Indus. Contractors, Inc.,*
    624 So. 2d 1041 (1993) ......................................................................... 49

*Tipton v. Canadian Imperial Bank of Commerce,*
    872 F. 2d 1491 (11th Cir. 1989) ........................................................... 39

*Vessels v. Atlanta Indep. School Sys.,*
    408 F.3d 763 (11th Cir. 2005) .............................................................. 35

*Walker v. Darby,*
    911 F.2d 1573 (11th Cir. 1990) ............................................................ 13

*Wilson v. B/E Aerospace, Inc.,*
    376 F.3d 1079 (11th Cir. 2004) ....................................................... 27, 28

*Wilson v. Gayfers Montgomery Fair Co.,*
    953 F. Supp. 1415 (M.D. Ala. 1996) .................................................... 49

**Statutes**

42 U.S.C. § 1981 ....................................................................... 2, 27, 38

42 U.S.C. § 1981(a) ........................................................................... 27

42 U.S.C. § 2000e ............................................................................. 27

Ala. Code § 6-2-38(*l*) .................................................................. 47, 48

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................... 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **PATRICK LEWIS, JACK RICHARDSON,** | ) | |
| **NATHANIEL LAMAR, WILLIAM** | ) | |
| **RAGLAND, RALO CALVIN & ERVIN** | ) | |
| **TARVER,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | **CASE NO.** |
| | ) | |
| **V.** | ) | **2:06-CV-497-SRW** |
| | ) | |
| **K2 INDUSTRIAL SERVICES, INC. AND** | ) | |
| **MANSFIELD INDUSTRIAL,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants K2 Industrial Services, Inc. and Mansfield Industrial, Inc. (collectively "Defendants" or "Mansfield") hereby submit the following brief in support of their motion for summary judgment on all claims.

## I.    BACKGROUND

This is a race discrimination case brought by six Plaintiffs: Patrick Lewis ("Lewis"), Jack Richardson ("Richardson"), Nathaniel Lamar ("Lamar"), William Ragland ("Ragland"), Ralo Colvin ("Colvin"), and Ervin Tarver ("Tarver"), (collectively "Plaintiffs"). The named Defendants are K2 Industrial Services, Inc. ("K2") and Mansfield Industrial, Inc. ("Mansfield"). K2 Industrial Services, Inc. ("K2") is the parent company of Mansfield Industrial, Inc. ("Mansfield"). *See* Vezinat Affidavit, Ex G, ¶¶ 3-4. Mansfield is a wholly owned subsidiary of K2. *Id.* At all relevant times, the Plaintiffs were solely employed by Mansfield. *Id.* As the parent company, K2 does not exercise such control over Mansfield that the two corporations are

1

essentially the same entity.  *Id.*  K2 and Mansfield are not a single employer for purposes of Title VII, 42 U.S.C. § 2000(e).  *Id.*  Accordingly, K2 is improperly named as a defendant in this case.

The Complaint was filed on June 1, 2006, two and one-half years after the last plaintiff last worked for Mansfield in December 2003.  None of the Plaintiffs is currently employed by Mansfield.  In their Complaint, Plaintiffs make claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[1]  Plaintiffs specifically claim they were subject to discrimination with respect to: (1) a racially hostile working environment (¶ 7); (2) compensation (¶¶ 8, 10, 12, 14, 16); (3) benefits (¶¶ 10, 15, 21); and (4) retaliation (¶¶ 32-27).  Plaintiffs also assert state law claims for breach of contract (¶¶ 38-40); negligent training, supervision and retention (¶¶ 41-45); and outrage (¶¶ 46-48).  The Plaintiffs were all terminated for legitimate non-discriminatory reasons.  Accordingly, Mansfield is entitled to summary judgment on each of the Plaintiffs' claims.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Mansfield Industrial is a wholly-owned subsidiary of K2 Industrial Services.  *See* Vezinat Affidavit, Ex G, ¶ 3.  Mansfield is engaged in the business of industrial painting and coating. *Id.*, ¶ 5. Pursuant to agreements between Mansfield and G.E. Plastics ("G.E."), Mansfield performed painting and coating work for a maintenance project at G.E.'s Burkville, Alabama facility from 2001 to 2004.  *Id.*, ¶ 6.  Each of the Plaintiffs was employed by Mansfield at the G.E. facility, and Johnny Crutchfield was the Mansfield superintendent there. *Id.*, ¶ 8.  Plaintiff Jack Richardson often drove Nathaniel Lamar, William Ragland, Ervin Tarver, and co-worker

---

[1] Title VII requires that a plaintiff file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred.  *See Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162, 2166-67 (2007).  In the instant action, any alleged "unlawful employment practices" that occurred more than 180 days prior to a plaintiff's EEOC charge are barred under Title VII.

Ben Gayle to and from the Mansfield jobsite at G.E.  *See* Richardson Depo, Ex B, p.53:18-21; *see also* Gayle Affidavit, Ex I, ¶ 5.

When hired by Mansfield, every employee receives and is trained on a "Code of Conduct & Safe Practices: Employee Handbook." *See* Vezinat Affidavit, Ex G, ¶ 9. *See also* Code of Conduct & Safe Practices: Employee Handbook ("Employee Handbook"), Exhibit J.  As part of this training, every employee is required to sign a Receipt, Acknowledgment, and Consent Form acknowledging that they received the handbook and will follow Mansfield's policies.  *See* Vezinat Affidavit, Ex G, ¶ 12.

Mansfield's "Conflict, Harassment, Violence in the Workplace" statement provides, in pertinent part:

> Any employee who wants to report an incident of…unlawful harassment, intimidation or acts of violence **should promptly report the matter to his or her supervisor**.  If the supervisor is unavailable or the employee feels it would be inappropriate to contact that person, he or she should immediately contact the Human Resource Department or the Safety Department. Employees can raise concerns and make reports without fear of reprisal.

Employee Handbook, Ex J, p. 11 at ¶ 5 (emphasis added).  Similarly, Mansfield's "Equal Employment Opportunity Policy Statement" sets forth:

> **If you feel that you have been discriminated against, you** should report the incident to your supervisor immediately.  **If you feel that you cannot go to your supervisor, contact the EEO Officer directly at Corporate Headquarters (312-645-9000). The Company will investigate promptly and take all appropriate corrective action. …We will not retaliate against any employee for submitting a complaint.**

*Id.*, p. 13 at ¶ 3 (emphasis added). The Employee Handbook also sets forth clear policies regarding absenteeism, tardiness, and drug use. *See id.*, pp. 9-11.

A.      **Jack Richardson**

Jack Richardson is a Caucasian male. He was hired by Mansfield for the position of

"helper" on January 8, 2003. *See* DX[2] 9 to Richardson Depo, Ex B. *See also* Vezinat Affidavit,

Ex G, ¶ 17(b).  On his first day at Mansfield, Richardson received the Employee Handbook and

signed the "Receipt, Acknowledgment, & Consent Form" of the Employee Handbook,

acknowledging that he would comply with the procedures outlined in the handbook. *See* DX 1 to

Richardson Depo, Ex B.   As part of orientation on his first day at Mansfield, Richardson viewed

a video regarding Mansfield's anti-discrimination policies.  Richardson Depo, Ex B, p. 25:9-15.

Richardson understood that Mansfield had a policy of "providing a safe work environment that is

free of discrimination, unlawful harassment, violence or threats."  Richardson Depo, Ex B, p.

132:23 -133:10.

Richardson's initial pay rate was $8.00 per hour, which is the initial pay rate for all

helpers. *See id.*; *see also* Vezinat Affidavit, Ex G, ¶ 17(b).  On the date he was hired, Richardson

began working at the G.E. site. Richardson Depo, Ex B, p. 19:23-20:6.  On October 16, 2003,

Richardson received a pay raise to $9.00 per hour. *See* DX 11 to Richardson Depo, Ex B.

Johnny Crutchfield indicated on Richardson's Wage Scale Adjustment form that Richardson was

a "good worker." *See id.*

On November 5, 2003, Richardson sent a letter to Paul Calais, Mansfield's Safety

Director, alleging among other things that he was "treated unfairly because [he was] friendly

with black people."  DX 12 to Richardson Depo, attached as Ex B.  In the letter, Richardson

indicated his desire to keep his concerns "strictly confidential."  *Id.*  Cecile Vezinat, Mansfield's

Director of Human Resources, then conducted a confidential investigation into Richardson's

---

[2] "DX" is a shorthand notation for "Defendants' Exhibit" as attached to the Plaintiffs'
depositions.

4

claims, but found no evidence of discrimination or harassment. Vezinat Affidavit, Ex G, ¶¶ 44-48. Due to Richardson's request to keep the claims "strictly confidential," the only Mansfield employees who had any knowledge of Richardson's claims were Ms. Vezinat and Mr. Calais. *Id.* at ¶¶ 46-47.

Although Richardson's quality of work was good, he was often late to work or absent. Richardson admits that, on numerous occasions, he was late to work by an hour or more. *See e.g.,* Richardson Depo, Ex B, pp. 63:10-11, 64:3-7, 96:19-21, 97:1-7. Likewise, Richardson admits that he took at least one week off from work without calling in. Richardson testified he "should have been fired" for those absences. Richardson Depo, Ex B, p. 166:5-21. *See also* DX 14 to Richardson Depo, Ex B, p. 3. Richardson failed to show-up to work on Friday, December 5, 2003. DX 13 to Richardson Depo, Ex B. Due to that absence and many others, Richardson was terminated from employment the following week, on December 9, 2004. DX 13 to Richardson Depo, Ex B.

Richardson claims that he, along with other Plaintiffs, first saw a lawyer about their claims in June or July of 2003, some four to five months before he sent his letter complaining to Vezinat. Richardson Depo, Ex B, pp. 115:22-116:23. Richardson filed an EEOC Charge against Mansfield on February 17, 2004. *See* EEOC Charges of all Plaintiffs, Ex N, pp. 3-4. Richardson's EEOC Charge indicates that the "earliest date" discrimination took place was September 2003. *Id.* In the Complaint, Richardson's individual factual allegations are set forth in Paragraphs 12 and 13. *See* Complaint, ¶¶ 12-13.

### B.    Nathaniel Lamar

Lamar, an African American male, applied and was hired for the position of "painter helper" at Mansfield on September 11, 2002. *See* DX 1 & 2 to Lamar Depo, Ex F. On his application, Lamar indicated that his job responsibilities at previous jobs included only "painter

helper" and "warehouse" positions. *Id.* He did not indicate that he had any prior experience in industrial painting. *Id.* In fact, the Mansfield application included a section for applicants to "list any special qualifications or skills," but Lamar left this section blank. *Id.*

Lamar's initial pay rate was $8.00 per hour, which is the initial pay rate for all "helpers." *See* DX 2 to Lamar Depo, Ex F; Vezinat Affidavit, Ex G, ¶ 17(a). On the date he was hired, Lamar began working at the G.E. site. Lamar Depo, Ex F, at p. 46:11-18. On April 1, 2003, Lamar received a pay raise to $9.00 per hour. *See* DX 15 to Lamar Depo, Ex F. Johnny Crutchfield indicated on Lamar's Wage Scale Adjustment form that Lamar was a "good worker." *See id.*

Lamar has admitted that he was late to work on at least two or three occasions. Lamar Depo, Ex F, p. 117:14-20. Lamar has stated that he has been "chewed out", or verbally disciplined, by Johnny Crutchfield for being late. *See* Lamar Depo, Ex F, pp. 111:19-112:12. Lamar admits that he did not show-up to work on Friday, December 5, 2003. Lamar Depo, Ex F, pp. 195:15-196:4. As a result of this and other repeated absences and tardiness, Mr. Lamar was terminated from employment on the following Monday, December 8, 2003.[3] DX 16 to Lamar Depo, Ex F.

Lamar claims he never saw or received a copy of the Employee Handbook. Lamar Depo, Ex F, p. 165:7-14. His claim is disproved by the undisputed fact that on September 11, 2002, Lamar signed the "Receipt, Acknowledgment, & Consent Form" of the Employee Handbook, acknowledging that he would comply with the procedures outlined in the handbook. DX 12 to Lamar Depo; DX 14 to Lamar Depo, at 57; Lamar Depo, Ex F, p. 170:10-21. Lamar also took

---

[3] Mr. Lamar's last day of work at Mansfield was December 4, 2003. He was verbally terminated on the following Monday, December 8, 2003, and Johnny Crutchfield completed his termination slip on December 12, 2003. *See* DX 16 to Lamar Depo, Ex F.

and passed a series of eight (8) exams testing information contained in Mansfield's Employee

Handbook.  DX 13 Lamar Depo, Ex F; DX 12 to Lamar Depo, Ex F, pp. 37-55.  Mr. Lamar has

reviewed each of these documents and acknowledged that they contain his handwriting.  Lamar

Depo, Ex F, pp. 169:17-170:12.

Lamar never made any sort of complaint, formal or informal, to any Mansfield supervisor

or to anyone in Mansfield's Human Resource or Safety departments about the conduct of any

Mansfield employee.  Lamar Depo, Ex F, pp. 71:20-72:21, 86:7-10, 126:19-127:19, 130:17-20,

133:18-134:4.  *See also* Vezinat Affidavit, Ex G, ¶ 51; Crutchfield Affidavit, Ex H, ¶ 11.   He

has indicated that he first visited a lawyer about his claims during October of 2003. Lamar Depo,

Ex F, pp. 152:16-155:5.  Subsequently, Lamar filed and signed an EEOC Charge of

Discrimination against Mansfield on February 16, 2004. DX 18 to Lamar Depo, Ex F, p. 1.  In

that charge, under the section entitled "Date Discrimination Took Place," Lamar wrote that the

earliest date of discrimination was September 2003. *Id.*  Lamar's individual factual allegations

are set forth in Paragraph 14 of the Complaint. *See* Complaint, at ¶ 14.

### C.    Ervin Tarver

Ervin "Yogi" Tarver ("Tarver"), an African American male, applied for a "painter-

blaster" position at Mansfield on August 29, 2002. *See* DX 1 to Tarver Depo, Ex D.  Tarver had

previously worked for Mansfield from approximately 1989 to 1991, and again from March 1997

to January 1999. *See id.*; Tarver Depo, Ex D, pp. 12:19-16:3.   Tarver was rehired as a "blaster &

painter" on September 4, 2002, at an initial hourly pay rate of $12.50. *See* DX 2 to Tarver Depo,

Ex D.  Tarver began working at the G.E. site on the same day. Tarver Depo, Ex D, pp. 17:19-

18:4.

On September 4, 2002, Tarver signed the "Receipt, Acknowledgment, & Consent Form"

of the Employee Handbook, acknowledging that he would comply with the procedures outlined

in the handbook. Tarver Depo, Ex D, pp. 111:17-112:16; DX 14 to Tarver Depo.  Tarver's

signature also indicated that he understood that his employment was dependent on acceptable

drug screen results.  DX 14 to Tarver Depo, Ex D. *See also* Tarver Depo, Ex D, pp. 168:10 -

169:7.

At the G.E. site, Tarver would sometimes oversee his crew's operations. Tarver Depo, Ex

D, p. 25:5-9. On May 13, 2003, Tarver received a pay raise to $13.50 per hour. DX 15 to Tarver

Depo, Ex D.  Tarver received this raise because Johnny Crutchfield considered him a "very good

worker." *Id.*  When Mansfield's contract with G.E. ended, Johnny Crutchfield offered Tarver an

opportunity to work for Mansfield as a foreman at the Hyundai facility in Hope Hull, Alabama.[4]

*See* Crutchfield Affidavit, Ex H, ¶ 16; Tarver Depo, Ex D, p. 117:1-9.

Tarver was ready and willing to accept the foreman position at the Hyundai site.

Hyundai required that all Mansfield employees pass a drug test before beginning work at the

facility.  *See* Crutchfield Affidavit, Ex H, ¶ 16.  Tarver tested positive for illegal substances,

namely marijuana. *See* Tarver Depo, Ex D, pp. 117:7-9, 169:8-13; *see also* DX 16 to Tarver

Depo.  He does not dispute the test results.  Because he failed the drug test, Tarver was

terminated.  *See* Crutchfield Affidavit, Ex H, ¶ 16; Tarver Depo, Ex D, p. 121:15-20; DX 19 to

Tarver Depo.

Tarver never complained of discriminating or harassing conduct by any Mansfield

employee to any supervisor or personnel in Mansfield's corporate office.  Tarver Depo, Ex D,

pp. 77:18-19, 78:10-16.  *See also* Vezinat Affidavit, Ex G, ¶ 51.  Tarver filed an EEOC Charge

---

[4] Johnny Crutchfield offered Tarver an opportunity to work as a foreman at the Hyundai facility. Crutchfield Affidavit, Ex H, ¶ 16.  However, Tarver denies that he was offered a foreman's position at that time, but admits he was offered a job at Hyundai. Tarver Depo, Ex D, p. 117:4-6.

of Discrimination against Mansfield on February 12, 2004. DX 19 to Tarver Depo, Ex D.  In that

charge, under the section entitled "Date Discrimination Took Place," Tarver indicated that the

earliest date of discrimination was September 2003.  *Id.* The Complaint failed to include a

section setting forth Tarver's factual claims.  *See* Complaint, ¶¶ 5-18.

      **D.**    **Patrick Lewis**

      Patrick Lewis, an African American male, began his employment with Mansfield on

March 24, 2003.  *See* Lewis Depo, Ex A, at pp. 131:16-132:4.  He was employed as a blaster

painter because he had prior sandblasting and painting experience.  *See* Vezinat Affidavit, Ex G,

¶ 19(b).  His initial pay rate was $12.50.  *Id.*   On his application for employment, Lewis writes

that he was referred by plaintiff Ervin Tarver.  *See* DX 4 to Lewis Depo, Ex A.

      Lewis thinks the first time he complained about any kind of racial discrimination was

during Mansfield's investigation in October of 2003.  Lewis Depo, Ex A, pp. 99:15-100:12.  On

October 17, 2003, Lewis contacted Cecile Vezinat, the Human Resources Manager, at the

corporate office and stated that he was being discriminated against by his supervisors on the G.E.

job.  *See* Vezinat Affidavit, Ex G, ¶ 34.  This included Crutchfield, Coy Watson, and Reed.  *Id.*

Lewis stated that he wanted to make a formal complaint and Vezinat asked him to submit a

written statement with the details of his allegations.  *Id.*, ¶ 35.

      During his employment, Johnny Crutchfield sent Lewis home after he arrived late for

work. Lewis Depo, Ex A, pp. 79:17-80:6.  Lewis admits this happened on at least two occasions.

*Id.*  On October 29, 2003, Lewis and his supervisor exchanged words over whether or not Lewis

was late for work. *Id.*, p. 86:17-20.  An argument ensued.  *Id.*, p. 92:11-12.  Lewis admits that he

was terminated after cursing at his supervisor in a raised voice. Lewis Depo, Ex A, pp. 81:10-

82:4, 89:12-13, 889:22-23, 90:16-18, and 93:9-14. According to Richardson, Lewis called his

supervisor a "stupid bitch" and a "mother-fucker."  Richardson Depo, Ex B, ¶¶ 161:7-162:18.

The handbook provides that employees may be disciplined, up to and including termination, for "[i]nsubordination, disrespect, or failure to follow instructions or assignments of supervisors, management or owner's representative." *See* Code of Conduct & Safe Practices: Employee Handbook, Ex J, p. 9. Due to Lewis's failure to comply with Mansfield's policy, Johnny Crutchfield, the site superintendent, terminated Lewis for insubordination. *See* Crutchfield Affidavit, Ex H, ¶ 18.

Lewis filed an EEOC Charge of Discrimination against Mansfield on February 12, 2004. *See* Ex N, pp. 1-2. In that charge, under the section entitled "Date Discrimination Took Place," Lewis indicated that the earliest date of discrimination was September 2003. *Id.*

### E.    Ralo Colvin

Ralo Colvin, an African American male, was hired by Mansfield Industrial on March 13, 2003, as a painter because he possessed prior experience in painting and sandblasting. *See* Vezinat Affidavit, Ex G, ¶ 18(b). His initial rate of pay was $10.00 an hour. DX 15 to Lewis Depo, Ex A, p. 3. Lewis, who was already employed with Mansfield at the time, suggested that Colvin apply for a job with the company. Colvin Depo, Ex C, pp. 51:15-52:23. Lewis and Colvin had previously worked together for another company that did similar industrial coating type work. *Id.* Colvin started work on the G.E. job. *Id.*, pp. 68:8-69:3. Johnny Reed was his supervisor. *Id.*, p. 69:18-21. During his time at Mansfield, Colvin was the only African American on his crew of about five people. *Id.*, p. 70:4-7. Colvin testified that though he was on the same level as the employees on his crew, his supervisor, Johnny Reed, entrusted him to oversee the crew when Reed would leave to work in other areas of the plant at the G.E. site. *Id.*, pp. 74:1-75:2. Colvin was laid off in November 2003, due to lack of work and then rehired to complete the G.E. job. *Id.*, p. 114:18-22; pp. 132:4-133:7. He was laid off again on December 14, 2003 due to lack of work. *Id.*, p. 157:2-3; *see also* Crutchfield Affidavit, Ex H, ¶ 15. In

10

December 2003, Colvin was offered the option to transfer to another jobsite, but he declined. *See* Colvin depo, Ex C, pp. 133:16-136:6.

Colvin believes he first met with an attorney shortly before he was laid off in December 2003. *Id.*, pp. 157:2-158:2. Colvin's first EEOC Charge was filed in April 2004. *See* DX 3 to Colvin depo, Ex C. Colvin's Amended EEOC Charge was filed in April 2005. *See* DX 4 to Colvin depo, Ex C. Though Colvin is unsure of the exact times, he and the other Plaintiffs also met with two attorneys from the EEOC on at least two or three occasions during this entire process. *See* Colvin depo, attached as Ex C, pp. 176:17-177:13. During those meetings, the Plaintiffs met as a group to discuss dates of different events and also to help each other develop their facts. *Id.*, pp. 178:12-181:16. As he testified, "[b]ut some guy just remembers more about what happened to you on that day than you probably would yourself because you have more going on in your life than just that, you know." *Id.*, p. 181:12-16.

Colvin filed an EEOC Charge of Discrimination against Mansfield on April 17, 2004. *See* Ex O. In that charge, under the section entitled "Date Discrimination Took Place," Colvin indicated that the earliest date of discrimination was March 2003. *Id.*

### F.    William Ragland

William Ragland, an African American male, was hired by Mansfield as a painter because he had some prior "brush and roll" and spraying experience. *See* Vezinat Affidavit, ¶ 18(a). He started work on April, 23 2003. *See* DX 4 to Ragland Depo, Ex E. His initial rate of pay was $9.00 an hour. *See* Vezinat Affidavit, ¶ 18(a). He was later given a raise, increasing his salary to $10.00 an hour. *Id.*; *see also* Ragland depo, Ex E, p. 64:6-8. On his application, Ragland indicates he was referred to Mansfield by plaintiff Ervin Tarver. *See* DX 4 to Ragland Depo, Ex E. Ragland called Tarver and asked him if he could help him get a job with Mansfield. *See* Ragland depo, Ex E, p. 46:18-47:3. Ragland says Tarver asked Crutchfield about a job for

11

him. *Id.*  Subsequently, Ragland was hired on and started work at the G.E. project. *Id.*, p. 64:8-13.  Eventually, he worked on the Hyundai project after the G.E. job was completed. *Id.*, p. 64:14-22.

Ragland never complained of discriminating or harassing conduct by any Mansfield employee to any supervisor or personnel in Mansfield's corporate office.  Ragland Depo, Ex E, pp. 225:12-226:8.  *See also* Vezinat Affidavit, Ex G, ¶51.  Ragland filed an EEOC Charge of Discrimination against Mansfield on February 17, 2004. *See* DX 10 to Ragland Depo, Ex E.  In that charge, under the section entitled "Date Discrimination Took Place," Ragland indicated that the earliest date of discrimination was September 2003.  *Id.*

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986*); see also Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1221 (11th Cir. 2002).  Once the movant satisfies its initial burden under Rule 56(c), the burden then shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Moreover, the nonmovant bears "the burden of coming forward with sufficient evidence on *each element* that must be proved."  *Earley v. Chapion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990) (emphasis added).  "A mere 'scintilla' of evidence supporting the opposing party's

position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. County Commission of Jefferson County,* 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## IV.    ARGUMENT

### A.    Mansfield is Entitled to Judgment as a Matter of Law on Plaintiffs' Hostile Work Environment Claim

Mansfield is entitled to judgment as a matter of law with respect to the Plaintiffs' hostile work environment claim.  The burden for proving a hostile environment claim is a high one and requires a plaintiff to show that the offensive conduct was so severe and pervasive that it resulted in a workplace that was "permeated with discriminatory intimidation, ridicule and insult sufficiently severe to alter the terms and conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).  The Plaintiffs cannot make such a showing here.

### 1.    Plaintiffs Were Not Subjected to a Racially Hostile Work Environment

A plaintiff may establish a hostile work environment claim through proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." *See id.*  To establish a hostile work environment claim a plaintiff must show that (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment;" and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability.  *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

13

## 2.    The Alleged Harassment Was Not Sufficiently Severe or Pervasive

Plaintiffs cannot satisfy the elements of a hostile work environment case. The evidence does not show they were subjected to any unwelcome racial harassment.  Even accepting Plaintiffs' allegations as true, the alleged harassment does not come close to satisfying the requirement that the harassment be "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive work environment." *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).  Off-handed comments in the course of casual conversation are not actionable. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 778 (1998); *Miller v. Kenworth of Dothan,* 277 F.3d at 1277; *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir. 1981) (racial comments that are merely part of casual conversation or are sporadic or accidental do not trigger Title VII's sanctions).  As the Eleventh Circuit has repeatedly held, Title VII is not a general civility code and mere offensive remarks will not sustain a cause of action for harassment. *See Howard v. City of Robertsdale,* 2006 WL  304552 at *5 (11th Cir. 2006).

The Plaintiffs belong to a protected class. With respect to element number two, the Plaintiffs contend that they heard racially offensive statements by coworkers and by supervisors. The supervisors deny making any racially derogatory comments.  Even viewing the evidence in the light most favorable to the non-moving party, any alleged harassment was not so severe or pervasive that their workplace was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe to alter the terms and conditions of employment."

To satisfy the "severe and pervasive" prong of the analysis, the Plaintiffs must prove that they subjectively perceived the conduct to be abusive, and that a reasonable person would also

14

objectively find the conduct sufficiently hostile or abusive.  *See Miller v. Kenworth of Dothan, Inc.,* 277 F. 3d 1269, 1276 (11th Cir. 2002).

### (a)    Patrick Lewis

Plaintiff Patrick Lewis has identified six (6) specific instances of hearing comments made by coworkers or supervisors that he considers racially inappropriate.  First, Lewis says he overheard Johnny Crutchfield, who was having a conversation with Johnny Reed, call him an "arrogant nigger."  Lewis Depo, Ex A, pp. 13:10-14:17.  Secondly, Lewis says Johnny Crutchfield called him "a black buzzard."  *Id.*, p.24:11-16.  Lewis says he also heard "Robert"[5] refer to Mexican employees as "spics" and "wetbacks."  *Id.*, pp. 15:8-10.  This is the third specific instance he identifies.  This occurred when the two were having a conversation about how to "tie off" or complete a specific job. *Id.*, pp.16:13-17:9.  The fourth instance of Lewis hearing a racial slur occurred when he heard Robert say, "You Niggers don't, you know, don't comply; don't want to get together with this and that."  *Id.*, p. 18:3-5.  Fifth, Lewis alleges to having heard Johnny Reed make "sly, sneaky racial words" (*Id.*, p. 26:7-8) such as the following:

> 11  **Q**    Well, let me hear them.
> 12  **A**    "Black people don't like getting up on
> 13  high towers; black people complain about this
> 14  here."  There's numerous things.
> 15  **Q**    I need specifics.
> 16  **A**    Specifics.  All right.  We didn't want to
> 17  go in the enclosures.  The blacks didn't go in
> 18  the enclosures.  It was always about the blacks
> 19  didn't want to go in the enclosures.  Hanging
> 20  off the towers, the blacks didn't want to hang
> 21  off the towers.  The blacks don't like wearing
> 22  their hard hats.

*Id.*, p. 26:11-21.  Lewis admits he never heard Johnny Reed use the word "nigger."  *Id.*, p. 29:20-22.  Finally, Lewis says he heard Reed make statements about the Mexican employees.

---

[5] Mansfield believes this to be Robert Kimberlin.

Specifically, he says Reed said, "The Mexicans do all the scum work that we don't want to do; or hang out on or get into the closures or this and that. We put all the wetbacks into this." *Id.*, p. 30:8-11.

### (b)    Jack Richardson

Plaintiff Jack Richardson, who is Caucasian, identified two instances where racially inappropriate language was used and directed toward him. Those two instances include: (1) the time wherein he was allegedly referred to as a "nigger lover"; (*see* Richardson Depo, Ex B, pp. 62:12-13, 83:15-21) and (2) the "Aunt Jemima" reference when he wore a bandana to cover his hair. *Id.*, pp. 86:21-87:4. Richardson has heard Robert Kimberlin, a white coworker, refer to African American employees as nigger. *Id.*, p. 64:15-23. He says he has also heard Kimberlin "talk about the Mexicans real bad out there," though he is not specific. *Id.*, p. 64:10-14. Richardson also testified to hearing Johnny Crutchfield refer to Patrick Lewis as a nigger and a black buzzard. *Id.*, p. 63:3-9. Richardson also testified to instances of hearing the African American Plaintiffs refer to each other as "nigger" in his presence and in the presence of other white employees. *Id.*, pp. 105:16-108:7.

### (c)    Nathaniel Lamar

Plaintiff Nathaniel Lamar testified about one instance wherein racially inappropriate language was directed toward him and one instance where he saw racially offensive language on a bathroom wall. The first instance refers to his supervisor, Corey "Coy" Watson, calling him a "black ass." Lamar Depo, Ex F, pp. 211:16-21. The second refers to writing he observed on a bathroom wall in the facility owned by G.E. that "[s]aid something about a klansman hanging a nigger something." *Id.*, p 132:7-133:5. Lamar also said there was other writing on the bathroom wall that he described as saying: "This plant would be a better place if all them niggers were to

go home. Nigger this, nigger that." *Id.*  Beyond this, Lamar testified that he heard racially inappropriate language directed at others.  Specifically, Lamar recalls hearing a white supervisor use the word "buzzard," a term he found racially offensive and he believed was directed toward Patrick Lewis.  *Id.,* pp. 84:13-87:16; 121:16-22.

### (d)    William Ragland

Plaintiff William Ragland testified about one specific instance of a comment made that he considered racially inappropriate.  Ragland alleges supervisor Corey Watson told him to tell Nathaniel Lamar "to bring his Black ass on."  Ragland Depo, Ex E, p. 126:21-23.  Ragland alleges that the word nigger was used frequently in the workplace. *Id.,* 126:12-13.  Specifically, he says he has heard white coworkers named "Robert[6]" and "Jeff"[7] use the word nigger before and in reference to other African American employees. *Id.*, pp. 127:8-10; 134:1-22.  He also contends that the word "Boy" was used "a lot." *Id.*, p. 126:23.  Though he cannot pinpoint the number of times the words nigger and boy were used in the workplace, and by whom, he admits that he even used the word "boy" when referring to his white coworkers.  *Id.*, p. 142:16-22. Specifically, he recalls saying, "We'd be, like, Boy, come over here.  Let's go, you know." *Id.* Ragland admits that African American employees, including Plaintiffs, also used the same racial language at work.  *Id.*, p. 137:2-138:3.

### (e)    Ralo Colvin

Plaintiff Ralo Colvin has identified three specific instances of comments he overheard in the workplace that he considered racially inappropriate.  He specifically recalls supervisor

---

[6] Ragland says there were two different employees named Robert that worked with him during his time at Mansfield.  Mansfield is only aware of Robert Kimberlin.  Mansfield is unsure of the other "Robert" that Ragland is referring to as a coworker and Ragland could not be more specific.

[7] Mansfield believes this to be a reference to Jeff Smitherman.

Johnny Crutchfield saying, in reference to Patrick Lewis, "he was going to get rid of a buzzard because he was starting up too much mess." Colvin Depo, Ex C, p. 100:18-101:1. He also claims to have heard Johnny Reed say Lewis was "slipping on a monkey peel" and "slipping on a banana peel." *Id.*, pp. 164:12-167:11. He, too, says he has heard Robert used the word "nigger." *Id.*, p. 104:2-22. Specifically, he recalls overhearing Robert tell Johnny Reed that "I'm not going up today. I thought that's what you hired the niggers for." *Id.*, p. 145:15-18. Colvin says he complained to Johnny Reed about this, saying "So he ain't got to go up high? He thinks all the black guys got to go up high?" *Id.*, p. 146:10-12. Colvin says Reed told him not to pay Robert any attention. *Id.*, p. 147:6-10. He also alleges that he saw such things like "white power" and "the south will rise again" written on a G.E. bathroom wall. *Id.*, p. 170:1-6. Colvin does admit, however, that he was not offended by the racial slurs written on the bathroom walls. *Id.*, p. 172:7-15. There is no evidence that any Mansfield employee was responsible for this.

### (f)    Ervin Tarver

Plaintiff Ervin Tarver admits he never heard any Mansfield employee use the word "nigger" or other racially offensive language (Tarver Depo, Ex D, pp. 90:18-91:6), but that he himself used the phrase "my nigger" when referring to other African American employees. *Id.*, p. 90:4-11. He testified that the only racially inappropriate material he encountered were the racial slurs written on the walls of the G.E. bathroom stalls. *Id.*, pp. 49:6-50:8. Again, there is no evidence that any Mansfield employee was responsible for this.

Vague and ambiguous comments are not evidence of a racially hostile environment. *See e.g., Alvarado v. Health Net, Inc.*, 21 F.3d 1111 (9th Cir. 1994)(unpublished opinion)(finding such comments such as "I don't understand you people," "you people have too many babies," and "you people drive up the cost of health insurance," were too general to be racial slurs.); *see also G*riffin v. Ambika Corp.*, 103 F. Supp. 2d 297 (S. D. N. Y. 2000). Even assuming that these

hearsay comments were directed to any one of the Plaintiffs, these comments were not sufficiently severe or pervasive (both subjectively and objectively) to alter the terms and conditions of their employment and create an abusive working environment.

To determine whether a plaintiff subjectively felt "harassed," the Court can look to whether the plaintiff quit as a result of the harassment, regularly avoided the workplace, reacted angrily to the alleged statements or actions, or exhibited physical or psychological reactions to the environment. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999) (quoting *Harris*, 510 U.S. at 21-22) ("The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms and conditions of employment…."); *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1324 (*citing Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272-73 (7th Cir. 1991)).

Here, none of the events, individually or collectively, show a frequency of conduct, a severity of conduct, or conduct that was physically threatening or humiliating versus a mere offensive utterance. Although some of the Plaintiffs claim that they were bothered by the comments, it is clear that none of the Plaintiffs quit as a result of the alleged harassment. There is no evidence that they regularly avoided the workplace to avoid the alleged harassment, nor did they react angrily to the alleged harassment or exhibit physical or psychological reactions.

Even if the Court finds that the Plaintiffs have satisfied the "subjective prong" of the analysis, they still must satisfy the objective inquiry. In determining whether the alleged conduct is hostile or abusive under the objective prong, the Court must look to the totality of the circumstances which, as a whole, "must reveal conduct extreme enough to 'amount to a change in terms and conditions of employment.'" *Lawrence*, 236 F. Supp. 2d at 1324 (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). In *Mendoza v. Borden, Inc.,* the court

19

identified several factors to consider in making the objective severity determination necessary to prevail in a hostile work environment claim: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  195 F.3d 1238, 1246 (11th Cir. 1999).  With regard to those elements, it has been stated that "Title VII prohibits discrimination; it is not a shield against harsh treatment in the workplace. Personal animosity is not the equivalent of... [race] discrimination.... The plaintiff cannot turn a personal feud into a... [race] discrimination case...."  *McCollum v. Bolger,* 794 F.2d 602, 210 (11th Cir. 1986).  An objectively hostile environment is an environment that a reasonable person would find hostile or abusive.  *Harris v. Forklift Sys., Inc.,* 510 U.S. at 21.

### 3. The Frequency, Severity, and Level of Offensiveness Here is Not Sufficient

The Plaintiffs cannot show that the incidents of harassing behavior were so frequent and severe that the abuse permeated the workplace.  *See Hansen v. Perry Tech, Inc.*, 206 F. Supp. 2d 1223, 1231 (S.D. Fla. 2002)(noting the Eleventh Circuit's choice of the word "permeated" in *Miller* "connotes significantly more than many other adjectives.")).  In order to determine whether a comment is severe (and therefore potentially actionable), it must appear to be physically intimidating or humiliating.  *Miller*, 277 F.3d at 1277.  For example, in *Miller*, the Eleventh Circuit held that the derogatory comments at issue were sufficiently severe because they were used in an intimidating manner.  There, the harassing coworkers used the offensive language while shouting at the plaintiff during the course of berating him for his job performance.  Here, there is no evidence that the alleged offenders yelled or shouted any epithets or used them to berate or taunt the Plaintiffs.  Indeed, it is questionable whether some of the

comments the Plaintiffs contend are racially offensive even connote a racial reference or meaning. Colvin Depo, Ex C, pp. 165:10-167:11.

Even when viewed in the light most favorable to the Plaintiffs, these comments do not rise to the level of severity required by Title VII. In *Barrow v. Georgia Pacific Corp.,* 144 Fed. Appx. 54 (11th Cir. 2005), the Court held that that plaintiff's evidence was too isolated and sporadic to be sufficiently severe or pervasive to alter the terms and conditions of his employment, even though part of the plaintiff's evidence was that his supervisor called him a "nigger" three times within the space of a year. *Id.*, 144 Fed. Appx. 54, 57. Here, the comments complained of by all of the Plaintiffs cannot be meaningfully distinguished from that in *Barrow,* in which evidence was held insufficient as a matter of law to support a hostile work environment claim. *See also Mahgoub v. Miami Dade Community College,* 2006 WL 952278 at *1 (11th Cir. 2006)(four incidents of offensive ethnic utterances over an unspecified period of time, with one accompanied by a threatening physical gesture, but which did not interfere with the plaintiff's work performance, were legally insufficient to support a hostile work environment claim).

Not only are the comments not sufficiently severe, the requisite frequency has not been shown. Although there is no "magic number" for frequency, the Eleventh Circuit has noted that "permeation of the workplace" is required and has found sufficient frequency in cases where the abuse was much more repeated than is alleged here. For example, in *Miller*, the Eleventh Circuit found that the offensive comments were sufficiently frequent where ethnic slurs were hurled at the plaintiff three to four times a day. 277 F. 3d at 1323. Similarly, in *Hansen*, the district court held the conduct to be sufficiently frequent where, at its lowest level, the plaintiff suffered "name-calling" and offensive comments two to four times a day. 206 F. Supp. 2d at 1227 n.3.

21

The situation here, when compared to *Miller* and *Hansen* fails to come close to rising to the level of severity and frequency that would lead a reasonable juror to find that the harassing behavior permeated the Plaintiffs' workplace.

**4.    There Was No Alteration of the Plaintiffs' Working Conditions**

Even if the Court finds that the alleged harassing behavior was sufficiently severe and permeated the plaintiff's workplace, which Mansfield has shown it did not, the evidence still clearly shows that the Plaintiffs' working conditions were not significantly altered, thereby precluding the Plaintiffs from presenting their *prima facie* case. To show that their working conditions were sufficiently altered, the Plaintiffs must show some negative, material alterations of their job performance. *Lawrence*, 236 F.Supp.2d at 1326; *Gupta v. Florida Bd. of* Regents, 212 F.3d 571, 586 (11th Cir. 2000). Indeed, the Eleventh Circuit requires a plaintiff to show that any racial slurs must be "so commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (citations omitted).

The Plaintiffs have presented no evidence, much less sufficient evidence, that their job performance was affected in any negative, material way by any of the alleged comments. In fact, Plaintiffs Richardson, Lamar, Tarver, and Ragland received pay increases (*see* Vezinat Affidavit, Ex G, ¶ 18(a); DX 11 to Richardson Depo, Ex B; DX 15 to Lamar Depo, Ex F; DX 15 to Tarver Depo, Ex D); *see Hansen*, 206 F. Supp. 2d at 1233-34 (noting that the fact that plaintiff received a pay raise revealed that the offensive comments did not unreasonably interfere with her job performance). Furthermore, as work was coming to a close on the G.E. project, Tarver was offered a "foreman" position at another jobsite in the area (the Hyundai plant) and an opportunity to become a permanent employee. However, before Tarver started working at the Hyundai project, Hyundai conducted an on-site urine drug screen, which he failed, in violation of not

22

only Hyundai's policy prohibiting drug use on the job, but Mansfield's as well, leading to his termination.  As other courts have recognized, though remarks could be deemed racially hostile "the mere utterance of an [ethnic or racial] epitaph which engenders offensive feelings in an employee does not affect the terms, conditions or privileges of employment to a sufficient degree to violate Title VII." *Harris v. Forklift Sys., Inc.,* 510 U.S. at 21.  *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir. 1982).  "Only the most blatant remarks whose intent could be nothing other than to discriminate ... will constitute direct evidence of discrimination" in a hostile work environment case.  *Early v. Champion Int'l Corp.,* 907 F.2d 1077, 1081-82 (11th Cir. 1990). The remarks must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility." *EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir. 1990) (use of terms such as niggers, swahilis and statements that blacks were meant to be slaves showed racial hostility).

> **B.    MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT ON THE HOSTILE WORK ENVIRONMENT CLAIMS BASED ON THE AFFIRMATIVE DEFENSE SET FORTH IN *BURLINGTON INDUSTRIES* AND *FARAGHER***

Assuming, *arguendo,* that the Plaintiffs have met their burden of presenting a *prima facie* case of hostile work environment, their claims cannot go forward because Mansfield has satisfied the requirements of the affirmative defense recognized in *Burlington Industries* and *Faragher. See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  Under *Burlington Industries/Faragher*, if a plaintiff shows that the harassing supervisor took a tangible employment action against him, then the defense is not applicable.[8]  Here, the Plaintiffs complain of various remarks made by various people.  In most

---

[8] A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

cases, remarks made by a coworker who was not a decision maker and could not affect a tangible employment action against them are not "direct evidence" of discrimination.  *See Horne v. Russell County Comm'n*, 379 F. Supp. 2d 1305, 1328 (M.D. Ala. 2005).  Indeed, all of the Plaintiffs were terminated for various reasons, ranging from absenteeism,[9] to insubordination,[10] to being laid off work due to lack of work,[11] to failing a drug test,[12] and by various supervisors.  Because the Plaintiffs cannot show any tangible employment action against them by a decision maker, Mansfield is entitled to this defense.

### 1.    Mansfield Exercised Reasonable Care to Disseminate its Equal Employment Policy Statement Prohibiting Discrimination.

The first element of the *Burlington Industries/Faragher* defense requires the defendant to show that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior."  *Faragher*, 524 U.S. at 807.  Mansfield has presented evidence that it has, at all relevant times, had a policy prohibiting harassment.  *See* Code of Conduct & Safe Practices Employee Handbook, attached as Ex J; *see also* Vezinat Affidavit, attached as Ex G, ¶¶ 9-14.  The policy was presented and explained to all new employees when they are hired.  *See* Vezinat Affidavit, attached as Ex G, ¶¶ 9-14.  Mansfield has in place a policy against discrimination and a means by which an employee could complain and seek relief.  *See* Code of Conduct & Safe Practices Employee Handbook, attached as Ex J, p. 13.  Indeed, Mansfield's Equal Employment

---

responsibilities, or a decision causing a significant change in benefits.  *Burlington Industries*, 425 U.S. at 761.

[9] Richardson and Lamar were both terminated for absenteeism.  *See* Ex M, Employee Separation Forms; *see also* Crutchfield Affidavit, attached as Ex H, ¶¶ 14, 17.

[10] Ragland was terminated for poor job performance.  *See* Ex M, Employee Separation Form; *see also* Crutchfield Affidavit, attached as Ex H, ¶ 13.  Lewis was terminated for insubordination.  *See* Crutchfield Affidavit, attached as Ex H, ¶ 18.

[11] Colvin was laid off.  *See* Crutchfield Affidavit, attached as Ex H, ¶ 15.

[12] Tarver was offered a foreman's position at the Hyundai jobsite, but failed the required drug screen.  Therefore, he was not permitted to work at the Hyundai facility.  *See* Crutchfield Affidavit, attached as Ex H, ¶ 16.

24

Opportunity Policy Statement, which is a part of the employee Code of Conduct & Safe Practices handbook was a required part of orientation.  *See* Vezinat Affidavit, attached as Ex G, ¶¶ 9-14. Each plaintiff signed the Receipt, Acknowledgment, & Consent Form acknowledging that they received the employee handbook, along with orientation and testing on its contents.  *See* Notices of Termination/Separation for all Plaintiffs, Ex M.  Furthermore, Mansfield's policy was posted in the break area and the trailer at the job site.  *See* Vezinat Affidavit, attached as Ex G, ¶14.  The policy clearly sets out Mansfield's position against discrimination and instructs employees who feel they have been discriminated against to report the incident to their supervisor immediately. *See* Code of Conduct & Safe Practices Employee Handbook, attached as Ex J, p. 13, ¶ 3.  If the employee did not feel he could go to his supervisor, he is advised to contact the EEO Officer directly at Corporate Headquarters to voice complaints and/or concerns.  *See id*.

## 2.    Plaintiffs Unreasonably Failed to Take Advantage of Available Avenues to Avoid Harm.

The second element of the *Burlington Industries/Faragher* defense requires the employer to show that the plaintiff unreasonably failed to take advantage of preventative or corrective opportunities or to avoid harm otherwise.  *See Faragher*, 524 U.S. at 807.  Three of the Plaintiffs[13]  failed to take advantage of Mansfield's anti-discrimination policy altogether by not reporting the alleged harassment to Mansfield's management or upper management at the corporate office at any time prior during their employment.[14]  Therefore, these Plaintiffs failed to

---

[13] Those three Plaintiffs are Nathaniel Lamar, William Ragland and Ervin Tarver.

[14] Two weeks prior to receiving Lewis's EEOC Charge, Mansfield investigated allegations from another employee regarding an incident of harassment and discrimination at the G.E. jobsite.  On October 2, 2003, Paul Calais, the District Safety Manager, interviewed a number of employees, including Lewis.  Calais asked Lewis if he had witnessed any incidents of harassment or racist remarks on the jobsite.  Lewis responded that he had not witnessed any such incidents.  *See* DX 2 to Lewis Depo, Ex A.  A few of the Plaintiffs claimed they feared doing so might result in the loss of their job.

reasonably avail themselves of the protections afforded by Mansfield's policy or otherwise avoid harm. Ralo Colvin claims he did complain to Johnny Reed, his supervisor, but no action was taken.[15] Plaintiffs Richardson and Lewis each complained of discrimination to Mansfield's corporate office during their employment.

On October 17, 2003, Lewis contacted Cecile Vezinat, the Human Resources Manager, at the corporate office and stated that he was being discriminated against by his supervisors on the G.E. job.[16] *See* Vezinat Affidavit, attached as Ex G, ¶¶ 34-43.

On November 5, 2003, Richardson sent a letter to Paul Calais, the Safety Manager, stating that he was being treated unfairly in the workplace. *See* Vezinat Affidavit, attached as Ex G, ¶¶ 44. Richardson requested that his letter be kept confidential. *Id.*, ¶ 45. Vezinat conducted a preliminary investigation into Richardson's allegations but could not obtain any conclusive information without speaking directly to other employees about the specific issues raised in the letter. *Id.*, ¶ 48. Mansfield did everything it could to address Richardson's and Lewis's concerns.

---

[15] This is disputed.

[16] Lewis stated that he wanted to make a formal complaint and Vezinat asked him to submit a written statement with the details of his allegations. *See* Vezinat Affidavit, attached as Ex G, ¶¶ 34-43. Lewis described his concerns and asked Vezinat to speak with Richard Davenport, a supervisor who is African American. *Id.* Vezinat indicated that she would speak with Davenport. *Id.* Lewis indicated that there was a tape recording of a conversation between employees on the jobsite. *Id.* Vezinat concluded the telephone call by asking Lewis to send a written statement along with a copy of the tape. *Id.* Vezinat never received a written statement or a copy of the tape. *Id.* She tried repeatedly to reach Lewis without success. *Id.* Vezinat spoke with Davenport about Lewis's allegations. *Id.* Davenport did not support or substantiate Lewis's allegations and stated that Lewis tended to make trouble on the jobsite. *Id.* Davenport's assertions are confirmed by Ben Gayle, a former African American employee who worked on the same crew with Lewis daily. *See generally* Gayle Affidavit, Ex I.

Because Mansfield acted reasonably to prevent harassment, and took action to correct

such behavior when put on notice of the alleged harassment, it is entitled to the *Faragher*

affirmative defense and should not be held liable for the alleged racially inappropriate conduct.

### C.    DISPARATE TREATMENT

In Counts I and II of the Complaint, Plaintiffs set forth a cause of action for disparate

treatment under Title VII (42 U.S.C. § 2000e) and Section 1981 (42 U.S.C. § 1981 and 1981(a)).

In order to prove a discrimination claim under Title VII or § 1981, Plaintiffs must either produce

direct evidence of discrimination or satisfy the familiar burden-shifting framework established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs

v. Burdine*, 450 U.S. 248 (1981).  *See Brooks v. County Commission of Jefferson County*, 446

F.3d 1160, 1162 (11th Cir. 2006); *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1087 (11th Cir.

2004).  *See also Cooper v. Southern Co.,* 390 F.3d 695, 724-25 (11th Cir. 2004) (applying the

same prima facie case and burden-shifting mechanisms to Title VII and § 1981 claims).  Because

Plaintiffs have not and cannot come forward with any direct evidence of race discrimination,

Plaintiffs must satisfy the *McDonnell Douglas* framework in order to survive summary

judgment.  *Id*.

Under the *McDonnell Douglas* framework, "a plaintiff first must show an inference of

discriminatory intent, and thus carries the initial burden of establishing a prima facie case of

discrimination."  *Brooks,* 446 F.3d at 1162 (citing *McDonnell Douglas*, 411 U.S. at 802). If a

plaintiff meets this initial burden, "the burden then shifts to the employer to produce evidence

that its action was taken for a legitimate, non-discriminatory reason."  *Brooks*, 446 F.3d at 1162

(citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)). Finally, when

the employer meets its burden of production, the inquiry "'proceeds to a new level of

specificity,' in which the plaintiff must show that the proffered reason really is a pretext for

unlawful discrimination." *Id*.  Although the burdens shift back and forth under the framework, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Id*.

Mansfield is entitled to summary judgment on Plaintiffs' disparate treatment claims because Plaintiffs have not established a prima facie case of disparate treatment, and because Mansfield has acted only for legitimate, non-discriminatory reasons.

### 1.    Plaintiffs cannot establish a prima facie case of disparate treatment.

To establish a prima facie case of disparate treatment, a plaintiff must show that he "was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc*., 376 F.3d at 1087 (11th Cir. 2004) (citing *McDonnell Douglas*, 411 U.S. at 802; *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)).  To establish an adverse employment action, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment," as viewed by a reasonable person in the circumstances.  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). The asserted adverse impact "cannot be speculative and must at least have a tangible adverse effect on the [employee's] employment." *Id*.  It follows that if an action has no effect on an employee, it is not an adverse employment action.  Plaintiffs' disparate treatment claims can be grouped into four categories: (1) hourly pay (Complaint, ¶¶ 8, 14, 16); (2) show-up time (Complaint, ¶¶ 10, 12, 14, 16); (3) benefits (Complaint, ¶¶ 10, 15, 21); and (4) discipline (Complaint, ¶¶ 11, 12, 14, 15).

### (a)    Disparate Treatment Claims Regarding Hourly Pay

Plaintiffs make very general allegations that African American employees were paid less than white employees with less experience for performing the same jobs. Complaint, ¶¶ 8, 14, 16.  In the Complaint, however, Plaintiffs point to only two white employees who they claim

received higher pay without justification:  Johnny Reed and Earl Shouse.  Complaint, ¶ 8.  In

their depositions, Tarver, Lamar, and Lewis and Colvin identified Jeff Smitherman and Robert

Kimberlin as other white employees who were paid an unfairly high wage for their positions.

*See* Tarver Depo, Ex D, pp. 152:4-154:23; Lamar Depo, Ex F, pp. 24:19- 25:3, 26:5-12, 27:10 -

13, and 110:18-111:2; Lewis Depo, Ex A, p.126:3-9; Colvin Depo, Ex C, p. 91:12-23.   Plaintiffs

cannot present sufficient evidence to show that any of these individuals received an undeserved

wage as compared to similarly situated African American employees.[17]

    In order to establish a prima facie case of disparate pay, the Plaintiffs must establish (1)

that they were paid less than one or more white employees and (2) the Plaintiffs were as

qualified as the white employee(s).  *See Malone v. K-Mart Corporation*, 51 F.Supp.2d 1287,

1310 (M.D. Ala. 1999).  Plaintiffs cannot meet this burden.

    Lamar and Richardson were hired as "helpers."  During the hiring process, they did not

provide any references or information showing that they possessed any prior industrial painting

experience.  As such, their initial pay rate was $8.00 an hour (as with all new helpers), until they

received raises to $9.00 an hour.  *See* DX 11 to Richardson Depo, Ex B; DX 1 &15 to Lamar

Depo, Ex F.  Ragland had some prior painting experience, so he was hired as a painter, making

an initial wage of $9.00. DX 6 to Ragland Depo, Ex E.  Colvin had more painting experience, so

he was also hired as a "painter" making $10.00 an hour.  *See* DX 2 to Colvin Depo, Ex C, pp. 1,

28.  Finally, Tarver and Lewis were hired in the advanced position of "blaster painter" (painters

who are also qualified to do sandblasting) and they made $12.50 an hour, until they received

---

[17] *See* Vezinat Affidavit, Ex G, ¶¶ 15-19(e) for a discussion of the pay scales and wages
at Mansfield.

raises to $13.50 an hour. *See* DX 1 & 15 to Tarver Depo, Ex D; DX 4 & 5 to Lewis Depo, Ex A.

By comparison, each of the white employees identified by the Plaintiffs was assigned a pay rate based solely on level of experience. On Smitherman's application for employment, he indicated that he had prior experience painting tanks, and as such he was hired as a "painter" making $10.00 an hour – the same rate as Colvin, also a painter. *See* Vezinat Affidavit, Ex G, ¶ 18(c). Due to Shouse's prior painting experience with three different companies, he was hired as a blaster painter making $12.50 an hour. Vezinat Affidavit, Ex G, ¶ 19(c). Similarly, Kimberlin had prior blaster painter experience with another major industrial painting company. Vezinat Affidavit, Ex G, ¶ 19(d). Thus, Kimberlin was hired as a blaster painter, making $12.50 an hour until he received a raise to $13.50 an hour. *Id.* Hence, Shouse and Kimberlin were both qualified for the position of blaster painter and were paid the same wage as Lewis and Tarver for the same work. Reed had previously worked as a blaster painter for large industrial painting contractor, and he was initially hired as a blaster painter, making $12.50 an hour. Vezinat Affidavit, Ex G, ¶ 19(e). When Reed was promoted to supervisor, he made $14.50 an hour. *Id.* In his deposition, Lewis admitted that he does not claim Kimberlin and Reed were paid more than they deserved, stating, "I didn't have a problem with what Robert made, nor Johnny Reed, because they knew a little something about it." Lewis Depo, Ex A, p. 26:21-23.

Plaintiffs cannot point to a single white employee who worked in the same position as an African American employee but was paid a higher wage. Likewise, none of the Plaintiffs can present sufficient evidence to show that they were more qualified than any white employee that held the same positions. Instead, Plaintiffs only make vague, general, and baseless allegations

that certain individuals "did not know painting" or "did not know how to mix paint." Complaint, at ¶¶ 8, 14, 16.   This is not sufficient to establish a prima facie case of disparate pay.

**(b)      Disparate Treatment Claims Regarding Show-Up Time**

Plaintiffs also claim that white employees were paid show-up time on rain days but African American employees were not. Complaint, ¶¶ 10, 12, 14, 16.  On some occasions, Mansfield employees will be permitted to receive "show-up time" on days when work is rained out (known as "rain days"). Crutchfield Affidavit, Ex H, ¶ 7.  On rain days, employees may be able to receive two (2) hours of pay for cleaning up the work site and performing other light labor.  Crutchfield Affidavit, Ex H, ¶ 8.  Whether Crutchfield allowed show-up time on rain days was discretionary, and was based on whether there was any work that could be done on rain days and whether the particular contract with G.E. allotted sufficient funds to pay workers for rain days. Crutchfield Affidavit, Ex H, ¶ 9.  If employees were not allowed to work on rain days, it was because there was no work that could be done on that particular rain day or because there were not sufficient funds under the contract to allow for show-up pay. *Id.* at ¶ 10. In such circumstances, *all* employees, regardless of race, would not be permitted to work or receive show-up time.  *Id*.

Plaintiffs have not identified a *single* white employee who received show-up time when Plaintiffs or any other African Americans were denied the same. Likewise, Plaintiffs have not pointed to any specific dates or times in which any white employees received show-up time, but Plaintiffs were denied it. Finally, Plaintiffs cannot list a single specific date on which any of them showed up to work on a rain day but was denied the opportunity to receive show-up time.

Plaintiffs have not shown that they suffered any legitimate adverse employment action with regard to show-up pay. Instead they have only generally and vaguely alleged that "white employees were paid for show-up time but African American employees were not." Complaint,

31

at ¶ 14.  It is noteworthy that Ben Gayle, a former African American employee who rode to work with Richardson, Tarver, Ragland and Colvin, has stated that he was *never* denied show-up time when he showed up to work on rain days.  Gayle Affidavit, Ex I, ¶¶ 5, 11.  Plaintiffs cannot establish a prima facie case for disparate pay with regard to show-up time, and therefore Mansfield is entitled to summary judgment on this claim.

(c)      **Disparate Treatment Claims Regarding Insurance Benefits**

The third category of disparate treatment alleged by Plaintiffs relates to benefits. Plaintiffs claim that white employees received insurance benefits, but African American employees were either denied insurance benefits or had to work for a longer period of time before receiving benefits. Complaint, ¶¶ 10,15, 21. The Complaint does not list a single white employee who received insurance benefits.  In their depositions, three of the Plaintiffs stated that Earl Shouse received insurance benefits, while Plaintiffs were denied the same.  Lamar Depo, Ex F, pp. 79:19-82:12, 187:2 -7; Tarver Depo, Ex D, pp. 42:19-43:14; Ragland Depo, Ex E, p. 261:4-15.

The only Mansfield employee named "Earl" who worked at the G.E. facility was Earl Shouse. Vezinat Affidavit, Ex G, ¶ 25.  Earl Shouse is a former Mansfield employee.  *Id.* at ¶ 26. Shouse wrongfully obtained an application for insurance coverage. Vezinat Affidavit, Ex G, ¶¶ 25-33.  This application was not given to him by any employee of Mansfield. *Id.* at 28.   Shouse completed the paperwork and mailed it to Mansfield's business office. *Id.* at 29.  The business office mistakenly processed the application.  *Id.* at 30.  As soon as the mistake was discovered, approximately thirty days later, Shouse's benefits were immediately terminated.  *Id.* at 31. Any temporary insurance coverage of Earl Shouse was a result of error and mistake, as opposed to any discriminatory intent. *Id*. at 32.  In fact, Shouse was *never intended* to receive insurance

32

benefits at all. Plaintiffs cannot establish a prima facie case of disparate pay with regard to insurance benefits.

### (d)    Disparate Treatment Claims Regarding Discipline

The final category of Plaintiffs' disparate treatment claims is related to discipline. Plaintiffs claim that African American employees were disciplined for tardiness and absenteeism more harshly than white employees. Complaint, at ¶¶ 11, 12, 14, 15.  Additionally, Lewis alleges that he was disciplined more harshly for "cursing" than similarly situated white employees. Complaint, at ¶ 11.

In their depositions, Lamar and Tarver only identified one specific instance in which African American employees were disciplined more harshly than white employees for the same or similar infractions.  Lamar Depo, Ex F, pp. 111:16-112:2; Tarver Depo, Ex D, pp. 59:19-60:5. Lamar and Tarver stated that on one specific occasion, Richardson, Lamar, Tarver, Ragland, and Ben Gayle all rode to work together and arrived late to the jobsite.  Lamar Depo, Ex F, pp. 111:16-112:2; Tarver Depo, Ex D, pp. 59:19-60:5. Lamar admitted each of them was late to work, but Lamar claims that Johnny Crutchfield "chewed out" only the African American employees in the car.  *Id.* at 112:1-12.  According to Lamar, Jack Richardson, a white employee and a plaintiff in this case, said that he was not disciplined for being late that day.  Lamar Depo, Ex F, p. 114:1-12.  Lamar and Tarver cannot identify a specific or general date on which this supposed incident occurred.  Moreover, Ben Gayle (an African American who rode to work with Richardson, Lamar, Tarver, and Ragland) has stated that he has never witnessed Johnny Crutchfield or Johnny Reed discipline African American employees more harshly than white employees.  Gayle Affidavit, Ex I, ¶¶ 5, 10.  Even if Lamar, Tarver, Ragland, and Gayle were unfairly disciplined on that *one* day, no reasonable jury would hold that being verbally

disciplined on one occasion constitutes an "adverse employment action" or a "*serious and material* change in the terms, conditions, or privileges of employment."

Likewise, Colvin has only identified one instance in which he claims he was disciplined more harshly than a white employee. Colvin admits that he was late to work, and Johnny Reed sent him home without pay. Colvin Depo, Ex C, pp. 96:15-100:17. Colvin claims, however, that Jack Richardson was often late or absent without calling in, but was not disciplined. *Id.* at pp. 98:5-99:5. Colvin is not able to identify a specific or general date that any of these incidents supposedly occurred. *Id.* at pp. 97:23-98:4. There is no evidence to suggest that Colvin was treated more harshly than Richardson or any other white employee. In fact, Richardson was terminated for absenteeism before Colvin's employment ended. *See* Notices of Termination/Separation for All Plaintiffs, Ex M.

Finally, Lewis claims he was disciplined for "cursing" at his supervisor, Johnny Reed, but white employees were not disciplined for the same conduct. Complaint, ¶ 11. *See* Lewis Depo, Ex A, pp. 80:7-98:8 (full discussion of Lewis's termination). Although Lewis admits to using expletives against Reed, Lewis claims white employees engaged in the same conduct without being disciplined. Lewis Depo, Ex A, p. 82:5-11. Specifically, Lewis claims that Johnny Crutchfield, Coy Watson, and Robert Kimberlin cursed at Reed without repercussion. *Id.* Even if these or other white employees did engage in the same or similar conduct, Lewis cannot show that they were not disciplined.

Plaintiffs have not identified any other specific incidents where they or any other African Americans were disciplined more harshly than white employees for the same or similar infractions. Because there is not sufficient evidence to show that African American employees

were disciplined more harshly than white employees, a reasonable jury could not hold Mansfield

liable for plaintiff's disparate treatment claims related to discipline.

> **2.  Mansfield had legitimate, non-discriminatory reasons for the alleged adverse actions.**

Even if this Court finds that Plaintiffs have met their initial burden (which they have not),

summary judgment is still appropriate in favor of defendants because Mansfield had legitimate,

non-discriminatory reasons for any actions it took.  "So long as an employer articulates 'a clear

and reasonably specific' non-discriminatory basis for its action, it has discharged its burden of

production."  *Vessels v. Atlanta Indep. School Sys.*, 408 F.3d 763, 770 (11th Cir. 2005) (citation

omitted) (failure to promote claim).

> **(a)  Hourly Pay**

All Mansfield employees, including the Plaintiffs, were assigned hourly rates based on

their level of skill in industrial painting. Vezinat Affidavit, Ex G, ¶¶ 15(a)-(d).  At Mansfield a

helper, or laborer, is a worker who has few or no skills and experience in industrial painting and

coating.  Vezinat Affidavit, Ex G, ¶ 15(a).  Hence, all helpers start at an hourly wage of $8.00.

*Id.* During the hiring process, Lamar and Richardson did not present any references or

information to Mansfield indicating that they had prior experience in industrial painting.  *Id.* at

¶¶ 17(a), (b).  As such, they were hired as helpers at the normal helper wage.  *Id.*  Any employee

who was paid a higher wage than $8.00 an hour received that wage because he possessed a

greater level of skill in the painting industry, as evidenced by his previous experience. Vezinat

Affidavit, Ex G, ¶¶ 15(a)-(d).  Because Ragland, Colvin, and Smitherman possessed and

demonstrated such skills, they were hired as "painters" making $9.00 to $10.00 an hour.  Vezinat

Affidavit, Ex G, ¶¶ 18(a)-(c).  Likewise, individuals with even greater skills, such as

sandblasting or extensive painting experience, were paid a higher wage to reflect their skill level.

*Id.* at ¶¶ 15(c)-(d). As such, Earl Shouse ($12.50), Tarver ($13.50), Lewis ($13.50), Kimberlin ($13.50), and Reed ($14.50) were paid an even higher wage. *Id.* at ¶¶ 19(a)-(e).  As demonstrated in Section A. 1. above, each of the four white employees identified by Plaintiffs was assigned a pay rate based solely on his level of background experience and skill. The same criteria were used to assign pay rates to all Mansfield employees, regardless of race.

### (b)    Show Up Time

Whether Johnny Crutchfield allowed show-up time on rain days was discretionary, and was based on whether there was any work that could be done on rain days and whether the particular contract with G.E. allotted sufficient funds to pay workers for rain days.  Crutchfield Affidavit, Ex H, ¶¶ 7-10.  If employees were not allowed to work on rain days, it was because there was no work that could be done on that particular rainy day or because there were not sufficient funds under the contract to allow for show-up pay. *Id.* at ¶ 9.  In such circumstances, *all* employees, regardless of race, would not be permitted to work or receive show-up time.  *Id.* at ¶ 10.

### (c)    Insurance Benefits

Regarding benefits, Plaintiffs did not receive insurance benefits because they, like the majority of Mansfield's work force, were classified as "casual" employees. Vezinat Affidavit, Ex G, ¶¶ 20-24.  Almost all of the employees on a Mansfield job site are casual employees, because they generally work for Mansfield on a job-by-job basis and are not long-term (or "permanent") employees. *Id.* at ¶¶ 22-23.  Casual employees are not eligible for insurance benefits at Mansfield, regardless of race.  *Id.* at ¶ 20.  The reasoning for Mansfield's policy regarding eligibility for benefits is that most of Mansfield's employment needs are based on particular contracts, for fixed periods of time, in various locations throughout Alabama, Florida, and Louisiana, as well as other states in the Southeast.  *Id.* at ¶¶ 20-24. As such, Mansfield

36

experiences a high employee turnover rate. Lamar has acknowledged that most employees

working for Mansfield "come in and out the door." Lamar Depo, Ex F, p. 83:11-12. The *only*

reason Plaintiffs were not eligible for insurance benefits was due the company's policy regarding

permanent versus casual employees.

### (d)    Discipline

Finally, regarding discipline, if Plaintiffs were disciplined, it was *only* because they were

tardy, absent from work, or in violation of some other company policy. On the day that certain

Plaintiffs were allegedly "chewed out" by Johnny Crutchfield, Lamar admits that they were late

for work. Lamar Depo, Ex F, p. 112:1-12. Likewise, Colvin was admittedly late on the one

occasion he was sent home. Colvin Depo, Ex C, p. 96:15-100:17. Any discipline that Plaintiffs

received was a direct result of their own unwillingness to show-up to work on time. The nature

of the G.E. contract made it very important for employees to be ready to work everyday at 7:00

a.m.. Crutchfield Affidavit, Ex H, ¶ 4. Every Mansfield employee knew this, and verbal

discipline was well within the letter of Mansfield's Employee Handbook. Finally, Lewis admits

that he was terminated after cursing at his supervisor in a raised voice. Lewis Depo, Ex A, pp.

81:10-82:4, 89:12-13, 889:22-23, , 90:16-18, and 93:9-14. According to Richardson, Lewis

called his supervisor a "stupid bitch" and a "mother fucker." Richardson Depo, Ex B, ¶¶ 161:7-

162:18. Because of Lewis's insubordination, Mansfield had good cause to terminate his

employment.

Hence, because Mansfield has offered "legitimate and non-discriminatory" reasons for

the employment actions at issue, the burden shifts to Plaintiffs to "meet [the proffered] reason

head on and rebut it, and the [employee] cannot succeed simply by quarreling with the wisdom

of that reason." *Brooks*, 446 F.3d at 1163 (citation omitted).

### D.    THE PLAINTIFFS' RETALIATION CLAIM IS WITHOUT MERIT

Count III of the Complaint sets forth a cause of action for retaliation under Title VII and Section 1981. Complaint, ¶¶ 32-37. A claim brought under 42 U.S.C. § 1981 is analyzed under the same framework as a Title VII claim because both statutes have the same requirements of proof. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998). Under the well-established law of this Circuit, a plaintiff who asserts a claim for retaliation must establish a prima facie case by showing that (1) he engaged in statutorily protected expression, (2) he suffered an adverse employment action, and (3) the protected activity and the adverse employment action were causally connected (in other words, the employer must have had a retaliatory motive). *See Hammons v. George C. Wallace State Cmty. Coll.*, 174 Fed.Appx. 459, 463 (11th Cir. 2006); *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000); *Meeks v. Computer Assoc.*, 15 F.3d 1013, 1021 (11th Cir. 1994). Protected expression or activity includes filing complaints with the EEOC and complaining to supervisors about harassment. *Johnson*, 234 F.3d at 507. In order to show that there is some causal link between the activity and the adverse employment action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer was aware of the plaintiff's protected activity before taking the adverse action. *See Hammons*, 174 Fed.Appx. at 463; *Clover v. Total Sys. Servs., Inc.***,** 176 F.3d 1346, 1355-56 (11th Cir. 1999); *Hudson v. S. Ductile Casting Corp.*, 849 F. 2d 1372, 1376 (11th Cir. 1988). Once the plaintiff presents a prima facie case of retaliation, the burden shifts to the employer to present a non-retaliatory reason for its actions. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F. 2d 1491, 1494-95 (11th Cir. 1989). It is then the plaintiff's burden to show that the articulated reason given by the employer is pretext. *Id*.

38

As demonstrated herein, none of the Plaintiffs can establish a prima facie case of retaliation because they cannot show a causal link between their termination and any protected activity.

### 1.    William Ragland, Nathaniel Lamar, Ralo Colvin, and Ervin Tarver

Plaintiffs Lamar, Ragland, Colvin, and Tarver were all terminated from employment at Mansfield during December of 2003.  *See* Notices of Termination/Separation for All Plaitniffs, Ex M.  However, none of them filed EEOC charges until February of 2004 or later.  *See* EEOC Charges of All Plaintiffs, Ex N.  Because Lamar, Ragland, Colvin and Tarver did not file EEOC charges until approximately two months *after* their employment ended, Mansfield's employment decisions could not have been based on their EEOC charges, and thus could not have been done in retaliation for protected activity.  *See Johnson*, 234 F.3d at 507.

### (a)    William Ragland

Ragland admits that he *never* complained, formally or informally, about any incident of harassment, discrimination, or disparate treatment to any supervisor or Mansfield management prior to his termination in December of 2003.  *See* Ragland Depo, Ex E, pp. 225:8-226:8, 231:8-13.  Because Ragland did not engage in any protected activity *before* his employment with Mansfield ended, he cannot show that any Mansfield employment decision was causally connected to any protected activity.  Ragland was terminated on December 26, 2003 for "poor performance/quality of work."  *See* Notices of Termination/Separation for All Plaintiffs, Ex M, p. 4.  As evidence of Ragland's performance, Ragland has admitted to being late to the job site "8 or 9 times."  *See* DX 11 to Ragland Depo, Ex E, p. 4.   In light of the foregoing, Mansfield had good cause to terminate Ragland's employment.

### (b)    Nathaniel Lamar

Lamar claims that, on an unspecified date, he suggested to Johnny Crutchfield that Mansfield employees paint over racial remarks in G.E. bathroom stalls. Lamar Depo, Ex F, pp. 133:18-134:4. Lamar cannot establish any retaliatory motive or causal connection between his complaining about G.E.-owned bathroom stalls and any Mansfield employment decision. With the exception of Lamar's one complaint about G.E. property, Lamar admits that he never complained about any incident of harassment, discrimination or disparate treatment to any supervisor or Mansfield management prior to his termination. *See* Lamar Depo, Ex F, pp. 71:20-72:1, 86:7-10, 126:19-127:19, 130:17-20, and 133:18-134:4. Lamar was terminated because he was tardy on an excessive number of days, and he had an excessive number of excused absences. Crutchfield Affidavit, Ex H, ¶ 14; DX 16 to Lamar Depo, Ex F. As an example, Lamar had impermissible absences on four different Fridays, including the Friday immediately preceding his termination. *See* Time Sheets for G.E. Jobsite, Ex K, pp. 100, 122, 43, and 90 (showing Lamar's absences on 4/11/03, 5/16/03, 8/8/03, and 12/5/03). As such, Mansfield had good cause to terminate Lamar's employment.

### (c)   Ralo Colvin

Colvin claims that on one occasion, in April of 2003, he complained to Johnny Reed about hearing another employee use the word "nigger." Colvin Depo, Ex C, pp. 144:22-145:7. Colvin was not laid off from Mansfield until over eight months later, on December 14, 2003, due to a reduction in work force. *See* Colvin Depo, Ex C, p. 28:5-7; DX 3 to Colvin Depo, Ex C, p. 2. There is no evidence of a causal connection between Colvin's one alleged complaint to Reed and his being laid off eight months later. Other than that one unsubstantiated occasion, Colvin never complained to anyone at Mansfield about any harassment, discrimination, or disparate treatment. Vezinat Affidavit, Ex G, ¶ 51. Colvin and many other Mansfield employees (white, African American, and otherwise) were laid off because Mansfield's contract with G.E. was

nearing an end, and Mansfield underwent a reduction in work force. Crutchfield Affidavit, Ex H, ¶ 15.

### (d)    Ervin Tarver

Tarver claims that he complained to Johnny Crutchfield that his crew did not have enough supplies, but Tarver's alleged complaint did not address any issues of racial discrimination. *See* Tarver Depo, Ex D, p. 77:14-21. Rather, Tarver only complained to Crutchfield that his crew needed supplies. *Id.* Additionally, Tarver stated that he "always complained" about a lack of supplies, and that occurred from the time he started working in 2002 until his employment at Mansfield ended in December of 2003. *Id.* at pp. 77:18-19, 78:10-16. There is no evidence that Tarver ever complained of racial harassment or discrimination, and it is undisputed that he was terminated because he failed a drug test required by Mansfield's customer, Hyundai. Tarver cannot show *any* causal link between his asking for supplies as early as September 2002, and his termination from employment at the end of 2003. Furthermore, Tarver *never* complained to any member of Mansfield's Human Resources or Safety Department about his crew's lack of supplies. Vezinat Affidavit, Ex G, ¶ 51. Other than complaining about supplies, Lamar never complained, formally or informally, about any incident of harassment or discrimination to any supervisor or Mansfield managerial staff. *Id. See also* Crutchfield Affidavit, Ex H, ¶¶ 11-12; Tarver Depo, Ex D, pp. 46:1-5, 48:9-12. Because Tarver cannot establish a causal connection, he cannot establish a prima facie case of retaliation. Tarver has admitted that he was terminated from employment at Mansfield because he failed a drug screen and tested positive for marijuana, in contravention of express company policy and the policy of Mansfield's customer. Tarver Depo, Ex D, pp. 117:7-9, 169:8-13. Hence, Mansfield terminated Tarver's employment for a legitimate, non-discriminatory reason.

Because Plaintiffs Ragland, Lamar, Colvin, and Tarver cannot establish any causal connection between protected activity and Mansfield employment decisions, they cannot establish a prima facie case of retaliation. Even if the Court finds that any of these Plaintiffs have established a prima facie case (which they have not), Mansfield has offered legitimate, non-discriminatory reasons for their termination. As such, Mansfield is entitled to summary judgment on the retaliation claims of Ragland, Lamar, Colvin, and Tarver.

### (e)    Jack Richardson

Richardson wrote a letter to Paul Calais (in Mansfield's Safety department) on November 5, 2003, complaining of various acts of discrimination. DX 12 to Richardson Depo, Ex B. In the letter, Richardson requested that his concerns be kept "strictly confidential." *Id.* As such, the *only* Mansfield employees who knew of Richardson's concerns were Paul Calais and Cecile Vezinat (Mansfield's Human Resources Director), whose offices are located in Baton Rouge, Louisiana. Vezinat Affidavit, Ex G, ¶¶ 46-48; Crutchfield Affidavit, Ex H, ¶ 12. Therefore, no Mansfield employee on the G.E. job site was aware Richardson had made any sort of complaint. Richardson was terminated by Johnny Crutchfield on December 9, 2003 after failing to show-up at work on the previous Friday. *See* DX 13 to Richardson Depo, Ex B; Crutchfield Affidavit, Ex H, ¶ 17; Time Sheets for G.E. Jobsite, Ex K, p. 90. Ms. Vezinat did not learn of Richardson's termination until a few weeks after it occurred. Vezinat Affidavit, Ex G, ¶¶ 49-50. Richardson cannot show that any Mansfield employee involved in the decision to terminate his emloyment knew about his complaint, and he cannot show any causal connection between his "confidential"

letter to Mansfield's corporate office and his termination for absenteeism. As such, he cannot establish a prima facie case of retaliation.[18]

Even if the Court finds that Richardson has established a prima facie case of retaliation, Mansfield had legitimate, non-discriminatory reasons for terminating Richardson's employment. In his deposition, Richardson admitted to being late or absent on several occasions. Richardson admits that, on numerous occasions, he was late to work by an hour or more. *See e.g.,* Richardson Depo, Ex B, pp. 63:10-11, 64:3-7, 96:19-21, and 97:1-7. Richardson also admits that he took at least one week off from work without calling in. Richardson admits he "should have been fired" for those absences. *Id.* at p.166:5-21. *See also* DX 14 to Richardson Depo, Ex B, p. 3 at ¶ 2. Finally, Richardson failed to show-up to work on Friday, December 5, 2003. *See* Time Sheets for G.E. Jobsite, Ex K, p. 90. Due that absence and many others, Richardson was terminated from employment the following week, on December 9, 2004. DX 13 to Richardson Depo, Ex B,

### (f)    Patrick Lewis

On October 17, 2003, Patrick Lewis called Cecile Vezinat, Mansfield's Human Resources Director, and complained of discrimination by Johnny Crutchfield, Coy Watson, Johnny Reed, and Robert Kimberlin. Vezinat Affidavit, Ex G, ¶¶ 34; Lewis Depo, Ex A, p. 115:5-14. Ms. Vezinat asked Lewis if he would like to make a formal complaint, and he said he would. Vezinat Affidavit, Ex G, ¶ 35. Ms. Vezinat then asked Mr. Lewis to send her a written

---

[18] Plaintiff Richardson was terminated from employment at Mansfield on December 9, 2003. *See* DX 13 to Richardson Depo, Ex B. However, he did not file his EEOC charge until February of 2004. *See* EEOC Charges of All Plaintiffs, Ex N, p. 3-4. Because Richardson did not file an EEOC charge until over two months *after* his employment ended, no Mansfield employment decision could have been based on Richardson's EEOC charge. *See Johnson*, 234 F.3d at 507.

statement describing his allegations in detail, and she provided her Baton Rouge, Louisiana office address. *Id.*; Lewis Depo, Ex A, p. 117:7-12. During the conversation, Lewis was vague and contradictory, and he did not explain any specific instances of discrimination or harassment. Vezinat Affidavit, Ex G, ¶ 36. When Ms. Vezinat tried to contact Lewis on October 18, 2003, and again on October 23, 2003, she was unable to reach him. *Id.* at ¶ 39. Although Lewis claims that he mailed a written statement to Ms. Vezinat's Louisiana address, he cannot remember what he said in the statement, and he has not located or produced the statement. Lewis Depo, Ex A, pp. 116:6-117:17. Furthermore, Ms. Vezinat never received any written statement from Lewis. Vezinat Affidavit, Ex G, ¶ 40. On October 29, 2003, Dean Mansfield, the Division Manager of the Mobile district office, called Ms. Vezinat and informed her that Patrick Lewis had been terminated for insubordination. Vezinat Affidavit, Ex G, ¶ 41. At that time, Ms. Vezinat had not informed inform anyone on the G.E. jobsite or outside of her Baton Rouge office about her conversation with Patrick Lewis. *Id.* at ¶¶ 42-43. Hence, no Mansfield employee at the G.E. site would have been aware of Lewis's phone call.

Lewis admits that on October 29, 2003, he and his supervisor, Johnny Reed, got into a "heated" argument over Lewis being late to work. Lewis Depo, Ex A, pp. 81:10-82:4, 93:9-14. When Reed told Lewis that he would be fired if he was late again, Lewis admits that he told Reed to "do whatever in the fuck he wanted to do." *Id.* at pp. 89:12-13, 89:22-23. *See generally* Lewis Depo, Ex A, pp. 80:7-98:8 (discussion of the circumstances surrounding Lewis's termination). Lewis also admits that he raised his voice while cursing Reed. *Id.* at 90:16-18. According to Richardson, Lewis called his supervisor a "stupid bitch" and a "mother fucker." Richardson Depo, Ex B, pp. 161:7-162:18. As a result, Lewis was terminated for insubordination. *See* Notices of Termination/Separation for All Plaintiffs, Ex M, p. 1; Crutchfield

Affidavit, Ex H, ¶ 18.  Lewis cannot establish a causal connection between his phone call to

Cecile Vezinat and his subsequent termination for insubordination.  Lewis cannot present any

admissible evidence showing that any Mansfield employee, other than Ms. Vezinat, was aware

of his verbal complaint.  Because Lewis cannot establish a causal connection between his verbal

complaint and his subsequent termination, he cannot establish a prima facie case of retaliation

with respect to his termination.[19]

Lewis also claims in the Complaint that he was retaliated against by being transferred to

Atlanta after he "witnessed a white employee pull a knife on and threaten a Mexican employee."

Complaint, ¶ 9.  This allegation is false.  Regarding the Atlanta transfer, Lewis has admitted that

his temporary transfer to Atlanta occurred in June of 2003.  Lewis Depo, Ex A, pp. 124:20-

125:10.  The undisputed evidence is that the dispute between Coy Watson and Carlos Marroguin

occurred in late September or early October of 2003.  *See generally* Carlos Marroguin

Investigation File, Ex L.  On October 2, 2003, just a few days after the alleged incident, Lewis

gave a signed a statement in connection with Mansfield's investigation.[20]  *See Id.*, p. 14; DX 2 to

Lewis Depo, Ex A. Lewis signed the statement *four months after* his transfer to Atlanta. As such,

there is no possible way that Lewis's transfer to Atlanta had any causal connection with the

Carlos Marroguin incident.

---

[19] Lewis was terminated from employment at Mansfield on October 29, 2003. *See* Notices of Termination/Separation for All Plaintiffs, Ex M, p. 1. He filed his EEOC charge on February 12, 2004.  *See* EEOC Charges of All Plaintiffs, Ex N, pp 1-2. Because Lewis did not file an EEOC charge until almost four months *after* his employment ended, no Mansfield employment decision could have been based on Lewis's EEOC charge.  *See Johnson*, 234 F.3d at 507.

[20] In Lewis's signed statement, he did not indicate that Coy Watson pulled a knife on *or* threatened Marroguin.  *See* Carlos Marroguin Investigation File, Ex L,  p. 14.

Because Lewis cannot establish a causal connection between any protected activity and any adverse employment action, his retaliation claim fails. Even if the Court determines that Lewis has established a prima facie case of retaliation (which he has not),  Mansfield has shown that Lewis was terminated for the legitimate, non-discriminatory reason of Lewis's insubordination.

### E.    THE PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS

Count IV of the Complaint sets forth a cause of action for "common law breach of contract." Complaint, ¶¶ 38-40. The Complaint provides:  "K2/Mansfield entered into a contract whereby the defendant(s) agreed to support the Plaintiffs['] efforts in good faith. Defendant breached the duty of good faith by failing to assist the Plaintiffs and by altering the terms and conditions of their employment."[21]  Complaint, ¶ 39.  Mansfield never entered into any express employment contract or agreement with any of the Plaintiffs.  Under Alabama law, the general rule is that "absent an agreement on a definite term, any employment is considered to be 'at-will'."  *Howard v. Wolff Broadcasting Corp.,* 611 So. 2d 307, 310 (Ala. 1992). Alabama law does not recognize an implied contract of employment.  Hence, because there was no employment contract in this case, Plaintiffs were employees at will.  There is no evidence to suggest (1) that there was an express or implied contract between Mansfield and the Plaintiffs, (2) what the terms of that "contract" were, or (3) that Mansfield breached such a "contract" in any way. Without a contract, Plaintiffs cannot claim breach of contract.  *See Hanson v. New Technology, Inc.*, 594 So. 2d 96 (Ala. 1992).  Because Alabama is an "at-will" state, and because

---

[21] The Alabama Supreme Court has clearly and specifically held that there does not exist a viable cause of action for breach of the covenant of good faith and fair dealing , except for contracts for policies of insurance.  *See Metmor Fin., Inc. v. Commonwealth Land Title Ins. Co*., 645 So. 2d 295, 297 (Ala. 1994); *Tanner v. Church's Fried Chicken, Inc.*, 582 So. 2d 449, 451-52 (Ala. 1991); *American Cast Iron Pipe Co. v. Williams*, 591 So. 2d 854, 857 (Ala. 1991).

no contract existed between Mansfield and the Plaintiffs, Mansfield is entitled to summary

judgment on Plaintiffs' breach of contract claim.

>    **F.    MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT AS A
>           MATTER OF LAW AS TO PLAINTIFFS' NEGLIGENT TRAINING,
>           SUPERVISION, AND RETENTION CLAIM**

Count V of the Complaint sets forth a cause of action for negligent training, supervision,

and retention of Mansfield's managerial employees. Complaint, ¶¶ 41-45. The statute of

limitations for a negligence action is two years. Ala. Code § 6-2-38(*l*). *See Boyce v. Cassese*,

941 So. 2d 942, 945 (Ala. 2006). The latest possible date any of the Plaintiffs were employed

with Mansfield was December 26, 2003.[22] See Notice of Termination/Separation for All

Plaintiffs, Ex M. As such, Plaintiffs cannot claim that Mansfield is liable for any negligent act

which occurred after December 26, 2003. Any cause of action under a theory of negligence

should have been brought, at the latest, by December 26, 2005. Because Plaintiffs' Complaint

was not filed until June 1, 2006, Plaintiffs' negligent training, supervision, and retention claim is

untimely, and it must fail.

Even if Plaintiffs' negligent training, supervision, and retention claim was timely (which

it is not), the claim would still fail under Alabama law. The Alabama Supreme Court has stated

that "the master is held responsible for the servant's incompetency when notice or knowledge,

either actual or presumed, of the incompetency has been brought to the master." *Mardis v.

Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995). Hence, for Mansfield to be liable,

---

[22] Patrick Lewis was terminated on October 29, 2003. *See* Notices of
Termination/Separation for All Plaintiffs, Ex M, p. 1. Jack Richardson was terminated on
December 4, 2003. *Id.* at p. 2. Nathaniel Lamar was terminated from employment on December
12, 2003. *Id.* at p. 3. William Ragland was discharged from employment on December 26, 2003.
*Id.* at p. 4. Tarver was terminated from employment on December 1, 2003. *Id.* at p. 5. Ralo
Colvin was laid off on December 14, 2003. *Id.* at p. Colvin Depo, Ex C, p. 157:2-3; see also
Crutchfield Affidavit, Ex H, ¶ 15.

the specific acts of incompetency must have been brought to the master's attention, or they must

be so severe and occurred so frequently that the master should have known about them.  *See*

*Kelley v. Worley*, 29 F. Supp.2d 1304 (M.D. Ala. 1998).

In the instant case, it is undisputed that Lamar, Ragland, Colvin, and Tarver never

reported any inappropriate behavior  to Mansfield's Human Resources department or corporate

office.  Moreover, although Richardson and Lewis contacted the Human Resources department,

there is no evidence that they brought any *specific* acts of incompetence to Mansfield's attention.

Furthermore, "Most courts carefully scrutinize [negligent training] claims as attempts to nullify

the at-will relationship."  Lindeman, B. & Grossman, P., *Employment Discrimination Law*, Vol.

1 (3d ed. 1996).  There is no evidence to support a claim for negligent training, supervision, or

retention against Mansfield.  Because Plaintiffs' negligent training, supervision, and retention

claim is procedurally time-barred, and because there exists no evidence of negligence, Mansfield

is entitled to summary judgment as a matter of law as to this claim.

### G.    PLAINTIFFS' OUTRAGE CLAIM FAILS BOTH PROCEDURALLY AND ON THE MERITS

#### 1.    Plaintiffs' Outrage claim is time barred.

As a threshold matter, Plaintiffs' outrage claim fails procedurally.  In Alabama, the

statute of limitations for a claim of outrage is two years.  *See* Ala. Code § 6-2-38(l); s*ee also*

*Archie v. Enterprise Hospital & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1997).  The latest

possible date any of the Plaintiffs were employed with Mansfield is on or before December 26,

2003.  *See* supra, at FN 20.  Therefore, the latest possible event or action giving rise to a claim of

outrage occurred on December 26, 2003, as to at least one of the Plaintiffs.  Plaintiffs must have

filed their outrage claims at the very latest by December 26, 2005.  This suit was filed June 1,

2006.  Plaintiffs' outrage claims are untimely.

## 2.    Plaintiffs' Outrage claim fails on the merits.

Assuming, arguendo, that Plaintiffs somehow overcome the statute of limitations problem they face, their outrage claim still fails on the merits.  In *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980), the Alabama Supreme Court first recognized that under very limited circumstances, a plaintiff may assert a cause of action for outrage, and set forth the elements of the tort:  (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme or outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it.  Over the next quarter-century, the Court "consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1044 (1993).  In *Potts v. Hayes*, 771 So. 2d 462 (Ala. 2000), the Alabama Supreme Court limited the tort of outrage to only three kinds of conduct: "(1) wrongful conduct in the family burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." (internal quotations omitted).  None of those three categories is even alleged to be at issue here.

Assuming *arguendo* that the alleged conduct fits in one of three categories, the conduct must result in emotional distress "so severe that no reasonable person could be expected to endure it."  *Inmon*, 394 So. 2d at 365.  "Mere insults, indignities, threats, annoyances, petty oppression, or other trivialities" will not support a finding of the tort of outrage.  *Id.*  This case does not rise to the requisite level of conduct to support a claim of outrage, as that cause of action has been limited by the Supreme Court of Alabama.  *See, e.g., Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415 (M.D. Ala. 1996) (alleging mocking or mean-spirited comments by managers did not constitute tort of outrage); *Saville v. Houston County Healthcare*

*Auth.*, 852 F. Supp. 1512 (M.D. Ala. 1994) (where an instructor's sexual comments and slapping plaintiff's buttocks was found insufficiently extreme and outrageous to warrant liability).

## V.    CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact, and the Defendants are entitled to judgment in their favor as to all counts contained in the Plaintiffs' Complaint.

Respectfully submitted,

/s/ Natasha L. Wilson
One of the Attorneys for Defendants
K2 Industrial Services, Inc. and
Mansfield Industrial

OF COUNSEL:
William H. King, III  (KINGW5426)
Natasha L. Wilson (WILSN6654)
Haley A. Andrews (ANDRH6198)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this <u>2nd</u> day of <u>July</u> 2007, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Collins Pettaway
CHESTNUT, SANDERS, SANDERS, PETTAWAY & CAMPBELL, LLC
One Union Street
Post Office Box 1200
Selma, Alabama  36701
cpettaway@csspca.com

/s/ Natasha L. Wilson
Of Counsel

51