IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PATRICK LEWIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-cv-0497-WKW (WO) |
| | ) | |
| K2 INDUSTRIAL SERVICES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on a Motion for Summary Judgment (Doc. # 36) filed by

defendants K2 Industrial Services, Inc. ("K2") and Mansfield Industrial, Inc. ("Mansfield").

For the reasons set forth below, the defendants' summary judgment motion is due to be

GRANTED.

## I.  PROCEDURAL HISTORY

Patrick Lewis ("Lewis"), Jack Richardson ("Richardson"), Nathaniel Lamar

("Lamar"), William Ragland ("Ragland"), Ralo Colvin ("Colvin"), and Ervin Tarver

("Tarver") filed a complaint against K2 and Mansfield on June 1, 2006, alleging three federal

claims (hostile work environment, disparate treatment, and retaliation) and three state claims

(breach of contract, negligent training, supervision, and retention, and outrage).  (Compl.)

The defendants filed a motion for summary judgment on July 2, 2007.  (Doc. # 36.)  The

plaintiffs responded, at which time they expressed a desire to withdraw their three state law

claims.[1]  (Pls.' Resp. Br. 15.)  On August 30, 2007, the defendants replied.  (Defs.' Reply Br.)

## II. FACTS

Mansfield is engaged in the business of industrial painting and coating and is a wholly-owned subsidiary of K2.[2]  All of the plaintiffs are former employees of Mansfield who were terminated in late 2003.  The plaintiffs performed painting and coating work for a maintenance project at a G.E. Plastics industrial facility ("G.E. site").  The superintendent who oversaw Mansfield's operations at the G.E. site was Johnny Crutchfield ("Crutchfield").

Mansfield classifies its employees into two categories: permanent and casual.  Casual employees hold positions of limited or unpredictable duration.  Health insurance is only offered to permanent employees; casual employees are not eligible.  All of the plaintiffs were casual employees, as were most employees at the G.E. site.  Four types of employment positions were available at that site:  helpers, painters, blaster painters, and supervisors.  Helpers are employees with little to no experience or skills related to painting and are essentially laborers.  Painters are a step up from helpers and have some level of experience painting.  Their duties generally consist of brush and roll painting and spraying.  Blaster

_____

[1]  The court construes the plaintiffs' desire to withdraw their state law claims (Pls.' Resp. Br. 15) as a concession to the defendants' motion for summary judgment.  (*See* Defs.' Br. 46-50.) Therefore, the defendants' motion for summary judgment is due to be granted with respect to the three state law claims.

[2]  Because the defendants' motion for summary judgment is due to be granted on all claims, there is no need to consider whether K2 is a proper party.

painters possess a greater level of skill than painters, and their duties consist of sandblasting and other industrial painting techniques. Supervisors are experienced painters who demonstrate leadership or managerial skills. They usually oversee one or more crews on a given jobsite.

Richardson is a white male hired by Mansfield as a helper on January 8, 2003. After receiving a pay raise in October 2003, Richardson was terminated from employment on December 9, 2003, for absenteeism. Lamar is a black male hired as a helper on September 11, 2002. After receiving a pay raise in April 2003, Lamar was terminated from employment on December 8, 2003, for repeated absences and tardiness. Tarver is a black male hired as a blaster painter on September 4, 2002. Tarver received a raise in May 2003 and was described as a very good worker. He was offered a job at another site at the end of Mansfield's contract with G.E., but he was terminated after he failed a drug test. Lewis is a black male hired as a blaster painter on March 24, 2003. Lewis was terminated from employment on October 29, 2003, for insubordination. Colvin is a black male hired as a painter on March 13, 2003. Colvin was laid off in November 2003 due to lack of work, subsequently rehired, and then laid off for lack of work again on December 14, 2003. Ragland is a black male hired as a painter on April 23, 2003. Ragland later received a raise, but he was ultimately terminated on December 26, 2003, for poor performance and work quality.

3

### III.  JURISDICTION

Because this case arises under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

### IV.  STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## V.  DISCUSSION

### A.    *Hostile Work Environment*

The plaintiffs allege they heard and were subject to racially offensive language while at work.  (*See, e.g.*, Compl. ¶¶ 7, 9, 12, 13, 17.)  Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'"  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In order to establish a *prima*

*facie* claim of hostile work environment, the plaintiffs must show:

> (1) that [they] belong[] to a protected group; (2) that [they have] been subject
> to unwelcome harassment; (3) that the harassment must have been based on a
> protected characteristic of the employee, such as [race]; (4) that the harassment
> was sufficiently severe or pervasive to alter the terms and conditions of
> employment and create a discriminatorily abusive working environment; and
> (5) that the employer is responsible for such environment under either a theory
> of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275.  The defendants do not dispute the plaintiffs belong to a protected

group (Defs.' Br. 14) and do not address the second, third, or fifth element of the *prima facie*

requirements.  Rather, the defendants only focus their argument on the fourth element,

disputing the alleged harassment was sufficiently severe or pervasive and arguing there was

no alteration of the plaintiffs' working conditions.  The plaintiffs' only response to this

argument is to conclusively state the element is satisfied "by the way the plaintiffs were

treated wit [sic] not having supplies, and have [sic] to do dangerous work assignments,"

because Richardson and Colvin "were sent to the crew with the other plaintiffs" as

punishment, and because management personnel "instituted or were aware of this conduct."

(Pls.' Resp. Br. 11.)

The plaintiffs fail to provide pinpoint citations to support their arguments in the face

of a record consisting of thousands of pages.  The court has previously ordered the following

in this case:

> In all briefs filed by any party relating to [a summary judgment motion], the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.  Failure to make such specific reference will result in the evidence not being considered by the court.

(Doc. # 12 § 2.)  In instances where a party fails to provide minimally adequate citations, "[t]he court will not dig through [their] jumbled submissions in what may be a fruitless search for record evidence that demonstrates that a genuine issue of material fact exists." *Fikes v. Ala. Dep't of Youth Servs.*, No. 03-1106, 2007 WL 1673940, at *4 (M.D. Ala. June 11, 2007).  Without citation to specific supporting facts, the plaintiffs' allegations are conclusory and fail to establish a *prima facie* claim of hostile work environment.  The defendants' motion for summary judgment with respect to hostile work environment is due to be granted.

## B.    *Disparate Treatment*

The plaintiffs allege they were treated disparately in four areas: hourly pay, show-up time, insurance benefits, and discipline.  Disparate treatment claims may be established through either direct or circumstantial evidence.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).  Direct evidence of discrimination is defined as "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Id.* at 1086 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted)).  Direct evidence is such that it makes it abundantly clear the employer

discriminated against the employees on the impermissible basis of race, and it consists of "only the most blatant remarks, whose intent could mean nothing [else]." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (internal quotation marks omitted)). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.*

The sufficiency of a disparate treatment claim based on circumstantial evidence is tested by applying the *McDonnell Douglas* burden-shifting framework, under which:

> a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. The plaintiff's successful assertion of a *prima facie* case "creates a rebuttable presumption that the employer unlawfully discriminated against her." Second, if the plaintiff successfully demonstrates a *prima facie* case, the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason. We proceed to the third step of the analysis once the employer meets its burden of production by proffering a legitimate, non-discriminatory reason, thereby rebutting the presumption of discrimination, and "[our] inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff."

*Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (citations omitted). In order to establish a *prima facie* case of disparate treatment, the plaintiffs must show they were "qualified member[s] of a protected class" and were "subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson*, 376 F.3d at 1087. "Demonstrating a prima facie case

8

is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

The plaintiffs fail to articulate whether they base their disparate treatment claim on direct or circumstantial evidence. (*See* Pls.' Resp. Br. 12-14.) However, a review of their response brief reveals no direct evidence of discriminatory based disparate treatment. (*Id.*) The plaintiffs argue they were treated less favorably than whites, but they do not identify any blatant evidence making it abundantly clear any alleged difference in treatment was race-based. Therefore, the court will evaluate the four claimed areas of disparate treatment based on circumstantial evidence.

1.    **Hourly Pay**

The plaintiffs have the burden of proving "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The entire argument for all six plaintiffs over their alleged hourly pay disparity consists only of the following unsupported sentence: "The plaintiffs' evidence in this regard consist [sic] of the fact that they were doing jobs above the 'helper' classification they were in, but not paid for such." (Pls.' Resp. Br. 12.) The only two plaintiffs employed as helpers, and therefore the only ones to whom this argument is applicable, are Lamar[3] (Doc. # 36-16 at 1) and Richardson (Doc. # 36-5 at 62). (*See also* Doc. # 36-18 at ¶ 17.) Furthermore, the

---

[3] Lamar is described as a "painter helper," but this appears to be the same position as a helper. (*See* Doc. # 36-18 at ¶ 15.)

court can only discern two plaintiffs who claim they received less pay than white employees from the complaint: Lamar (Compl. ¶ 14) and Colvin (*Id.* ¶ 16). Therefore, the court assumes Lamar, Richardson, and Colvin are the only plaintiffs claiming disparate treatment based on hourly pay. Because these three plaintiffs identify no comparator whatsoever, much less a "nearly identical" comparator, they fail to establish a *prima facie* case of discrimination. The defendants' motion for summary judgment with respect to disparate treatment of hourly pay is due to be granted.

### 2.    <u>Show-Up Time</u>

"Show-up time" was a discretionary two hours of pay employees could receive for cleaning up the work site and performing other light labor on rainy days. (Doc. # 36-19 at ¶¶ 7-9.) It was up to the Mansfield superintendent to decide whether show-up time for the employees would be allowed. (*Id.* ¶ 9.) According to his affidavit, the decision was "based on whether there was any work that could be done on rain days and whether the contract . . . allotted sufficient funds to pay workers for rain days." (*Id.*) The superintendent further states that if there was insufficient light work or funds available to justify show-up time, "*all* employees, regardless of race, would not be permitted to receive show-up pay." (*Id.* ¶ 10.)

Lewis (Compl. ¶ 10), Lamar (*Id.* ¶ 14), and Colvin (*Id.* ¶ 16) allege in the complaint that white employees were allowed to receive show-up time when black employees were not. Richardson, the white plaintiff, received show up time. (Pls.'s Resp. Br. 12.) However, in their response brief, the plaintiffs undercut their own complaint by arguing that another black

10

employee, who is not a party to this lawsuit, did receive show-up time. (*Id.*) Colvin received show-up time after complaining,[4] and Lamar received show-up time once. (*Id.*) The only three plaintiffs who apparently never received show up time were Tarver, Lewis, and Ragland. (*See id.*)

The plaintiffs identify no comparators for Tarver, Lewis or Ragland. In his deposition testimony, which is cited by the plaintiffs in their response brief, Lamar cannot identify anyone who received show-up time when he did not.[5] (Lamar Dep. 129:2-9.) Colvin is the only plaintiff who identifies a comparator. In his deposition, he identifies a white employee named "Richard" and describes a conversation with him through which Colvin first learns of the show-up time policy. (Colvin Dep. 129:2-131:9.) As the other employees were about to leave because of rain, Richard explained to them he was staying so he could get his show-up time. (*Id.*) Nothing indicates Richard received show-up time that day and Colvin did not. Colvin, along with the other plaintiffs, does not identify any specific date when a white employee received show-up time and any of the plaintiffs were denied it. Without more

---

[4] One possible explanation why Colvin may not have received show-up time on some rain days is that he apparently worked inside at times, thereby enabling him to work as normal. (Colvin Dep. 120:6-12.)

[5] The relevant portion of the deposition is as follows:

Q: And who was not getting show-up time?
A: I wasn't. Everybody in our car wasn't. I don't think — I don't know who got it. I know we wasn't getting show-up time.
Q: Do you know if anybody was getting show-up time?
A: I can't say that.

(Lamar Dep. 129:2-9.)

detail on the type of employment position held by Richard (*e.g.*, outside or inside work), it is impossible for Colvin to establish a *prima facie* case of discrimination because he has not identified a nearly identical comparator. Furthermore, the plaintiffs' claims actually indicate any disparate treatment in show-up time was not race-based because, while failing to identify a white employee who received show-up time, the plaintiffs freely admit there was a black employee who did receive it. (Pls.' Resp. Br. 12.) Because Tarver, Lewis, Lamar, and Ragland identify no comparators whatsoever, and Colvin does not identify a "nearly identical" comparator, the plaintiffs fail to establish a *prima facie* case of discrimination. The defendants' motion for summary judgment with respect to disparate treatment of show-up time is due to be granted.

### 3. <u>Insurance Benefits</u>

Mansfield classifies their employees into two categories: "permanent" and "casual." (Vezinat Aff. ¶ 20.) Casual employees hold positions "of limited or unpredictable duration." (*Id.* ¶ 21.) Only permanent employees are eligible to receive medical insurance benefits. (*Id.* ¶ 20.) Each plaintiff was classified as a casual employee by Mansfield. (*Id.* ¶ 24.)

According to the plaintiffs, none of them received insurance benefits except Colvin. (Pls.' Resp. Br. 13.) Ragland alleges in the complaint that "white employees were given insurance benefits where as [sic] African American employees were denied insurance benefits and/or had to spend more time on the job before they received insurance benefits." (Compl. ¶ 15.) Lewis alleges he "was denied the position of a regular full-time employee

which would have allowed me to receive full employee benefits including medical and retirement benefits." (*Id.* ¶ 10.)  No other plaintiffs make any allegations with respect to denial of insurance benefits in the complaint.  Lamar, Tarver, and Ragland identify a white employee in their depositions, Earl Shouse,[6] who they claim received insurance benefits while they were denied the same.  (Lamar Dep. 79:19-82:12; Tarver Dep. 42:19-43:14; Ragland Dep. 261:4-15.)  Shouse was also a casual employee.  (Vezinat Aff. ¶ 33.)

A denial of insurance benefits is an adverse employment action, and Shouse is a nearly identical white employee who received insurance benefits while the plaintiffs were denied the same; therefore, the plaintiffs have established a *prima facie* case of disparate treatment and have shifted the burden onto their employer to produce evidence that its actions were taken for a legitimate, non-discriminatory reason.  Mansfield argues there is a legitimate business reason behind its policy of limiting eligibility for insurance benefits to permanent employees, namely because its employment needs are based on particular job contracts for fixed periods of time, thereby creating high employee turnover.  (Defs.' Br. 36.)  Mansfield admits Shouse received insurance benefits but insists it was only the result of a mistake.  (Vezinat Aff. ¶ 30.)  According to Mansfield, Shouse "wrongfully procured" an insurance application and sent it to their business office where it was mistakenly processed.  (*Id.* ¶¶ 27-30.)  When the mistake was discovered about thirty days later, "Shouse's benefits were

---

[6] Although Lamar thinks the white employee's name is Jeff, he was with Tarver at the time who remembers the name as Earl.  (Lamar Dep. 80:1; Tarver Dep. 43:3.)  The plaintiffs now appear to agree with the defendants that the white employee at issue was Earl Shouse.  (Pls.' Resp. Br. 13.)

immediately terminated." (*Id.* ¶ 31.)

The administrative paperwork and cost of adding and dropping employees who only work for short periods of time to and from Mansfield's insurance coverage is a legitimate reason for only providing coverage to permanent employees. Based on the short period of time it took to discover and terminate Shouse's insurance benefits, the defendants have produced sufficient evidence that Shouse's benefits were provided only because of an inadvertent mistake and not due to discrimination. With the burden now shifted back to the plaintiffs, they must show their employer's proffered reason was really just a pretext for unlawful discrimination.

The plaintiffs' only rebuttal is to argue that the defendants' documentation of their proffered, legitimate reason is "self-serving." (Pls.' Resp. Br. 13.) It is true that Mansfield's documentation supports their position. However, this does nothing to show Mansfield's reason was pretextual. The burden is on the plaintiffs, and they have cited no evidence and make no legitimate argument that Mansfield's reason was a pretext. The defendants' motion for summary judgment with respect to disparate treatment of insurance benefits is due to be granted.

**4.    <u>Discipline</u>**

In general, the plaintiffs allege that Mansfield disciplined black employees for infractions more harshly than white employees. Lewis claims he was terminated "for cursing at a white supervisor" but that "white employees cursed all of the time and were not

14

disciplined nor was there [sic] employment terminated." (Compl. ¶ 11.)  Lamar claims he was "disciplined more harshly for small infractions than white employees who made the same infractions," and also that Johnny Reed ("Reed") and Crutchfield disciplined black employees for being late but not the white employees.  (*Id.* ¶ 14.)  Ragland also claims white employees were not disciplined or terminated for coming to work late when black employees doing the same would be subject to discipline.  (*Id.* ¶ 15.)  Richardson, the white plaintiff, claims he was not disciplined for missing work or coming in late, unlike black employees. (*Id.* ¶ 12; Pls.' Resp. Br. 14.)  Tarver is not even mentioned in the Complaint or the section of the plaintiffs' response brief on disparate discipline.[7]  (*See* Compl.; Pls.' Resp. Br. 13-14.)

Lamar and Tarver only identify one specific instance where they claim they were disciplined more harshly than similarly situated white employees.  On that occasion, Lamar, Tarver, Richardson, Ragland, and Ben Gayle, another black employee, all rode together to work and arrived late. (Lamar Dep. 111:16-114:22; Tarver Dep. 59:19-60:5.)  Lamar admits

---

[7]  In their response brief, the plaintiffs devote the majority of their argument to an incident between a white Mansfield supervisor and a minority employee.  (Pls.' Resp. Br. 13-14.)  The minority employee claimed he was subjected to racial slurs and threatened with a knife by the white supervisor.  (Doc. # 36-24 at 1.)  The minority employee is not a party to this suit and the company's internal investigation found no merit to the complaint.  (*Id.*)  The only plaintiff with any connection to the incident is Lewis, who witnessed it and made a written statement.  (*Id.* at 14.)  Lewis's statement does not corroborate the alleged use of a weapon and, according to Mansfield's investigation, Lewis also "stated that he had not witnessed any harassment or racial remarks from anyone in the company" during the altercation.  (*Id.* at 10.)  The court assumes the plaintiffs raise this incident to support an argument that Mansfield disciplines minorities more harshly than whites.  Besides failing to provide any contradictory evidence to the conclusion of Mansfield's internal investigation, none of the plaintiffs were involved in the incident and nothing about the incident provides a requisite contrast in employment action with a similarly situated employee outside the plaintiffs' protected class.  The incident is irrelevant to the establishment of the plaintiffs' *prima facie* claim of disparate treatment.

to arriving late and claims the black employees were "chewed out" by their supervisor, while Richardson was not. Assuming Lamar's story as true and construed in a light most favorable to him, Lamar and Tarver fail to establish a *prima facie* case of discrimination because the only discipline they received was an oral reprimand. "[T]he protections of Title VII simply do not extend to 'everything that makes an employee unhappy.'" *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)); *see also Malladi v. Principi*, No. 03-0633, 2006 WL 2709621, at *11 n.31 (M.D. Ala. Sept. 19, 2006) (discussing other cases cited in *Davis* that found "criticisms of an employee's job performance — written or oral — that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit").

Colvin identifies one instance where he claims he was disciplined in a manner more harshly than a white employee. Colvin was running late for work one day and called in to tell his supervisor. (Colvin Dep. 97:16-22.) When he finally arrived, his supervisor met him at the gate and told him to "go back home for the day and think about whether [he] want[s] to come to work or not." (*Id.*) Colvin claims that only the day before, Richardson "didn't call in for work and he didn't come in." (*Id.* 97:1-2.) A few days later, Colvin discovered that even though Richardson was late and failed to call in to work, Richardson's supervisor "didn't say nothing to [him]." (*Id.* 99:4.) Assuming the lost day of pay was a materially adverse employment action, Colvin fails to establish a *prima facie* case of discrimination because employees outside of a plaintiff's protected class who are identified as comparators

16

"must be similarly situated 'in all relevant respects.'" *Wilson*, 376 F.3d at 1091 (quoting *Holifield*, 115 F.3d at 1562). Richardson is not similarly situated because his infraction was absenteeism;[8] Colvin's was tardiness. There is no evidence to suggest had Richardson eventually shown up to work, he would have been allowed to stay.

Lewis claims that he was terminated for cursing at his supervisor, Reed, and that white employees who also cursed at Reed were not disciplined. (Compl. ¶ 11; Lewis Dep. 81:23-82:4.) Lewis admits to cursing at Reed during an argument over whether or not he was late for work. (Lewis Dep. 81:15-18.) After Reed threatened to dock his time, Lewis thinks he told Reed to "[d]o whatever the fuck you want to do." (*Id.* 89:12-13.) Richardson testified that Lewis also called Reed a "stupid bitch" and a "mother-fucker" (Richardson Dep. 162:8-16), although Lewis denies it. (Lewis Dep. 88:22-89:7.) Because of this incident, Lewis was terminated for insubordination. (Crutchfield Aff. ¶ 18; Doc. # 36-25 at 1.) Termination is an adverse employment action; therefore, the establishment of Lewis's *prima facie* case depends on whether he successfully identifies similarly situated employees outside his protected class who received more favorable treatment.

Lewis identifies three white employees who he claims also cursed Reed without being disciplined: Crutchfield, Coy Watson ("Watson"), and Robert Kimberlin ("Kimberlin"). (Lewis Dep. 82:8-11; Defs.' Br. 34.) Crutchfield allegedly told Reed on one occasion that "The boom won't go up in there. It's your goddamn job to make the boom go up in there."

---

[8] Richardson was eventually fired for his absenteeism. (Doc. # 36-25 at 2.)

(Lewis Dep. 82:17-19.)  Watson allegedly cursed at Reed on another occasion, telling him something along the lines of "You're goddamn going to do it.  If you don't do it, I'm going to tell Johnny."  (*Id.* 85:17-18.)  Kimberlin allegedly cursed at Reed on many occasions, calling him a "[t]railer trash white boy" and "[y]ou $12.00 an hour ass white boy," or something similar.  (*Id.* 86:2-3.)

Crutchfield and Watson are easily distinguishable from Lewis because Reed was not in a supervisory position above them.  Crutchfield was the superintendent in charge of overseeing Mansfield's operations at the job site (Crutchfield Aff. ¶ 2) and Watson filled in for him when Crutchfield was offsite.  (Lewis Dep. 83:15-19.)  Rather than acting insubordinate to an authority figure, Crutchfield and Watson were giving orders to an employee below them in the company management structure, albeit crudely.  This is not insubordination and Crutchfield and Watson are not similarly situated to Lewis.

Kimberlin appears to be employed in a similar position as Lewis because they both ran paint crews on the same job site, sometimes working "side-by-side." (Lewis Dep. 49:5-17.)  A *prima facie* claim of discrimination is not established, however, because Lewis fails to show Kimberlin was not subject to discipline for his cursing and the context of Lewis's cursing varies importantly from that of his proposed comparators.  Lewis was engaged in a heated argument in which he cursed at Reed in a raised voice — essentially telling his supervisor that he was wrong and disputing his authority in front of a dozen other employees.  (Lewis Dep. 89:4-7; 90:16-18.)  Nothing about the information concerning Kimberlin's

alleged cursing indicates it was in the course of an argument, disputed Reed's authority, or made in front of so many other employees. Kimberlin's cursing was more akin to a schoolyard taunt from a crude individual, which does not rise to the same level of severity as the Lewis incident. Kimberlin is not similarly situated to Lewis in all relevant respects, and Lewis fails to establish a *prima facie* claim of discrimination.

The plaintiffs identify no comparators at all for Ragland, and Richardson has no claim for disparate treatment because he actually claims to have received favorable treatment. Therefore, all of the plaintiffs fail to establish a *prima facie* case of discrimination. The defendants' motion for summary judgment with respect to disparate discipline is due to be granted.

### C.    Retaliation

"To establish a prima facie showing of retaliation under Title VII, 'the plaintiff[s] must show (1) [they were] engaged in statutorily protected expression; (2) that [they] suffered an adverse employment action; and (3) that there is some causal relation between the two events.'" *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). To establish a causal connection, a plaintiff "need only show 'that the protected activity and the adverse action are not completely unrelated.'" *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (quoting *Meeks*, 15 F.3d at 1021). A plaintiff satisfies this element if he shows his employer knew of the protected activity and there was a close temporal proximity

between this awareness and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Wideman*, 141 F.3d at 1457. "At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct." *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999).

Each plaintiff suffered adverse employment action as a result of their respective terminations. The plaintiffs claim none of them "were fired until after the word was out that they sought counsel and the EEOC." (Pls.' Resp. Br. 14.) The defendants point out instances where some of the plaintiffs complained to Mansfield about racial harassment. (Defs.' Br. 39-45.) Therefore, it appears the plaintiffs engaged in three potential forms of statutorily protected expression: seeking counsel, filing EEOC charges, and complaining to their employer.

Assuming the plaintiffs' search for and contact with counsel in preparation for an employment discrimination lawsuit is a type of statutorily protected expression, no causal connection between it and their termination can be determined because the plaintiffs do not provide a date, or even an estimate, of when the contact first occurred. By failing to establish temporal proximity, or even that the protected expression preceded the termination, the plaintiffs cannot rely on the contact with counsel as a protected expression for the purposes of a *prima facie* case of discrimination.

Filing an EEOC Charge of Discrimination is statutorily protected expression. However, there is no causal connection between the EEOC charges and the terminations. It

is undisputed that all of the plaintiffs were terminated in late 2003, and the EEOC charges were filed in early 2004 — after their employment had ended. (*See* Doc. # 36-25 at 1-5; Doc. # 36-26 at 1-15.) The only remaining possible instances of statutorily protected expression are the complaints made by the plaintiffs against their employer.

The court first examines the retaliation claims of Ragland and Lamar. Ragland never complained, formally or informally, with anyone at Mansfield. (Ragland Dep. 226:1-8.) Because he did not engage in a protected expression, he cannot establish a *prima facie* case of retaliation. Lamar's only complaint was about racially offensive writings on the bathroom wall at the plant where they were working. (Lamar Dep. 133:18-134:4.) The extent of his complaint was to tell his supervisor "[w]e ought to go in there and paint over some of them [sic] words in the bathroom." (*Id.*) The date of this occurrence is not specified, making it impossible to determine its temporal proximity to his termination date. Therefore, Lamar fails to show temporal proximity, or any other causal connection, and cannot establish a *prima facie* case of discrimination.[9]

Neither Colvin nor Tarver are able to establish a *prima facie* case of discrimination either. Colvin complained to his supervisor on one occasion in April 2003 that he heard

---

[9] Even were the court to assume Lamar has established a *prima facie* case, he fails to show that the defendants' proffered non-discriminatory, legitimate reasons to terminate his employment were pretextual. *See Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989). The defendants assert Lamar was fired "because he was tardy on an excessive number of days, and he had an excessive number of excused absences," and the plaintiffs do not even attempt to respond. (*See* Defs.' Br. 40; Pls.' Resp. Br. 14-15.) Accordingly, the defendants' motion for summary judgment with regard to Lamar's retaliation claim is due to be granted on this alternative basis.

another employee use a racial slur.[10]  (Colvin Dep. 145:3-149:11.)  Colvin was laid off on

November 5, 2003, rehired the next Sunday, and then terminated for the final time on

December 14, 2003.  (Doc. # 36-26 at 13.)  Colvin was rehired after his first lay off, which

strongly indicates his subsequent termination in December 2003 was not in retaliation for his

complaint made eight months earlier because otherwise they would not have invited him

back.  Nothing indicates a causal connection, and eight months is too long to establish

temporal proximity.  *See Higdon*, 393 F.3d at 1221 (finding a three month gap too

protracted).  Colvin fails to establish a *prima facie* case of discriminatory retaliation.

Tarver's only alleged complaint was that Mansfield failed to provide his crew with

adequate and proper supplies, as it did other crews.  (Tarver Dep. 76:11-79:17.)  Tarver

complained of this to the superintendent several times.  (*Id.*)  While the defendants

characterize this complaint as not addressing any racial discrimination, it is clear that Tarver

believed the lack of supplies was discriminatorily based.  (*Id.* 77:5-7.)  It also appears he

complained of this problem from the time his employment began until he was terminated,

thereby satisfying temporal proximity.  (Defs.' Br. 41.)  Tarver's retaliation claim still fails,

however, because he does not show that the defendants' proffered non-discriminatory,

legitimate reason to terminate his employment was pretextual.  Tarver is described as a "good

---

[10]  The offensive remark was made by a fellow employee who allegedly said, "I'm not
going up today.  I thought that's what you hired the niggers for."  (Colvin Dep. 145:17-18.)

employee" and was offered a position at another jobsite.[11]  (Crutchfield Aff. ¶ 16.)  However, Mansfield was forced to fire him after he failed a drug test in violation of the policies of both Mansfield and their customer.  (Tarver Dep. 117:7-9; Doc. # 36-25 at 5.)  Tarver does not dispute this and does not contend this reason was pretextual.  Therefore, Tarver fails to meet his burden under the *McDonnell Douglas* burden-shifting framework.

Richardson wrote a letter on November 5, 2003, to Mansfield's human resources director in which he complained of various acts of discrimination.  (Doc. # 36-5 at 60.)  On December 9, 2003, he was fired for absenteeism.  (*Id.* at 61.)  These two events establish he engaged in a statutorily protected expression and was subject to an adverse employment action.  While Richardson does nothing to refute the defendants' assertion that no one outside of their human resources office was aware of his letter (Defs.' Br. 42), because he was fired only a little over a month after writing the letter, he has established temporal proximity sufficient to show the protected activity and the adverse action are not completely unrelated for the purposes of establishing a *prima facie* case of retaliation.  *See Wideman*, 141 F.3d at 1457 (noting one month is sufficient to establish *prima facie* causal connection).

The defendants proffer Richardson's absenteeism as a legitimate, non-discriminatory reason for his termination, thereby meeting their burden under the *McDonnell Douglas* framework.  Richardson fails to establish this reason is only a pretext.  Richardson admits in

---

[11]  Mansfield claims he was offered a foreman's position (Crutchfield Aff. ¶ 16), but Tarver denies this and claims he was only offered a job as a painter/journeyman.  (Tarver Dep. 117:1-6.)  Regardless, it is undisputed Mansfield wished to continue employing him.

an affidavit filed with the EEOC that "I was fired because I failed to show up on a Friday," after his supervisor placed a note with his paycheck that instructed him "it was mandatory to work that Friday." (Doc. # 36-5 at 64.) Richardson admits he was late to work by an hour or more on several occasions (Richardson Dep. 63:10-11, 64:3-7, 96:19-21, 97:1-7), admits he took at least one week off from work without calling in (*id.* 166:5-21), and even admits that he should have been fired for those absences. (*Id.*) In light of the extensive evidence and admissions, Richardson cannot meet his burden to show Mansfield's reason for terminating him was a pretext. The defendants' motion for summary judgment with respect to Richardson's retaliation claim is due to be granted.

Lewis called Mansfield's human resources director on October 17, 2003, to complain of discrimination. (Vezinat Aff. ¶ 34.) Twelve days later, he was fired for insubordination after getting into an altercation with his supervisor about whether he was five minutes late for work. (Doc. # 36-25 at 1.) Informal complaints to employers are protected expressions, *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002), and Lewis has established a *prima facie* case of retaliation because he also suffered an adverse employment action within a close enough period of time to his phone call to indicate the action may not be completely unrelated. The defendants proffer insubordination as a legitimate, non-discriminatory reason for terminating Lewis, thereby meeting their burden and shifting it back to Lewis. (Defs.' Br. 44.)

24

Lewis admits to cursing at his supervisor in front of a dozen other employees over whether he was late to work. (Lewis Dep. 80:7-98:8.) Lewis still maintains he was on time (Compl. ¶ 11) and, construing the facts most favorably to him, the court assumes it to be true. Lewis was not fired for being late, though. He was fired for the insubordination that followed his arrival to the jobsite. He admits to acting in a disrespectful way towards his supervisor, and insubordination is listed as an offense subject to immediate discharge in the Mansfield employee handbook. (Doc. # 36-21 at 6.) Mansfield was also diligent in following up with Lewis's complaint, indicating a desire to remedy any discovered problems. (*See* Doc. # 36-3 at 13.) Mansfield's human resources director spoke with Lewis on the phone, asked if he wanted to make a formal complaint, and followed up with a black superintendent that Lewis had told her to call. (*Id.*) Rather than corroborate Lewis's account, the black superintendent "did not substantiate" the allegations and told her Lewis "tends to make trouble on a jobsite." (*Id.*) The plaintiffs do not even attempt to show Mansfield's reason for terminating Lewis was pretextual in their response brief. (Pls.' Resp. Br. 14-15.) In light of the following, Lewis has not met his burden and the defendants' motion for summary judgment with respect to Lewis's retaliation claim is due to be granted.[12]

---

[12] Lewis also alleges he was retaliated against by being transferred to Atlanta after complaining to Mansfield's management after he "witnessed a white employee pull a knife on and threaten a Mexican employee." (Compl. ¶ 9.) This claim is without merit because his transfer to Atlanta occurred in June 2003 before the altercation took place in September 2003. (*See* Lewis Dep. 124:20-125:10; Doc. # 36-24.) It should also be noted that the statement Lewis gave to Mansfield as part of their investigation of the altercation makes no mention of a knife or threats being made. (Doc. # 36-24 at 14.)

## VI.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the Defendants' Motion for Summary Judgment (Doc. # 36) is GRANTED as to each and every claim brought by the plaintiffs.

An appropriate judgment will be entered.

DONE this 14th day of November, 2007.

_____/s/   W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE